**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| PABLO MORENO GONZALEZ, FELIPE AGUSTIN ZAMACONA, and a class of similarly situated people, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | Case No. 25-cv-13323 |
| KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; MARCOS CHARLES, Acting Executive Associate Director, U.S. Immigration and Customs Enforcement and Removal Operations, in his official capacity; SAMUEL OLSON, Interim Chicago Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; GREGORY BOVINO, Commander-at-Large, U.S. Customs and Border Protection, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; and the DEPARTMENT OF HOMELAND SECURITY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Class Action |
| Defendants. | ) ) | |

**CIVIL RIGHTS CLASS ACTION COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Pablo Moreno Gonzalez and Felipe Agustin Zamacona file this complaint for

declaratory and injunctive relief on behalf of themselves and a class of similarly situated people

against Secretary of the U.S. Department of Homeland Security ("DHS") KRISTI NOEM in her

official capacity, Acting Director of U.S. Immigration and Customs Enforcement ("ICE") TODD

LYONS in his official capacity, Acting Executive Associate Director of ICE Enforcement and Removal Operations ("ERO") MARCOS CHARLES in his official capacity, Interim Chicago ICE Field Office Director SAMUEL OLSON in his official capacity, Commander-at-Large of U.S. Customs and Border Protection ("CBP") GREGORY BOVINO in his official capacity, ICE, CBP, and DHS. Plaintiffs allege as follows:

## INTRODUCTION

1.      Federal authorities are conducting a massive and inhumane immigration enforcement operation in the Chicago area—Operation Midway Blitz. Under Defendants' authority, huge numbers of people are being arrested and detained. Most have been brought to what is being used as a *de facto* immigration detention facility right outside the city limits: the Broadview ICE facility at 1930 Beach Street, Broadview, Illinois ("Broadview"), where Defendants are perpetrating mass constitutional violations.

2.      Broadview is meant to be a "holding" facility, a way station where people are briefly held for processing before being moved to a longer-term detention facility. Historically, people were held for a few hours in the holding cells that occupy a portion of the first floor. But in the wake of Midway Blitz, Defendants are now warehousing people at Broadview for days on end. The consequences have been dire, and wholly predictable.

3.      Plaintiffs and the putative class members are immigration detainees who have been arrested by officers operating under Defendants' command. They are being confined at Broadview inside overcrowded holding cells containing dozens of people at a time. People are forced to attempt to sleep for days or sometimes weeks on plastic chairs or on the filthy concrete floor. They are denied sufficient food and water. They cannot shower, they are denied soap, hygiene items, and menstrual products, and they have no way to clean themselves. They are often denied a change

of clothes. The temperatures are extreme and uncomfortable. Most nights are freezing cold, yet only some receive a thin foil blanket, sweater, or sweatpants to try to retain warmth. The lights are typically on all night. These conditions result in widespread sleep deprivation for the putative class.

4. Putative class members lack access to adequate medical care, even for pre-existing medical conditions. There is no medical intake when people are brought into the facility. Detainees are denied prescription medication, even when it is dropped off by family members, and cannot obtain routine medicines like aspirin or Tylenol. The physical conditions are filthy, with poor sanitation, clogged toilets, and blood, human fluids, and insects in the sinks and the floor. Due to the overcrowding, unhygienic conditions, lack of medical care, and deprivation of adequate food, the facility is a breeding ground for illness to spread.

5. Privacy is non-existent. People are forced to use a toilet that is located inside their crowded holding cell, which in some cells are separated by a partial wall that affords almost no privacy, and in others, is entirely unseparated from the rest of the cell. Officers keep watch through the windows and video surveillance. Large windows in the holding cells allow men to see the women when they use the toilet, and women to see the men.

6. The federal officers who patrol Broadview under Defendants' authority are abusive and cruel. Putative class members are routinely degraded, mistreated, and humiliated by these officers.

7. Defendants know and intend that the conditions they have created in Broadview are resulting in the inhumane treatment of Plaintiffs and the putative class members.

8. Worsening these conditions, Defendants have cut off detainees from the outside world. Defendants' officers prevent people detained at Broadview from speaking with their

lawyers, or from obtaining a lawyer if they do not already have one.[1] Class members are blocked from making confidential phone calls to their lawyer or a prospective lawyer.

9.     Defendants prohibit detainees who are represented by attorneys from accessing their counsel. Officers tell attorneys they cannot visit their clients, and attorneys who try to contact their clients inside the facility are rebuffed or ignored. Attorney telephone calls are sent to an unattended line, and their calls and emails go unanswered.

10.     The ICE online detainee locator fails to accurately reflect the location of individuals in Defendants' custody so that attorneys cannot physically find their clients. And while Broadview contains attorney visit rooms, Defendants do not use them for that purpose—officers turn attorneys away at the facility gate and refuse to allow detainees to meet with them.

11.     The consequences of denying detainees access to counsel are grave. Federal officers at Broadview operating under Defendants' command are coercing people to sign immigration paperwork that many detainees do not understand, and that relinquishes their rights and purports to allow Defendants to send detainees out of the country without ever seeing an immigration judge. Defendants are transferring people to distant detention facilities—or sending them out of the country outright—before their attorneys can locate them and intervene. Defendants are detaining immigrants without bond while preventing them from speaking with an attorney who could otherwise intercede and file a petition in this Court or a bond motion in immigration court seeking their release. Some U.S. citizens, arrested for protesting outside of Broadview, have been interrogated without their counsel present.

---

[1] Emma Janssen, *How ICE Hides Detainees From Their Lawyers*, American Prospect (Oct. 6, 2025), https://prospect.org/justice/2025-10-06-how-ice-hides-detainees-from-their-lawyers/ [https://perma.cc/TR7Q-V99E].

12.     Defendants have blocked access at Broadview not just for attorneys but for others who have historically been granted entrance. This includes members of Congress, whom Defendants have repeatedly turned away from Broadview despite Congress's explicit oversight authority over such facilities. It also includes faith leaders and members of the clergy, who have provided religious services at Broadview for years but are now denied the ability to provide pastoral care under Defendants' command.

13.     By blocking access to detainees inside Broadview, Defendants have created a black box in which to disappear people from the U.S. justice and immigration systems.

14.     Plaintiff Pablo Moreno Gonzalez is an immigrant who was arrested in the morning or early afternoon of October 29, 2025, while walking near West Foster Avenue and North Pulaski Road in Chicago, Illinois. He was subsequently taken to Broadview, where he is currently detained in the conditions described in this Complaint. He is one of the many class members who are currently detained or who soon will be detained at Broadview and who will suffer the rights violations at issue in this case

15.     Plaintiff Felipe Agustin Zamacona is an immigrant who has been in the United States for over thirty years. He was arrested on the morning of October 30, 2025, in Wheeling, Illinois, while working as a delivery driver. He was subsequently taken to Broadview, where he is currently detained in the conditions described in this Complaint. He is one of the many class members who are currently detained or who will soon be detained at Broadview and who will suffer the rights violations at issue in this case.

16.     The conditions at Broadview are not an anomaly. Similar overcrowding, unsanitary conditions, lack of basic hygiene, insufficient food and water, inadequate sleeping conditions, substandard medical care, and extreme restrictions on attorney-client communications are

pervasive at immigration facilities in New York, Baltimore, Los Angeles, San Francisco, Alexandria, and other cities throughout the country. These conditions have given rise to multiple lawsuits, putting Defendants on notice that the conditions in the facilities they operate violate the law and ICE's own policies.

17.     Incommunicado detention is not tolerated in our democracy. Defendants have an obligation under the U.S. Constitution and federal law to provide the people they detain with due process and to treat them with basic decency. This case asks the Court to enforce compliance with these obligations by ordering ready access to counsel and humane conditions of confinement. Plaintiffs ask this Court to order Defendants to stop flouting the law inside Broadview.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331, because Plaintiffs' claims arise from federal statutes, 5 U.S.C. § 702, and the First and Fifth Amendments to the U.S. Constitution (federal question jurisdiction).

19.     This Court has authority to grant injunctive relief in this action pursuant to its inherent equitable authority, the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706, Rule 65 of the Federal Rules of Civil Procedure, and the All Writs Act, 28 U.S.C. § 1651.

20.     This Court has the authority to issue a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

21.     The United States' sovereign immunity is waived under the Administrative Procedure Act, 5 U.S.C. §§ 702 and 706.

22.     Venue is proper under 28 U.S.C. §§ 1391(b) and 1391(e) because at the time of the filing of this action, Plaintiffs are detained in Defendants' custody within this District; a substantial part of the events and omissions giving rise to these claims occurred, and continue to occur, in this

District; and Defendants are officers or employees of the United States acting in their official capacities.

## PARTIES

### Plaintiffs

23.     Plaintiff Pablo Moreno Gonzalez is an immigrant from Mexico. He has lived in the United States for approximately 32 years. He is married and has four children. He resides in Chicago, Illinois, with his wife and two of his children who are U.S. citizens. He is the primary financial provider for his family. He has limited English proficiency. On October 29, 2025, he was summarily arrested by federal agents while he was walking near West Foster Avenue and North Pulaski Road in Chicago, Illinois, and he is currently detained by Defendants at the Broadview ICE facility, which is operated by Defendants.

24.     Plaintiff Felipe Agustin Zamacona is an immigrant from Mexico. He has lived in the United States for most of his life—over thirty years—and resides in Illinois. He has no criminal record. He was summarily arrested in Wheeling, Illinois, while working as a delivery driver, and he is currently detained by Defendants at the Broadview ICE facility, which is operated by Defendants.

### Defendants

25.     Defendant Kristi Noem is sued in her official capacity as the Secretary of DHS, the highest-ranking officer in the agency. In this capacity, she directs each of the component agencies within DHS, including ICE and CBP. Secretary Noem is therefore responsible for the administration and enforcement of immigration laws, including ICE's administration of holding and detention facilities, such as Broadview, and ensuring ICE and CBP's compliance with the Constitution and other applicable laws and policies. Defendant Noem has personally overseen

operations at Broadview, including by visiting the facility on Friday, October 3, 2025. She is a legal custodian of Plaintiffs Moreno Gonzalez and Agustin Zamacona, and the members of the putative class.

26. Defendant Todd Lyons is sued in his official capacity as the Acting Director of ICE, an agency of the United States and a division of DHS. Acting Director Lyons is responsible for ICE's enforcement and removal operations, including ICE's administration of holding and detention facilities, such as Broadview, and is responsible for ensuring ICE agents' compliance with the Constitution and other applicable laws and policies at ICE facilities. He is a legal custodian of Plaintiffs Moreno Gonzalez and Agustin Zamacona, and the members of the putative class.

27. Defendant Marcos Charles is sued in his official capacity as the Acting Executive Associate Director of ICE ERO. Acting Executive Associate Director Charles is responsible for ICE's enforcement and removal operations, including ICE's administration of holding and detention facilities, such as Broadview, and is responsible for ensuring ICE agents' compliance with the Constitution and other applicable laws and policies at ICE facilities. He is a legal custodian of Plaintiffs Moreno Gonzalez and Agustin Zamacona, and the members of the putative class.

28. Defendant Samuel Olson is sued in his official capacity as the Interim Director of the Chicago Field Office. Interim Director Olson oversees the Chicago Field Office and is responsible for enforcement and removal operations in the geographic area covered by the Chicago Field Office. He is responsible for the supervision of officers within the Chicago ICE ERO who arrest and detain individuals believed to be in violation of civil immigration law, and for ensuring ICE agents' compliance with the Constitution and other applicable laws and policies. Broadview

is within the geographic area under Interim Director Olson's command, and he controls who has access to the facility. Defendant Olson took over for former Interim Field Office Director Russell Hott on or around October 17, 2025. He is a legal custodian of Plaintiffs Moreno Gonzalez and Agustin Zamacona, and the members of the putative class.

29.     Defendant Gregory Bovino is sued in his official capacity as the Commander at Large of U.S. Customs and Border Protection ("CBP"). Commander Bovino oversees all DHS assets in ongoing immigration operations in Chicago and is responsible for the supervision of all CBP officers in the Chicago area, including Border Patrol Processing Coordinators working inside the Broadview facility, and is responsible for ensuring CBP officers' compliance with the Constitution and other applicable laws and policies.

30.     Defendant DHS is a Department of the Executive Branch of the United States government, headquartered in Washington, D.C., and is responsible for enforcing federal laws governing customs, border control, and immigration. Broadview is under the control and administration of DHS. DHS is a legal custodian of Plaintiffs Moreno Gonzalez and Agustin Zamacona, and the members of the putative class.

31.     Defendant ICE is a component of DHS, headquartered in Washington, D.C., and is responsible for enforcing federal immigration law, including arresting and detaining non-citizens and ensuring that its agents are properly trained and comply with the Constitution and other laws and policies. Broadview is under the control and administration of ICE. ICE is a legal custodian of Plaintiffs Moreno Gonzalez and Agustin Zamacona, and the members of the putative class.

32.     Defendant CBP is a component of DHS, headquartered in Washington, D.C., and is responsible for enforcing federal immigration law at the border and, more recently, in the Chicago area, including arresting and detaining non-citizens and ensuring that its agents are

properly trained and comply with the Constitution and other laws and policies. At least some officials working inside the Broadview facility are officers of CBP who, upon information and belief, are working under the control and administration of CBP.

## FACTUAL ALLEGATIONS

**A. Defendants' Policies of Mass Arrest and Mandatory Detention Have Created Crisis Conditions at Broadview.**

33.     Defendants have implemented immigration enforcement and mandatory detention policies that have greatly increased the number of immigrants arrested and detained in the Chicago area.

34.     Through a series of policy decisions, public statements, and actions on the ground, Defendants have made clear that their overriding objective is to expel as many people from the country as quickly as possible, irrespective of constraints imposed by the Constitution, federal law, their own policies, or basic human decency.

35.     On his very first day in office, President Trump issued an executive order outlining his immigration priorities. The executive order characterized immigrants as invaders. *See* Executive Order, Protecting the American People Against Invasion, Jan. 20, 2025. It declared the government's policy of mass deportation, *i.e.*, to achieve "total and efficient enforcement" of laws against all "inadmissible and removable aliens."

36.     Defendants effectuated the Administration's order by pursuing increasingly exorbitant quotas for the number of immigrants to be arrested each day. Initially, the Administration imposed a target of seventy-five arrests per day for each ICE field office, including

the Chicago ERO, or 1,200 to 1,500 arrests nationwide.[2] In mid-May, the Administration more

than doubled the quotas to 3,000 arrests per day.[3]

37.     DHS, ICE, and CBP have vastly broadened the categories of people whom they

seek to arrest on civil immigration violations. They are detaining immigrants regardless of their

criminal record, immigration status, or the status of their legal cases.[4] Defendants are using these

tactics in service of meeting the arrest quotas and in furtherance of the Administration's mass

deportation policy.[5]

38.     These actions have had a dramatic impact on immigration enforcement operations

in the United States. Nationwide, from early January to June 2025, civil arrests of immigrants with

no criminal records increased over 800%.[6] Between January and May 2025, two-thirds of

---

[2] Nick Miroff & Maria Sacchetti, *Trump Officials Issue Quotas to ICE Officers to Ramp Up Arrests*, Washington Post (Jan. 26, 2025), https://www.washingtonpost.com/immigration/2025/01/26/ice-arrests-trump-quota/ [https://perma.cc/K6J9-JVGB].

[3] Ted Hesson & Kristina Cooke, *ICE's Tactics Draw Criticism as it Triples Daily Arrest Targets*, Reuters (June 11, 2025), https://www.reuters.com/world/us/ices-tactics-draw-criticism-it-triples-daily-arrest-targets-2025-06-10/ [https://perma.cc/B4N8-EGFY].

[4] *See, e.g.*, Ximena Bustillo, *DHS is Urging DACA Recipients to Self-deport*, NPR (July 29, 2025), https://www.npr.org/2025/07/29/nx-s1-5482923/dhs-daca-recipients-self-deport [https://perma.cc/KA5H-7K4S] (quoting statement by DHS assistant press secretary Tricia McLaughlin that "any DACA recipient may be subject to arrest and deportation").

[5] Ted Hesson *et al.*, *ICE Agents Burnt Out and Struggling with Trump's Immigration Crackdown*, The Independent (Aug. 26, 2025), https://www.independent.co.uk/news/world/americas/ice-agent-raids-trump-immigration-b2814175.html [https://perma.cc/H9LA-T2YC].

[6] José Olivares & Will Craft, *ICE Arrests of Migrants With No Criminal History Surging Under Trump*, Guardian (June 14, 2025), https://www.theguardian.com/us-news/2025/jun/14/ice-arrests-migrants-trump-figures [https://perma.cc/FQ7H-6TEV].

deportations were of people with no criminal record at all.[7] As one ICE insider explained: "All that matters is numbers, pure numbers. Quantity over quality."[8]

39.     The vast increase in arrests has also resulted the detention of more individuals than Defendants have capacity to hold nationwide.[9] Immigration detention facilities across the country were already at capacity by March 2025.[10]

40.     Chicago and its surrounding suburbs have been particularly hard hit by Defendants' enforcement policies and practices.

41.     In June 2025, ICE ramped up operations in the Chicago area.[11] According to ICE data, from mid-January through the end of July 2025, ICE arrested 537 more people in Illinois

---

[7] Christie Thompson & Anna Flagg, *ICE is Deporting Thousands with Minor Offenses—from Traffic Violations to Weed Possession*, The Marshall Project (Aug. 15, 2025), https://www.themarshallproject.org/2025/08/15/ice-georgia-traffic-stop-arrest-immigration [https://perma.cc/AG3R-R5XZ].

[8] Jennie Taer, *Trump Admin's 3,000 ICE Arrests Per Day Quota is Taking Focus Off Criminals and 'Killing Morale': insiders*, New York Post (June 17, 2025), https://nypost.com/2025/06/17/us-news/trump-admins-3000-ice-arrests-per-day-quota-is-taking-focus-off-criminals-and-killing-morale-insiders/ [https://perma.cc/ASS4-8Y78].

[9] *See* Allison McCann, *Local Sheriffs are Turning Their Jails Into ICE Detention Centers*, N.Y. Times (Sept. 8, 2025), https://www.nytimes.com/interactive/2025/09/08/us/politics/ice-detention-county-jails-sheriffs-deportation.html [https://perma.cc/R9SC-4XTJ]; Andrea Castillo & Gabrielle LaMarr LeMee, *'It's Happening Everywhere': 1 in 3 ICE Detainees Held in Overcrowded Facilities, Data Show*, LA Times (Aug. 29, 2025), https://www.latimes.com/politics/story/2025-08-29/as-ice-detainees-top-60000-some-detention-centers-stack-mattresses-on-the-floor [https://perma.cc/APW8-FM6E]; Chris Cameron & Hamed Aleaziz, *Over 60,000 Are in Immigration Detention, a Modern High, Records Show*, N.Y. Times (Aug. 11, 2025), https://www.nytimes.com/2025/08/11/us/politics/immigration-detention-numbers.html [https://perma.cc/G2MZ-65J4]; Jasmine Garsd, *In Recorded Calls, Reports of Overcrowding and Lack of Food at ICE Detention Centers*, NPR (June 6, 2025) https://www.npr.org/2025/06/05/nx-s1-5413364/concerns-over-conditions-in-u-s-immigration-detention-were-hearing-the-word-starving [https://perma.cc/375E-EVR5].

[10] *See* Ariana Baio, *DHS Officials Desperately Search for More Beds to House People Awaiting Deportation After Filling the Nation's Facilities*, The Independent (Mar. 13, 2025), https://www.independent.co.uk/news/world/americas/us-politics/dhs-deportation-detention-capacity-immigration-beds-b2714502.html [https://perma.cc/5PUD-BYSW].

[11] Joe Mahr & Nell Salzman, *ICE Arrests Increase Across Chicago Under Trump, Many with No Convictions, Data Shows*, Chicago Tribune (July 23, 2025), https://www.chicagotribune.com/2025/07/21/ice-arrests-increase-across-chicago-under-trump-many-with-no-convictions-data-shows/ [https://perma.cc/XJM6-8NDJ].

than in the same time period in 2024—an increase of 59%.[12] During that same period, ICE detained 3,182 more people than it did in 2024—an increase of 185%.[13] This was just the start.

42.     On September 6, 2025, President Trump threatened the City of Chicago with a federal takeover, posting an image on Truth Social entitled "Chipocalypse Now," which depicted President Trump in front of helicopters, a Chicago skyline in flames, and a caption stating, "'I love the smell of deportations in the morning...[sic]' Chicago [is] about to find out why it's called the Department of WAR."[14]

43.     On September 8, 2025, DHS announced an escalated federal immigration action in Chicago, called "Operation Midway Blitz."[15]

44.     By September 19, 2025, DHS stated that there had been 550 arrests from the Midway Blitz operation, up to 50% of which were collateral arrests, or arrests of individuals who were not intended targets of federal agents and are generally warrantless arrests.[16]

45.     Defendants have direct responsibility and control over these mass arrests. Defendant Charles told reporters in September that cities like Chicago had limited cooperation

---

[12] Lauren FitzPatrick, *How Many Immigrants Has ICE Arrested and Detained so Far This Year? Here's What We Know*, Chicago Sun Times & WBEZ Chicago (Sept. 12, 2025), https://chicago.suntimes.com/the-watchdogs/2025/09/12/immigration-customs-enforcement-ice-arrests-detentions-deportation-trac [https://perma.cc/52QH-JDSE].

[13] *Id.*

[14] Donald J. Trump (@realDonaldTrump), Truth Social (Sept. 6, 2025, at 8:38 AM), https://truthsocial.com/@realDonaldTrump/posts/115158096026629509 [https://perma.cc/4FSV-6UP8].

[15] Jaclyn Diaz, *DHS Launches Immigration Crackdowns in Chicago, Boston*, NPR (Sept. 8, 2025), https://www.npr.org/2025/09/08/nx-s1-5534338/ice-chicago-boston-immigration-raids [https://perma.cc/DTY8-9PL9].

[16] Rebecca Santana, *ICE Arrests Nearly 550 in Chicago Area as Part of 'Midway Blitz'*, AP News (Sept. 19, 2025), https://apnews.com/article/trump-immigration-deportation-ice-chicago-arrests-a09921fedd10489f08a4073abe31345e [https://perma.cc/A6RW-GKNL].

with ICE for too long and it was "time to hit Chicago."[17] Vowing to continue the mass arrests in

Chicago, Defendant Charles also stated that, "We have a lot of targets in the area and we want to

make sure we can arrest as many of those as possible to get them out of the community[.]"[18]

46. Defendant Noem has echoed these sentiments, calling Chicago a "war zone"[19] and

swearing that "[o]ur work is only beginning."[20]

47. Defendants Noem, Bovino, and Charles have personally been involved in arrests

and detentions in Chicago, joining multiple raids and arresting at least one U.S. citizen.[21] On

September 16, 2025, Defendant Noem declared, "I was on the ground in Chicago today to make

clear we are not backing down[.]"[22] She has been galvanizing officers engaged in enforcement

---

[17] Rebecca Santana, *ICE Denies Using Excessive Force as it Broadens Immigration Arrests in Chicago*, Associated Press (Sept. 20, 2025), https://apnews.com/article/trump-immigration-deportation-ice-chicago-arrest-fd6d049fcd293b62f85ffcd5b1a547ee [https://perma.cc/WG4V-CZAY].

[18] AP Archive, *ICE Arrests Two as Part of Enforcement Surge in Chicago Area*, at 1:17 (YouTube, Sept. 24, 2025), https://www.youtube.com/watch?v=kni4HQVfvtU [https://perma.cc/DSF9-NEXZ].

[19] Ron Smith (@Ronxyz00), X (Oct. 5, 2025, 7:44 AM), https://x.com/Ronxyz00/status/197481799515213032 [https://perma.cc/B6D4-UPA8].

[20] *Secretary Kristi Noem on the Ground with Law Enforcement in Chicago While DHS Arrests the Worst of the Worst During Operation Midway Blitz*, Dep't of Homeland Sec. (Sept. 16, 2025), https://www.dhs.gov/news/2025/09/16/secretary-kristi-noem-ground-law-enforcement-chicago-while-dhs-arrests-worst-worst [https://perma.cc/9M3Z-UJPB].

[21] Ariel Parrella-Aureli & Melody Mercado, *Federal Agents Handcuff Chicago Alderperson At Hospital ER*, Block Club Chicago (Oct. 3, 2025), https://blockclubchicago.org/2025/10/03/federal-agents-handcuff-chicago-alderperson-who-tried-to-help-immigrant/ [https://perma.cc/ATY9-TXMZ]; Adriana Cardona-Maguigad & Cindy Hernandez, *Homeland Security Secretary Kristi Noem Leads Elgin Raid; 1 U.S. Citizen Among 6 Detained*, WBEZ Chicago (Sept. 17, 2025), https://www.wbez.org/immigration/2025/09/17/homeland-security-secretary-kristi-noem-leads-elgin-raid-1-u-s-citizen-among-6-detained [https://perma.cc/U8L5-XYBB]; CBS Evening News (@CBSEveningNews), X (Sept. 15, 2025, 11:12 AM), https://x.com/CBSEveningNews/status/1967622259251750360 [https://perma.cc/D2TZ-8SN6].

[22] Dep't of Homeland Sec., *supra* note 20

action, vowing "President Trump and I have your backs"[23] and proclaiming that they were going to "go hard" in conducting their raids.[24]

48.     Federal agents operating under Defendants' command are indiscriminately arresting individuals based on "how they look," as confirmed by Defendant Gregory Bovino, Commander-at-Large of CBP,[25] increasing the number of people arrested. Latinx communities in the Chicago area have been the targets of aggressive ICE and CBP enforcement on the streets, in schools, in the workplace, and in their homes.[26]

49.     Further widening the enforcement net, ICE, CBP, and other federal agencies are seizing and arresting U.S. citizens, lawful permanent residents, refugees and asylum seekers, and individuals with valid visas or other legal authorization.[27]

---

[23] Peter Pinedo, *DHS Chief Slams 'Violent Anarchists,' Pledges Full Support for Federal Agents*, Fox News (Oct. 6, 2025), https://www.foxnews.com/politics/first-fox-dhs-chief-slams-violent-anarchists-pledges-full-support-federal-agents [https://perma.cc/9VHK-B3LX].

[24] Rick Pearson, *US Homeland Security Secretary Kristi Noem Says 'We're Here to Stay,' Indicating ICE May Expand in Broadview*, Chicago Tribune (Oct. 3, 2025), https://www.chicagotribune.com/2025/10/03/kristi-noem-broadview-says-were-here-to-stay/ [https://perma.cc/UR2T-Q3W4].

[25] Chip Mitchell, *Transcript: Gregory Bovino Says Arrestees in Downtown Chicago Chosen Partly on 'How They Look'*, WBEZ Chicago (Sept. 30, 2025), https://www.wbez.org/immigration/2025/09/30/transcript-audio-gregory-bovino-immigrant-arrests-downtown-chicago-chosen-how-they-look [https://perma.cc/YA6Q-GCWJ]; Chip Mitchell *et al.*, *Feds March Into Downtown Chicago; Top Border Agent Says People are Arrested Based Partly on 'How They Look'*, Chicago Sun Times (Sept. 28, 2025), https://chicago.suntimes.com/immigration/2025/09/28/ice-agents-spotted-downtown-on-michigan-avenue-along-chicago-river [https://perma.cc/UXK4-KK4Y].

[26] Sarah Schulte & John Garcia, *Video Appears to Show ICE Agents Arrest Man in Little Village as His Wife and Two Young Children Cry*, ABC7 Chicago (Sept. 15, 2025), https://abc7chicago.com/post/ice-chicago-news-agents-arrest-man-24th-albany-1-day-little-village-parade-mexican-independence/17823351/ [https://perma.cc/AB42-J3LF]; Robin Sluzas, *Lopez Slams City as ICE Raids Continue on Southwest Side*, Greater Southwest News-Herald (Sept. 22, 2025), https://southwestregionalpublishing.com/2025/09/22/lopez-slams-city-as-ice-raids-continue-on-southwest-side/ [https://perma.cc/J79R-BVKU]; Asal Rezaei & Sara Tenenbaum, *West Chicago, Illinois ICE Arrests Caught on Video; District 33 Schools Spend Day on Soft Lockdown*, CBS News (Sept. 16, 2025), https://www.cbsnews.com/chicago/news/west-chicago-illinois-ice-arrests-district-33-schools/ [https://perma.cc/H25Q-KJ6W].

[27] Jamie Nesbitt Golden & Francia Garcia Hernandez, *Family and Friends Rally to Free Man Taken by Ice on Chicago Skyway,* Block Club Chicago (Oct. 1, 2025), https://blockclubchicago.org/2025/10/01/family-

50.     As of October 30, 2025, ICE and CBP have arrested an estimated 3,300 people as part of Midway Blitz.[28] According to Defendant Charles, "there's not an end date in sight" for the Chicago operation.[29]

51.     Defendant Noem plans to further increase the numbers of arrests and detentions in the Chicago area. She stated: "We're doubling down, and we're going to be in more parts of Chicago in response to the people there."[30]

52.     In addition to mass arrests, Defendants have implemented other policy changes aimed at keeping as many immigrants as possible in detention during their legal proceedings, rather than permitting them to be released on bond with conditions. In a July 8 memo, Defendant Lyons informed ICE agents that the vast majority of immigrants are now to be detained for the duration of their removal proceedings.[31] As a result, most people are now being detained without any

---

and-friends-rally-to-free-man-taken-by-ice-on-chicago-skyway/ [ https://perma.cc/ALJ7-7FWE]; Nicholas Bogel-Burroughs et al., *A Squalid Building, a Tip to the Feds, and Then 'Straight-Up Chaos'*, New York Times (Oct. 19, 2025), https://www.nytimes.com/2025/10/19/us/chicago-south-shores-border-patrol-raid.html [https://perma.cc/FYY8-9S8Z]; Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents. They've Been Kicked, Dragged and Detained for Days*, Pro Publica (Oct. 16, 2025), https://www.propublica.org/article/immigration-dhs-american-citizens-arrested-detained-against-will [https://perma.cc/HKM3-9DZQ].

[28] Camilo Montoya-Galvez, *Border Patrol Takes Lead Role in Trump Administration's Chicago Crackdown, Carrying Out More Arrests Than ICE*, CBS News (Oct. 30, 2025), https://www.cbsnews.com/news/border-patrol-trump-administrations-chicago-crackdown-more-arrests-than-ice/# [https://perma.cc/CZ87-74Y3].

[29] Rebecca Santana, *More Than 400 Arrests Made so Far in Chicago Area Enforcement Operation, Top ICE Official Says*, PBS News (Sept. 19, 2025), https://www.pbs.org/newshour/nation/more-than-400-arrests-made-so-far-in-chicago-area-enforcement-operation-top-ice-official-says [https://perma.cc/84TM-TBSR].

[30] Rick Pearson, *Kristi Noem Says Homeland Security 'purchasing more buildings in Chicago'*, Chicago Tribune (Oct. 9, 2025), https://www.chicagotribune.com/2025/10/09/kristi-noem-homeland-security-purchasing-buildings-chicago/ [https://perma.cc/J5HS-59RR].

[31] DHS and ICE implemented a policy whereby anyone alleged to have entered the U.S. without inspection is subjected to mandatory detention for the entirety of their removal proceedings, requiring adults, families, and children alike to stay in detention while their cases are processed. *See* Maria Sacchetti & Carol D. Leonnig, *ICE Declares Millions of Undocumented Immigrants Ineligible for Bond Hearings*, Wash. Post (July 15, 2025), www.washingtonpost.com/immigration/2025/07/14/ice-trump-undocumented-immigrants-bond-hearings/ [https://perma.cc/7KGB-ZB2H]; *see also* Trevor Hughes, *No Bond, No*

inquiry into their dangerousness, risk of flight, or the efficacy of supervised release (or other alternatives to detention) to assure their appearance in immigration court.

53.     On June 24, 2025, DHS and ICE issued a policy memorandum to all ERO field office directors, including the Chicago Field Office, titled "Nationwide Hold Room Waiver." Ex. 1, Nationwide Hold Room Waiver Memo. The memorandum waived the 12-hour limit in holding facilities, permitting immigrant detainees to be held in such facilities for up to 72 hours, six times more than the historical 12-hour policy limit. Defendants claimed this hold room waiver was necessary because of their increased immigration enforcement efforts. The result was that many more people were held in hold rooms across the country for longer periods of time.

54.     At the same time, DHS and Defendant Noem have sought to incapacitate oversight bodies that serve as an internal check and investigate complaints of wrongdoing and abuse by DHS, ICE, and CBP officials. These include the Office of Immigration Detention Ombudsman, the Citizenship and Immigration Services Ombudsman, and the DHS Office of Civil Rights and Civil Liberties, which have been effectively gutted since Trump took power.[32]

---

*Freedom: New ICE Policy Keeps Migrants Locked Up Longer*, USA Today (July 16, 2025), https://www.usatoday.com/story/news/nation/2025/07/16/trump-no-bond-policy-immigration-detainees-ice/85207175007/ [https://perma.cc/JMC7-N4C3].
This policy is being challenged around the country. *See, e.g., Campos Leon v. Forestal*, No. 1:25-cv-01774-SEB-MJD, 2025 WL 2694763 (S.D. Ind. Sept. 22, 2025); *Bautista v. Noem et al.*, No. 5:25-cv-01873-SSS-BFM (C.D. Cal. July 28, 2025); *Rodriguez Vasquez v. Bostock*, No. 3:25-cv-05240-TMC, 2025 WL 2782499 (W.D. Wash. Sept. 30, 2025); *Romero v. Hyde*, CV 25-11631-BEM, 2025 WL 2403827 (D. Mass. Aug. 19, 2025); *Lopez Benitez v. Francis*, 25 CIV. 5937 (DEH), 2025 WL 2371588 (S.D.N.Y. Aug. 13, 2025); *Leal-Hernandez v. Noem*, 1:25-CV-02428-JRR, 2025 WL 2430025 (D. Md. Aug. 24, 2025); *Aguilar Maldonado v. Olson*, No. 25-cv-3142 (SRN/SGE), 2025 WL 2374411 (D. Minn. Aug. 15, 2025).
[32] *Court Forces DHS to Preserve Immigrant Rights Offices*, Migrant Insider (May 27, 2025), https://migrantinsider.com/p/court-forces-dhs-to-preserve-immigrant?utm_source=publication-search [https://perma.cc/5B8C-T5K5]; Angélica Franganillo Díaz, *Cuts to DHS Watchdogs Spark More Questions as Deportation Efforts Increase*, CNN (July 8, 2025), https://www.cnn.com/2025/07/08/politics/homeland-security-watchdog-cuts"https://www.cnn.com/2025/07/08/politics/homeland-security-watchdog-cuts [https://perma.cc/65FC-3GN8].

55. Defendants' immigration enforcement and detention policies, as well as the lack of federal oversight and accountability, have culminated in crisis conditions at Broadview for Plaintiffs and the hundreds of putative class members who pass through its doors.

**B. As a Result of Defendants' Immigration Enforcement Policies, Broadview is Severely Overcrowded and People Are Being Confined in Deplorable Conditions Unfit for Human Habitation.**

56. It is Defendants' policy and practice to hold detainees in Broadview in uninhabitable conditions of confinement.

57. Broadview is a small, two-story office building located in a suburb of Chicago, yet it serves as the "primary processing location" for the nation's third most populous city. People are typically processed at Broadview before being transported to detention centers across the country or sent out of the United States altogether.[33]

58. Broadview is solely intended for use as a holding facility. A holding facility is "for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." Ex. 2, Directive 11087.2, *Operations of ERO Holding Facilities* (the "Holding Facility Policy"), § 3.2. Prior to the institution of the hold room waiver, ICE policy dictated that "[a]bsent exceptional circumstances, no detainee should be housed in a holding facility for longer than 12 hours." *Id.* §§ 3.2, 5.1.1.

59. Broadview is not equipped for multi-day or even overnight detention.

60. In 2023, on average, detainees were held at Broadview for approximately five hours. Ex. 3, 2023 Audit of Broadview by DHS ("2023 Audit") at 12.

---

[33] Sophie Tareen, *Chicago Area Center in Trump's Immigration Crackdown Sparks Complaints of Inhumane Conditions*, Associated Press (Sept. 25, 2025), https://apnews.com/article/immigration-chicago-trump-arrests-protest-3ceeb1a0bf6cf23249d7a0ebc6c3fb4b [https://perma.cc/9KSF-JRRJ].

61.     Under Defendants' new immigration enforcement and detention policies, including the hold room waiver, hundreds of people are being held at Broadview at one time, where they stay overnight, for days at a time.[34]

62.     On June 4, 2025, the median time a detainee was held at Broadview was nearly 48 hours, four times the 12-hour limit.[35] By mid-June, according to data provided by ICE, the median time a detainee was held at Broadview had risen to three days, meaning half of the detainees were held for more than three days, already six times the 12-hour limit.[36] Now, some detainees are being held for up to a week or more at a time.

63.     Defendants know that Broadview does not have the capacity or capability to hold the number of detainees currently being incarcerated in the facility. Just last month, a Department of Justice attorney for Defendants Olson, Noem, and others admitted in a habeas court proceeding in this District that despite having held the petitioner there overnight, Broadview was "not equipped to be an overnight facility."[37]

64.     DHS's *Standards to Prevent, Detect, and Respond to Sexual Abuse and Assault* requires routine audits of ICE detention and holding facilities to evaluate compliance with agency standards. 79 Fed. Reg. 13100 (Mar. 7, 2014), codified at 6 C.F.R. Part 115. Broadview underwent audits in 2018 and 2023.

65.     DHS's own audits confirm that Broadview is classified as a "very short-term staging facility;" its purpose is to "receive, process, and prepare detainees for transport to other

---

[34] *Id.*

[35] Laura Rodríguez Presa & Joe Mahr, *'Dehumanizing': Inside the Broadview ICE Facility Where Immigrants Sleep on Cold Concrete*, Chicago Tribune (Aug. 3, 2025), https://www.chicagotribune.com/2025/08/03/dehumanizing-inside-the-broadview-ice-facility-where-immigrants-sleep-on-cold-concrete/ [https://perma.cc/977S-V8CA].

[36] *Id.*

[37] Transcript of Proceedings at 7, *Gimenez Gonzalez v. Olson et al.*, No. 25-CV-11073 (N.D. Ill. Sept. 23, 2025).

detention facilities, release, or re-patriotization." Ex. 4, 2018 Audit at 2. Both audits determined that it is only intended to be operated as a 12-hour holding facility and it does not have the capabilities for overnight detention. The 2018 audit found that detainees never shower at Broadview. The 2023 audit confirmed that detainees do not change clothes or shower at Broadview and found that it had no medical unit, medical staff, food facilities, or food staff. Ex. 3, 2023 Audit at 3, 8-9.

66.      Despite ramping up arrests in the Chicago area, instituting a policy of mandatory detention, and implementing the nationwide hold room waiver, Defendants did not make any physical modifications or improvements to Broadview to accommodate holding people overnight or for multiple days or weeks. Defendants did nothing to ensure that the facility had adequate sleeping conditions, sufficient supplies of food and water, hygiene products, or medical services for the people they incarcerated. That such changes were needed was obvious given that Defendants were seeking to detain hundreds of people in a small short-term facility. The changes were also required by their own regulations, as set forth below.

67.      The result of Defendants' policies and practices was foreseeable. Widespread media reports over the summer revealed the deplorable and inhumane conditions to which people at Broadview are subjected.[38] Congressional representatives, too, complained about the conditions to DHS and other Defendants beginning in early summer, as set forth below.

---

[38] Laura Rodríguez Presa & Joe Mahr, *supra* note 35; Corli Jay, *Pritzker: Homeland Security Seeks Deployment of 100 Troops to Protect ICE Agents*, The Triibe (Oct. 2, 2025), https://thetriibe.com/2025/09/live-mayor-johnson-and-gov-pritzker-speak-on-deployment-of-federal-agents-in-chicago/ [https://perma.cc/47JG-NMGB]; Cindy Hernandez, *Honduran Woman Held at Broadview ICE Facility Describes Conditions as 'Inhumane'*, Chicago Sun Times (Jul. 28, 2025), https://chicago.suntimes.com/news/2025/07/28/honduran-woman-held-at-broadview-ice-facility-describes-conditions-as-inhumane [https://perma.cc/6BC4-7RLT].

68.     Conditions have only further deteriorated since Operation Midway Blitz took effect.

69.     Advocates and government officials have raised the alarm about conditions at Broadview. Over the last several months, people have gathered outside of the facility to protest the conditions inside, as well as to protest the immigration enforcement operations in the Chicago area. This fall, Congressional representatives have continued to press Defendants for answers about the conditions inside Broadview.

70.     Rather than address these concerns, federal agents have responded with violence. They have launched tear gas and pepper spray on protesters, lawyers, religious leaders, elected officials, and journalists, shot pepper balls and rubber bullets into the crowd, pointed rifles at unarmed individuals, including legal observers and attorneys, and thrown individuals on the asphalt.[39]

---

[39] *See* Robert Chiarito & Julie Bosman, *Protesters and Federal Agents Clash Outside ICE Detention Facility Near Chicago*, New York Times (Sept. 19, 2025), https://www.nytimes.com/2025/09/19/us/politics/ice-protests-chicago.html [https://perma.cc/62ZC-Z4YW]; Cindy Hernandez, Chip Mitchell & Mohammad Samra, *Congressional Candidate Thrown to Ground, Protesters Tear-gassed in Clashes at Broadview ICE Facility,* Chicago Sun Times (Sept. 19, 2025), https://chicago.suntimes.com/news/2025/09/19/ice-broadview-protest-write-thru [https://perma.cc/297V-24DF]; Charles Thrush, Leigh Giangreco & Alex V. Hernandez, *Agents Tear Gas, Detain Demonstrators Outside Broadview ICE Facility During Friday Protest*, Block Club Chicago (Sept. 20, 2025), https://blockclubchicago.org/2025/09/19/ice-tear-gasses-detains-protesters-outside-broadview-facility/ [https://perma.cc/PZ3L-Z3MZ]; Caroline Kubzansky & Madeline Buckley, *Feds Fire Baton Rounds, More Tear Gas at ICE Protesters in Broadview*, Chicago Tribune (Sept. 26, 2025), https://www.chicagotribune.com/2025/09/26/ice-baton-rounds-tear-gas-chicago/ [https://perma.cc/3QUA-KE2Z]; Asal Rezaei & Victor Jacobo, *Pepper Bullets, Tear Gas Deployed During Protest Outside Broadview Immigration Facility*, CBS News Chicago (Sept. 28, 2025), https://www.cbsnews.com/chicago/news/broadview-ice-protests-saturday/ [https://perma.cc/KA58-URZH]; Sarah Lazare, *"Even When They Gas Us": Hundreds Brave Tear Gas, Pepper Balls to Protest ICE*, In These Times (Sept. 26, 2025), https://inthesetimes.com/article/ice-broadview-chicago-tear-gas-trump-blitz-immigration [https://perma.cc/Z4FM-RACN]; Charles Thrush, *ICE Escalates Violence Against Protesters In Broadview; Journalist Arrested*, Block Club Chicago (Sept. 28, 2025), https://blockclubchicago.org/2025/09/28/ice-escalates-violence-against-protesters-in-broadview-journalist-arrested/ [https://perma.cc/RT78-2W9E].

71.     Defendants have remained impervious to the abject conditions detainees are suffering at Broadview.

**1. Defendants Subject Detainees at Broadview to Severe Overcrowding.**

72.     Broadview contains four small multiple occupancy holding rooms. The two largest holding rooms are estimated to be only about 30 feet by 30 feet. The other two rooms are even smaller. One of the smaller rooms is generally used to hold female detainees. There are also two single-person isolation cells.

73.     Defendants pack dozens—and sometimes more than 100—individuals into these holding rooms overnight and for days on end. They do not always utilize all four multiple occupancy rooms, at times squeezing detainees into only two or three of the rooms. *See, e.g.*, Ex. 5, S. Held Decl. ¶¶ 16-17. ICE officers have even held eight women in an isolation room designed for a single person for at least a day. *See* Ex. 6, Guevara Decl. ¶ 30.

74.     According to data provided by ICE, between January 1, 2025, and July 28, 2025—before Operation Midway Blitz began—ICE detained 5,202 people at Broadview.[40] Of those, 1,132 people were detained in June 2025 and 856 were detained in July. Defendants have ceased publishing more recent detention data, which obscures the precise level of overcrowding at the facility. But reports estimate that Defendants generally hold at least two hundred people in Broadview at one time.[41]

75.     The increased number of immigration arrests during Operation Midway Blitz has resulted in overcrowding at Broadview so extreme that people are forced to stand in cramped conditions. There often is not even room for detainees to lie down on the floor. *See* Ex. 5, S. Held

---

[40] Government data provided by ICE in response to a FOIA request to the Deportation Data Project and analyzed by Plaintiffs' counsel. Some individuals in this data were detained more than once.
[41] Sophie Tareen, *supra* note 33.

Decl. ¶¶ 21, 23; Ex. 7, Aguirre Alvarez Decl. ¶ 8; Ex. 36, Rebolledo Altamirano Decl. ¶ 9. And people are often held in these conditions for extended periods of time. Both detainees and attorneys who have represented people formerly at Broadview have detailed prolonged detention and severe overcrowding at the facility.

     a. Attorney Laura Smith's client was detained at Broadview for three weeks, from September 17, 2025, until October 8, 2025. Ex. 8, Smith Decl. ¶ 9. Three of her other clients were detained at Broadview for approximately five days. *Id*. ¶¶ 6-8.

     b. Attorney Louise Carhart's client was detained at Broadview for four days from June 16, 2025, until June 20, 2025. Ex. 9, Carhart Decl. ¶ 2.

     c. Attorney Khiabett Osuna's client, an elderly woman in her late seventies with several health conditions, was confined in a small holding cell with many people for four days in August 2025. Ex. 10, Osuna Decl. ¶¶ 8-10.

     d. Juan Gaspar-Nochebuena was held at Broadview for six days, from September 8 to September 13, in a very crowded room with about 80 other people. He observed three other hold rooms that were also very crowded. Gaspar-Nochebuena met two people from Honduras who were at Broadview for seven or eight days. Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 1, 9, 11, 27.

     e. Claudia Pereira Guevara, a mother of two young children, was held at Broadview for five days, from October 2 to October 7, 2025. She met another person who had already been there for 6 days when Guevara arrived and was still there when Guevara was released 5 days later. Ex. 6, Guevara Decl. ¶ 5. For one day, she was held together with eight other women in a single-person

isolation cell. *Id*. ¶ 30. She observed that the holding rooms for men were extraordinarily overcrowded, with men forced to stand shoulder to shoulder for lack of space. *Id*. ¶ 53.

f.  Jack Doe was held at Broadview for six days in September 2025. He estimated there were well over 100 people in the room. There was no space to lie down; people were lying on top of each other and in the bathroom area. He was forced to attempt to sleep sitting up. Ex. 38, Jack Doe Decl. ¶¶ 3, 5, 7, 8.

g.  Juan Gabriel Aguirre Alvarez was first held in a room with hundreds of others. The room was so crowded that there was not enough room for everyone to lay down. Later, he was placed in a smaller room which officers filled with over 50 people, making it even more crowded than the first room he was in. Ex. 7, Aguirre Alvarez Decl. ¶¶ 8, 11.

h.  Gladis Chavez, a mother and organizer who was arrested at a routine check-in in June, was confined in a Broadview holding room for four days with nearly 30 other women, including women who were nursing, pregnant, and elderly, some of whom were held for up to six days.[42]

i.  Fredy Cazarez Gonzalez was detained at Broadview for five days, from September 16 to September 20, 2025. He was held in a small room with hundreds of people. He was forced to lay down near the toilet, where there was urine on the ground, because there was nowhere else to lay down. Ex. 40, Cazarez Gonzalez Decl. ¶¶ 2, 8, 11.

---

[42] Laura Rodríguez Presa & Joe Mahr, *supra* note 35.

76.     On information and belief, individuals are not screened for vulnerabilities, and vulnerable individuals, such as elderly, disabled, pregnant, LGBTI or gender-nonconforming individuals, are not provided heightened protection, such as single housing.[43]

77.     A woman who spent three days in Broadview in late September explained: "We told the guards that the place was at full capacity, but they kept bringing people inside[.] They treated us like animals, or worse than animals, because no one treats their pets like that."[44] Another person explained that immigrants detained at Broadview are confined in cells "like a pile of fish."[45]

### 2. Defendants Deny Detainees Sufficient and Adequate Food and Water.

78.     The individuals held at Broadview are kept in a state of hunger and thirst.

79.     Defendants have not constructed food facilities or hired food preparation staff at Broadview. Ex. 2, 2023 Audit at 3.

80.     The food provided to detainees is insufficient and lacks nutrition. At most, detainees receive two to three small, cold sandwiches per day. *See, e.g.*, Ex. 12, Jane Doe Decl. ¶¶ 18, 23; Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 15-17; Ex. 13, Giménez-González Decl. ¶ 27; Ex. 38, Jack Doe Decl. ¶ 10; Ex. 6, Guevara Decl. ¶¶ 39-40; Ex. 7, Aguirre Alvarez Decl. ¶ 15; Ex. 9, Carhart Decl. ¶ 7; Ex. 14, Temich Polito Decl. ¶¶ 19-20; Ex. 15, Toto Polito Decl. ¶ 18. Sometimes, detainees receive just bread. Ex. 16, Guerrero Pozos Decl. ¶¶ 36-37; Ex. 8, Smith Decl. ¶ 9; Ex.

---

[43] Under ICE policy, pregnant, postpartum, and nursing individuals should not be arrested, detained, or taken into custody except under limited circumstances. ICE Directive 11032.4, Identification and Monitoring of Pregnant, Postpartum, or Nursing Individuals (ICE 2021); *see also* Letter from Patty Murray *et al.*, Members of Congress, to Kristi Noem, DHS Secretary (Sept. 18, 2025), https://www.murray.senate.gov/wp-content/uploads/2025/09/09182025-Letter-to-Sec.-Noem-on-Pregnant-Postpartum-and-Nursing-Women-in-ICE-Custody-FINAL.pdf [https://perma.cc/V53G-R4CT].

[44] Lauren FitzPatrick & Adriana Cardona-Maguigad (WBEZ), *ICE's Broadview Facility Has Become a de facto Detention Center, Minus the Rules and Oversight*, Chicago Sun Times (Oct. 1, 2025), https://chicago.suntimes.com/immigration/2025/10/01/broadview-immigration-processing-center-detention-ice-dhs [https://perma.cc/9356-VLJW].

[45] *Id.*

36, Rebolledo Altamirano Decl. ¶ 12; Ex. 40, Cazarez Gonzalez Decl. ¶ 20. Detainees do not receive any hot meals.[46] Detainees repeatedly decried the lack of food and the extreme hunger they suffered as a result. Ex. 6, Guevara Decl. ¶¶ 39-40; Ex. 14, Temich Polito Decl. ¶ 19; Ex. 11, Gaspar-Nochebuena Decl. ¶ 16; Ex. 16, Guerrero Pozos Decl. ¶ 36; Ex. 38, Jack Doe Decl. ¶ 10; Ex. 13, Giménez-González Decl. ¶ 27; Ex. 7, Aguirre Alvarez Decl. ¶ 15.

81.     Defendants also fail to provide any dietary accommodations for detainees with specific dietary or medical needs or religious restrictions. For instance:

a.   Attorney Khiabett Osuna's client is in her late seventies and has diabetes, high cholesterol, and high blood pressure. She was only offered sandwiches for every meal, which was dangerous for her medical conditions. Ex. 10, Osuna Decl. ¶¶ 4, 10.

b.   Attorney Shelby Vcelka's client is pre-diabetic and follows a special diet. During the four days she was detained at Broadview, she was not given a special diet; she also only received a sandwich for each meal. Ex. 34, Vcelka Decl. ¶ 11.

c.   John Doe has religious restrictions that prevent him from eating the Subway sandwiches he was provided at the facility. When he informed the officers of his restrictions, he was told to "take it or leave it." As a result, he went without food for approximately four days. Ex. 17, John Doe Decl. ¶ 13.

d.   Jose Guerrero Pozos was detained with some individuals who were diabetic, but they received the same food—a small amount of bread—as all the other

---

[46] Laura Rodríguez Presa & Joe Mahr, *supra* note 35.

detainees, which can lead to dangerous and uncontrolled surges in blood sugar. Ex. 16, Guerrero Pozos Decl. ¶¶ 36, 38.

82.     On information and belief, pregnant detainees are not provided with regular access to meals, nor additional snacks, milk, juice, or any of the extra nutrition recommended for pregnant people.[47]

83.     Drinking water at Broadview is a scarce resource. Ex. 16, Guerrero Pozos Decl. ¶¶ 34-35; Ex. 6, Guevara Decl. ¶¶ 41-43; Ex. 12, Jane Doe Decl. ¶¶ 25-26; Ex. 11, Gaspar-Nochebuena Decl. ¶ 18; Ex. 8, Smith Decl. ¶ 9; Ex. 14, Temich Polito Decl. ¶¶ 19-20; Ex. 7, Aguirre Alvarez Decl. ¶ 16; Ex. 40, Cazarez Gonzalez Decl. ¶ 20. Drinking water is not readily available, and Defendants do not distribute it regularly. An adequate daily fluid intake is about 15.5 cups of fluids per day for men and about 11.5 cups per day for women, with about 80% of daily fluid intake coming from drinks.[48] At Broadview, detainees typically receive one bottle of water with each small sandwich, generally two or three times daily but sometimes less. Detainees are lucky if they receive 6 cups of water—about half of the adequate amount—per day.[49] When detainees request more drinking water, officers refuse to provide it.

### 3. Detainees Are Held in Filthy, Unsanitary Conditions and Denied Access to Showers and Hygiene Items.

84.     The holding rooms at Broadview are "extremely dirty"[50] and infested with cockroaches, centipedes, and spiders. Jane Doe Decl. ¶ 10. There is trash on the floor. There is

---

[47] *Nutrition During Pregnancy*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/wellness-and-prevention/nutrition-during-pregnancy [https://perma.cc/2NDR-NGAJ] (last visited Oct. 20, 2025).
[48] *Water: How Much Should You Drink Every Day?*, Mayo Clinic, https://www.mayoclinic.org/healthy-lifestyle/nutrition-and-healthy-eating/in-depth/water/art-20044256 [https://perma.cc/A7ZS-AWXD] (last visited October 12, 2025).
[49] The most common size of plastic water bottle is 16.9 oz., or about two cups.
[50] Lauren FitzPatrick & Adriana Cardona-Maguigad, *supra* note 44.

blood, other bodily fluids, and hair in the sinks and on the walls. Ex. 18, Cerrone Decl. ¶ 4. The toilets are filthy and often get clogged, resulting in urine and dirty water on the floor where detainees are forced to sleep. Ex. 14, Temich Polito Decl. ¶ 14; Ex. 36, Rebolledo Altamirano Decl. ¶ 10; Ex. 39, Munoz Decl. ¶ 40; Ex. 38, Jack Doe Decl. ¶ 18; Ex. 40, Cazarez Gonzalez Decl. ¶¶ 9, 11. The windows have been sealed and boarded up, depriving detainees of fresh air and natural light.

85.     Defendants refuse to provide individuals with basic hygiene items including soap, toothbrushes, toothpaste, hand sanitizer, wet wipes, shampoo, lotion, or tissues.

86.     Defendants fail to provide adequate menstrual products. One woman held at Broadview in June with nearly thirty other women reported not being provided any menstrual products.[51]

87.     Defendants largely fail to provide detainees the opportunity to bathe. One of the holding rooms has two showers, but according to the 2023 DHS audit of Broadview, the showers are inoperable, and the space is used for storage. No other rooms have bathing facilities. Broadview facility staff have told auditors that "detainees do not shower while at this facility," nor do they change clothes. Ex. 3, 2023 Audit at 9. Detainees are not provided with clean clothing or towels and are forced to wear the same clothes, including underwear, for the duration of their detention.

　　　　　　a. Claudia Pereira Guevara states that the holding cells at Broadview were dirty and unsanitary. She and others asked for a broom to try to clean the cell themselves but were refused. Officers never cleaned the room during the five days she was detained from October 2 to 7, 2025. There was no soap, no sanitizer, no showers, and no way to wash herself. She was forced to wear the

---

[51] *Id.*

clothes she was arrested in the entire time she was detained at Broadview. Ex. 6, Guevara Decl. ¶¶ 31-34.

b.   Attorney Jasmine Pedraza's client did not have access to soap, a toothbrush, or toothpaste during the three days he was detained at Broadview. He was not given any opportunity to shower. Ex. 19, Pedraza Decl. ¶ 9.

c.   Martin Temich Polito did not receive soap, toothpaste, a toothbrush, or any other hygiene products. There were two showers in one of the rooms he was held in, but neither worked. He was unable to shower while he was detained at Broadview. Ex. 14, Temich Polito Decl. ¶ 15.

d.   Chao Zhou had no opportunity to bathe or shower at Broadview, and the only shower fixture he saw had a sign on it that read "out of order." The room stank of body odor. Ex. 20, Zhou Decl. ¶ 6.

e.   Juan Gabriel Aguirre Alavarez did not have access to a shower, soap, hand sanitizer, toothpaste, or a toothbrush while he was at Broadview. No one received a change of clothes. As a result, the room smelled very badly of sweat and body odor. Ex. 7, Aguirre Alvarez Decl. ¶ 6.

f.   Aguirre Alvarez saw a man get sick and vomit in and around the toilet in his holding room. The officers did not provide medical care, nor did they clean up the vomit. Detainees were forced to try to use toilet paper to clean up the vomit. *Id.* ¶ 13.

g.   On the final night that Aguirre Alvarez was detained at Broadview, another man in the room defecated in his pants. The man's soiled pants were placed in the

garbage. No staff members came to clean it up, so it was left there the entire night and smelled terrible. *Id.* ¶ 14.

h. Fredy Cazarez Gonzalez was unable to shower for the five days he was at Broadview. Officers did not give him any soap, toothpaste, a toothbrush, or anything else to clean himself with. Ex. 40, Cazarez Gonzalez Decl. ¶ 12.

88. The rooms smell strongly of feces, urine, and body odor. The risk of transmission of illness or disease is high because of overcrowding, limited access to food, limited access to medical care, and poor hygiene and sanitation.[52]

### 4. Detainees Are Forced to Sleep on the Concrete Floor Without Bedding, Near Open Toilets, and with Constant Bright Lights, Resulting in Sleep Deprivation.

89. Defendants are systematically subjecting class members to sleep deprivation as a result of the poor sleeping conditions.

90. There are hard benches or plastic chairs in some of Broadview's holding cells, but not enough for everyone. Most individuals are forced to sleep on the dirty, concrete floor, and near open toilets, raising the risk that they will come in contact with feces or urine matter.

91. There are often so many people in the holding cells that some detainees cannot even lay down to sleep on the floor.[53] Some have reported trying to sleep sitting upright.[54]

92. Defendants do not provide beds, mats, mattresses, bedding, pillows, or sufficiently warm blankets. Some individuals receive thin foil blankets. *See* Ex. 5, S. Held Decl. ¶ 24; Ex. 16, Guerrero Pozos Decl. ¶ 26. Others receive nothing. Ex. 40, Cazarez Gonzalez Decl. ¶ 11; Ex. 21, Ochoa Ochoa Decl. ¶ 7; Ex. 36, Rebolledo Altamirano Decl. ¶ 11; Ex. 15, Toto Polito Decl. ¶ 17.

---

[52] Jason R. Andrews, Yiran E. Liu & Julio Croda, *Enduring Injustice: Infectious Disease Outbreaks in Carceral Settings*, 229(2) J. Infectious Diseases 307, 307 (2024); Nathan C. Lo et al., *Influenza, Varicella, and Mumps Outbreaks in US Migrant Detention Centers*, 325 JAMA 180, 180 (2020).
[53] Sophie Tareen, *supra* note 33.
[54] Lauren FitzPatrick & Adriana Cardona-Maguigad, *supra* note 44.

93. Defendants subject detainees to severe and uncomfortable temperature differentials. Sometimes the rooms are hot, and the air is thick and suffocating. At other times, especially overnight, the hold rooms are freezing cold with the air-conditioner blasting. Detainees often arrive in T-shirts, and most do not have sweatshirts or jackets. Some have their shoes taken away. When they ask federal agents for more blankets or clothing, the officers generally refuse or delay. Gaspar-Nochebuena asked agents for a foil blanket, as he could see that the officers had available blankets in the facility, but the officers did not give him a blanket for three days, by which time he had become sick. On his fifth day at Broadview, after another detainee fainted and was taken to the hospital, he finally received a sweater. Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 12-14.

94. Defendants generally keep on bright security lights throughout the night, making it more difficult to sleep.

95. The sleeping conditions at Broadview deprive the putative class members of sleep and increase their risk of suffering anxiety, depression, and sickness. Many detainees—including detainees who were elderly or had medical conditions—described attempting to sleep on dirty floors in brightly-lit and crowded holding rooms for days at a time. Ex. 12, Jane Doe Decl. ¶¶ 10-12; Ex. 6, Guevara Decl. ¶¶ 44-46, 49; Ex. 21, Ochoa Decl. ¶ 8; Ex. 9, Carhart Decl. ¶ 7; Ex. 10, Osuna Decl. ¶ 10; Ex. 14, Temich Polito Decl. ¶¶ 16-18; Ex. 20, Zhou Decl. ¶ 7; Ex. 7, Aguirre Alvarez Decl. ¶¶ 7-8; Ex. 36, Rebolledo Altamirano Decl. ¶ 9; Ex. 40, Cazarez Gonzalez Decl. ¶ 11.

**5. Defendants Do Not Provide Putative Class Members with Essential Medical or Mental Health Care.**

96. Defendants fail to provide the putative class members with adequate medical or mental healthcare.

97.     Broadview has the capacity to accommodate a medical office; it has rooms "where private interviews and mental health examinations may take place." Ex. 4, 2018 Audit at 2.

98.     Defendant ICE maintains the ICE Health Service Corps which, among other things, is supposed to provide medical support for domestic transfers and international removals.[55]

99.     Despite these capabilities, Defendants have not created a medical unit at Broadview, nor have they hired any medical or mental health staff to care for detainees incarcerated in the facility. Ex. 3, 2023 Audit at 3, 8. Defendants do not conduct even a basic medical or mental health screening for people brought to the facility. Defendants do not monitor detainees for physical or mental health conditions. When detainees ask for medical attention, officers refuse.

      a.     Claudia Pereira Guevara became ill at Broadview, suffering from numbness in her lower body, an inability to feel her legs, and vomiting. She was not seen by a doctor or any other medical professional. Defendants' officers refused to take her to a hospital or medical facility. She was eventually taken out of her holding cell and was left to sit in a wheelchair in the central area of the building outside the cells. Ex. 6, Guevara Decl. ¶ 49. Guevara also observed two men suffer serious medical events at Broadview. One of the men appeared to have suffered a heart attack. Officers laughed at the man and made light of his medical condition. *Id.* ¶ 48.

---

[55] *ICE Health Service Corps*, ICE (updated 09/10/2025), https://www.ice.gov/detain/ice-health-service-corps [https://perma.cc/8VHE-V534] (last visited Oct. 13, 2025).

b. Attorney Kimberly Weiss's client reported that he saw people being carried out on stretchers, and he was not sure if they were alive. The air was thick and suffocating, and he saw people struggling to breathe. Ex. 22, Weiss Decl. ¶ 7.

c. Juan Gabriel Aguirre Alvarez saw a man whose face was bleeding. Officers placed the man in the holding room while he was bleeding and did not provide him with any medical treatment. Ex. 7, Aguirre Alvarez Decl. ¶ 17.

d. Aguirre Alvarez also saw several people whose hands and arms were swollen and bruised as a result of their treatment during their arrests. Only some of the men received slings for their arms but were not otherwise provided with treatment for their injuries. *Id.* ¶ 18.

e. Many of the people in the cell with Jack Doe were sick and coughing. They complained of headaches and body aches and became sick. They requested medication but the officers did not give them anything and said they do not have medication at Broadview. Ex. 38, Jack Doe Decl. ¶ 9.

f. Jane Doe requested medical care for an injured toe, made worse by use of force by officers during her arrest, but she received no care at Broadview. She asked for medical attention at Broadview, but the officers refused to provide her care and told her that she would have to wait until she was at another detention facility to receive medical care. Defendants held her at Broadview for three days without medical attention. Ex. 12, Jane Doe Decl. ¶¶ 19, 24.

g. Juan Gaspar-Nochebuena requested Tylenol for a toothache. The officers told him that they did not have any. They did not give him any medication or medical attention. Ex. 11, Gaspar-Nochebuena Decl. ¶ 23.

h. Santos Rebolledo Altamirano attempted to alert officers about an older man who was not feeling well. The officers swore at him and did nothing. It was not until the man started foaming at the mouth that officers finally took the man out of the cell. Ex. 36, Rebolledo Altamirano Decl. ¶ 23.

i. Juan Munoz saw a man who has a scraped face and neck, swollen jaw, a bruised wrist, and a bruised leg. Despite his multiple injuries, officers at Broadview did not provide him with medical attention. Ex. 39, Munoz Decl. ¶ 32.

j. Fredy Cazarez Gonzalez was kicked and beaten by the officers who arrested him, and as a result, he was in extreme pain at Broadview. Despite his injuries and the pain he was in, officers at Broadview did not provide Cazarez Gonzalez with any medical care. Ex. 40, Cazarez Gonzalez Decl. ¶¶ 5, 23.

100. Defendants often do not provide detainees with prescription medication. In order for a detainee to receive prescription medication, their family members must first locate them at Broadview and then get in contact with ICE—which often does not respond to calls or email—in order to arrange dropping off the medication. Even then, Defendants' officers do not always give detainees their medication as prescribed.

a. Prior to being detained at Broadview, Samuel Ochoa Ochoa became sick at another detention center, where he was prescribed with an ibuprofen mix to be taken every eight hours. Once he arrived at Broadview, he had a fever and sore throat. Broadview officers did not give him the medication for almost 24 hours, until right before he left. Ex. 21, Ochoa Decl. ¶ 13.

b. Samuel Ochoa Ochoa saw and heard a pregnant woman request her medication from officers, but they refused to provide it. *Id.* ¶ 12.

    c.   Attorney Jasmine Pedraza's client was held at Broadview for over three days and needed his medication. She emailed and called the Chicago ERO office multiple times but was unable to speak to anyone at ICE or Broadview. She had to contact the Mexican consulate for assistance in getting her client his medication. Ex. 19, Pedraza Decl. ¶¶ 6, 8.

    d.   Attorney Louise Carhart's client required medication for high blood pressure. ICE did not give him his medication during the four days he was detained at Broadview, even though his family brought his prescription medication to the facility. Ex. 9, Carhart Decl. ¶ 8.

    e.   Attorney Shelby Vcelka's client required prescription medication for her pre-diabetic condition. However, during the four days she was detained at Broadview, ICE failed to provide her with access to her medication. Ex. 34, Vcelka Decl. ¶ 11.

101.    Defendants' officers at Broadview fail to conduct intakes for and document detainees' medical and mental health needs, medications, medical events, and even medical emergencies. These failures impede detainees' ability to receive adequate medical care at Broadview and prevent them from receiving adequate treatment once they are transferred out of the facility. Ex. 10, Osuna Decl. ¶¶ 4, 12, 13.

102.    Making matters worse, Defendants have doused protestors, legal observers, and journalists with pepper spray and tear gas immediately outside the facility in an attempt to quell demonstrations. These chemical agents are tracked into holding cells by people entering with chemicals on their clothes, shoes, and bodies. Ex. 5, S. Held Decl. ¶¶ 18-20; Ex. 18, Cerrone Decl.

¶ 6. This has the potential to further harm detainees, who are not given personal protective equipment.[56]

103.    Combined with the poor physical conditions and lack of sanitation and hygiene products, the lack of medical and mental health care significantly increases the risk and spread of illness among the detained population in Broadview.

**6.  Broadview Officers Abuse and Mistreat the People in Their Custody.**

104.    Defendants' officers systematically mistreat and abuse the detainees who are in their custody. Fredy Cazarez Gonzalez who was detained at Broadview for five days stated that "officers treated all of us like savage animals." Ex. 40, Cazarez Gonzalez Decl. ¶ 3.

105.    Officers are physically and verbally abusive of detainees. They fail to treat detainees with basic human decency and instead demean and humiliate them.

  a.  Rosalio Pelayo Salgado reported that agents directed racial slurs at detainees and only gave them food and water for what they felt was good behavior.[57]

  b.  Jack Doe was held in a cell with an elderly disabled man in his seventies who was hemiplegic. The detained men helped him use the bathroom, but after two days of sleep deprivation, they were too tired to help anymore. The officers refused to provide assistance and the man soiled himself. The officers did not

---

[56] *See* Natasha Korecki, *How Immigration Enforcement Turned Sleepy Broadview Into a Chaotic, Militarized Town*, NBC (Oct. 13, 2025), https://www.nbcnews.com/news/us-news/broadview-illinois-ice-protests-chicago-immigration-rcna236519 [https://perma.cc/VGW7-8U9P] ("plumes of tear gas deployed by federal agents [at Broadview] have been so potent it's irritated two of the children in the home [across the street] who have asthma — even when they're inside"); Bob Charito, *Neighbors of Broadview ICE Facility Say They're Stuck in Clashes Between Protesters, Feds*, Chicago Sun Times (Sep. 30, 2025), https://chicago.suntimes.com/business/2025/09/29/broadview-businesses-ice-immigration-protest-suburbs [https://perma.cc/S4L4-AXWN] (tear gas seeped into the plant next door to Broadview).
[57] Nadar Issa, *What To Know About Trump's Immigration Enforcement Campaign in Chicago*, Chicago Sun-Times (Sept. 24, 2025), https://chicago.suntimes.com/immigration/2025/09/24/chicago-immigration-president-donald-trump-dhs-ice [https://perma.cc/6PFZ-X75X].

give him a change of clothes or take him to a private room. He was forced to remain in his soiled clothes for several days. Ex. 38, Jack Doe Decl. ¶ 21.

c. Jack Doe witnessed officers pull shackled people out of the hold room and hit them. The officers grabbed people by the neck, threw people to the ground, and got on top of people to beat them up. When someone asked: "we have human rights, why are you doing this to us?" the officers took him out of the room and beat him. *Id.* ¶¶ 12-16.

d. John Cerrone was detained inside Broadview after being shot with rubber-coated bullets while attending a demonstration near the facility. The agent who shot him came inside, said "where's the pussy at?" and bragged to other agents about how he shot Cerrone in the head with rubber bullets. Ex. 18, Cerrone Decl. ¶ 12.

e. Claudia Guevara Pereira reported that officers used obscenities and insults against detainees, jeered at detainees, and generally treated them with contempt. Ex. 6, Guevara Decl. ¶ 50.

f. Officers repeatedly swore at Santos Rebolledo Altamirano and told him that he is not allowed to be in the country. Whenever he asked for anything, officers simply responded that they were not supposed to be here. Ex. 36, Rebolledo Altamirano Decl. ¶ 22.

g. When Rebolledo Altamirano asked an officer for his jacket because he was freezing cold in just his undershirt, the officer told him to "take it like a man" and "stop acting like a child." *Id.* ¶ 11.

106. When detainees ask for basic necessities, officers respond with threats, abuse, or contempt, and many detainees reported being belittled or ignored by officers when they asked for food and water. Ex. 12, Jane Doe Decl. ¶ 21; Ex. 16, Guerrero Pozo Decl. ¶ 21; Ex. 38, Jack Doe Decl. ¶ 12; Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 15-18; Ex. 36, Rebolledo Altamirano Decl. ¶¶ 11, 22-23. Claudia Pereira Guevara stated that after she and others were denied water for 13 hours, officers would pretend that they did not hear the requests. When people asked for necessities, officers would insult detainees or make light of their suffering. Ex. 6, Guevara Decl. ¶¶ 41, 50. She saw a man who was very ill and appeared to be having a heart attack. The officers at Broadview laughed at him and made light of his medical emergency. *Id*. ¶ 48.

**7. There is No Privacy at Broadview, Raising Serious Safety Concerns.**

107. Defendants intentionally deny detainees privacy. The putative class members are constantly exposed and subject to surveillance.

108. Some of the hold rooms each have one toilet with a sink attached for all the detainees to share. The toilet is out in the open. Ex. 14, Temich Polito Decl. ¶ 12; Ex. 16, Guerrero Pozos Decl.¶ 27; Ex. 7, Aguirre Alvarez Decl. ¶ 12; Ex. 36, Rebolledo Altamirano Decl. ¶ 10; Ex. 40, Cazarez Gonzalez Decl. ¶ 10.

109. The other rooms have only two or three toilets, which are sometimes broken or clogged, despite holding more than 100 detainees at one time. Ex. 38, Jack Doe Decl. ¶ 18. The toilets in these rooms are separated by only a small wall that is insufficient to provide privacy. Ex. 7, Aguirre Alvarez Decl. ¶ 7.

110. Individuals in all holding rooms are forced to urinate and defecate in front of each other while crammed together in crowded holding rooms. *See* Ex. 5, S. Held Decl. ¶ 22; Ex. 20,

Zhou Decl. ¶¶ 5-6; Ex. 14, Temich Polito Decl. ¶ 12; Ex. 7, Aguirre Alvarez Decl. ¶¶ 7, 12; Ex. 40, Cazarez Gonzalez Decl. ¶ 10.

111.    While detainees are separated by sex, the holding rooms have large glass windows. Male detainees can see female detainees use the toilets, and female detainees can see the men. Ex. 16, Guerrero Pozos Decl. ¶¶ 27-28. When someone on the women's side uses the toilet, other detainees gather around the toilet, trying to use their bodies to provide privacy.[58]

112.    Officers can also see the toilets inside the holding rooms and watch detainees use the bathroom. Ex. 16, Guerrero Pozos Decl. ¶ 29. This is especially distressing for female detainees, as most of the officers are male.

113.    Defendants have placed cameras throughout Broadview, so they can observe detainees at their most vulnerable moments, including when they are using the toilet. This causes heightened anxiety, particularly for women at Broadview who have no idea who is watching them use the toilet, or what is done with recordings from the facility cameras. *See* Ex. 6, Guevara Decl. ¶ 36. It also increases the risk of sexual abuse and mistreatment at the hands of ICE officers.

### C. Defendants Intentionally Impede and Deny Access to Counsel for Detainees in Broadview.

114.    It is Defendants' policy and practice to prohibit detainees at Broadview from contacting counsel and to bar lawyers from calling or visiting clients confined there.

115.    Defendants systematically deny detainees access to their attorneys or prospective attorneys at a time when their need for legal counsel is extraordinarily acute.

116.    With access to counsel, detainees work with their attorneys to file petitions for bond, habeas, and asylum, rely on their attorneys to inform them of their rights in immigration

---

[58] Lauren FitzPatrick & Adriana Cardona-Maguigad, *supra* note 44.

proceedings, and counsel them regarding relief that may be available to them if they choose to fight their removal in immigration court. Attorneys can also intervene on behalf of individuals who are authorized to live or work in the United States, who have pending legal claims barring their transfer, or who were otherwise arrested and detained by federal agents without a legitimate legal basis.

117.    But as a result of Defendants' conduct, detainees are routinely cut off from pursuing legal redress, and only able to pursue legal remedies if they have luck, resources, or ingenuity to circumvent the facility's restrictive policy.

**1.  Defendants Deny Detainees the Ability to Make Confidential Calls to Counsel.**

118.    There are theoretically four ways that detainees can make telephone calls out of Broadview: 1) by using a five-minute prepaid card, provided by an officer, on the non-confidential payphone; 2) by making a free 20-second call on the payphone which can only be extended if the call recipient adds funds; 3) by using a personal cell phone brought in during arrest, if permitted by officers to do so; or 4) by using a landline on the officers' desks, again, if permitted by officers to do so. Ex. 5, S. Held Decl. ¶¶ 12-14; Ex. 13, Giménez González Decl. ¶¶ 38-39; Ex. 15, Toto Polito Decl. ¶ 6.

119.    The payphones, located in some of the holding rooms, are shared by all detainees. There is no privacy around the payphones. Ex. 16, Guerrero Pozos Decl. ¶ 16; Ex. 7, Aguirre Alvarez Decl. ¶ 20. The system is confusing, unpredictable, and often does not work. *See* Ex. 20, Zhou Decl. ¶ 5; Ex. 16, Guerrero Pozos Decl. ¶ 15; Ex. 36, Rebolledo Altamirano Decl. ¶ 13; Ex. 40, Cazarez Gonzalez Decl. ¶ 24. The prepaid card typically is inoperative or does not last the full five minutes. Ex. 16, Guerrero Pozos Decl. ¶ 15. The free 20-second call often fails to connect or does not stay connected long enough for the recipient to add funds. *See* Ex. 12, Jane Doe Decl. ¶

8. Steve Held tried to call his wife several times, but the call never connected, and her phone never rang. No one else in the holding room with him was able to successfully connect through the payphone; both the prepaid card and the free 20-second calls failed. Ex. 5, S. Held Decl. ¶¶ 12-14; *see also* Ex. 23, R. Held Decl. ¶ 8.

120.    While some individuals have been permitted to briefly use their cell phone or a landline on an officer's desk, these calls take place in the central area where other detainees can easily hear their conversation, and in front of officers who are actively listening and restricting communication. Ex. 12, Jane Doe Decl. ¶¶ 2, 6; Ex. 16, Guerrero Pozos Decl. ¶¶ 2-4; Ex. 15, Toto Polito Decl. ¶ 6; Ex. 38, Jack Doe Decl. ¶ 22.

121.    There is no mechanism for detained individuals to have confidential and private phone calls with counsel. All calls on the payphones are made on a monitored and recorded line in front of other detainees and officers, making it impossible to have privileged and confidential conversations or to effectively receive legal advice. Other calls, including cell phone and landline calls, must be made in front of officers. Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 5, 7; Ex. 24, Herrera Decl. ¶¶ 12-13.

122.    When detained individuals ask to speak to their lawyer or to call a prospective lawyer, officers ignore them or explicitly tell them that there is no way to communicate with attorneys at Broadview. Sometimes they directly intervene to shut down legal calls.

a.  Jane Doe informed officers at Broadview that she needed to speak with her lawyer. They responded that she could not talk to her lawyer because she was just going to be deported. She repeatedly asked the officers to let her speak with her lawyer, but the officers ignored her. While Doe was at Broadview, she did

41

not witness anyone who had the opportunity to talk to a lawyer. Ex. 12, Jane Doe Decl. ¶¶ 4, 9.

b. Juan Gaspar-Nochebuena witnessed detainees asking officers if they could speak with their lawyers. Officers told the detainees to wait, but none were ever allowed to speak with a lawyer. Ex. 11, Gaspar-Nochebuena Decl. ¶ 4.

c. An officer permitted Willian Giménez González to call his wife using his cellphone. Giménez González's wife happened to be with his immigration attorney, Kevin Herrera, at the time of the call. When the officer heard Herrera's voice and learned that he was an attorney, the officer told Giménez González to end the call. The officer then reached for the phone and hung up the call himself. Ex. 13, Giménez González Decl. ¶¶ 38-43.

d. Valentin Toto Polito was never allowed to use the phone to call anyone. An officer told him that he did not need an attorney and that he could speak to an attorney when he got to the Texas detention facility. Toto Polito was taken straight from Broadview to the U.S.-Mexico border and instructed to cross the border; he never went to a Texas facility. Ex. 15, Toto Polito Decl. ¶¶ 10-12.

e. Jack Doe repeatedly told officers he had a lawyer and asked to call her, but the officers denied him access. Ex. 38, Jack Doe Decl. ¶¶ 23, 28.

f. When Samuel Ochoa Ochoa arrived at Broadview, he asked to call his attorney, but the ICE officer told him no. Ex. 21, Ochoa Decl. ¶ 5.

123.    Santos Rebolledo Altamirano informed officers he had a lawyer and asked to speak with his lawyer multiple times, but officers refused, and responded that "you have no rights to a lawyer;" "you have no rights in here;" "you're not gonna talk to anyone;" and "you don't talk to

anyone here," or words to that effect. Ex. 36, Rebolledo Altamirano Decl. ¶ 15. Even if detainees are permitted phone access, Defendants' polies make it nearly impossible for them to contact counsel. Most detainees do not have their attorneys' phone number memorized, and detainees cannot check their phones for their attorneys' contact information because officers generally take their cell phones away. Detainees must rely on counsel to get in touch with them, but, as set forth below, attorneys are blocked from reaching their clients both in person and by telephone. If detainees are somehow able to pass information along to attorneys by telephone, it is only by circumventing Broadview policies through luck, happenstance, and use of occasional successful family calls, which take place on monitored and recorded lines or in front of officers, to relay messages and information.

124.    Because of Defendants' policies and practices, detainees are unable to initiate confidential calls with attorneys, making it nearly impossible for their attorneys to directly assist them in obtaining legal relief.

### 2. Defendants Deny Attorneys Access to Their Clients Held at Broadview.

125.    Defendants also systematically deny attorneys access to their clients at Broadview in a variety of ways.

126.    Defendants obfuscate where detainees are being held, so that attorneys cannot find their clients when they are at Broadview.

127.    The ICE Online Detainee Locator (the "locator") (https://locator.ice.gov/odls/#/search) is supposed to specify the location of individuals in ICE custody. It is often inaccurate or missing information, in the following ways: 1) the detainee's name does not appear in the locator, *e.g.*, Ex. 24, Herrera Decl. ¶¶ 5-6; Ex. 10, Osuna Decl. ¶¶ 5-7, 11; Ex. 25, Ayala-Bermejo Decl. ¶ 6; Ex. 26, Lara Decl. ¶¶ 4, 8, 12; 2) the locator provides the

wrong location for a detainee, *e.g.*, Ex. 9, Carhart Decl. ¶ 5 (locator said Clay County but client was sent to Campbell County); or, 3) the locator says only that the detainee is generally in ICE Custody and to contact ICE for more information, *e.g.*, Ex. 8, Smith Decl. ¶ 3; Ex. 9, Carhart Decl. ¶ 3; Ex. 37, Peyton Decl. ¶¶ 5-6; Ex. 27, Meija Decl. ¶ 6.

128.     Under Defendants' authority, ICE has removed information from its Attorney Information and Resources webpage concerning communicating with a client or prospective client, legal resources available to immigrants in ICE custody, and legal resources available to non-detained immigrants. The sections removed included information on, among other things, legal visits; privacy and confidentiality; scheduling unmonitored legal calls; the Detainee Telephone System (DTS) free call platform to contact legal service providers, consular officials, and various governmental agencies and non-governmental organizations; accommodations for disabled detainees; legal access-related detention standards; pro bono legal service providers; know your rights materials; and immigration court helpdesks for pro se petitioners.[59]

129.     Detainees are not always processed the day they arrive at Broadview; some individuals are processed days later. Sometimes, officers input the wrong name, further limiting attorneys' abilities to locate their clients.

130.     The phone line for the Chicago Field Office is unattended, and no one answers or returns phone calls. *See* Ex. 37, Peyton Decl. ¶¶ 5-6; Ex. 19, Pedraza Decl. ¶ 6; Ex. 9, Carhart Decl. ¶ 4; Ex. 26, Lara Decl. ¶ 5; Ex. 34, Vcelka Decl. ¶ 9.

---

[59]     *Compare* Attorney Information and Resources, ICE (updated April 7, 2025), https://web.archive.org/web/20250408221936/https://www.ice.gov/detain/attorney-information-resources (archived April 8, 2025), *with* Attorney Information and Resources, ICE (updated May 12, 2025), https://web.archive.org/web/20250524101707/https://www.ice.gov/detain/attorney-information-resources [https://perma.cc/M5VG-USPJ] (archived May 24, 2025).

131.     When attorneys call the Broadview facility directly, no one answers, and the line disconnects without an option to leave a message. *See* Ex. 9, Carhart Decl. ¶ 4; Ex. 8, Smith Decl. ¶ 4.

132.     Even when attorneys know or suspect their client is at Broadview, Defendants prevent them from contacting their clients.

133.     When attorneys email the facility directly (detentionbroadview-ins@ice.dhs.gov) or ICE (chicago.outreach@ice.dhs.gov and chi-ero-detained@ice.dhs.gov), they often do not receive a response. Ex. 19, Pedraza Decl. ¶ 6; Ex. 26, Lara Decl. ¶ 12. If they do, it is generally not until after their client has been transferred out of Broadview. Ex. 10, Osuna Decl. ¶¶ 6-8.

134.     Some federal officers have lied to attorneys about their clients being at Broadview or have refused to say where they are being held. Ex. 28, Thomson Decl. ¶¶ 6-7; Ex. 26, Lara Decl. ¶ 13.

135.     Defendants have instituted a wholesale prohibition on in-person legal visits at Broadview. They either do so directly or through other federal agencies and the Illinois State Police agents who have been patrolling around the facility. When attorneys speak to ICE officers or to other federal agents or ISP officers, the officers explicitly tell them that they cannot contact their clients at Broadview and refuse them access. Multiple attorneys have described attempting to visit clients and being denied entry—sometimes repeatedly—until their clients were transferred away from the facility. Ex. 24, Herrera Decl. ¶¶ 8-9; Ex. 8, Smith Decl. ¶¶ 6-7; Ex. 26, Lara Decl. ¶¶ 6-7; Ex. 27, Mejia Decl. ¶¶ 3, 7; Ex. 28, Thomson Decl. ¶¶ 2, 3-4, 8, 11; Ex. 29, Spreadbury Decl. ¶¶ 2, 3-4, 6, 8-9; Ex. 37, Peyton Decl. ¶¶ 4-5; Ex. 34, Vcelka Decl.¶¶ 5-7, 9, 10, 19.

136.    Because Defendants maintain a blanket ban on legal visits at Broadview, it is nearly impossible for attorneys and clients to share documents. As a result, attorneys cannot obtain clients' approval of legal pleadings or their signature on important documents.

### 3. Defendants Deny the Putative Class Access to Counsel Intentionally in Order to Deprive Them of Legal Remedies and Access to the Courts.

137.    Defendants have intentionally turned Broadview into a "black hole" where "people go missing for days" and "are forced to sign [] voluntary departure forms," while their attorneys are denied access to their clients.[60]

138.    Without access to legal counsel, detainees have no opportunity to consult an attorney about their rights, pursue immigration relief, or file a habeas action to contest their placement before being sent out of the country.

139.    Defendants have denied detainees access to counsel even though Broadview has the facilities and capabilities to allow legal access. The facility maintains attorney-client visit rooms in which people can meet with or call their attorneys confidentially. Ex. 3, 2023 Audit at 3, 17; Ex. 28, Thomson Decl. ¶ 8; Ex. 18, Cerrone Decl. ¶¶ 8-9. Most individuals are arrested with their cell phones, which can be given back to them on a limited basis to facilitate confidential, unmonitored calls with counsel.

140.    Broadview is located right outside Chicago, making it easy for lawyers to visit. There is a robust immigration bar in Chicago, and attorneys are willing and able to provide legal services for individuals detained at Broadview. For instance, the Chicago Bar Foundation, working with the National Immigrant Justice Center and ACLU of Illinois, coordinates the Immigrant Habeas Project of Illinois, which recruits and trains pro bono attorneys to deliver critical legal

---

[60] Corli Jay, *supra* note 38.

relief to detainees by filing federal habeas petitions and temporary restraining orders. The Habeas Project attorneys are available to provide representation for detainees in Broadview.

141.     Defendants intentionally impede detainees' access to counsel and attorney access to clients to prevent immigrants from obtaining legal relief. On information and belief, Defendants do this to minimize legal interference and to speedily send immigrants out of the United States irrespective of their legal rights.

142.     Defendants' officers have a policy and practice of threatening and coercing detainees to sign forms consenting to their being sent out of the country without appearing before an immigration judge and otherwise waiving their legal rights. The objective of this policy and practice is to expel as many detainees out of the country as quickly as possible.

143.     On information and belief, in many instances the document that Defendants are coercing and threatening detainees to sign is ICE Form I-210, entitled "Voluntary Departure and Verification of Departure." Ex. 7, Aguirre Alvarez Decl. ¶ 10; Ex. 14, Temich Polito Decl. ¶ 5; Ex. 15, Toto Polito Decl. ¶ 8; Ex. 40, Cazarez Gonzalez Decl. ¶ 15. Defendants' officers fill out the form to specify that the individual is "granted voluntary departure by DHS" and is required to depart the United States "under safeguard," *i.e.* while in custody.

144.     Defendants use the Voluntary Departure form, completed in this manner, to send detainees out of the United States without placing them in formal removal proceedings before an immigration judge, without any hearing in immigration court or any other court, and without any opportunity for the individual to contest their removal or to seek relief from removal through immigration proceedings, appeals, petitions for review to federal court, or otherwise.

145.     When an immigrant agrees to voluntary departure without being placed in formal removal proceedings, they have no opportunity to challenge the action or seek relief in an

immigration court or any court of law. Signing such paperwork relinquishes an individual's right to the Due Process afforded by such procedures.

146.    There is no mechanism in immigration court to challenge or obtain review of whether an individual knowingly or voluntarily signed ICE Form I-210 granting voluntary departure by DHS prior to the initiation of removal proceedings.

147.    On information and belief, as part of Defendants' policy and practice of using coercion and threats to procure signatures on forms and waive rights, Defendants are seeking to compel detainees to sign other documents to effectuate their removal and to waive their rights under U.S. immigration law and the Constitution.

148.    As part of Defendants' policy and practice of procuring signatures and waivers of rights that are not knowing and voluntary, Defendants are employing a number of coercive and threatening tactics.

149.    Officers often do not allow detainees to read forms before signing.

150.    Officers typically present forms to detainees in English, despite the fact that many immigration detainees do not speak or understand English. Officers generally do not provide a translated version or orally translate forms that detainees are forced to sign. Officers do not fully or accurately explain the consequences of signing forms. Ex. 14, Temich Polito Decl. ¶ 4; Ex. 6, Guevara Decl. ¶ 8; Ex. 13, Giménez-González Decl. ¶ 49; Ex. 16, Guerrero Pozos Decl. ¶¶ 5-6; Ex. 36, Rebolledo Altamirano Decl. ¶ 19; Ex. 40, Cazarez Gonzalez Decl. ¶ 15.

151.    Officers have falsely translated the contents of a document that a detainee is being asked to sign. Ex. 22, Weiss Decl. ¶ 8. Officers have used a variety of verbal threats in order to coerce detainees into signing forms, including threatening a detainee that they will remain in horrific conditions inside Broadview until they sign; threatening that things will go badly for the

detainee if they do not sign; threatening that the detainee will remain incarcerated unless they sign; threatening a detainee with physical abuse if they do not sign; and issuing angry verbal insults in response to a detainee's reluctance to sign. Ex. 12, Jane Doe Decl. ¶¶ 3-4; Ex. 16, Guerrero Pozos Decl. ¶¶ 9, 11-12; Ex. 6, Guevara Decl. ¶ 7; Ex. 40, Cazarez Gonzalez Decl. ¶¶ 15-16.

152. Officers have falsely conveyed to detainees that they have no rights within Broadview. Ex. 22, Weiss Decl. ¶ 8; Ex. 36, Rebolledo Altamirano Decl. ¶ 15.

153. Officers have continued to insist that a detainee must sign a document even when the individual says that they do not want to sign, or that their lawyer has advised them not to sign anything. Ex. 16, Guerrero Pozos Decl. ¶¶ 5-9, 11-12; Ex. 13, Giménez González Decl. ¶¶ 49-53; Ex. 22, Weiss Decl. ¶ 8; Ex. 12, Jane Doe Decl. ¶¶ 3-4; Ex. 38, Jack Doe Decl. ¶¶ 29-30; Ex. 40, Cazarez Gonzalez Decl. ¶¶ 15-16.

154. Officers have told detainees that they are required to sign forms and that there is no need or right to speak with a lawyer. Ex. 6, Guevara Decl. ¶ 9; Ex. 16, Guerrero Pozos Decl. ¶¶ 5-6, 13.

155. Officers have denied all access to legal advice or counsel to people who are being compelled to sign forms. They have rebuffed and reacted angrily to requests from detainees to consult with a lawyer before signing. Ex. 16, Guerrero Pozos Decl. ¶¶ 5-9, 11-14; Ex. 13, Giménez González Decl. ¶¶ 49-53; Ex. 6, Guevara Decl. ¶ 9; Ex. 12, Jane Doe Decl. ¶¶ 3-4.

156. On information and belief, Defendants intentionally subject detainees to degrading and inhumane conditions in Broadview and in other detention facilities in order to encourage immigrants to sign forms, waive rights, and agree to leave the country.[61]

---

[61] *See* Kate Morrissey, *ICE is Pressuring People in Custody to Self-Deport. Many Are Giving Up*, Capital & Main (Aug. 6, 2025), https://capitalandmain.com/ice-is-pressuring-people-in-custody-to-self-deport-

157.    As a result of Defendants' policies and practices, detained individuals are prejudiced in court and face serious consequences.

    a. Attorney Kimberly Weiss's client had a strong case as a 56-year-old widower, single parent, and sole caretaker for four children who are all U.S. citizens. He entered legally and had a work permit as a fully certified union journeyman roofer. Unbeknownst to him, at the time he signed the voluntary departure, his lawyer had already secured a court date for a bond hearing for the next day. But by that afternoon, he was on the other side of the border. His children, who are already grieving the loss of their mother from earlier this year, now must process the sudden loss of their father. Ex. 22, Weiss Decl. ¶¶ 4, 6, 10.

    b. Defendants' refusal to allow Attorney Laura Smith to communicate with her clients while they were detained at Broadview has prevented her from obtaining information critical to their removal proceedings, bond hearings, and habeas petitions. Defendants' refusal to allow her to even obtain her clients' signatures has prevented her from obtaining their immigration records and impacted her ability to file on her clients' behalf. Ex. 8, Smith Decl. ¶ 11.

    c. While one of Smith's clients was detained at Broadview, Smith filed her Form G-28 (Notice of Entry of Appearance as Attorney) electronically with ICE but was still denied access to him. ICE then transferred him to a detention facility in Texas. There, one hour before he was deported, he was allowed to make one

---

many-are-giving-up [https://perma.cc/BKQ4-7WAZ]; *see also* Jasmine Garsd, *supra* note 9; *Self-Deportation*, ICE (updated July 16, 2025), https://www.ice.gov/self-deportation [https://perma.cc/KX92-UHZM] (emphasizing that immigrants who do not self-deport "may have to spend several months in detention") (last visited Oct. 19, 2025).

phone call with an ICE officer listening in. He called Smith. Smith began to inform him of his eligibility for immigration relief, but the officer cut her off. Her client was deported after this brief phone call. Immediately upon his return to Mexico, he was kidnapped and disappeared. *Id*. ¶ 12.

d.  Smith was also unable to obtain a teenage client's signature while he was at Broadview. He was transferred to Indiana and then Texas. The Texas detention facility refused to transmit any legal paperwork or allow Smith to meet with her client virtually. They told Smith, who is based in Chicago, that she had to travel to Texas to obtain her client's signature. *Id.* ¶ 14.

e.  Attorney David Mejia's client was transferred out of Broadview and out of state before Mejia was able to speak with him. As a result, Mejia's client was irreparably harmed because Mejia was prevented from demanding that proceedings for his client take place at the Chicago Field Office. Ex. 27, Mejia Decl. ¶ 8.

158.    Because of their policies and practices denying access to counsel, Defendants have deprived immigrants of the ability to challenge their deportation, removal, or transfer, resulting in unreviewable and irreversible consequences.

**D.  The Conditions at Broadview Violate Even Defendants' Own Standards and Policies.**

159.    By denying detainees access to counsel and keeping them in deplorable conditions, Defendants intentionally and systematically violate their own standards and policies governing both detention centers and holding centers.

### 1. Defendants' Policies Governing Detention Conditions

160.    ICE's Performance-Based National Detention Standards ("PBNDS"), promulgated and adopted by ICE, set minimum standards for the operation and conditions of facilities detaining immigrants and apply to all ICE-operated facilities. ICE detention facilities that hold detainees overnight—like Broadview—have more stringent requirements for conditions of confinement than short-term processing facilities.

161.    The PBNDS require that each detainee, upon admission to a facility, be given an opportunity to shower and issued "clean clothing, bedding, towels, and personal hygiene items." 2011 PBNDS (rev. 2016) § 2.1(II)(6); *see also id.* § 4.5(V)(B). The bedding must include, at minimum, one mattress, one blanket, one pillow, two sheets, and one pillowcase. *Id.* § 4.5(V)(G).

162.    Each detainee must be provided with soap, a comb, toothpaste, a toothbrush, shampoo, and lotion.[62] *Id.* § 4.5(V)(D).

163.    ICE must provide one toilet for every 12 male detainees, one toilet for every 8 female detainees, one operable shower for every 12 detainees, and sinks with hot and cold running water 24 hours a day. *Id.* § 4.5(V)(E).

164.    Detainees must be provided with "a reasonably private environment," which requires that detainees "be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances . . . ." *Id.* § 4.5(V)(E).

165.    The PBNDS require that "[m]edical and mental health screening shall be conducted to identify requirements for medical care, special needs and housing, and to protect the health of others in the facility." *Id.* § 2.1(II)(4). The PBNDS further require that "[d]etainees shall be able

---

[62] Even for detentions under 12 hours, the PBNDS requires detainees in hold rooms to be provided with "basic personal hygiene items (e.g., water, disposable cups, soap, toilet paper, feminine-hygiene items, diapers and sanitary wipes), as appropriate." 2011 PBNDS (rev. 2016) § 2.6(V)(B)(6).

to request health services on a daily basis and shall receive timely follow-up." *Id.* § 4.3(II)(4). Detainees with prescription medication must be evaluated by a healthcare professional within 24 hours of arriving to the facility, and ICE is required to provide detainees with their prescription medication "on schedule and without interruption, absent exigent circumstances." *Id.* § 4.3(V)(U)(4)-(5).

166.    Detainees are required to be served "three meals every day, at least two of which shall be hot meals," and require drinking water to be made available to detainees. *Id.* § 4.1(V)(D)(1). Detainees who have medical conditions "shall be prescribed special diets as appropriate." *Id.* § 4.1(V)(H)(1).

167.    Facilities must "neither restrict the number of calls a detainee places to his/her legal representatives, nor limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones." *Id.* § 5.6(V)(F)(1).

168.    "For detainee telephone calls regarding legal matters, each facility shall ensure privacy by providing a reasonable number of telephones on which detainees can make such calls without being overheard by staff or other detainees." *Id.* § 5.6(V)(F)(2). For incoming calls, facilities "shall take and deliver telephone messages to detainees as promptly as possible." *Id.* § 5.6(V)(J).

169.    Each facility must "permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays." *Id.* § 5.7(V)(J)(2). Facilities are also required to permit detainees to meet with prospective legal representatives during regular hours for legal visitation. *Id.* § 5.7(V)(J)(7). These legal visits must be confidential and not subject to auditory supervision by officers. *Id.* § 5.7(V)(J)(9).

## 2. Conditions at Broadview Even Violate Defendants' Policies for Short-Term Detentions Under 12 Hours.

170. Even though Defendants have instituted a hold room waiver policy and thus are keeping people at Broadview for much longer than 12 hours at a time, they are violating even their own less restrictive policies governing short-term detentions.

171. DHS and ICE issued Directive 11087.2, *Operations of ERO Holding Facilities* (the "Holding Facility Policy") on January 31, 2014. The Holding Facility Policy reaffirmed the 12-hour limit on holding facilities, absent exceptional circumstances, which has been in place for over ten years.[63]

172. The Holding Facility Policy provides ICE ERO officers—including the officers who operate and staff Broadview—with policies and procedures for facilities that detain individuals for under 12 hours. Ex. 2, Holding Facility Policy § 3.2 n.3. Defendants routinely violate the Holding Facility Policy, despite regularly detaining people at Broadview for far longer than 12 hours.

173. Under the Holding Facility Policy, the Executive Associate Director for ERO, currently Defendant Marcos Charles, is "responsible for ensuring compliance with the provisions of this [Holding Facility Policy] within ERO." *Id*. § 4.1.

174. Field Office Directors (FODs)—here, Defendant Olson—are "responsible for ensuring that field office personnel follow the procedures in this [Holding Facility Policy] for operating holding facilities[.]" *Id*. § 4.3. FODs are also responsible for:

> a. "Ensuring that detainees are properly screened so that those with serious mental health disorders or conditions are expeditiously identified and those who exhibit

---

[63] U.S. Immigration & Customs Enforcement, Office of Enforcement and Removal Operations, 11087.1: Operations of ERO Holding Facilities 1 (Sept. 22, 2014), available at https://www.ice.gov/doclib/foia/policy/directive11087.1.pdf [https://perma.cc/BRJ6-Y2JJ].

signs of acute mental health distress are referred to mental health professionals pursuant to the applicable detention standards and policy." *Id*. § 4.3(1).

b. They shall "[e]nsure that before placing detainees together in a hold room, there [is] consideration of whether a detainee may be at a high risk of being sexually abused or assaulted, and, when appropriate, shall take necessary steps to mitigate any such danger to the detainee." *Id*. § 5.10(1)(a). This screening shall include consideration of, inter alia, whether the individual has a mental, physical, or developmental disability; their age, build, and appearance; whether they are LGBTI or gender nonconforming; whether they have previously experienced sexual victimization; and their own concerns about their physical safety. Id. FODs shall provide heightened protection, such as single housing, for detainees identified as being at high risk for victimization. *Id.* § 5.10(1)(b)(i) – (ix).

175. ERO personnel are required to "be sensitive to detainees' cultural and religious practices," and "whenever possible, detainees' religious beliefs and practices shall be accommodated." *Id*. § 2.4.

176. Under the Holding Facility Policy, ERO Officers are responsible for, *inter alia*:

a. "Ensuring detainees are provided a meal at least every six hours." *Id*. § 4.4.1(2);

b. "Ensuring that hold rooms are safe, clean, [and] equipped with restroom facilities[.]" *Id*. § 4.4.1(3).

c. "Ensuring that males and females are not detained in the same hold room, unless they are a family unit." *Id*. § 4.4.1(4).

d. "Ensuring that . . . elderly detainees . . . are not placed in hold rooms, unless they have demonstrated or threatened violent behavior, have a history of criminal activity, or pose an escape risk." *Id*. § 4.4.1(5); and

e. "Ensuring that detainees with disabilities are provided an equal opportunity to access, participate in, and benefit from in-custody programs, services, and activities and those with communication disabilities are provided with auxiliary aids and services as necessary to allow for effective communication and those who are illiterate or with limited English proficiency are provided with meaningful access to services." *Id*. § 4.4.1(8).

177. The Holding Facility Policy further requires that ERO Officers:

a. "[E]mpty holding facilities upon the conclusion of daily operations in those field office locations operating on a daily schedule. Absent exceptional

circumstances, no detainee should be housed in a holding facility for longer than 12 hours." *Id*. § 5.1(1);

b. "Monitor detainees for any apparent indications of a mental or physical health condition or signs of hostility, self-harm, or harm to others that may require closer supervision or emergency medical care." *Id*. § 5.1(2);

c. "Provide minors and pregnant women with regular access to meals, snacks, milk, and juice, regardless of their time in custody." *Id*. § 5.2(1);

d. "Provide detainees with access to drinking water in hold rooms at all times." *Id*. § 5.2(2);

e. "Detain pregnant individuals in the least restrictive setting available, provided such setting is consistent with the need to protect the well-being of the pregnant individual and others and separate them from other detainees, whenever possible." *Id*. § 5.3(1).

f. "Provide any detainee who has a communication disability with auxiliary aids and services as necessary to allow for effective communication." *Id*. § 5.4(1).

g. "Provide any detainee who is illiterate or has limited English proficiency and speaks a language in which written material has not been translated with in-person or telephonic oral interpretation," including "all ICE- and facility-related information and communications." *Id*. § 5.4(2);

h. "Permit detainees to shower (where showers are available), perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exceptional and unusual circumstances or when incidental to routine cell checks." *Id*. § 5.6(1);

i. "[A]nnounce their presence when entering an area where detainees [of the opposite gender] are likely to be showering, performing bodily functions, or changing clothing." *Id*. § 5.6(2);

j. "Allow detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary." *Id*. § 5.7(2);

k. "Maintain a detention log for every detainee brought into custody regardless of purpose," recording, *inter alia*, (a) Detainee's name, (f) Language spoken, and if a detainee is not proficient in English, (g) known or reported disability, (j) time in, (k) mealtime, and (l) time out." *Id*. § 5.8(1).

l. "Respond immediately to observed or reported medical emergencies and contact local emergency medical services when a detainee is determined to need urgent medical care." *Id*. § 5.9(b).

**E. Court Intervention is the Only Remedy Sufficient to Address the Dire Circumstances at Broadview, in Light of Defendants' Growing Lack of Transparency.**

178.    In a sharp deviation from historical practice, Defendants have also implemented a policy of denying members of Congress access to inspect Broadview. Elected senators and representatives have repeatedly tried to enter the facility as part of their congressionally mandated oversight authority and have been barred entrance.

179.    On June 17 and 18, 2025, U.S. House Representatives Jesús "Chuy" García (IL-04), Delia Ramirez (IL-03), Jonathan Jackson (IL-01), and Danny Davis (IL-04) attempted to conduct congressional oversight visits to Broadview following reports of inhumane detention conditions and denial of access to counsel, but they were denied entrance by ICE. Ex. 30, Davis Decl. ¶¶ 1-2; Ex. 31, García Decl. ¶¶ 4-5; Ex. 35, Ramirez Decl. ¶¶ 1-2. On June 18, Defendants adopted a new policy limiting Congressional access to ICE facilities.[64]

180.    Following the denial of the visit, Representatives Davis, García, Jackson, and Ramirez sent a public letter to Defendants Noem and Lyons detailing the denial of their access to Broadview and demanding that they be permitted to exercise their right of oversight over ICE facilities. The Representatives did not receive a response. Ex. 30, Davis Decl. ¶ 3; Ex. 31, García Decl. ¶ 6; Ex. 35, Ramirez Decl. ¶ 3.

181.    On September 12, 2025, Representatives García, Ramirez, Jackson, and Davis sent Defendants Noem and Lyons a letter noting their concerns about the conditions at Broadview and

---

[64]    *See* Office of Congressional Relations, ICE, https://www.ice.gov/leadership/ocr [https://perma.cc/KQ2N-NN8B] (last visited October 13, 2025) (requiring requests be made seven days in advance to schedule congressional oversight visits to DHS detention facilities); *see also* U.S. Immigration and Customs Enforcement (ICE) Facility Visit and Engagement Protocol for Members of Congress and Staff, ICE (updated June 2025). Several members of Congress recently filed a lawsuit challenging these policies. *See* Complaint, *Neguse et al. v. U.S. Immigration and Customs Enforc., et al.*, No. 1:25-cv-2463-JMC (D.D.C., filed July 30, 2025), Dkt. 1.

including a list of questions about Broadview.[65] They did not receive a response to their questions. Ex. 31, García Decl. ¶ 16.

182. On September 16, 2025, Senator Richard J. Durbin and Representative Ramirez communicated to ICE that an Illinois Delegation of Congressional Representatives (the "Delegation") intended to conduct an oversight visit to Broadview on September 23, 2025. ICE refused to allow the visit. Ex. 30, Davis Decl. ¶ 4; Ex. 31, García Decl. ¶ 9; Ex. 35, Ramirez Decl. ¶ 4.

183. In lieu of the visit, ICE agreed to meet with the Delegation on September 26, 2025, but then postponed the meeting to an unconfirmed date in October. Ex. 30, Davis Decl. ¶ 5; Ex. 31, García Decl. ¶ 10; Ex. 35, Ramirez Decl. ¶ 5. The meeting has not occurred.

184. On September 26, 2025, members of the Delegation including Senators Durbin and Duckworth and Representatives Ramirez, Jonathan L. Jackson, Robin Kelly, Jesus "Chuy" García, Mike Quigley, Sean Casten, Raja Krishnamoorthi, Jan Schakowsky, Bradley Scott Schneider, Bill Foster, Nikki Budzinski, Lauren Underwood, and Eric Sorenson sent a letter to then-Chicago Field Office Director Hott, underscoring their need to meet with ICE and requesting information about Operation Midway Blitz and Broadview "to provide much-needed transparency."[66] The Delegation was concerned about its inability to gain access to Broadview because Operation Midway Blitz has been "shrouded in secrecy, with little notice to state or local officials about the

---

[65] Letter from Jesús G. "Chuy" García, Delia C. Ramirez, Jonathan L. Jackson & Danny K. Davis, Members of Congress, to Kristi Noem, DHS Secretary & Todd M. Lyons, Acting Director of ICE (Sept. 12, 2025), https://chuygarcia.house.gov/sites/evo-subsites/chuygarcia.house.gov/files/evo-media-document/letter-to-dhs-ice-re-broadview-9.12.25-2.pdf [https://perma.cc/72RK-8ZST].

[66] Letter from Richard J. Durbin, United States Senator *et al*., to Russell Hott, ICE Chicago Field Office Director (Sept. 26, 2025), https://ramirez.house.gov/sites/evo-subsites/ramirez.house.gov/files/evo-media-document/letter-to-ice-fod-hott-on-meeting-to-discuss-pressing-matters.pdf [https://perma.cc/E8XZ-8CNJ].

nature of the operations, the types of people targeted, where DHS was detaining people, and which agencies were detailing officers to conduct immigration enforcement." Ex. 31, García Decl. ¶ 13. Defendants have not responded. *Id*. ¶ 16; Ex. 35, Ramirez Decl. ¶ 10.

185.    Senators Durbin and Duckworth attempted to visit Broadview on October 10, 2025, and Defendants, once again, denied them entry.[67] On October 13, 2025, Representative Krishnamoorthi tried to access the facility. Again, agents refused him access.[68] On October 16, Representatives García, Jamie Raskin, Ranking Member of the House Judiciary Committee, and other Committee Members sent a letter to President Trump, Defendant Noem, and Defendant Lyons highlighting the poor conditions at Broadview. Ex. 31, García Decl. ¶ 15. The Representatives did not receive a response. *Id*. ¶ 16.

186.    It is not just congressional officials and attorneys who have been denied access to Broadview. For many years, faith leaders and members of the clergy—including Mercy Sisters JoAnn Persch and Pat Murphy—provided pastoral care to individuals detained inside Broadview. Ex. 32, Persch Decl. ¶¶ 9-11. Family members of individuals detained at Broadview were also historically permitted inside to meet with their loved ones. *Id*. ¶ 10. Now, no one is allowed inside Broadview. Faith leaders seeking to provide religious services are blocked from providing communion and spiritual support to detainees, even from outside. *Id*. ¶ 14; Ex. 33, Holcombe Decl. ¶¶ 5-8. Family members are no longer allowed inside.

---

[67] Mohammad Samra & Mariah Rush, *Scuffle Between Demonstrators, Police Outside Broadview ICE Facility as Sens. Durbin, Duckworth Denied Entry*, Chicago Sun Times (Oct. 10, 2025), https://chicago.suntimes.com/immigration/2025/10/10/protests-broadview-ice-facility-chicago-trump-rulings-fence-removed [https://perma.cc/2LL6-VJV6].

[68] Rob Hughes, *Illinois Leaders Call for Removal of Broadview ICE Facility Fence as Judge's Deadline Nears*, ABC News (Oct. 13, 2025), https://abc7chicago.com/post/ice-chicago-fencing-around-broadview-facility-set-removed-live/17997242/ [https://perma.cc/5F9A-2G67].

187.     Broadview is a black hole, and federal officials are acting with impunity inside its walls. The only way to obtain relief for the hundreds of immigrants being detained at Broadview is for the Court to remedy the Defendants' constitutional violations through the injunctive and declaratory action requested below, on a class-wide basis.

## CLASS ACTION ALLEGATIONS

188.     Plaintiffs bring this Complaint as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(1) and (b)(2).

189.     Plaintiffs seek to represent a class defined as: "All immigration detainees who are detained and those who will be detained in the future at the Broadview ICE facility at 1930 Beach Street, Broadview, Illinois."

190.     The putative class consists of people detained and awaiting release, removal, or transfer to a detention facility, which constitutes an inherently transitory population. While there is uncertainty as to how long any one plaintiff will remain at Broadview, there will be a constant class of detainees suffering the constitutional and legal violations alleged in this Complaint as long as Broadview remains in operation in its current state.

191.     Plaintiffs are simultaneously seeking emergency discovery of information relating to the opaque Broadview facility, and if discovery or further investigation reveals that the putative class should be expanded or otherwise modified, the named Plaintiffs reserve their right to amend the class definition or propose subclasses as necessary.

192.     Defendants track those currently in the Broadview facility, all of whom are easily identifiable, for purposes of ascertaining the applicable class.

193.     The proposed class satisfies the requirements of Fed. R. Civ. P. 23(a)(1) because the class is so numerous that joinder of all members is impracticable. Upon information and belief,

at any given time, there are up to 200 or more people detained at Broadview at one time. Joinder is impracticable because the putative class members are detained, many do not speak English well or at all, and most are unable to initiate individual litigation because they lack sufficient resources, financial or otherwise. Furthermore, the population of detained individuals at Broadview changes on a daily basis and, as detailed above, the putative class members' access to legal representation and services is obstructed by the lack of phone calls and denial of attorney access to the facility.

194.    The proposed class meets the requirements of Fed. R. Civ. P. 23(a)(2). There are several common questions of law and fact. The class members have all been denied the ability to have confidential conversations and visits with counsel; they have all been detained in overcrowded cells; they have all been denied beds and bedding material and have been forced to sleep on the concrete floor, on plastic chairs, or sitting up; they have all been denied sufficient food and water; they have all been denied the ability to bathe; they have all been denied access to proper medical care; and they have all been denied basic hygiene products. As a result, the common questions of law and fact include, but are not limited to, the following:

a. Whether Defendants' policy and practice of denying Broadview immigration detainees access to counsel violates their First and Fifth Amendment rights.

b. Whether Defendants have instituted a policy and practice of systematically obstructing access to legal counsel.

c. Whether Defendants have instituted a policy and practice of using threats and coercion in order to procure signatures on immigration documents, including documents that waive rights and allow Defendants to take people out of the country without process.

d. Whether Defendants have instituted a policy and practice of procuring signatures on immigration documents that are written in a language that the signer does not understand and which have not been translated.

e. Whether Defendants have instituted a policy and practice of systematically overcrowding Broadview to a capacity that makes constitutional conditions of confinement impossible given the constraints of the facility.

f. Whether Defendants' policy and practice of overcrowding the Broadview facility and denying detainees adequate food, adequate food, water, bedding, medication, and sanitation violates the Fifth Amendment.

g. Whether Defendants have acted knowingly, purposefully, or recklessly in imposing the conditions described above.

h. Whether any legitimate government purpose justifies the conditions described above.

i. Whether Broadview maintains attorney-visitation rooms that Defendants are refusing to permit immigration detainees and their lawyers to access.

j. Whether Defendants systematically refuse to permit immigration detainees to conduct confidential calls with attorneys on their own cell phones or on any other phone within the facility.

k. Whether Defendants systematically refuse to connect attorneys who call the facility with their clients who are detained inside.

l. Whether Defendants have systematically denied entry to attorneys who have gone to the facility to consult with their clients.

m. Whether Defendants maintain medical services on-site, including for purposes of conducting medical intakes of detainees being processed in the facility and for treating people with pre-existing conditions.

n. Whether Defendants have food preparation facilities onsite.

o. Whether Defendants have a policy of depriving detainees of adequate food and water.

p. Whether Defendants accommodate the dietary needs of people with religious and dietary restrictions or needs.

q. Whether Defendants provide bedding for detainees who are kept at Broadview overnight.

r. Whether detainees are forced to use the toilet in a manner that provides no privacy and can be overseen by other detainees and officers.

s. Whether Defendants systematically deprive detainees of access to basic hygiene products.

t. Whether the facility and the hold rooms where detainees are being held are regularly cleaned.

195. The proposed class meets the requirements of Fed. R. Civ. P. 23(a)(3). The named Plaintiffs' claims are typical of those of the class because they are detained at Broadview and is subjected to the punitive conditions of confinement, including through denial of access to counsel that are challenged here, in violation of their and the putative class members' constitutional rights.

196. The proposed class meets the requirements of Fed. R. Civ. P. 23(a)(4). The named Plaintiffs have the requisite personal interest in the outcome of this action and have no interests

adverse to the interests of the class. They will fairly and adequately represent the interests of all proposed class members.

197.    The proposed class is represented by counsel from the MacArthur Justice Center, ACLU of Illinois, and Eimer Stahl. Counsel collectively have extensive experience litigating class action lawsuits and other complex cases in federal court, including on behalf of detained people and noncitizens.

198.    This action is maintainable as a class action pursuant to Rule 23(b)(1) because the prosecution of separate actions by individual detainees would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Broadview.

199.    The proposed class meets the requirements of Fed. R. Civ. P. 23(b)(2). Defendants have acted on grounds generally applicable to the proposed class through their policies and practices of detaining people at Broadview in punitive conditions, including the denial of access to counsel, in violation of Plaintiffs' and the putative class members' rights. Therefore, declaratory and injunctive relief are appropriate with respect to the proposed class as a whole.

200.    Each of the members of the putative class is or will be entitled to bring a complaint for injunctive or declaratory relief to obtain relief from unlawful detention.

201.    Plaintiffs and the putative class members have been and are being substantially harmed by Defendants' unconstitutional policies and practices. In addition to the harm that flows inherently from the deprivation of their Constitutional rights, they have suffered from pain and hunger, sleep deprivation, the exacerbation of preexisting medical issues and risks of new medical problems, harm to their immigration cases as a result of being forced to sign away their legal rights, and psychological and emotional harm. Their inability to access legal counsel has further harmed

their ability to properly prepare for their legal proceedings, and in some cases has led to them being sent out of the country without representation.

## CAUSES OF ACTION

### COUNT ONE
*Violation of the Fifth Amendment*
*Conditions of Confinement*
*On Behalf of Plaintiffs and the Putative Class*
*Against All Defendants*

202. Plaintiffs, on behalf of the putative class, repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

203. Defendants have policies and practices of subjecting Plaintiffs and the putative class members to objectively unreasonable conditions of confinement at Broadview.

204. Under the Fifth Amendment, Defendants must provide for Plaintiffs' and the putative class members' health, safety, and well-being while Plaintiffs and the putative class members are in Defendants' custody.

205. Conditions of confinement for individuals in civil detention are unconstitutional if they are objectively unreasonable. Conditions satisfy this standard when (1) the conditions are objectively serious; (2) defendants acted purposefully, knowingly, or recklessly with respect to the consequences of their actions; and (3) defendants' actions were not rationally related to a legitimate governmental objective or excessive in relation to that purpose.

206. The conditions of confinement Plaintiffs and putative class members face at Broadview are objectively serious.

207. Defendants are holding Plaintiffs and the putative class members for more than 12 hours.

208.     Broadview is neither designed nor equipped to detain individuals overnight. Defendants have a practice of not providing beds or bedding for Plaintiffs and the putative class members, despite forcing them to spend one or more nights at Broadview.

209.     Defendants have policies and practices of detaining Plaintiffs and the putative class under conditions that are unsanitary and hazardous to their health. Defendants overcrowd the holding rooms in the facility, refuse to allow detained individuals to bathe, and deny them access to hygiene supplies.

210.     Defendants have failed to provide Plaintiffs and the putative class members adequate access to basic necessities like food, water, sanitation facilities, access to medical and mental health care, and privacy.

211.     Defendants have acted purposefully, knowingly, or recklessly in imposing the inhumane conditions at Broadview. Defendants have violated their own policies governing detention and holding facilities. Defendants ignore detainees' repeated requests for food, water, hygiene supplies, and other basic necessities.

212.     Defendants have also impeded access to counsel as set forth in this complaint and in Count II.

213.     Defendants systematically bar Plaintiffs and the putative class members from initiating or having confidential phone calls with attorneys, and from attorneys having calls with their clients inside the facility. Defendants have prohibited all attorney visits to Broadview and thus Plaintiffs and the putative class members have no way to consult with their counsel in person or to review and/or sign legal documents and seek legal remedies, including habeas petitions or bond motions.

214. Widespread media reporting, letters from congressional representatives, and related lawsuits about Broadview and other similar facilities nationwide have put Defendants on notice that the conditions at the facility are unacceptable.

215. The government has no legitimate interest in subjecting detainees at Broadview to abusive conditions, including denial of access to counsel, that amount to punishment. No other government interest justifies the inhumane conditions at Broadview.

216. ICE's policies applicable to detention and holding facilities demonstrate that any legitimate government objectives sought to be achieved by detaining Plaintiffs and the putative class members and others could be accomplished under more humane conditions.

217. Defendants' policies and practices pertaining to conditions of confinement at Broadview are thus objectively unreasonable and violate the Due Process Clause of the Fifth Amendment.

218. Defendants' policies and practices pertaining to conditions of confinement at Broadview, including denial of access to counsel have caused, are causing and, if not enjoined, will continue to cause Plaintiffs and putative class members to imminently suffer irreparable injury in the form of deprivation of their fundamental rights, along with a range of physical, psychological, and emotional harms.

219. Plaintiffs and the putative class members are entitled to declaratory and injunctive relief to avoid any further injury.

**COUNT TWO**
***Violation of the First Amendment***
***Access to Counsel***
***On Behalf of Plaintiffs and the Putative Class***

220. Plaintiffs, on behalf of the putative class, repeat, re-allege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

221.     Plaintiffs and the putative class members have a First Amendment right to hire and consult attorneys while held at the Broadview ICE facility. The ability to maintain confidentiality is an important component of this First Amendment right. The government may not unreasonably restrict this right.

222.     Defendants have impeded access to counsel as set forth in this complaint and in Count I.

223.     By unreasonably restricting Plaintiffs and the putative class members from retaining, consulting, and communicating with counsel, Defendants have violated and continue to violate their rights under the First Amendment.

224.     Plaintiffs and the putative class members have suffered and will imminently suffer irreparable injury as a result of Defendants' policies and practices, including the deprivation of their fundamental rights.

225.     Plaintiffs and putative class members are entitled to injunctive relief to avoid any further injury.

**COUNT THREE**
*Violation of Due Process, 8 C.F.R. § 287.8(c)(2)(vii), Administrative Procedure Act*
*Coerced and Involuntary Signatures and Waivers of Rights*
*On Behalf of Plaintiffs and Putative Class*
*Against All Defendants*

226.     Plaintiffs on behalf of the putative class, repeat, reallege, and incorporate by reference each and every allegation in the preceding paragraphs as if fully set forth herein.

227.     Defendants have adopted a policy and practice of coercing, threatening, and otherwise pressuring putative class members in order to procure their signature on immigration documents, including Voluntary Departure forms that waive their legal rights and allow Defendants to send them out of the country.

228.   Defendants have adopted a policy and practice of requiring putative class members to sign immigration documents written exclusively in English, without translation, when putative class members do not speak English.

229.   In order to obtain putative class members' signatures on immigration documents, Defendants, as part of their policy and practice, have employed coercive, threatening, and deceptive tactics.

230.   The Due Process Clause of the Fifth Amendment to the Constitution forbids coerced signatures and requires that, in order for non-citizens to waive rights to which they would otherwise be entitled, the waiver must be both knowing and voluntary.

231.   Defendants' policy and practice of coercing, threatening, and otherwise pressuring putative class members to sign immigration documents, including documents that waive their rights, violates the Due Process Clause.

232.   Defendants' policy and practice of compelling putative class members to sign immigration documents, including documents that waive their rights, in a language they do not understand and without translation, violates the Due Process Clause.

233.   Defendants also violate the Due Process Clause under the doctrine of *United States* e*x rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954), which requires Defendants to comply with their own administrative regulations, including 8 C.F.R. § 287.8(c)(2)(vii), that are designed to safeguard individual interests.

234.   Defendants' policy and practice of threatening, coercing, and otherwise pressuring putative class members to sign immigration documents and/or to waive their rights violates 8 C.F.R. § 287.8(c)(2)(vii), which prohibits "[t]he use of threats, coercion, or physical abuse by

the designated immigration officer to induce a suspect to waive his or her rights or to make a statement."

235.    Defendants' policies and practices of procuring signatures on untranslated documents and using coercion and threats to obtain signatures and waivers of rights is also final agency action within the meaning of the Administrative Procedure Act, 5 U.S.C. § 704.

236.    Defendants' final agency action is not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), because it is contrary to Defendants' own regulation, 8 C.F.R. § 287.8(2)(c)(ii), which is enforceable against Defendants under *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954).

237.    Defendants' final agency action is also contrary to constitutional right, within the meaning of 5 U.S.C. § 706(2)(B), because it violates the Due Process protections of the Fifth Amendment.

238.    Defendants' final agency action is also arbitrary, capricious, and an abuse of discretion. 5 U.S.C. § 706(2)(A).

239.    Defendants' policies and practices of procuring signatures on untranslated documents and using coercion and threats to obtain signatures and waivers of rights have caused, are causing and, if not remedied, will continue to cause Plaintiffs and putative class members to imminently suffer irreparable injury in the form of deprivation of their fundamental rights and deprivation of their procedural and substantive rights under the Immigration and Nationality Act relating to their immigration status, immigration proceedings, and their rights not to be sent out of the United States.

240.    Plaintiffs are entitled to injunctive relief, and Plaintiffs and the putative class members are entitled to declaratory relief, in order to avoid any further injury.

241.    Plaintiffs and the putative class members are entitled to an order under the Administrative Procedure Act holding unlawful, setting aside, and vacating the Defendants' final agency action as set forth in this complaint and this count. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1.    Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), and (b)(2);

2.    Enter judgment for Plaintiffs and the putative class and against Defendants;

3.    Declare that Defendants' policy and practice of denying Plaintiffs and the putative class the right to retain, consult, and communicate confidentially with counsel violates the First Amendment;

4.    Declare that Defendants' policy and practice of denying Plaintiffs and the putative class access to counsel violates the Fifth Amendment Due Process Clause;

5.    Declare that the conditions of confinement imposed by Defendants at Broadview violates the Fifth Amendment Due Process Clause;

6.    With respect to Counts One and Two, preliminarily and permanently order Defendants to:

   a.   Ensure, with respect to the living conditions at Broadview, that

   i.   the hold rooms at Broadview contain no more than one detainee for each 50 square feet of space, not including the area within 8 feet of any toilet;

   ii.  each detainee held overnight is provided a clean bedding mat and bedding for sleeping;

    iii.    the hold rooms be cleaned thoroughly on an ongoing basis and be furnished with adequate supplies of soap, towels, toilet paper, toothbrushes and toothpaste, and menstrual products;

    iv.    hold rooms have access to sufficient toilets for class members and that class members be able to use toilets outside the view of other detainees, Defendants' officers, or staff;

    v.    hold rooms have access to sufficient showers for class members and that class members be permitted regular showers outside the view of staff or detainees of a different gender;

    vi.    class members be provided with clean clothing and a private area to change clothing;

    vii.    class members be provided full meals at least three times per day that meet U.S. Recommended Daily Allowances and accommodate class members' religious or dietary restrictions;

    viii.    class members be provided as much bottled potable water as they need;

    ix.    class members have access to prescribed medications and medical and mental health care, including emergency and non-emergency medical and mental health care;

b.  Ensure, with respect to counsel access at Broadview, that

    i.    class members have the means, capability, and access to make outgoing confidential, unmonitored, unrecorded, free, and temporally unrestricted calls to legal representatives and prospective legal representatives, including allowing for connection to outside interpretation services during the call, within

3 hours of being detained at Broadview, or sooner if transfer is expected within 3 hours of arrival, and at least once during each subsequent 12-hour period while they are detained;

    ii.    class members have the means, capability, and access to schedule a call promptly with legal representatives or prospective legal representatives;

    iii.    class members have access to sufficient telephones to accommodate class members' legal calls;

    iv.    legal representatives are able to schedule confidential legal calls with detainees at Broadview within 3 hours of a request made during business hours;

    v.    confidential legal visitation is permitted seven days per week, eight hours per day on business days and four hours per day on weekends and holidays;

    vi.    Defendants accurately update the location of detainees held at Broadview in Defendant ICE's Online Detainee Locator System within 3 hours of their arrival at the facility;

7.    Order Defendants to provide written Notice of Rights to detainees, including their rights with respect to living conditions and access to counsel;

8.    Order Defendants to provide the Notice of Rights and all other ICE or DHS communications (including any forms, agreements, stipulations, or other documents relating to a class members' immigration status, proceedings, or removal) to class members in a language they understand, and to provide interpretation or assistance to detainees with limited English proficiency or who are illiterate;

9.    With respect to Count Three:

a. Declare that Defendants' policy and practice of coercing, threatening, and otherwise pressuring Plaintiffs and class members to sign immigration documents and/or to waive rights violates the Fifth Amendment Due Process Clause, the *Accardi* doctrine, and 8 C.F.R. § 287.8(c)(2)(vii);

b. Declare that Defendants' policy and practice of procuring signatures from Plaintiff Moreno Gonzalez and class members on immigration documents in a language that they do not understand, without translation, violates the Fifth Amendment Due Process Clause;

c. Vacate, set aside, and hold unlawful Defendants' policy and practice of using coercion and threats to procure detainees' signatures on immigration documents and/or to waive rights;

d. Vacate, set aside, and hold unlawful Defendants' policy and practice of procuring detainees' signatures on untranslated documents;

e. Enjoin Defendants from using any form of threat, coercion, abuse, or other pressure to obtain Plaintiffs' signatures on any form or to obtain their agreement to be removed or taken out of the country or to forego any rights, procedures, or benefits under the INA or the Constitution;

f. Enjoin Defendants from procuring Plaintiff Moreno Gonzalez's signature on an untranslated document written in a language he does not read and understand;

10.    Enjoin Defendants from retaliating in any form against Plaintiffs, any class member, or any declarants or witnesses in this matter in their immigration proceedings or in any other capacity for asserting rights or otherwise participating in this proceeding;

11. Enjoin Defendants from transferring Plaintiffs outside the judicial district during the pendency of these proceedings;

12. Award counsel for Plaintiffs and the putative class reasonable attorneys' fees and costs in this action under the Equal Access to Justice Act, 28 U.S.C. § 2412, and on any other basis justified under law; and

13. Grant such other relief as the Court deems just and proper.


Dated: October 30, 2025                    Respectfully submitted,

                                           /s/ Alexa Van Brunt
                                           Alexa Van Brunt
                                           Jonathan Manes
                                           Danielle Berkowsky
                                           Chisato Kimura (license pending)
                                           **MACARTHUR JUSTICE CENTER**
                                           160 E. Grand Avenue, 6th floor
                                           Chicago, Illinois 60611
                                           Phone: 312-503-1336
                                           alexa.vanbrunt@macarthurjustice.org
                                           jonathan.manes@macarthurjustice.org
                                           danielle.berkowsky@macarthurjustice.org
                                           chisato.kimura@macarthurjustice.org

                                           /s/Kevin Fee
                                           Kevin M. Fee
                                           Michelle T. García
                                           Rebecca K. Glenberg
                                           Samuel Cole
                                           Jennifer Stark
                                           Kathleen Hickey
                                           **ROGER BALDWIN FOUNDATION OF ACLU, INC.**
                                           150 N. Michigan, Suite 600
                                           Chicago, Illinois 60601
                                           Phone: (312) 201-9740
                                           Fax: (312) 288-5225
                                           kfee@aclu-il.org
                                           mgarcia@aclu-il.org
                                           rglenberg@aclu-il.org

scole@aclu-il.org
jstark@aclu-il.org
khickey@aclu-il.org

<u>/s/Nathan Eimer</u>
Nathan P. Eimer
Scott C. Solberg
Michael L. McCluggage
James B. Speta
Lisa S. Meyer
Brent R. Austin
**EIMER STAHL LLP**
224 S. Michigan Avenue, Suite 1100
Chicago, Illinois 60604
Phone:  312-660-7600
neimer@eimerstahl.com
ssolberg@eimerstahl.com
mmccluggage@eimerstahl.com
jspeta@eimerstahl.com
lmeyer@eimerstahl.com
baustin@eimerstahl.com

**COUNSEL FOR PLAINTIFFS**