# EXHIBIT 13

## DECLARATION OF WILLIAN GIMÉNEZ GONZÁLEZ

I, William Giménez González, make the following declaration based on my personal knowledge:

1. My name is Willian Giménez González. I am competent to make this declaration.

2. On September 12, 2025, at approximately 10 or 10:30 a.m. I was arrested by federal agents on Cermak between California and Rockwell.

3. At the time I was arrested, I had already received a work permit from the U.S. government. I had a hearing scheduled in immigration court for July 2026. I did not have a criminal record.

4. The federal agents who arrested me were traveling in three vehicles. When they arrested me, they placed me in handcuffs and then put me in the back seat of one of those vehicles. The officers then proceeded to travel to different places and arrest two other people.

5. We were then taken to a location where the three of us were loaded into a white van. The white van already contained four other people who had been arrested. Federal officers drove the white van to the parking lot of a police station, where they conferred with another official. The white van then proceeded to take us to the detention facility in Broadview, Illinois.

6. I arrived at the Broadview ICE building at approximately 12 or 12:30 p.m. on September 12, 2025. I was taken inside the building into the detention area.

7. When I was taken inside the Broadview facility, officers removed my handcuffs and took all of my property, including my cell phone. I was not allowed to make a phone call at that time. I was not processed at that time. I was put inside a holding cell and kept there until I was taken out for processing the next day.

8. The Broadview detention facility contains four holding cells that surround a central area where there are desks and computers for the officers to use.

9. Two of the holding cells are very small. Those two holding cells are located along one wall of the central area. One of those smaller cells was used to hold female detainees while I was there. The other small cell contained men.

10. There are two other, somewhat larger, holding cells along another wall of the central area, adjacent to the two smaller holding cells. I was held in one of those two cells. The cell I was in was located near a corner of the central area.

11. There appeared to be at least one individual cell that the officers used to separate individual detainees from others. That cell was located down a small hallway that separates the two small holding cells from the larger holding cells. I saw officers take a person down that hallway to put him in the individual cell as a form of punishment.

12. All four of the holding cells surround a central area that has desks with computers where federal officers sit. This is where federal officers process people who are detained at the facility. There are also benches in the central area where people who are detained can be told to sit and wait.

13. There are large glass windows in all of the holding cells facing the central area. The guards in the central area can always see into each holding cell. People detained in one holding cell can see inside the other holding cells.

14. I was not processed at the desks in the central area on the first day that I was held at Broadview. Instead, I was put directly into a holding cell, where I was locked up overnight until the next day.

15. When I arrived, there were other people in the holding cells who had already been there for 4-5 days.

16. The conditions inside my holding cell were horrible.

17. The room was extremely overcrowded. There were around 40 or 50 people inside the room. The room was maybe 3.5 meters long and 3.5 meters wide.

18. There was not enough room for all of the people in my holding cell to sleep properly. People had to sleep curled up in order not to touch other people. If one person stretched, they would hit someone else.

19. There was individual seating with hard cushions that were arranged back-to-back. Some people slept sitting uncomfortably on the seats. Everyone else had to sleep on the hard floor. I had difficulty sleeping because it was very uncomfortable. I would have to try to sleep in one these seats and would hit a cellmate because it was too crowded.

20. There were three toilets inside the holding cell. There was no privacy. There was only a very low wall between each of the three toilets, but anyone using the toilet was in full view of everyone else in the holding room. People only used the toilets to urinate. While I was there, nobody used the toilets in my holding cell for other bodily functions. We did not have access to any other toilet facilities.

21. Each toilet had a sink attached to it. This was the only place we could get water.

22. We were not given cups to drink water from the sink. We were not given any water bottles. In order to drink, people had to either put their faces directly to the faucet of the sink above the toilet, or use their hands to try to cup water.

23. We were not provided with any soap.

24. There was no way to wash or shower.

25. We were not provided with any change of clothes. I stayed in the same clothes that I was arrested in until I was transferred to another detention facility in Michigan.

26. Each person in my holding cell was provided one thin foil plastic sheet, which people used as a makeshift blanket.

27. We were not given enough food. The only food we ever received was small Subway sandwiches. When the officers gave us food, they would line us up and give us each one sandwich out of a box. We were not allowed to get more than one small sandwich. I was given a sandwich twice on September 12 (once around 1-2pm and once in the evening), and then another sandwich the next day.

28. We were not given a water bottle or anything else to drink when we got a sandwich. We were not given any other food besides the small sandwiches during the time I was held there.

29. Officers ignored requests from detainees for medical assistance or other necessities.

30. I recall one man who was perhaps 45 or 55 years old telling officers that he was sick and suffering from a medical condition. The officers did not provide him with any medical attention. They left him inside the holding cell without paying attention to him.

31. The holding cell had a telephone, but it was very difficult to use and often did not work. When people would try to make a call, the call would be dropped very quickly if it connected at all. Because of the large number of people it was difficult to be able to use the one and only phone in the cell. In addition, many people could not make phone calls because they did not know the phone numbers of the people they wanted to call. There was no way to look up phone numbers. The officers had taken everyone's property (including cell phones) before putting people into the holding cells.

32. I was not able to make a phone call from inside the holding cell.

4

33. On the morning of September 13, 2025, at approximately 10 or 10:30 a.m., I was called out of my cell and taken into the central area for processing.

34. I sat on a bench while a different, dark-skinned federal officer was sitting at a computer processing my case. After he had begun processing my case, he called over a senior officer who spoke Spanish with a Mexican accent. The senior officer appeared to be in charge.

35. The dark-skinned officer appeared to be talking to the senior officer about something he had seen on the computer. They were speaking in English, which I do not speak well, but I understood the dark-skinned officer to be asking the senior officer something about why I was there if I didn't have a criminal record. I recall that in response the senior officer shrugged and said something in English that included the word "Biden." It appeared to me based on the gestures he was making that the senior official was explaining that I entered the country during the Biden administration.

36. While he was processing my case, the dark-skinned officer asked me if I would accept deportation. I told him that I refused and that I wanted to see a judge.

37. I repeatedly asked the senior officer to allow me to make a phone call, perhaps three or four times.

38. The senior officer eventually took me to the back of the central area, where detainee property was kept. My property was there in a transparent bag with my name on it. He gave me my cell phone from the bag.

39. I then called my wife from my cell phone. The senior officer insisted that I must put the phone on speakerphone. He was standing close to me and was listening to both sides of the conversation. The officer was always next to me during the entire call.

5

40. My wife told me that she was outside of the Broadview facility and that my lawyer, Kevin Herrera, was right next to her.

41. My wife handed the phone to my attorney, Kevin Herrera. Mr. Herrera began speaking to me and asking me questions.

42. The senior officer heard Mr. Herrera's voice on the speakerphone. He asked me who I was speaking to. I told him that it was my lawyer. My lawyer told me that he was outside and that people were protesting. When the senior officer heard my lawyer tell me that, the senior official told me to write down Mr. Herrera's phone number and to hang up the phone.

43. The senior officer did not allow me to have any further conversation with my lawyer. I wrote down some phone numbers. Mr. Herrera then passed the phone back to my wife and I told her that the officer was telling me that I had to hang up the call. The officer then reached over and hung up the call himself by pressing the "hang up" button on my cell phone while I was still holding it.

44. The senior officer then told me to turn off the phone to preserve my battery. I believe this was a pretext for hanging up the call. It was clear to me that he did not want me to be able to speak with my attorney and hung up the phone for that reason. He took my phone away and put it back in the bag with my other property. I have not been able to access my phone since then. I was not allowed to talk to my lawyer again while at Broadview.

45. I was not able to get any legal advice from my lawyer because the officer was listening and hung up the call.

46. I did not feel comfortable speaking freely with my lawyer or my wife because the senior officer was listening to everything.

6

47. The phone call was very short, perhaps 2-3 minutes. Other people had been allowed to make phone calls to family members that lasted 5-10 minutes.

48. After I spoke with my wife and lawyer, and after the senior officer heard that my wife and lawyer were outside the facility, the senior officer and the other officer continued to process my paperwork. It took a long time, perhaps one hour. At some point I asked the officer if they were going to release me. The dark-skinned officer said he did not know.

49. During that period, the senior official told me that I needed to sign a paper. I did not know what the paper was. They were in English and nobody translated them for me. I do not read English.

50. I told the senior official that I did not want to sign. I told him that my lawyer had told me not to sign anything.

51. The senior official continued to insist that I had to sign the paper. He said that the paperwork had something to do with me being transferred to Michigan and that I had to sign. I told him again that I did not want to sign anything. The senior official insisted that I do so.

52. I was at that time overcome with emotions, having been arrested so suddenly and having spoken with my wife who was just outside the detention center. At the insistence of the senior officer, I eventually relented and signed at the bottom of the paper.

53. I still do not know what the paper that I signed was or what it said. It was never translated for me, and I was never provided a copy.

54. After I signed the paper and they finished processing me, I was told to sit and wait on one of the other benches in the central area. Other people who were being processed were put back into the holding cells, but I was not.

7

55. While I was sitting in the central area, officers called 15 names from a list and took those people to be loaded onto a van going to a detention facility in Michigan. My name was not on that list.

56. After they took the 15 people to the bus, they kept me sitting on the bench in the central area for approximately 30 more minutes. I could see that officers were doing more paperwork for my case. They then added my name to the list of people going on the bus at the last minute.

57. I was taken out of the Broadview facility onto the bus at approximately 12 or 1 p.m. The bus was black in color.

58. There were 13 men and 3 women on the bus, including me. I learned that the 15 other people on the bus had existing court dates scheduled in Michigan. I had not been told of any court date in Michigan and had not been provided any paperwork to that effect. I was the only one on the bus who had not been notified of an upcoming court date in Michigan.

59. It appeared to me that I was added to the group on the bus to Michigan at the last minute, after the senior official listened to me speaking to my wife and attorney on the phone. I suspect they decided to put me on the bus that day because they learned that my wife and attorney were there at Broadview. It appeared to me that after the senior officer heard me speak to Mr. Herrera, he mobilized to move me to Michigan.

60. I was taken to the North Lake Processing Center in Baldwin, Michigan. I remain detained there today.

8

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Executed on October 14th, 2025, at the North Lake Processing Center, Baldwin, Michigan.

_____
Willian Gimenez