# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| PABLO MORENO GONZALEZ, FELIPE AGUSTIN ZAMACONA, and a class of similarly situated people, )<br><br>Plaintiffs, )<br><br>v. )<br><br>KRISTI NOEM, Secretary of the U.S. Department of Homeland Security, in her official capacity; TODD LYONS, Acting Director, U.S. Immigration and Customs Enforcement, in his official capacity; MARCOS CHARLES, Acting Executive Associate Director, U.S. Immigration and Customs Enforcement and Removal Operations, in his official capacity; SAMUEL OLSON, Interim Chicago Field Office Director, U.S. Immigration and Customs Enforcement, in his official capacity; GREGORY BOVINO, Commander-at-Large, U.S. Customs and Border Protection, in his official capacity; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; U.S. CUSTOMS AND BORDER PROTECTION; and the DEPARTMENT OF HOMELAND SECURITY, )<br><br>Defendants. ) | Case No. 25-cv-13323<br><br>Class Action |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................................

I.     INTRODUCTION ..........................................................................................1

II.    FACTS ..........................................................................................................3

       A.     Inhumane Conditions at Broadview.................................................3

              1.     Overcrowding. .....................................................................4

              2.     Oppressive sleeping conditions............................................6

              3.     Insufficient food and water .................................................7

              4.     Lack of sanitation and privacy.............................................9

              5.     Denial of basic medical and mental health care.................11

              6.     Verbal abuse by officers ....................................................13

       B.     Denial of Access to Counsel at Broadview....................................14

              1.     Barriers to outgoing communications from detainees ........14

              2.     Barriers to incoming communications from attorneys..........17

              3.     Effect of access restrictions ...............................................19

              4.     Defendants' practice of demanding detainees sign paperwork without
                     counsel. ..............................................................................21

       C.     Defendants' Written Policies. ........................................................24

              1.     Short-term hold room policies ............................................24

              2.     Long-term detention center policies ...................................25

III.   LEGAL STANDARD..................................................................................26

IV.    ARGUMENT………...................................................................................27

A.     Plaintiffs are Likely to Succeed on the Merits of Their Claim that the Conditions of Confinement at Broadview Violate the Fifth Amendment..............................27

      1.     The conditions at Broadview are objectively serious ...............................28

      2.     Defendants acted purposefully, knowingly, or recklessly in imposing the conditions at Broadview ........................................................................31

      3.     No legitimate government purpose justifies the inhumane conditions at Broadview ...................................................................................33

B.     Plaintiffs are Likely to Succeed on the Merits of Their Claim that Defendants' Denial of Access to Counsel at the Broadview Processing Facility Violates the First and Fifth Amendments ...................................................................35

      1.     Defendants violate the First Amendment by denying access to counsel ......................................................................................36

      2.     Defendants violate the Fifth Amendment Substantive Due Process rights by denying access to counsel .................................................41

C.     Plaintiffs are Likely to Continue to Suffer Irreparable Harm ...............................44

D.     The Balance of Equities Favors Plaintiffs ............................................49

E.     The Court Should Order a Ten Dollar Bond Under Rule 65(c)...........................50

V.      CONCLUSION.............................................................................51

VI.     REQUEST FOR ORAL ARGUMENT ............................................................51

## TABLE OF AUTHORITIES

**Cases**

*A.C. by M.C. v. Metro. Sch. Dist. Of Martinsville,*
   75 F.4th 760 (7th Cir. 2023) ............................................49

*Adams v. Carlson,*
   488 F.2d 619 (7th Cir. 1973) ............................................37

*Am. Hosp. Supply v. Hosp. Prods. Ltd.,*
   780 F.2d 589 (7th Cir. 1985) ............................................44

*Americans for Immigrant Justice v. U.S. Dep't of Homeland Sec.,*
   No. 22-cv-3118, 2023 WL 1438376 (D.D.C. Feb. 1, 2023)....................43, 45

*Ardestani v. I.N.S.,*
   502 U.S. 129 (1991)....................................................46

*Aurora Chicago Lakeshore Hosp. v. Azar,*
   No. 18-cv-8162, 2019 WL 8231646 (N.D. Ill. Mar. 4, 2019) ...............51

*Barco Mercado v. Noem,*
   --- F.Supp.3d ----, No. 25-cv-6568, 2025 WL 2658779 (S.D.N.Y. Sept. 17, 2025).. passim

*Belbachir v. Cty. Of McHenry,*
   726 F.3d 975 (7th Cir. 2013) ...........................................27, 43

*Bell v. Dart,*
   807 F. App'x 562 (7th Cir. 2020) .......................................32

*Bell v. Wolfish,*
   441 U.S. 520 (1979).....................................................34

*Bevis v. City of Naperville,*
   85 F.4th 1175 (7th Cir. 2023) ..........................................26

*Brown v. Gulash,*
   No. 07-cv-370, 2011 WL 1085637 (S.D. Ill. Mar. 22, 2011)................37

*Brown v. Phillips,*
   801 F.3d 849 (7th Cir. 2015) ...........................................38

*Brown v. Plata,*
   563 U.S. 493 (2011).....................................................50

*Budd v. Motley,*
    711 F.3d 840 (7th Cir. 2013) ............................................................29, 30

*Bull v. City & Cnty. of San Francisco,*
    595 F.3d 964 (9th Cir. 2010) .................................................................30

*Castillo v. Nielsen,*
    No. 18-cv-01317, 2018 WL 6131172 (C.D. Cal. June 21, 2018). ...................................45

*Chen v. Noem,*
    No. 25-cv-00733, 2025 WL 1163653 (S.D. Ind. Apr. 21, 2025)...................................50

*Chicago Women in Trades v. Trump,*
    773 F. Supp. 3d 592 (N.D. Ill. 2025) ............................................................26

*Davis v. Biller,*
    No. 00-cv-50261, 2003 WL 22764872 (N.D. Ill Nov. 19, 2003) ...............................29, 32

*DeLoach v. Bevers,*
    922 F.2d 618 (10th Cir. 1990) ...............................................................36

*Denius v. Dunlap,*
    209 F.3d 944 (7th Cir. 2000) ...............................................................36, 37

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,*
    489 U.S. 189 (1989)........................................................................27, 31

*Detroit Free Press v. Ashcroft,*
    303 F.3d 681 (6th Cir. 2022) ...............................................................46

*Doe #1 v. Trump,*
    No. 25-cv-4188, WL 1341711 (N.D. Ill. May 8, 2025)..............................................50, 51

*Dupuy v. Samuels,*
    462 F. Supp. 2d 859 (N.D. Ill. 2005), *aff'd*, 465 F.3d 757 (7th Cir. 2006) ....................49

*Evans v. City of Belleville,*
    No. 14-cv-01417, 2015 WL 226047 (S.D. Ill. Jan. 15, 2015) ...................................29, 30

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ...............................................................45

*Foster v. Ghosh,*
    4 F. Supp. 3d 974 (N.D. Ill 2013) ...........................................................45, 48

*French v. Owens*,
  777 F.2d 1250 (7th Cir. 1985) ....................................................30

*Gaston v. Beatty*,
  No. 17-cv-01798, 2020 WL 1288878 (N.D. Ill. Mar. 18, 2020) ......................................31

*Gillis v. Litscher*,
  468 F.3d 488 (7th Cir. 2006) ...............................................29, 30

*Gray v. Hardy*,
  826 F.3d 1000 (7th Cir. 2016) ...............................................30, 31

*Hardeman v. Curran*,
  933 F.3d 816(7th Cir. 2019) ................................................ passim

*Hernandez v. Thornburgh*,
  919 F.2d 549 (9th Cir. 1990) ...............................................41

*Hernandez-Lara v. Lyons*,
  10 F.4th 19 (1st Cir. 2021)...............................................48

*Immigrant Defs. L. Ctr. V. Mayorkas*,
  No. 20-cv-9893, 2023 WL 3149243 (C.D. Cal. Mar. 15, 2023)...................................38

*Innovation Law Lab v. Nielsen*,
  310 F. Supp. 3d 1150 (D. Or. 2018) ...........................................41, 45, 46, 48

*Joelner v. Village of Washington Park, Ill.*,
  378 F.3d 613 (7th Cir. 2004) ...............................................49, 50

*Johnson v. Foster*,
  No. 18-cv-5379, 2020 WL 5891405 (N.D. Ill. Oct. 5, 2020) ...........................................32

*Johnson v. Rimmer*,
  936 F.3d 695 (7th Cir. 2019) ...............................................30

*Jones'El v. Berge*,
  164 F. Supp. 2d 1096 (W.D. Wis. 2001) ...........................................48, 59, 50

*Jones v. Sheahan*,
  No. 01-cv-6548, 2002 WL 959814 (N.D. Ill May 9, 2002)...........................................36

*Kingsley v. Hendrickson*,
  576 U.S. 389 (2015)...............................................passim

*Koger v. Dart,*
 114 F. Supp. 3d 572 (N.D. Ill 2015) ..........................................................39

*Korte v. Sebelius,*
 735 F.3d 654 (7th Cir. 2013) ....................................................................27

*Lareau v. Manson,*
 651 F.2d 96 (2nd Cir. 1981)......................................................................34

*Lashbrook v. Hyatte,*
 758 F. App'x 539 (7th Cir. 2019) ........................................................37, 38

*Lewis v. Lane,*
 816 F.2d 1165 (7th Cir. 1987) ..................................................................30

*Life Spine, Inc. V. Aegis Spine Inc.,*
 8 F.4th 531 (7th Cir. 2021) .......................................................................44

*Lyon v. Immgr. Customs Enf't.,*
 171 F. Supp. 3d 961 (N.D. Cal 2016) ........................................................38

*Lyons v. Powell,*
 838 F.2d 28 (1st Cir. 1988) .......................................................................30

*Lyttle v. United States,*
 867 F. Supp. 2d 1256 (M.D. Ga. 2012) ....................................................47

*Make the Rd. New York v. Noem,*
 No. 25-cv-190, 2025 WL 249 2908 (D.D.C. Aug. 29, 2025).....................47, 48

*Mansoori v. Patel,*
 No. 17-cv-08846, 2022 WL 683667 (N.D. Ill. Mar. 8, 2022) .........................29

*Martin v. Lauer,*
 686 F.2d 24 (D.C. Cir. 1982) ...............................................................36, 37

*Mathis v. Fairman,*
 120 F.3d 88, 91 (7th Cir. 1997) ................................................................27

*Mays v. Dart,*
 453 F. Supp. 3d 1074 (N.D. Ill. 2020) .......................................................26

*Miranda v. Cnty of Lake,*
 900 F.3d 335 (7th Cir. 2018) ....................................................................27

*Mitchell v. Baker*,
    No. 13-cv-0860, 2015 WL 278852 (S.D. Ill. Jan. 21, 2015) ............................................49

*Nadzhafaliyev v. Hardy*,
    No. 16-cv-6844, 2020 WL 7027578 (N.D. Ill Nov. 30, 2020) ........................................32

*Ochoa v. Kolitwenzew*,
    464 F. Supp. 3d 972 (C.D. Ill. 2020) .............................................................27, 28, 34, 43

*Orantes-Hernandez v. Thornburgh*,
    919 F.2d 549 (9th Cir. 1990) ..........................................................................................41

*Perkins v. Hepp*,
    No. 18-cv-1058, 2018 WL 4374945 (E.D. Wis. Sept. 13, 2018) .....................................29

*Potts v. Moreci*,
    12 F. Supp. 3d 1065 (N.D. Ill 2013) ...............................................................................37

*Preston v. Thompson*,
    589 F.2d 300 (7th Cir. 1978) ...........................................................................................45

*Ralston v. McGovern*,
    167 F.3d 1160 (7th Cir. 1999) .........................................................................................30

*Ramos v. Lamm*,
    639 F.2d 559 (10th Cir. 1980) .........................................................................................30

*Randle v. Baldwin*,
    No. 16-cv-1191, 2020 WL 1550638 (S.D. Ill. Apr. 1, 2020) ..........................................29

*Reed v. Bowen*,
    769 F. App'x 365, 370 (7th Cir. 2019) .......................................................................29, 30

*Richardson v. Sheriff of Middlesex Cnty.*,
    407 Mass. 455, 458 (1990) ..............................................................................................30

*S. Poverty L. Ctr. v. Dep't of Homeland Sec.*,
    No. 18-cv-760, WL 3265533 (D.D.C. June 17, 2020)....................................35, 41, 45, 46

*Smith v. Bd. of Election Comm'rs for City of Chicago*,
    591 F. Supp. 70 (N.D. Ill. 1984) .....................................................................................51

*Smith v. Dart*,
    803 F.3d 304 (7th Cir. 2015) ...........................................................................................29

*Stevens v. United States Dep't of Health & hum. Servs.*,
666 F. Supp. 3d 734 (N.D. Ill. 2023) ...............................................................27

*Tay v. Dennison*,
457 F. Supp. 3d 657 (S.D. Ill. 2020) .........................................................45, 49

*Taylor v. Anderson*,
868 F. Supp. 1024 (N.D. Ill. 1994) ...............................................................30

*Thakker v. Doll*,
451 F. Supp. 3d 358 (M.D. Pa. 2020) ...........................................................34

*Thompson v. City of Los Angeles*,
885 F.2d 1439 (9th Cir. 1989) .........................................................................30

*Torres v. United States Dep't of Homeland Sec.*,
411 F. Supp. 3d 1036 (C.D. Cal 2019) ................................................... passim

*Turley v. Bedinger*,
542 F. App'x 531 (7th Cir. 2013) ...................................................................29

*Turner v. Safley*,
482 U.S. 78 (1987) .......................................................................38, 39, 40, 41

*Vasquez Perdomo v. Noem*,
No. 25-cv-5605, 2025 WL 1915964 (C.D. Cal. July 11, 2025)..............3, 36, 42

*Wellman v. Faulkner*,
715 F.2d 269 (7th Cir. 1983) ..........................................................................29

*Wilson v. Seiter*,
501 U.S. 294 (1991).........................................................................................30

*Wynn v. Southward*,
251 F.3d 588 (7th Cir. 2001) ..........................................................................30

*Zadvydas v. Davis*,
533 U.S. 678 (2001).........................................................................................33

## Statutes and Rules

725 Ill. COMP. STAT 5/103-3.5(a) ...........................................................................40

8 C.F.R. § 208.4 ........................................................................................................46

8 U.S.C. § 1231 .................................................................................................................48

Fed. R. Civ. P. 65(c) .................................................................................................50, 51

**Other Authorities**

Eric Bradner, *Trump's Boarder Czar Says He'll Need Funding and at Least 100K Beds to Carry Out Deportation Plans*, CNN (Dec. 18, 2024), https://www.cnn.com/2024/12/18/politics/border-czar-homan-trump-deportation-plans [https://perma.cc/4A7J-TED3] .........................................33

Congressional Research Service, The Statutory Bars to Reentry into the United States (Aug. 30, 2023), https://www.congress.gov/crs_external_products/IF/PDF/IF12484.1.pdf [https://perma.cc/X3U7-VZEV] ................................................................................22

Cook County Jail, Individual in Custody Locator, https://iic.ccsheeriff.org/ (last visited October 23, 2025) ....................................................................................................44

*Deportation Data Project*, Detention Dataset (Sept. 2023 – July 2025), https://deportationdata.org/data/ice.htm#latest-data-release [https://perma.cc/CBG4-JS4H].........4

Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025)...............48

Ted Hesson, *US Immigration Detention Maxed Out at 47,600 Detainees, ICE Official Says*, Reuters (Mar. 12, 2025), https://reuters.com/world/us/us-immigration-detention-maxed-out-47600-detainees-ice-offical-says-2025-03-12 [https://perma.cc/S5BJ-RTQR] ...........................33

ICE, *Alternatives to Detention* (Feb. 27, 2025), https://www.ice.gov/features/atd#content1 [https://perma.cc/5F2H-GB4B] ................................................................................34

Immigration Project, ICE Stipulations to Removal FAQ & Explainer (June 2025), https://nipnlg.org/sites/default/files/2025-07/2025_NIPNLG-ICE-stipulations.pdf [http://perma.cc/A8VR-AL5V]................................................................................22

*Individual In Custody Virtual Visitation Request Application System*, Cook County Sheriff, https://avv.ccsheriff.org/ [https://perma.cc/XG8A-KB6R] (last visited Oct. 23, 2025)...............44

Laura Rodriguez Presa & Joe Mahr, '*Dehumanizing': Inside the Broadview ICE Facility Where Immigrants Sleep on Cold Concrete*, Chicago Tribune (Aug. 3, 2025), https://chicagotribune.com/2025/08/03/dehumanizing-inside-the-broadview-ice-facility-where-immigrants-sleep-on-cold-concrete/ [https://perma.cc/977S-V8CA]............................................4

Loyola Center for Criminal Justice, *Tracking the Cook County Jail and Community Corrections Population* (Nov. 21, 2023), https://loyolaccj.org/blog/tracking-the-cook-county-jail-and-community-corrections-population [https://perma.cc/8EV3-DDJR]............................................44

United States Immigration and Customs Enforcement, (2011, Revised Dec. 2016), https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc.V9Pz-5M3A]...........................................................................................25

United States Immigration and Customs Enforcement, National Detention Standards for Non-Dedicated Facilities (2019) at §§ 2.5(II)(A)(6), (B)(5), (D)(3), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf [https://perma.cc/MD7E-9RU8] ......................................................................................................................35

Plaintiffs Pablo Moreno Gonzalez and Felipe Agustin Zamacona submit this Memorandum in support of their Emergency Motion for a Temporary Restraining Order under Rule 65(b) of the Federal Rules of Civil Procedure (the "Motion"). A [Proposed] Temporary Restraining Order specifying the relief sought is attached to the Motion as Exhibit A.[1]

## I. INTRODUCTION

In 2025, Defendants began a sharp escalation in immigration enforcement in the Chicago area, culminating in the September announcement of a mass arrest campaign called "Operation Midway Blitz." Many of the immigrants swept up in this aggressive arrest initiative have been detained and processed in a federal immigration facility in Broadview, Illinois ("Broadview").

For years, Defendants designated Broadview as an "ICE Hold Room"—a short-term detention facility which, "[a]bsent exceptional circumstances," holds detainees for "[no] longer than 12 hours" before they transfer to a long-term detention facility. Ex. 3 (2023 Audit of Broadview by DHS ("2023 Audit")) at 2, 6. Now, as arrests have ramped up, Defendants are transforming Broadview into a *de facto* long-term detention center, packing more and more individuals into the building and keeping many there for days or even weeks.

Predictably, conditions inside Broadview are deteriorating to the extreme. Dozens or even more than a hundred detainees are crammed into four small, filthy holding cells, each outfitted only with one or two exposed toilets and plastic chairs. For sleep, detainees must choose between the concrete floor or plastic chairs, assuming they have space to lie down at all. Bright lights shine and frigid air blasts in the cells day and night. Detainees in each cell share one to two toilets, which are visible to officers and detainees of the opposite sex.

---

[1] All other citations to exhibits and declarations herein refer to those filed in support of Plaintiffs' contemporaneously filed Complaint.

1

Defendants fail to provide showers, soap, menstrual products, or changes of clothing, even when detainees stay for days. Detainees receive at most only two to three small sandwiches per day, each accompanied by a bottle of water—a quantity well below daily nutritional requirements for adults—and officers often lash out with verbal abuse when someone dares ask for more food or water. Medical care is practically non-existent; Defendants employ no medical or mental health staff at Broadview, and officers routinely deny requests for medication or medical attention.

Defendants also impose a near-total blackout on access to counsel at Broadview. Even though detainees face potential deportation and/or prolonged detention, Defendants deprive detainee of any ability to consult confidentially with counsel. Some detainees are shut out from the outside world entirely during their time at Broadview, with access only to a handful of payphones that often do not work. When callers are lucky enough to connect, they speak on monitored lines and within earshot of officers and detainees. Defendants likewise shut out attorneys when they attempt to contact clients, ignoring phone calls and emails, turning away lawyers who show up at the door, and failing to confirm detainees' presence at Broadview until after they are gone.

Standing alone, Defendants' systematic denial of access to counsel is alarming. It is even more troubling considering Defendants' practice of greeting detainees upon arrival at Broadview with a demand to sign legal documents that waive any hearing before an immigration judge. Defendants coerce detainees into signing these and other documents—written in English with no translation available—and threaten detainees if they refuse, all while refusing to allow them to consult with an attorney.

Plaintiffs seek an order enjoining Defendants from blocking access to counsel, imposing inhumane conditions, and coercing detainees to sign away their rights at Broadview while this case

2

can be tried on the merits. These practices constitute grave violations of the First and Fifth Amendment rights of Plaintiffs and the putative class.

Defendants are well aware of these violations, but nonetheless pack the building beyond capacity, cut off detainees from counsel, and refuse a growing number of requests by detainees, congressional representatives, clergy, and the public to improve conditions at Broadview. Plaintiffs and the putative class are likely to succeed on the merits of their claims, especially given recent decisions from other district courts granting preliminary relief to nearly identical classes of immigration detainees challenging conditions and denial of access to counsel at ICE holding facilities in New York and California. *See Barco Mercado v. Noem*, --- F.Supp.3d ----, 2025 WL 2658779, at *20 (S.D.N.Y. Sept. 17, 2025); *Vasquez Perdomo v. Noem*, No. 25-cv-5605, 2025 WL 1915964, at *12-14 (C.D. Cal. July 11, 2025).

Defendants' practices at Broadview cause and will continue to cause a range of irreparable harms to Plaintiffs and the putative class, including ongoing deprivations of their constitutional rights, denial of legal counsel at critical points in their immigration cases, and psychological and physical distress. These serious harms will continue unless the Court intervenes.

## II.   FACTS

### A.   Inhumane Conditions at Broadview

Defendants' ongoing practice of packing scores of people into Broadview and holding them for days at a time creates deplorable conditions that leave detainees feeling "lucky to be alive by the time" they leave. Ex. 9, Carhart Decl. ¶ 7. The nightmarish environment inflicts a wide spectrum of harm to Plaintiffs and the putative class, from physical harms like extreme hunger, thirst, sleep deprivation, and medical ailments caused or worsened by lack of medical care or

3

medication, to emotional and psychological harm from abusive treatment and claustrophobic and degrading conditions. *See* Compl. Factual Allegations § B.

### 1. Overcrowding

Historically, fewer than 2,000 detainees passed through Broadview in a year. *See* Ex. 3, 2023 Audit at 2. Before 2025, the median length of stay at Broadview stayed below the 12-hour mark.[2] Since the start of 2025, both detainee population numbers and the median length of stay at Broadview have skyrocketed. From January to July 2025, Defendants reported that Broadview detained over 5,000 individuals in only seven months.[3] By mid-June 2025, the median length of stay soared well beyond 12 hours, reaching over 70 hours.[4] Since June 2025, detainees have reported staying up to three weeks at Broadview. *See, e.g.*, Ex. 8, Smith Decl. ¶ 9 (three weeks); Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 1, 9 (six days); Ex. 6, Guevara Decl. ¶ 5 (five days); Ex. 9, Carhart Decl. ¶ 2 (four days); Ex. 10, Osuna Decl. ¶ 8 (four days).

As a result of this massive influx of detainees at Broadview, Defendants routinely pack the handful of small holding cells there with dozens or more than a hundred detainees for days on end. *See, e.g.*, Ex. 38, Jack Doe Decl. ¶ 5 ("150-200 people in [one] room," and "all the rooms were extremely crowded"); Ex. 40, Cazarez Gonzalez Decl. ¶ 8 ("200 people" in one "small" room); Ex. 7, Aguirre Alvarez Decl. ¶¶ 5, 11 (detainee first held "in a crowded room with hundreds of

---

[2] *See Deportation Data Project*, Detentions Dataset (Sept. 2023 – July 2025), https://deportationdata.org/data/ice.html#latest-data-release [https://perma.cc/CBG4-JS4H] (government data provided by ICE in response to a FOIA request to the Deportation Data Project and analyzed by counsel for Plaintiffs) ("Deportation Data Project Dataset"); *see also* Laura Rodríguez Presa & Joe Mahr, *'Dehumanizing': Inside the Broadview ICE Facility Where Immigrants Sleep on Cold Concrete*, Chicago Tribune (Aug. 3, 2025), https://www.chicagotribune.com/2025/08/03/dehumanizing-inside-the-broadview-ice-facility-where-immigrants-sleep-on-cold-concrete/ [https://perma.cc/977S-V8CA] (analyzing Deportation Data Project Dataset).

[3] *See* Deportation Data Project Dataset.

[4] *See* Presa & Mahr, *supra n. 3* (analyzing Deportation Data Project Dataset).

other people," then held in a smaller room with over 50 people, which was "even more crowded than the other room"); Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 1, 9, 11 (detainee held in "very crowded" room, about the "length of six people lying down end-to-end" with "80 other people"); Ex. 14, Temich Polito Decl. ¶ 13 (detainee held in a "very crowded" room "about 4 meters by 4 meters" with "30-40 other people"); Ex. 5, S. Held Decl. ¶¶ 21-23 (one cell "appeared to hold about 40 male immigration detainees" and appeared "very crowded"); Ex. 13, Giménez-González Decl. ¶ 17 (one cell "was extremely overcrowded" with "40 or 50 people" inside); Ex. 6, Guevara Decl. ¶ 30 (officers put eight women "into one of the individuals cells meant for a single person"); Ex. 10, Osuna Decl. ¶ 10 ("elderly client was confined in a small holding cell with many people for four days"); Ex. 21, Ochoa Decl. ¶ 7 (cell "seemed only large enough to hold fifteen men" but held 30 men).

This extreme overcrowding forces detainees to stand or sit shoulder-to-shoulder and prevents them from lying down. *See, e.g.*, Ex. 5, S. Held Decl. ¶ 23 (detainees "were trying to lay down, but there was not enough space for all of them to spread out"); Ex. 23, R. Held Decl. ¶ 7 (immigration detainees were "packed in very close" and sitting "shoulder to shoulder" with each other); Ex. 13, Giménez-González Decl. ¶¶ 18-19 (cell had "not enough room for all of the people [] to sleep properly," and "if one person stretched, they would hit someone else"); Ex. 38, Jack Doe Decl. ¶ 7 (cells had "not enough space for everyone to lie down," causing people to "sleep[] on top of each other and in the bathroom area next to the toilet"); Ex. 6, Guevara Decl. ¶ 53 (in the men's holding cells, people "were packed together, forced to stand one next to the other because there was so little space"); Ex. 7, Aguirre Alvarez Decl. ¶ 8 ("If you got to sleep on the floor, you were lucky"); Ex. 36, Rebolledo Altamirano Decl. ¶ 9 (cell was so crowded that "there was not even enough space to sit on the floor," so "we all had to stand").

### 2. Oppressive sleeping conditions

Defendants make it nearly "impossible to sleep" inside Broadview's holding cells. Ex. 20, Zhou Decl. ¶ 7. Even though many are held for days, Defendants provide "no beds[,] mattresses, [or] pillows," forcing detainees to sleep on the concrete floor or in plastic chairs. *See* Ex. 12, Jane Doe Decl. ¶¶ 10-12; Ex. 8, Smith Decl. ¶ 6 (detainee "slept on the floor for five days without a pillow or blanket"); Ex. 9, Carhart Decl. ¶ 7 (detainee "forced to attempt to sleep on the floor"); Ex. 20, Zhou Decl. ¶ 7 (because "there were no beds or mats to sleep on," detainee tried to sleep by "lay[ing] across" seats); Ex. 11, Gaspar-Nochebuena Decl. ¶ 10 (detainee "joined two plastic chairs together to sleep on," but those "who arrived after all of the plastic chairs were occupied were forced to attempt to sleep on the floor"); Ex. 14, Temich Polito Decl. ¶ 16 (rooms had "no beds or mattresses," so "people tried to sleep slouched over on the chairs" or "on the floor"); Ex. 13, Giménez-González Decl. ¶ 19 (some detainees "slept sitting uncomfortably on the seats" and "[e]veryone else had to sleep on the hard floor"); Ex. 38, Jack Doe Decl. ¶ 8 (detainee "had to sleep sitting up because there was not enough space to lie down"); Ex. 6, Guevara Decl. ¶ 44 (detainee "had no other choice" but to "sleep on the hard floor," which "was very dirty"); Ex. 7, Aguirre Alvarez Decl. ¶¶ 7-8 (detainee slept on the floor which "was very hard and cold," and saw people "laying down very close to the toilets"). One detainee held for three days "used toilet paper as a pillow." Ex. 12, Jane Doe Decl. ¶ 10.

Even when detainees can find a place to lay down, officers keep "bright lights on all day and night." Ex. 10, Osuna Decl. ¶ 10; *see also* Ex. 20, Zhou Decl. ¶ 7; Ex. 6, Guevara Decl. ¶ 46; Ex. 7, Aguirre Alvarez Decl. ¶ 8; Ex. 21, Ochoa Decl. ¶ 8. Detainees try to "cover [their] eyes" with their arms or clothing "to try to block the light and sleep." Ex. 12, Jane Doe Decl. ¶ 12. These

conditions leave detainees "unable to sleep" for nights on end. Ex. 38, Jack Doe Decl. ¶ 8 (detainee did not sleep for two nights, then only for "an hour or two" the next three nights").

At night, Defendants blast the air conditioning and create freezing cold temperatures in the cells. *See* Ex. 12, Jane Doe Decl. ¶¶ 10-11 (cell was "extremely cold"); Ex. 14, Temich Polito Decl. ¶ 17 (same); Ex. 6, Guevara Decl. ¶ 45 (same); Ex. 21, Ochoa Decl. ¶ 8 (same); Ex. 10, Osuna Decl. ¶ 10 (cell was "very cold"); Ex. 9, Carhart Decl. ¶ 7 (cell was "cold"); Ex. 20, Zhou Decl. ¶ 7 (cell "was freezing cold"); Ex. 38, Jack Doe Decl. ¶ 6 (same); Ex. 36, Rebolledo Altamirano Decl. ¶ 11 (same). The exposure to severe cold makes people sick, even sending at least one detainee to the hospital. *See* Ex. 11, Gaspar-Nochebuena Decl. ¶ 13. During the day, Defendants often keep cells hot. *See* Ex. 38, Jack Doe Decl. ¶ 6; Ex. 7, Aguirre Alvarez Decl. ¶ 6.

Despite the severe cold at night, officers provide no bedding at all—except, when detainees are lucky, thin foil or plastic blankets that "[make] a loud rustling noise" throughout the night. Ex. 20, Zhou Decl. ¶ 7; *see also* Ex. 12, Jane Doe Decl. ¶ 11 (detainees "only received foil blankets for warmth and to cover ourselves, and not until the third day"); Ex. 38, Jack Doe Decl. ¶ 6 (some "given aluminum blankets," but "there were not enough blankets for everyone"); Ex. 6, Guevara Decl. ¶ (the ("plastic sheet they gave us was not enough to keep warm"). Officers sometimes taunt detainees by refusing to provide the foil blankets, "even though [detainees] could see they had plenty on hand right there in the facility." Ex. 11, Gaspar-Nochebuena Decl. ¶ 26.

### 3. Insufficient food and water

Defendants offer only meager amounts of food and water to those held at Broadview. Detainees receive no nutritional or hot meals—at best, they get two to three small, cold sandwiches each day. *See, e.g.*, Ex. 12, Jane Doe Decl. ¶¶ 18, 23 (received 2 six-inch Subway sandwiches per

day); Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 15-17 (detainee received only 2-3 Subway sandwiches per day, which "was not enough food"); Ex. 13, Giménez-González Decl. ¶ 27 ("small Subway sandwiches" were not "enough food"); Ex. 38, Jack Doe Decl. ¶ 10 (received two "small, child-size sandwich[es]" per day); Ex. 6, Guevara Decl. ¶ 39 (sandwiches were "terrible and insufficient"); Ex. 7, Aguirre Alvarez Decl. ¶ 15 (detainee received "one half a Subway sandwich" 2-3 times a day, which "was not anywhere near enough food"); Ex. 36, Rebolledo Altamirano Decl. ¶ 12 (detainee typically received "just a piece of bread with cheese" 2-3 times a day). Others eat only once per day. Ex. 8, Smith Decl. ¶ 9 (received "usually just a piece of bread" once per day); Ex. 9, Carhart Decl. ¶ 7 (detainee received "only one cold meal per day"); Ex. 14, Temich Polito Decl. ¶ 19-20 (detainee received "only one small sandwich" which "was not enough").

Defendants provide only one bottle of water with each so-called "meal." *See* Ex. 8, Smith Decl. ¶ 9 (detainee given "one bottle of water a day"); Ex. 12, Jane Doe Decl. ¶¶ 25-26 (detainee given one bottle of water per sandwich); Ex. 11, Gaspar-Nochebuena Decl. ¶ 18 (same); Ex. 14, Temich Polito Decl. ¶ 19 (same); Ex. 13, Giménez-González Decl. ¶ 28 (same); Ex. 6, Guevara Decl. ¶ (same); Ex. 7, Aguirre Alvarez Decl. ¶ 16 (same).

Defendants provide detainees no additional food or water even when detainees plead for more or have dietary restrictions. *See* Ex. 34, Vcelka Decl. ¶ 11 (a pre-diabetic detainee who is on a special diet was denied a special diet, only receiving small sandwiches); Ex. 17, John Doe Decl. ¶ 13 (officers refused to provide religious dietary accommodations so detainee went without food for four days); Ex. 16, Guerrero Pozos Decl. ¶ 38 (officers only provided bread to diabetic detainees). In one instance, when detainees become so hungry they "banged on the walls to try to get more food," officers "became annoyed" and "started giving us less food." Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 15-17. One elderly woman detained at Broadview suffered "several health

conditions" requiring a special diet, including diabetes, but was still "only given sandwiches for every meal." Ex. 10, Osuna Decl. ¶¶ 4, 10.  The food and water that Defendants provide detainees are well below the required intake of an adult.  *See* Compl. Factual Allegations § B(2).

### 4. Lack of sanitation and privacy

Defendants refuse to maintain rudimentary sanitation or privacy inside Broadview. Defendants do not offer showers, a change of clothes, or basic hygiene items even to detainees held for up to a week.  *See* Ex. 19, Pedraza Decl. ¶ 9; Ex. 9, Carhart Decl. ¶ 7 ("There were no working showers available"); Ex. 12, Jane Doe Decl. ¶¶ 15-17 (cells had "no shower," "no menstrual products," and "no toothbrushes or toothpaste"); Ex. 37, Peyton Decl. ¶ 7 (detainee held for five days "was not given a change of clothes"); Ex. 14, Temich Polito Decl. ¶ 15 (showers did not work and detainee received no "soap, toothpaste, a toothbrush, or any other hygiene products"); Ex. 13, Giménez-González Decl. ¶¶ 23-25 (no soap, shower, or change of clothes); Ex. 38, Jack Doe Decl. ¶¶ 19-20 (detainee held for five days given no "soap, hand sanitizer, a toothbrush, toothpaste," "shower" or "change of clothing"); *see* Ex. 19, Pedraza Decl. ¶ 5; Ex. 6, Guevara Decl. ¶¶ 32-33 (cells had "no showers," "no soap or anything to sanitize with," and detainees "were never given a change of clothes"); Ex. 7, Aguirre Alvarez Decl. ¶ 6 (cells had no working showers, and detainee "did not have access to soap, hand sanitizer, toothpaste,[] a toothbrush," or "a change of clothes"); Ex. 21, Ochoa Decl. ¶ 9 ("men's cell" had "no soap or any ability to wash or sanitize my hands or keep clean") *see also* Ex. 11, Gaspar-Nochebuena Decl. ¶ 21 (detainee who stayed six days "asked officers for soap many times" and "was only given a small amount of soap one time"); Ex. 12, Jane Doe Decl. ¶ 15 (detainees "only had a little piece of soap"); Ex. 36, Rebolledo Altamirano Decl. ¶ 10 (officers failed to "provide any soap or personal hygiene items" and "[s]howers were not permitted").

9

"Centipedes, spiders, and roaches" infest the small rooms holding detainees. Ex. 12, Jane Doe Decl. ¶ 10. Officers rarely, if ever, clean these rooms—resulting in spaces covered with hair and blood and smelling of feces, urine, and body odor. *See* Ex. 6, Guevara Decl. ¶ 31 (the cell was "dirty and unsanitary"); *id.* (detainee "did not see officers clean at any time while I was there," and when she asked officers for a broom to clean, they refused); Ex. 14, Temich Polito Decl. ¶ 13 (cell was "very dirty" with "trash on the floor"); Ex. 38, Jack Doe Decl. ¶ 18 (officers did not use cleaning products, so the "room smelled awful"); Ex. 7, Aguirre Alvarez Decl. ¶¶ 13-14 (when other detainees who were ill vomited and defecated on the floor and in the garbage, "no one came to clean it up or take it away, so it smelled terrible the entire night"); Ex. 18, Cerrone Decl. ¶ 4 (cell was "very dirty," with "blood and other bodily fluids on the wall" and blood, hair, and mucus in the sink); Ex. 40, Cazarez Gonzalez Decl. ¶ 10 (room was "dirty" with "urine on the floor").

Each holding room has only a few exposed toilets, inches away from where detainees sleep and eat. *See* Ex. 5, S. Held Decl. ¶ 22 ("toilets were mostly exposed and only covered by a small half concrete wall"); Ex. 37, Peyton Decl. ¶ 7 (detainees slept "near the toilet"); Ex. 7, Aguirre Alvarez Decl. ¶ 7 (detainees were "laying down very close to the toilets"). When toilets "would get clogged" because "so many people [were] using" them, "the toilet water flooded onto the floor, where [detainees] were forced to sleep." Ex. 38, Jack Doe Decl. ¶ 18; *see also* Ex. 36, Rebolledo Altamirano Decl. ¶ 10 (toilet in cell was "extremely dirty").

Toilets are also in plain view of officers and detainees of the opposite sex, undermining the security of people and especially women in the facility. *See* Ex. 11, Gaspar-Nochebuena Decl. ¶ 20 (there "was no privacy in the toilet area" and "[w]omen could see into" the men's toilet area); Ex. 12, Jane Doe Decl. ¶ 13 (there "was no privacy" at Broadview, and female detainees "were in full view of the male officers and the detainees, even when we used the toilet"); Ex. 14, Temich

Polito Decl. ¶ 12; Giménez-González ¶ 20; Ex. 7, Aguirre Alvarez Decl. ¶¶ 7, 12; Ex. 21, Ochoa

Decl. ¶¶ 10-11; Ex. 36, Rebolledo Altamirano Decl. ¶ 10. As a result, women are forced to gather

and shield their fellow female detainees from view of the men when they use the bathroom. *See*

Ex. 12, Jane Doe Decl. ¶ 14 (women "had to use a trash can and hold up a foil blanket to block the

men from seeing us use the toilet"). Defendants place cameras throughout Broadview, so they can

observe detainees at their most vulnerable moments, including when they are using the toilet. *See*

Ex. 12, Jane Doe Decl. ¶ 13 ("even the toilet area" had cameras). This causes heightened anxiety,

particularly for women at Broadview who have no idea who is watching them use the toilet, or

what is done with recordings from the facility cameras. *See* Ex. 6, Guevara Decl. ¶ 36.

**5. Denial of basic medical and mental health care**

Defendants provide detainees virtually no access to medical or mental health care at

Broadview. Broadview has no medical unit, no medical or mental health staff, and Defendants

fail to provide any medical or mental health screenings when detainees enter the facility. *See*

Compl. Factual Allegations § B(5). When detainees get sick or injured, Defendants routinely

refuse to provide them medical attention. *See* Ex. 12, Jane Doe Decl. ¶¶ 19, 24 (officers said

detainee "would have to wait until [she] was at detention facility" to receive medical attention for

injured toe); Ex. 21, Ochoa Decl. ¶ 13 (detainee "was sick" with "fever and sore throat" in

Broadview, and officers denied medication or COVID test even when "I told an ICE officer that I

might have COVID"); Ex. 13, Giménez-González Decl. ¶¶ 29-30 (officers "ignored requests from

detainees for medical assistance," including one man "telling officers that he was sick and

suffering from a medical condition"); Ex. 7, Aguirre Alvarez Decl. ¶ 17 (officers placed a man

"who was bleeding from his face" in a cell and "did not give him any medical treatment"); Ex. 36,

Rebolledo Altamirano Decl. ¶ 23 (detainee attempted to alert officers about an older man who was

11

sick, but officers " just swore at us"). Detainees report that "lots of people [] were sick and coughing" and "complaining of headaches and body aches," but officers "did not give them anything." Ex. 38, Jack Doe Decl. ¶ 9; *see also* Ex. 7, Aguirre Alvarez Decl. ¶ 13 (a detainee became sick and vomited in and around the toilet, but "[t]he man received no medical care"); Ex. 18, Cerrone Decl. ¶ 6 (detainee shot with pepper balls, tear gas, and rubber bullets before arrest was "covered in chemicals" and "could not see very well" when arriving at Broadview, but officers "did not offer me any medical attention").

Defendants fail to provide proper care to detainees who suffered serious medical events at Broadview. *See* Ex. 6, Guevara Decl. ¶ 48 (detainee saw "two men who were seriously ill," including one who "appeared to be having a heart attack," but officers just "laugh[ed] at him"); *see id.* ¶ 49 (detainee woke up vomiting, was numb from the waist down, and could not feel her legs, but officers refused to provide medical care or take her to a hospital); Ex. 22, Weiss Decl. ¶ 7 (detainee saw "people being carried out in stretchers" and "some going into cardiac arrest").

Defendants deny requests for medication, including over-the-counter items like Tylenol and necessary prescriptions for diabetes and blood pressure conditions. *See* Ex. 11, Gaspar-Nochebuena Decl. ¶ 23 (officers refused to provide Tylenol for a toothache); Ex. 9, Carhart Decl. ¶ 8 (officers did not give detainee blood pressure medication for four days, even though family dropped it off); Ex. 38, Jack Doe Decl. ¶ 9 (when detainees "asked for medications," officers "told us that they do not have medication at Broadview"); Ex. 21, Ochoa Decl. ¶ 12 (detainee "saw a pregnant woman" who "asked ICE officers for medication that she needed, but they would not provide her with any medication"). One "elderly woman in her late 70s with several health conditions that require medication" did not receive the proper medication, even though a friend "dropped it off with an ICE officer at Broadview." Ex. 10, Osuna Decl. ¶¶ 4, 12. His attorney

12

reports that this "experience with her medication seems to be a pattern" that other clients experience as well. Ex. 10, Osuna Decl. ¶¶ 4, 13; *see also* Ex. 19, Pedraza Decl. ¶ 8 (client "needed medication," but "there was no one that [attorney] could speak with at ICE or Broadview to assist him").

### 6. Verbal abuse by officers

In addition to imposing inhumane physical conditions, officers at Broadview verbally abuse detainees. *See* Ex. 38, Jack Doe Decl. ¶ 12 (guards at Broadview were "abusive"); Ex. 16, Guerrero Pozos Decl. ¶¶ 11-12 (officer "tried to intimidate me" and "insulted me" when detainee said he "wanted to talk to a lawyer") Ex. 36, Rebolledo Altamirano Decl. ¶ 22 (officers "swore at me and the other detainees and constantly told us that we are not allowed to be in the country").

Officers often "punish" and "belittle" detainees when they request necessities "like food, blankets, hygienic items or medicine." Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 17-18, 24-25; *see also* Ex. 16, Guerrero Pozos Decl. ¶¶ 34-35 (when detainees asked for water, officers "got upset" and said "to stop bothering [them]"); *id.* ¶ 32 (when detainees "asked for medical attention, the officers told them to be quiet"); Ex. 36, Rebolledo Altamirano Decl. ¶ 11 (when detainee asked for his jacket due to the cold temperature, an officer "told me to 'take it like a man' and 'stop acting like a child'"); *see also* Ex. 6, Guevara Decl. ¶ 48 (officers "laughing about [detainee's] medical emergency"); Ex. 36, Rebolledo Altamirano Decl. ¶ 23 (when detainees alerted officers about an older man being sick, officers "just swore at us"). When women at Broadview were forced to "bang on the glass" to try "to get [officer's] attention," officers "threaten[ed] to isolate" them. Ex. 12, Jane Doe Decl. ¶ 21.

**B. Denial of Access to Counsel at Broadview**

Defendants systematically cut off detainees from access to legal counsel, blocking detainees from contacting attorneys outside, and preventing attorneys from contacting their clients inside. These restrictions in both directions result in a near-total ban on attorney-client communications.

**1. Barriers to outgoing communications from detainees**

Defendants deny Plaintiffs and the putative class any ability to make confidential calls, including to speak with lawyers. Some detainees "never observed anyone able to speak with their lawyer" during multiple days at Broadview. Ex. 11, Gaspar-Nochebuena Decl. ¶ 4 (six days); *see also, e.g.,* Ex. 12, Jane Doe Decl. ¶ 9 (detainee "did not see anyone who had the opportunity to talk to a lawyer" over three days); Ex. 6, Guevara Decl. ¶ 11 ("Nobody at Broadview was able to talk to a lawyer"). When detainees ask to speak with an attorney, officers deny their requests and sometimes threaten them. *See, e.g.*, Ex. 16, Guerrero Pozos Decl. ¶¶ 12-18 ("I told [the officer] if she was discussing my case, I wanted to talk to a lawyer. She again became upset and insulted me. I said I had a right to a lawyer. She told me I did not need to talk to a lawyer."); Ex. 11, Gaspar-Nochebuena Decl. ¶ 4 ("When people asked to speak with lawyers, officers told people to wait but never actually allowed people to speak with their lawyers"); Ex. 12, Jane Doe Decl. ¶¶ 4, 9 (detainee "repeatedly asked the officers to let me speak to my lawyer," but they "ignored me" or "told me that I could not talk to my lawyer because I was just going to be deported"); Ex. 14, Temich Polito Decl. ¶¶ 6-7 (detainee "asked the officer if I would get a lawyer," but "was never given the opportunity to talk to a lawyer the entire time while I was at Broadview"); Ex. 38, Jack Doe Decl. ¶ 23 (detainee "kept asking to call my lawyer," but officers "never let me"); Ex. 6, Guevara Decl. ¶ 9 (officers "said no" when detainee "asked to speak with a lawyer"); Ex. 21,

Ochoa Decl. ¶ 5 ("I asked to call to my attorney, but the ICE officer told me no and did not provide me with any information about attorneys"); Ex. 18, Cerrone Decl. ¶ 9 (officers "ignored me when I asked to speak with my lawyer"); Ex. 15, Toto Polito Decl. ¶¶ 10-12 (detainee "repeatedly asked the officers if I could make a call" but "they never let me make a call" and "I was never able to speak to a lawyer"); Ex. 36, Rebolledo Altamirano Decl. ¶ 15 (detainee repeatedly requested to speak to a lawyer but was rebuffed, with officers telling him "you have no rights to a lawyer" or words to that effect and insulting him).

Many detainees cannot make calls at all, whether to attorneys or family members, because they do not have access to functioning phones. *See, e.g.*, Ex. 12, Jane Doe Decl. ¶¶ 2, 6, 8; ("I was not able to get through to my lawyer" on phone in the holding cell); Ex. 16, Guerrero Pozos Decl. ¶ 18 ("I was not able to speak to my attorney or anyone else the entire time I was at Broadview."); Ex. 5, S. Held Decl. ¶¶ 12-14. The few phones inside Broadview's holding cells require pre-paid calling cards or else detainees can only place a free call for 15-20 seconds. *See, e.g.*, *id*. ¶¶ 12-14; Ex. 12, Jane Doe Decl. ¶ 8. But detainees report that, in some rooms, neither the pre-paid cards nor the free calls actually work. *See, e.g.*, Ex. 5, S. Held Decl. ¶¶ 12-14 (no detainees in one cell "got through to anyone," even with a pre-paid card); Ex. 23, R. Held Decl. ¶ 8 ("[N]o one was able to successfully get through to anyone" in the holding cell); Ex. 16, Guerrero Pozos Decl. ¶ 17 ("The code on the calling cards did not work for the majority of people, but the officers refused to help"). Others report that the phone system is confusing, and officers refuse to provide instructions. *See* Ex. 13, Giménez-González Decl. ¶ 31 (phones were "very difficult to use and often did not work"); Ex. 20, Zhou Decl. ¶ 5 (cell had "two phones on the wall that no one could figure out how to use"). When phones do work, they are shared between the often "large number of people" in each holding cell, making it "difficult to be able to use the one and only phone in the

cell." Ex. 13, Giménez-González Decl. ¶ 31.

In the rare case that detainees can place calls to attorneys, Defendants provide them with no privacy or the ability to speak confidentially. Defendants offer "no place [] where detainees could make a confidential telephone call." Ex. 11, Gaspar-Nochebuena Decl. ¶ 5. Detainees are warned that phone lines in the cells are "recorded and monitored," and officers and other detainees remain within earshot of all other telephones. *See, e.g.*, Ex. 11, Gaspar-Nochebuena Decl. ¶¶ 5, 7; Ex. 7, Aguirre Alvarez Decl. ¶ 20; Ex. 16, Guerrero Pozos Decl. ¶ 16 (holding rooms had "one phone" which "everyone had to wait to use," and "[t]here was no privacy or confidentiality"). One attorney reports speaking with his detained client for only three minutes, but "an officer was standing close" and instructed the client "to get off the phone when he learned [detainee] was speaking to his attorney." Ex. 24, Herrera Decl. ¶¶ 12-13. This makes it impossible for detainees to "feel comfortable speaking freely." Ex. 13, Giménez-González Decl. ¶ 46.

While Defendants occasionally permit some detainees to make a single, brief phone call to family from their cell phone upon arriving at Broadview before the phone is confiscated, that call is made in front of officers (and, if the call does not connect, officers take the phone and allow no additional attempts). *See id.* ¶¶ 38-45; Ex. 38, Jack Doe Decl. ¶ 22 (detainee allowed one two-minute call to wife "in front of an officer"); Ex. 21, Ochoa Decl. ¶ 6. For example, officers permitted one detainee to use his cell phone to call his wife, but "insisted that [he] must put [it] on speakerphone." Ex. 13, Giménez-González Decl. ¶¶ 38-39. When the officer heard the detainee's wife pass the phone to his lawyer, the officer demanded he "hang up the phone" and eventually "reached over and hung up the call himself," preventing him from getting any legal advice. *id.* ¶¶ 40-45; *see also* Ex. 24, Herrera Decl. ¶¶ 12-13 (attorney recounting the same phone call).

16

### 2. Barriers to incoming communications from attorneys

Attorneys likewise consider Broadview "a black hole" for detained clients, where lawyers are generally "unable to speak to them or contact them." Ex. 37, Peyton Decl. ¶ 3; *see also* Ex. 34, Vcelka Decl. ¶ 2 ("Broadview has no method for lawyers to contact or communicate with their detained clients and does not offer legal visits"). When attorneys call the Chicago Field Office attempting to speak with clients at Broadview, no one answers the phone or returns calls, and the line disconnects without the option to leave a message. *See e.g., id.* ¶ 9 (attorney called "at least fifteen times to schedule legal calls" and no one "returned my calls"); *see also* Ex. 37, Peyton Decl. ¶¶ 4-6; Ex. 19, Pedraza Decl. ¶ 6; Ex. 9, Carhart Decl. ¶ 4; Ex. 8, Smith Decl. ¶ 4; Ex. 26, Lara Decl. ¶ 5. When attorneys email Broadview or the ICE Chicago Field Office, they receive either no response or a response after their client has already left Broadview. *See, e.g.,* Ex. 19, Pedraza Decl. ¶ 6; Ex. 10, Osuna Decl. ¶¶ 6-8; Ex. 26, Lara Decl. ¶ 12.

Defendants wholly prohibit in-person attorney visitation,[5] despite the fact that Defendants' audits of the facility describe Broadview as having "attorney/detainee visiting rooms," (Ex. 3, 2023 Audit at 3), and at least one "private interview room," (Ex. 4, 2018 Audit at 2); s*ee also* Ex. 18, Cerrone Decl. ¶¶ 8-9 (detainee held briefly in what "looked like an attorney visitation room," but officers "did not allow me to speak with my lawyer"). Attorneys who arrive at Broadview asking to speak with their detained clients are ignored or turned away. *See* Ex. 24, Herrera Decl. ¶¶ 8-9

---

[5] Along with denying counsel access to detainees at Broadview, Defendants have also shut out members of Congress and clergy who have tried to access the building. U.S. Representatives Danny K. Davis, Delia C. Ramirez, and Jesus "Chuy" Garcia tried to enter in June 2025, but were denied access. *See* Ex. 30, Davis Decl. ¶¶ 1-2. U.S. Senator Durbin and a delegation of Congressional Representatives again tried to visit in September 2025, but ICE "refused" to allow a visit. *Id.* at ¶ 4. One local pastor has visited Broadview three times "to provide pastoral care to people detained in the facility," but agents refuse to allow her or "other faith leaders" inside. Ex. 33, Holcombe Decl. ¶¶ 2-10; *see also* Ex. 32, Persch Decl. ¶¶ 13-14 (in October 2025, "for the first time in nineteen years," Catholic nun with Sisters of Mercy "not allowed to hold our prayer service in front of the Broadview facility").

(when attorney arrived at Broadview and told officers "I was trying to contact my client," officers "ignored me and proceeded inside the building"); Ex. 8, Smith Decl. ¶¶ 6-7 ("I went to Broadview in person and requested to speak with my client and obtain her signature on several documents," but officers "refused to let me speak with her"); *see also* Ex. 37, Peyton Decl. ¶ 4 (officers told attorney no legal visits at Broadview); Ex. 19, Pedraza Decl. ¶ 5 (same); Ex. 26, Lara Decl. ¶ 7; Ex. 27, Mejia Decl. ¶ 3. One attorney waited outside the facility for hours trying to speak with two detained clients, even as agents "began gassing everyone in the vicinity" with tear gas, including several attorneys, and "officers on the roof of the building pointed pepper ball guns in [her] direction." Ex. 29, Spreadbury Decl. ¶¶ 4-15.

In many cases, attorneys are unable to confirm that their clients were at Broadview until Defendants transported them out of the country or to far-off detention facilities. ICE does not notify attorneys of their clients' whereabouts, even if the attorney already has a Notice of Appearance (also called a G-28) on file with ICE. *See* Compl. Factual Allegations § C(3). Although ICE maintains an online detainee locator, it routinely provides inaccurate information and/or fails to reflect that a person is at Broadview. *See, e.g.*, Ex. 24, Herrera Decl. ¶¶ 5-6 (detainee locator "provided no information as to [client's] whereabouts"); Ex. 10, Osuna Decl. ¶¶ 5-7, 11 (detainee locator never updated to show client's location at Broadview); Ex. 9, Carhart Decl. ¶ 5 (detainee locator reflected wrong location); Ex. 25, Ayala-Bermejo Decl. ¶ 6 (detainee at Broadview did not show up in detainee locator system for days after arrest); Ex. 26, Lara Decl. ¶¶ 4, 8, 10, 12 (client did not appear on detainee locator until 48 hours after arrest). The detainee locator sometimes shows no location at all and directs attorneys to call the local field office, but the number provided is "not monitored, and no one answers, nor is there any mechanism to leave messages." Ex. 37, Peyton Decl. ¶ 5.

Some attorneys are lucky enough to speak with clients at Broadview when the detainee calls a family member who manages to connect with the attorney quickly enough to allow them to join the same call.  *See* Ex. 34, Vcelka Decl. ¶ 10; Ex. 24, Herrera Decl. ¶ 13.  But these calls are short, non-confidential, and officers even "instructed [one detainee] to get off the phone when he learned [the detainee] was speaking to his attorney."  Ex. 24, Herrera Decl. ¶ 13; *see also* Ex. 34, Vcelka Decl. ¶ 10.

### 3. Effect of access restrictions

These barriers prevent attorneys from taking critical steps to intervene and secure the release of their clients before they are transferred hundreds of miles away to out-of-state detention facilities.  Attorneys consistently report that this prejudices their clients by causing delay and prolonging detention.  *See, e.g.*, Ex. 9, Carhart Decl. ¶ 6 ("Because ICE denied access, my client was in detention for nine days before I could even begin seeking relief"); Ex. 8, Smith Decl. ¶ 11 ("My clients are unduly prejudiced in court and face serious consequences from ICE's denial of legal access"); Ex. 27, Mejia Decl. ¶ 8.  "[T]he denial of legal access prevents [attorneys] from obtaining" signatures and "critical information" needed to secure a client's release through "bond hearings[] and habeas petitions."  Ex. 8, Smith Decl. ¶ 11.

For example, one attorney planned to "seek [his client's] release from detention on bond" and file other immigration papers, but could not speak to him at Broadview before he was transferred to Mississippi.  *See* Ex. 25, Ayala-Bermejo Decl. ¶¶ 8-10.  Another lawyer similarly "could not obtain [her client's] signature on documents or file for bond while he was detained at Broadview," leading him to stay in detention longer.  Ex. 9, Carhart Decl. ¶ 6.  One local attorney needed her teenage client's signature on legal paperwork while he was at Broadview, but he was then transferred to Texas, where authorities "told [her] to travel to Texas to get his signature."  Ex.

8, Smith Decl. ¶ 14.

Even worse, the access restrictions at Broadview lead to individuals being sent out of the country before they can speak with counsel. One attorney reports that she was "unable to speak to" one of her clients—a father of three who was eligible for multiple forms of relief—while he was at Broadview, resulting in her inability to file a habeas petition while he was still in the country. Ex. 37, Peyton Decl. ¶ 8. From Broadview, he was "transferred to Indianapolis for five hours" then to "Texas for several hours before being deported to Honduras." *Id.* Due to the access barriers at Broadview and how quickly he was shipped to Honduras, she "was unable to speak to [her] client before he was deported" and was forced to file a habeas petition after he had already left the country. *Id.* One man tried to contact an attorney while he was detained at Broadview but was told by officers that "the government would give me a lawyer after I was transferred out of Broadview" and that he had a court date in Texas later that month. Ex. 14, Temich Polito Decl. ¶¶ 5-6, 10. The next morning, Defendants put him on a plane to Texas, then a bus that drove him to the Mexican border, then "instructed [him] to get off the bus and cross the border." *Id.* ¶¶ 5-6, 22-23.

One attorney reports that, after learning that her client with "a strong case" for multiple forms of relief was detained at Broadview, she managed to get a bond hearing scheduled for the same week. Ex. 22, Weiss Decl. ¶¶ 6-7. But, after four days of detention at Broadview, the conditions "were so inhumane that he couldn't bear it," and he "signed [a voluntary deportation document] under duress" after officers told him he had "no rights" and would stay detained for years if he refused to sign. *Id.* ¶¶ 7-9. By the date of his hearing, "he was already on the other side of the border." *Id.* ¶ 9.

Another attorney was unable to speak with her client while he was detained at Broadview,

20

then could only speak to him for eight minutes—with ICE officers on the line—after he was transferred to a facility in Texas and told he "would be deported in one hour." Ex. 8, Smith Decl. ¶ 12. During that call, she quickly tried to advise her client of his eligibility for relief, but the ICE officer "cut [her] off" and then deported her client to Mexico after the phone call. *Id.* Her client was "immediately kidnapped and disappeared" upon his arrival in Mexico, and "is missing in no small part because ICE denied him access to counsel." *Id.*

### 4. Defendants' practice of demanding detainees sign paperwork without counsel

Defendants also institute a practice of demanding that detainees sign paperwork that relinquishes their rights to challenge their removal in immigration court, all while refusing to allow them to speak with an attorney. *See* Ex. 12, Jane Doe Decl. ¶¶ 3-4 (an "agent tried to get me to sign a document, which I understood to be a document agreeing to deportation with my kids"); Ex. 38, Jack Doe Decl. ¶ 18 (officers "tried to make [detainees] sign a document agreeing to voluntary deportation"); Ex. 6, Guevara Decl. ¶ 7 (an officer "told me it was a paper for deportation and that I had to sign it" and "told me that if I did not sign paperwork, I would remain detained there at Broadview until I agreed to sign," so "I felt that I had no choice but to sign the paperwork"); Ex. 14, Temich Polito Decl. ¶¶ 4-5 (officer presented detainee with paperwork and "told me to sign the document if I wanted to leave voluntarily"); Ex. 13, Giménez-González Decl. ¶¶ 49-53 (a "senior official told me that I need to sign a paper" and "continued to insist that I had to sign the paper"); Ex. 16, Guerrero Pozos Decl. ¶¶ 5-9 ("officer told me to sign a form" and "did not tell me I could talk to an attorney" or "explain the document"); Ex. 17, John Doe Decl. ¶¶ 15-17 (officers "held a paper for me to sign" but "did not let me read it and told me to just sign and not worry about it"); Ex. 7, Aguirre Alvarez Decl. ¶ 10 (officer "asked me if I wanted voluntary departure" but "I told him I was not going to sign anything because I needed to talk to a lawyer"); Ex. 15, Toto Polito Decl. ¶¶ 7-10 ("officer tried to make me sign a document" but just said "not to worry"

when detainee "asked him what the consequences would be if I signed"); Ex. 22, Weiss Decl. ¶ 8 (officers "threatened detainee repeatedly to sign his own voluntary deportation"); *see also* Ex. 18, Cerrone Decl. ¶ 13 (officers "asked me to sign a citation," and when "I asked []for my glasses," officers said "you don't need your glasses").[6]

These documents are typically in English, a language many immigration detainees do not speak or understand, and agents generally refuse to provide any translation. *See* Ex. 14, Temich Polito Decl. ¶ 4 (the "paperwork was in English, so I did not understand most of it because I only speak Spanish"); Ex. 6, Guevara Decl. ¶ 8 ("paperwork was in English, but I am not able to read English," no copy "was provided to me in Spanish," and officer "did not translate" the paperwork and "just told me it was a paper for deportation and that I had to sign it"); Ex. 13, Giménez-González Decl. ¶ 49 (papers "were in English and nobody translated them for me," even though "I do not read English"); *id.* ¶¶ 52-53 (after detainee "eventually relented and signed," he "still do[es] not know what the paper [he] signed was or what it said"); Ex. 16, Guerrero Pozos Decl. ¶¶ 5-6 ("The form was in English. . . . [The officer] was speaking to me in Spanish so I asked her to translate the form, but she refused, she just kept telling me to sign it."); Ex. 15, Toto Polito Decl.

---

[6] It remains somewhat unclear what exactly these documents say because, so far as counsel is aware, Defendants have not allowed any attorney or outsider into Broadview to review the document(s) that detainees are being pressured to sign. But, based on reporting from other ICE facilities, it appears likely that these documents are either consent to voluntary departure or stipulations to an order of removal. Under both voluntary departure or a stipulation to an order of removal, the detainee would be agreeing to leave the United States without appearing before an immigration judge and foregoing all potential applications to stay in the United States. Stipulated orders of removal carry even more serious potential consequences. *See* National Immigration Project, ICE Stipulations to Removal FAQ & Explainer (June 2025), https://nipnlg.org/sites/default/files/2025-07/2025_NIPNLG-ICE-stipulations.pdf [https://perma.cc/A8VR-AL5V]. Agreeing to this kind of stipulation—and foregoing the right to a hearing—carries wide-ranging and potentially complex consequences that can only be understood with legal advice. For instance, a person who accepts a removal order will be prohibited from applying to return to the United States for a period of time that can vary immensely—from 5 years to a lifetime ban—depending on a complex set of individual circumstances. *See generally* Congressional Research Service, The Statutory Bars to Reentry into the United States (Aug. 30, 2023), https://www.congress.gov/crs_external_products/IF/PDF/IF12484/IF12484.1.pdf [https://perma.cc/X3U7-VZEV].

¶¶ 9-10 (detainee "told [officer] that I needed somebody to translate the document into Spanish because I cannot read English" but he "did not translate" or "explain its contents"); Ex. 36, Rebolledo Altamirano Decl. ¶ 19 (an ICE officer asked detainee to sign a document, which was in English, and detainee "did not know what it was"). In one instance, Defendants "used an ICE agent as a 'translator' to lie about what the document said." Ex. 22, Weiss Decl. ¶ 8.

Officers insist that individuals sign these documents upon their arrival at Broadview, then intimidate and threaten them if they refuse. *See* Ex. 12, Jane Doe Decl. ¶¶ 3-4 (agents "were mad that I would not sign the paper"); Ex. 38, Jack Doe Decl. ¶ 29 ("When people refused to sign, [officers] got angry"); Ex. 16, Guerrero Pozos Decl. ¶¶ 8-9 (officer "became angry at me" when "I explained that I would not sign something I did not understand"); Ex. 6, Guevara Decl. ¶¶ 7, 9 (the officer "emphasized that until I signed the deportation paperwork, I would be stuck there in detention at Broadview"). One detainee reports that, when one man refused to sign, officers "tried to force him" and "pulled the man's hand so hard" that "he had to go to hospital." Ex. 38, Jack Doe Decl. ¶ 30. Another saw "officers push around two Hispanic men to get them to sign the paper." Ex. 17, John Doe Decl. ¶ 17. Detainees describe being told that "things would go badly for [them]" unless they sign the document, *see* Ex. 16, Guerrero Pozos Decl. ¶ 9, or that they will remain detained in terrible conditions for a very long time unless they sign, *see* Ex. 22, Weiss Decl. ¶¶ 7-8 (officers told detainee held for four days in "inhumane" conditions that "if you don't sign, you'll stay in jail for fifteen years").

Detainees are not permitted to speak with a lawyer to discuss the implications of signing these documents, even if the detainee already retained counsel and explicitly asked to speak with their lawyer about the documents. *See* Ex. 13, Giménez-González Decl. ¶¶ 50-52 ("I told the senior official that I did not want to sign" because "my lawyer had told me not to sign anything,"

but he "continued to insist" until I was "overcome with emotions" and "eventually relented"). One detainee reported that she "asked to speak with a lawyer" after receiving the papers, but an officer said "no" and that "I had no right to speak with a lawyer." Ex. 6, Guevara Decl. ¶ 9.

This practice has caused grievous harm. The same detainee reports that she learned only after being sent out of the country that she was subject to a 10-year prohibition on returning and that her legal options were far more limited now that she is outside the United States. *Id.* ¶¶ 18-22. She is now separated indefinitely from her 8-month-old baby and 4-year-old child in the United States. *Id.* ¶ 23.

### C. Defendants' Written Policies

#### 1. Short-term hold room policies

Defendants' conduct at Broadview violates their own written policies governing the conditions at ICE hold rooms like Broadview. *See* Ex. 2, Directive 11087.2, *Operations of ERO Holding Facilities* (the "Holding Facility Policy"). The Holding Facility Policy defines a "holding facility" as "[a] facility that contains hold rooms that are primarily used for the short-term confinement of individuals who have recently been detained, or are being transferred to or from a court, detention facility, other holding facility, or other agency." *Id.* § 3.2. The Policy further defines "short term" as "a period *not to exceed 12 hours*, absent exceptional circumstances." *Id.* § 3.2 n.3 (emphasis added). On June 24, 2025, ICE issued a waiver that extended this 12-hour limit to 72 hours. *See* Ex. 1, Nationwide Hold Room Waiver Memo.

The Holding Facility Policy requires that detainees be "provided a meal at least every six hours" and "access to drinking water in hold rooms at all times." Ex. 2, Holding Facility Policy §§ 4.4.1(2), 5.2(2). It also requires Defendants to "[e]nsur[e] that hold rooms are safe, clean, [and] equipped with restroom facilities." *Id.* § 4.4.1(3). Defendants must also ensure that detainees are

able "to shower (where showers are available), perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exceptional and unusual circumstances or when incidental to routine cell checks." *Id.* § 5.6(1). Defendants must "[r]espond immediately to observed or reported medical emergencies" and "[a]llow detainees to keep personal inhaled medication on their person and have access to other prescribed medication as necessary." *Id.* § 5.9(b), 5.7(2). The Holding Facility Policy makes no mention of detainees' access to counsel, either in person or via phone.

### 2. Long-term detention center policies

Defendants adopt a different set of written policies applicable to long-term detention centers, designed to hold detainees for longer than 12 hours. *See* 2011 PBNDS (rev. 2016) ("Performance-Based National Detention Standards" or "PBNDS").[7] The PBNDS requires, among other things, that facilities shall "neither restrict the number of calls a detainee places to his/her legal representatives, nor limit the duration of such calls by rule or automatic cut-off, unless necessary for security purposes or to maintain orderly and fair access to telephones." *Id.* § 5.6(V)(F)(1). Facilities must also "ensure privacy" for legal calls "by providing a reasonable number of telephones on which detainees can make such calls without being overheard by staff or other detainees." *Id.* § 5.6(V)(F)(2). Each facility must also "permit legal visitation seven days a week, including holidays, for a minimum of eight hours per day on regular business days (Monday through Friday), and a minimum of four hours per day on weekends and holidays." *Id.* § 5.7(V)(J)(2).

---

[7] U.S. Immigration and Customs Enforcement, (2011, Revised Dec. 2016) https://www.ice.gov/doclib/detention-standards/2011/pbnds2011r2016.pdf [https://perma.cc/V9PZ-5M3A].

Detainees must also be provided "clean clothing, bedding, towels, and personal hygiene items." *Id.* § 2.1(II)(6). This includes soap, a comb, toothpaste, a toothbrush, shampoo, and lotion. *Id.* § 4.5(V)(D). Detainees must be provided with a "reasonably private environment," which requires that detainees "be able to shower, perform bodily functions, and change clothing without being viewed by staff of the opposite gender, except in exigent circumstances." *Id.* § 4.5(V)(E). Detainees are required to be served "three meals every day, at least two of which shall be hot meals," and require drinking water to be made available to detainees. *Id.* § 4.1(V)(D).

The PBNDS require that "[m]edical and mental health screening shall be conducted to identify requirements for medical care, special needs and housing, and to protect the health of others in the facility." *Id.* § 2.1(II)(4). Facilities must allow detainees to "request health services on a daily basis and shall receive timely follow-up." *Id.* § 4.3(II)(4). Detainees with prescription medication must be evaluated by a healthcare professional within 24 hours of arriving to the facility, and Defendants must provide detainees with their prescription medication "on schedule and without interruption, absent exigent circumstances." *Id.* §§ 4.3(T)(1), 4.3(V)(U)(4).

## III.    LEGAL STANDARD

"The standard for issuing a temporary restraining order is identical to that governing the issuance of a preliminary injunction." *Mays v. Dart*, 453 F. Supp. 3d 1074, 1087 (N.D. Ill. 2020). To obtain a temporary restraining order (TRO), the movant must demonstrate that "[they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Chicago Women in Trades v. Trump*, 773 F. Supp. 3d 592, 603–04 (N.D. Ill. 2025) (quoting *Bevis v. City of Naperville*, 85 F.4th 1175, 1188 (7th Cir. 2023)). The balance of equities and public interest "merge when the government is the party sought to be enjoined."

26

*Stevens v. United States Dep't of Health & Hum. Servs.*, 666 F. Supp. 3d 734, 748 (N.D. Ill. 2023) (citation modified). The balance of the equities "proceeds on a sliding-scale analysis; the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor." *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

## IV. ARGUMENT

### A. Plaintiffs are Likely to Succeed on the Merits of Their Claim that the Conditions of Confinement at Broadview Violate the Fifth Amendment

Defendants knowingly impose a long list of cruel and inhumane conditions at Broadview, so Plaintiffs are likely to succeed on the merits in showing that the Defendants are violating the Fifth Amendment rights of the people in their custody. As it does for pretrial detainees, the Due Process Clause protects immigration detainees from "abusive conditions" of confinement. *Miranda v. Cnty. of Lake*, 900 F.3d 335, 350 (7th Cir. 2018); *see also Ochoa v. Kolitwenzew*, 464 F. Supp. 3d 972, 986 (C.D. Ill. 2020) ("[T]he same standards apply to" conditions-of-confinement claims for both "pretrial detainees under the Fourteenth Amendment" and "federal civil immigration detainees bringing claims under the Fifth Amendment") (citing *Belbachir v. Cty. of McHenry*, 726 F.3d 975, 979 (7th Cir. 2013)).[8] At a minimum, due process requires the government to provide for a detained individual's "basic human needs—*e.g.,* food, clothing, shelter, medical care, and reasonable safety." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Detainees must also receive "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019) (citation modified).

---

[8] A detainee's due process rights are "at least as great as the Eighth Amendment protections available to a convicted prisoner," *Mathis v. Fairman*, 120 F.3d 88, 91, n.3 (7th Cir. 1997), so conduct that violates the Eighth Amendment necessarily also violates the Fifth.

Conditions of confinement violate the Due Process Clause if they are "objectively unreasonable" under the standard set out in *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015). *See Hardeman*, 933 F.3d at 823. Detainees satisfy this standard by proving three elements: (1) the conditions "are or were objectively serious"; (2) defendants "acted purposefully, knowingly, or recklessly with respect to the consequences of [their] actions"; and (3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 576 U.S. at 397); *see also Ochoa*, 464 F. Supp. 3d at 986 (applying *Kingsley* to immigration detainee's conditions-of-confinement claim). The inhumane conditions at Broadview satisfy this standard.

### 1. The conditions at Broadview are objectively serious

Detainees across the board describe enduring "objectively serious" conditions at Broadview. *Hardeman*, 933 F.3d at 827. As detailed above and in the Complaint, Defendants impose a laundry list of inhumane conditions at Broadview. Plaintiffs and the putative class experience severe overcrowding within only a few small holding rooms. *See supra* II.A.1. Despite holding detainees for days, Defendants provide no beds or bedding, beyond the occasional foil blankets. *See supra* II.A.2. Detainees must sleep on the dirty concrete floor or on plastic chairs, under bright lights and in blasted air conditioning. *See id*.

Defendants refuse to provide detainees with sufficient food or water, even when detainees plead for more. *See supra* II.A.3. Defendants similarly deny detainees necessary medication or any semblance of medical or mental health care, even when detainees are sick or injured. *See supra* II.A.5. Detainees have no access to basic sanitation and hygiene items, like showers and

soap.  *See supra* II.A.4.  These sanitation problems are compounded by the filthy state of the holding rooms, which are infested with pests and rarely, if ever, cleaned.  *See id.*

Each of these conditions is "objectively serious" and contributes to a violation of Due Process.  *Hardeman*, 933 F.3d at 827.  Courts routinely condemn severe overcrowding,[9] inadequate food[10] and water,[11] lack of appropriate bedding or sleeping conditions,[12] lack of medical care,[13] and inadequate sanitation[14] as unconstitutional.

Together, these conditions paint a harrowing picture.  As the Seventh Circuit has explained, multiple conditions of confinement "may violate the Constitution in combination when they have

---

[9] *See, e.g.*, *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013) ("[A]llegations of overcrowding . . . contribute to a valid conditions-of-confinement claim"); *Wellman v. Faulkner*, 715 F.2d 269, 274 (7th Cir. 1983) (overcrowding and lack of adequate medical care contributed to conditions of confinement claim); *see also Turley v. Bedinger*, 542 F. App'x 531, 533 (7th Cir. 2013) (Mem) (reversing district court dismissal of conditions of confinement claim when plaintiff alleged "tiny, cramped, poorly ventilated cell, exacerbated by his inability to leave it for exercise"); *Evans v. City of Belleville*, No. 14-cv-01417, 2015 WL 226047, at *1 (S.D. Ill. Jan. 15, 2015) (plaintiff stated conditions-of-confinement claim when, "[d]ue to overcrowding, [he] was housed along with 40 or 50 other prisoners in the Jail's gymnasium" with "only one toilet" and "no cots, tables or chairs, so prisoners had to sleep and eat on the floor"); *Randle v. Baldwin*, No. 16-cv-1191, 2020 WL 1550638, at *8 (S.D. Ill. Apr. 1, 2020) ("the Supreme Court and courts within this circuit have repeatedly addressed how excessively small cells and overcrowding can violate" constitutional standards).

[10] *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (plaintiff stated conditions-of-confinement claim when served only "[f]ood [that was] well below nutritional value"); *see also Reed v. Bowen*, 769 F. App'x 365, 370 (7th Cir. 2019) (unpublished) (detainee adequately alleged diet of unhealthy food was unconstitutional, especially given that "confinement to a crowded cell for 20 hours a day aggravated the effects of the poor diet"); *Mansoori v. Patel*, No. 17-cv-08846, 2022 WL 683667, at *5 (N.D. Ill. Mar. 8, 2022) ("a prisoner's allegation that he was served a 'nutritionally deficient diet' or that his food was 'well below nutritional value' is sufficient to state a claim under the Due Process Clause").

[11] *See Hardeman*, 933 F.3d at 821 ("provid[ing] a limited amount of water," when staff was "made aware that more water was needed" and "failed to provide any additional water," contributed to unconstitutional conditions of confinement); *Perkins v. Hepp*, No. 18-cv-1058, 2018 WL 4374945, at *3 (E.D. Wis. Sept. 13, 2018) ("[C]ourts in the Seventh Circuit have held that lack of adequate drinking water can amount to an objectively serious condition of confinement"); *see also Davis v. Biller*, No. 00-cv-50261, 2003 WL 22764872, at *2 (N.D. Ill. Nov. 19, 2003) ("[A]n inmate has a basic right to adequate drinking water").

[12] *See Budd*, 711 F.3d at 843 ("Jails must meet minimal standards of habitability[,] includ[ing] adequate bedding"); *Gillis v. Litscher*, 468 F.3d 488, 489-90, 493 (7th Cir. 2006) (plaintiff experienced unconstitutional conditions of confinement when he "had no mattress or other bedding" and was "forced to

'a mutually enforcing effect that produces the deprivation of a single, identifiable human need.'"

*Budd*, 711 F.3d 840, 842–43 (7th Cir. 2013) (quoting *Wilson v. Seiter*, 501 U.S. 294, 304 (1991)).

The long list of shocking conditions at Broadview combines to create an especially grave

constitutional violation.  *See French v. Owens*, 777 F.2d 1250, 1252 (7th Cir. 1985) (courts must

"examin[e] the totality of conditions of confinement," and "the lack of space and furnishings, to

the unwholesome food, medical neglect and continuous threats to prisoners' safety" combined to

create unconstitutional conditions); *Reed*, 769 F. App'x at 370 (courts must "assess together the

---

sleep on a concrete floor or slab"); *Evans*, 2015 WL 226047, at *1 (plaintiff stated conditions-of-confinement claim when jail had "no cots, tables or chairs, so prisoners had to sleep and eat on the floor"); *see also Thompson v. City of Los Angeles*, 885 F.2d 1439, 1448 (9th Cir. 1989), *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) ("[S]everal courts have held that a jail's failure to provide detainees with a mattress and bed or bunk runs afoul of" due process) (collecting cases); *Lyons v. Powell*, 838 F.2d 28, 31 (1st Cir. 1988) ("[S]ubjecting pretrial detainees to the use of a floor mattress for anything other than brief emergency circumstances may constitute an impermissible imposition of punishment, thereby violating the due process rights of such detainees."); *Barco Mercado*, 2025 WL 2658779, at *28 (forcing detainees "to sleep on a bare concrete floor in cramped conditions with only an aluminum blanket" and "in proximity to open toilets" "ris[es] to the level of an objectively serious deprivation").

[13] *See Johnson v. Rimmer*, 936 F.3d 695, 706 (7th Cir. 2019) (general obligation to meet needs of detainees includes "meeting the person's medical needs while he is in custody"); *Wynn v. Southward*, 251 F.3d 588, 594 (7th Cir. 2001) (plaintiff stated constitutional violation when he alleged that facility failed to provide him with heart medication despite his requests); *Ralston v. McGovern*, 167 F.3d 1160, 1162 (7th Cir. 1999) (reversing grant of summary judgment for defendants where prison official refused to administer prescribed pain medication); *see also Taylor v. Anderson*, 868 F. Supp. 1024, 1025 (N.D. Ill. 1994) (plaintiff stated conditions-of-confinement claim when defendant "fail[ed] to provide him with the dietary items required to treat him for his diabetes").

[14] *See Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016) (detainee's conditions claim based on "the myriad infestations and his lack of access to adequate cleaning supplies"— including receiving only one towel and inability to keep soap in his cell—survived summary judgment); *Gillis*, 468 F.3d at 493 (prisoner stated constitutional rights were violated when he was denied "hygiene items" and also slept "on the concrete floor or on the concrete slab that is the bed" with no blankets or mattress; *see also Lewis v. Lane*, 816 F.2d 1165, 1171 (7th Cir. 1987) ("[A] state must provide reasonably adequate [] sanitation [and] hygienic materials") (quoting *Ramos v. Lamm*, 639 F.2d 559, 568 (10th Cir. 1980)); *Richardson v. Sheriff of Middlesex Cnty.*, 407 Mass. 455, 458, 463 (1990) (affirming trial judge's finding that two toilets and one shower for a multi-occupancy room of 60 individuals amounted to unconstitutional punishment); *Barco Mercado*, 2025 WL 2658779, at *29 (unsanitary conditions "rise to the level of an objective deprivation" when detainees denied ability to bathe or shower, denied basic hygiene items, and were forced to share only a few toilets).

joint effects of [] conditions," and overcrowding "aggravated" the effects of other conditions like "poor diet"). The joint effect of these conditions is to deprive Plaintiffs and the putative class of a multitude of "basic human needs," including food, water, sleep, medical care, sanitation, warmth, and reasonable safety. *DeShaney*, 489 U.S. at 200; *see also Gray*, 826 F.3d at 1005 (recognizing the "basic human need of rudimentary sanitation"); *Barco Mercado*, 2025 WL 2658779, at *28 ("Sleep is a basic human need").

### 2. Defendants are acting purposefully, knowingly, or recklessly in imposing the conditions at Broadview

There is no question that Defendants are acting "purposefully, knowingly, or recklessly" in imposing the inhumane conditions at Broadview. *Hardeman*, 933 F.3d at 827. Defendants Noem, Marcos, and Lyons have not obscured their intention to arrest as many people as possible, as quickly as possible, in order to expel non-citizens from the country. *See* Compl. Factual Allegations § A. They are specifically targeting Chicago for their enhanced immigration efforts without making any provision for how they are going to incarcerate so many more people in the area at one time. Their actions are resulting in the inevitable: the primary processing center—Broadview—is overcrowded, under-resourced, and the site of deplorable conditions unfit for human habitation.

The *Kingsley* standard requires only that the defendants purposefully, knowingly, or recklessly undertook the *conduct* at issue—here, the severe overcrowding of detainees and denial of adequate food, water, medical care, bedding, and sanitation. *See* 576 U.S. at 395 (explaining that the subjective component only "concerns the defendant's state of mind with respect to his physical acts—i.e., his state of mind with respect to the bringing about of certain physical consequences in the world"). It does not require subjective knowledge of the harm or risk of harm posed by that conduct. *See id.* at 395–97, 401; *see also Gaston v. Beatty*, No. 17-cv-01798, 2020

31

WL 1288878, at *4 (N.D. Ill. Mar. 18, 2020) ("[T]he state-of-mind requirement is measured against each defendant's *actions*, . . . rather than their subjective view of the risks" of those actions) (emphasis in original).

Here, Defendants knowingly place scores of people in undersized rooms and refused to provide sufficient food, water, bedding, medical care, or hygiene items. Defendants did none of this "by accident" or "unintentionally." *See Kingsley*, 576 U.S. at 395–96. Rather, Defendants ignored their own policy, which requires hold rooms to have sufficient sanitation, water, and food. *See supra* II.C.1. Further, Defendants ignore detainees' repeated requests for food, water, medication, cleaning supplies, and hygiene items, even subjecting detainees to harassment and threats for asking. *See supra* II.A.2.-6. This conduct makes clear that Defendants know the conditions at Broadview deprive Plaintiffs and the putative class of basic necessities, but they impose those conditions anyway. *See, e.g.*, *Bell v. Dart*, 807 F. App'x 562, 564 (7th Cir. 2020) (Mem) (plaintiff stated conditions-of-confinement claim when he alleged he "told [defendants] about his lack of water," and "neither one did anything to get him water or provide sanitation"); *Davis*, 2003 WL 22764872, at *2 (similar); *Nadzhafaliyev v. Hardy*, No. 16-cv-6844, 2020 WL 7027578, at *7 (N.D. Ill. Nov. 30, 2020) (defendants "acted purposefully, knowingly, or recklessly" when civil detainee complained of conditions of confinement and requested accommodations, but defendants refused); *Johnson v. Foster*, No. 18-cv-5379, 2020 WL 5891405, at *2 (N.D. Ill. Oct. 5, 2020) (similar).

Widespread media reporting, multiple congressional letters requesting oversight access, protests about the conditions in the facility, and related lawsuits about inadequate conditions in similar facilities also put Defendants on notice that the conditions at Broadview are unacceptable. *See Barco Mercado*, 2025 WL 2658779 at *32 (describing "inhumane conditions" at New York

hold room and citing to other lawsuits and articles concerning ICE facilities in Baltimore, Virginia, and Florida).[15]   Further, Defendants have publicly acknowledged that detention capacity across the country will not keep up with their planned increase immigration enforcement.[16]   Defendants therefore "were and are on notice" of both "capacity constraints at their holding facilities" and also that these facilities "would be forced to hold many more detainees for much longer periods, essentially serving as *de facto* detention centers."  *Barco Mercado*, 2025 WL 2658779, at *31–32.

### 3. No legitimate government purpose justifies the inhumane conditions at Broadview

The conditions imposed by Defendants at Broadview are "not rationally related to a legitimate governmental objective" and, at a minimum, are "excessive in relation to that purpose." *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring).  The government has no legitimate interest in subjecting civil immigration detainees at Broadview to abusive conditions that amount to punishment.  *See Zadvydas v. Davis*, 533 U.S. 678, 690 (because immigration proceedings "are civil, not criminal," immigration detention is "nonpunitive in purpose and effect"); *Youngberg v. Romeo*, 457 U.S. 307, 321–22 (1982) (civil detainees "are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish").  As the *Barco Mercado* court noted, "[s]tatements from senior officials suggest that harsh conditions of confinement are a deliberate feature of the enforcement program intended to induce self-deportation and to deter illegal immigration."  2025 WL 2658779, at *33.  "[A]busive and

---

[15] Defendants also deny access to members of Congress who have repeatedly and publicly sought to examine the conditions at Broadview.  *See supra* II.B.2.

[16] *See* Eric Bradner, *Trump's Border Czar Says He'll Need Funding and at Least 100K Beds to Carry Out Deportation Plans,* CNN (Dec. 18, 2024), https://www.cnn.com/2024/12/18/politics/border-czar-homan-trump-deportation-plans [https://perma.cc/4A7J-TED3]; *see also* Ted Hesson, *US Immigration Detention Maxed Out at 47,600 Detainees, ICE Official Says,* Reuters (Mar. 12, 2025), https://www.reuters.com/world/us/us-immigration-detention-maxed-out-47600-detainees-ice-official-says-2025-03-12 [https://perma.cc/S5BJ-RTQR].

demeaning behavior by guards [also] supports an inference that detention facility officials have an express intent to punish." *Id.* at *35. But "[r]etribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell v. Wolfish*, 441 U.S. 520, 539 n.20 (1979).

Even if a legitimate, non-punitive governmental objective existed, Plaintiffs and the putative class's "continued confinement" in a facility with unhealthy conditions cannot be "justified by [any] legitimate interest in [their] detention" pending removal. *Ochoa*, 464 F. Supp. 3d at 988. This is especially true given that "there are "a plethora of means *other than* physical detention at [the Government's] disposal by which they may monitor civil detainees and ensure that they are present at removal proceedings, including remote monitoring and routine check-ins." *Id.* (emphasis in original) (quoting *Thakker v. Doll*, 451 F. Supp. 3d 358, 371 (M.D. Pa. 2020)). ICE already operates an "Alternatives to Detention (ATD) program," which "exists to ensure compliance with release conditions" and "provides important case management services for non-detained aliens."[17] Moreover, any stated interests in "administrative convenience and resource constraints" are "basically economic motive[s] [that] cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship." *Barco Mercado*, 2025 WL 2658779, at *33 (quoting *Lareau v. Manson*, 651 F.2d 96, 104 (2d Cir. 1981)).

Defendants' own policy for so-called "hold rooms" like Broadview set out their view of the minimum conditions necessary to accomplish any governmental objectives: hold rooms should be "safe [and] clean," and detainees should be provided meals "at least every six hours," drinking water "at all times," "access to [necessary] prescribed medication," and the ability "to perform bodily functions [] without being viewed by staff of the opposite gender." Ex. 2, Holding Facility

---

[17] ICE, *Alternatives to Detention* (Feb. 27, 2025),
https://www.ice.gov/features/atd#content1 [https://perma.cc/5F2H-GB4B].

Policy at §§ 4.4.1(3), 4.4.1(2), 5.2(2), 5.7(2), 5.6(1).[18] Defendants' own standards therefore "offer an example of less restrictive alternative measures" to accomplish their objectives. *Torres v. United States Dep't of Homeland Sec.*, 411 F. Supp. 3d 1036, 1065 (C.D. Cal. 2019) (conditions restricting attorney access at ICE detention center "in excess of restrictions in" ICE's own standards sufficient to state due process violation); *S. Poverty L. Ctr. v. Dep't of Homeland Sec.*, No. 18-cv-760, 2020 WL 3265533, at *30 (D.D.C. June 17, 2020) (same).

Moreover, the minimum standards set forth in Defendants' hold room policy assume that a detainee may not be held for more than 12 hours absent exceptional circumstances. *See* Ex. 2, Holding Facility Policy at § 3.2, n.3. Defendants' failure to meet these standards when detainees stay for days at a time makes the conditions at Broadview even more egregious. ICE's standards for detention centers—which serve as "a valuable point of reference because [Broadview] acts as a *de facto* detention center" for those held longer than 12 hours—also "identify alternative humane methods to achieve any legitimate government objectives to which these conditions may be connected." *Barco Mercado*, 2025 WL 2658779, at *33.

### B. Plaintiffs are Likely to Succeed on the Merits of Their Claim that Defendants' Denial of Access to Counsel at the Broadview Processing Facility Violates the First and Fifth Amendment

Defendants violate the First and Fifth Amendment rights of detainees by systematically denying them access to counsel. As a result, Broadview is, for all intents and purposes, a black box. Defendants routinely hold individuals at Broadview for days on end without access to lawyers and affirmatively impede lawyers' ability to contact their clients. The near-wholesale ban on

---

[18] A previous iteration of this policy also required that that "sanitation and temperatures in hold rooms are maintained at acceptable levels," "[h]old rooms with toilets shall allow for an appropriate amount of privacy," and "[a]dult males shall be segregated from adult females at all times." U.S. Immigration and Customs Enf., National Detention Standards for Non-Dedicated Facilities (2019) at §§ 2.5(II)(A)(6), (B)(5), (D)(3), https://www.ice.gov/doclib/detention-standards/2019/nds2019.pdf [https://perma.cc/MD7E-9RU8].

confidential attorney-client communications at Broadview causes serious prejudice to detainees, including by preventing them from promptly seeking release on bond or filing writs of habeas corpus in federal court to challenge the legality of their detention in the first place. These harms are compounded by Defendants' alarming practice of forcefully pressuring detainees to sign away their rights to an immigration court hearing at which they could challenge their detention or removal.

Defendants' practice of depriving detainees at Broadview of access to counsel is no accident but part of an intentional nationwide policy and practice. *See* Compl. ¶ 16. In the past several months, district courts in Los Angeles and New York issued interim relief requiring proper access to counsel at similar ICE facilities that prevented detainees from speaking with lawyers in almost exactly the same ways. *See Barco Mercado,* 2025 WL 2658779, at \*34; *Vasquez Perdomo,* 2025 WL 1915964, at \*12– 14. This Court should do the same.

### 1. Defendants violate the First Amendment by denying access to counsel

Defendants' ongoing denial of attorney access at Broadview violates Plaintiffs' First Amendment rights. "The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000); *Jones v. Sheahan*, No. 01C6548, 2002 WL 959814, at \*3 (N.D. Ill. May 9, 2002) (same); *see also, e.g.*, *Eng v. Cooley*, 552 F.3d 1062, 1069 (9th Cir. 2009) (noting the "long-recognized First Amendment right to hire and consult an attorney"); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult with an attorney . . . implicates . . . clearly established First Amendment rights of association and free speech"). This protection extends to Plaintiffs and the putative class, as "[d]etainees have the right to hire and consult an attorney.'" *Potts v. Moreci*, 12 F. Supp. 3d 1065, 1077 (N.D. Ill. 2013); *see also Martin v. Lauer*,

686 F.2d 24, 32 (D.C. Cir. 1982) (parties in civil proceedings "have an undeniable right to retain counsel to ascertain their legal rights" under the First Amendment). That right drastically impacts detainees' ability to file habeas petitions challenging the legality of their detentions; seek release on bond in immigration court proceedings; defend against deportation; or evaluate whether to waive one's right to the immigration court process entirely. *See supra* II.B.3.

Further, Defendants must provide for *confidential* communications between detainees and their counsel. "Because the maintenance of confidentiality in attorney-client communications is vital to the ability of an attorney to effectively counsel her client, interference with this confidentiality impedes the client's First Amendment right to obtain legal advice." *Denius*, 209 F.3d at 954; *see also Lashbrook v. Hyatte*, 758 F. App'x 539, 541 (7th Cir. 2019) (inmate stated First Amendment violation based on prison's practice of "disallow[ing] prescheduled attorney calls and eliminat[ing] private rooms" for those calls because "an important part of the right to legal advice is confidentiality") (citing *Denius*, 209 F.3d at 954); *Martin*, 686 F.2d at 32 ("[T]he right to confer with counsel would be hollow if those consulting counsel could not speak freely about their legal problems"); *Adams v. Carlson*, 488 F.2d 619, 631 (7th Cir. 1973) ("[T]he effective protection of access to counsel requires that the traditional privacy of the lawyer-client relationship be implemented in the prison context"); *Brown v. Gulash*, No. 07-cv-370, 2011 WL 1085637, at *13 (S.D. Ill. Mar. 22, 2011) (detainees must "have a reasonable opportunity to seek and receive the assistance of counsel" and "[p]rivate communication with an attorney is a meaningful part of that access").

Accordingly, several courts have found that the First Amendment prohibits unreasonable restrictions on an immigrant detainee's ability to communicate confidentially with counsel, including in cases involving far milder restrictions than those occurring at Broadview. *See, e.g.*,

37

*Barco Mercado,* 2025 WL 2658779, at \*34–35 (plaintiff "has shown a clear and substantial likelihood of success on his claim that [attorney access] restrictions [in ICE holding facility] violate his and putative class members' First [] Amendment rights"); *Immigrant Defs. L. Ctr. v. Mayorkas*, No. 20-cv-9893, 2023 WL 3149243, at \*33 (C.D. Cal. Mar. 15, 2023) (plaintiffs adequately alleged First Amendment claim where detainees had "a maximum of one hour" to consult with counsel before hearings "in non-confidential setting[s]"); *Torres*, 411 F. Supp. 3d at 1045, 1067 (plaintiffs adequately alleged First Amendment claim based on a variety of attorney access restrictions, including denial of "confidentiality during their legal calls"); *Lyon v. U.S. Immigr. & Customs Enf't*, 171 F. Supp. 3d 961, 994 (N.D. Cal. 2016) (denying defendants' motion for summary judgment on First Amendment claim based on "how telephone restrictions affect detainees' ability to gather evidence to present at their immigration hearing and to contact, retain, and consult with attorneys").

Restrictions on a civil detainee's First Amendment rights are unconstitutional when the restrictions are not "rationally connected to the state's interests." *Brown v. Phillips*, 801 F.3d 849, 853 (7th Cir. 2015) (citing *Turner v. Safley*, 482 U.S. 78, 84 (1987)). Under *Turner*, courts must consider four factors: (1) whether the restriction is "rationally related to a legitimate governmental interest"; (2) whether "alternative means" to exercise the right at issue remain open to detainees; (3) the "impact [of] an accommodation of the right" on guards, other detainees, and resources; and (4) the existence of "ready alternatives" to the restrictions. *Lashbrook*, 758 F. App'x at 541–42. Each of these factors weighs in favor of Plaintiffs and the class.

*First*, no legitimate government interest justifies the near-complete denial of access to confidential communications with counsel at Broadview. Defendants cannot reasonably argue that allowing detainees to speak confidentially with counsel would create security issues, especially

given that Defendants' own detention standards allow unrestricted access to legal calls and in-person attorney access seven days a week. *See supra* II.C.2. Even if Defendants could offer up a so-called security interest related to the practices at Broadview, "officials do not have *carte blanche* to institute any policy they please under the justification of institutional security." *Koger v. Dart*, 114 F. Supp. 3d 572, 584 (N.D. Ill. 2015); *see also Torres*, 411 F. Supp. 3d at 1068 ("[T]he Court discerns only a weak connection between the alleged restrictions [on attorney access] and legitimate security concerns").

*Second*, Plaintiffs and the putative class have no "alternative means" to exercise their First Amendment rights to confer with counsel on a confidential basis. *Turner*, 482 U.S. at 91. Defendants have effectively banned confidential attorney communications at Broadview. *See supra* II.B. No attorney visits are permitted at Broadview, period. *See supra* II.B.2. In the rare instances when Defendants permit detainees to speak to counsel on the phone, they refuse to allow confidential calls. *See id.* In effect, these practices "completely extinguish[] an inmate's ability to exercise his First Amendment right" to consult with counsel on a confidential basis— "the most extreme response available." *Koger*, 114 F. Supp. 3d at 584. Even practices that do not amount to "an outright ban" violate the First Amendment if, like here, Plaintiffs have no alternative means to speak confidentially with counsel. *Torres*, 411 F. Supp. 3d at 1067.

*Third*, Defendants could easily implement "ready alternatives" to Broadview's attorney access restrictions. *Turner*, 482 U.S. at 90–91. The most obvious alternative is the set of attorney access policies already imposed by Defendants at hundreds of ICE detention facilities under the 2011 Performance-Based National Detention Standards: unrestricted access to private legal calls and daily legal visitation hours. *See supra* II.C.2.; *Torres*, 411 F. Supp. 3d at 1068 ("Plaintiffs sufficiently allege that the PBNDS provide less restrictive policies that would allow them to

39

exercise their communication rights and would also satisfy legitimate government interests in order and security"); *Barco Mercado*, 2025 WL 2658779, at *34 (noting that holding facility "most certainly does not conform even to the [ICE National Detention Standards], which require detention facilities to permit legal visitation seven days a week"). Plaintiffs propose allowing detainees confidential, unmonitored, unrecorded, temporally unrestricted, and free telephone calls to counsel and prospective counsel within at least three hours of arrival at Broadview. *See* Ex. A to Motion ([Proposed] Temporary Restraining Order) at 1(i). The *Barco Mercado* court similarly found "free access to unmonitored, temporally unrestricted phone calls and the ability for detainees and legal counsel to schedule calls" to be "feasible alternatives" to similar access restrictions in a New York hold room. 2025 WL 2658779, at *35; *see also* 725 ILCS 5/103-3.5(a) (state law requiring those in police custody "the right to communicate free of charge with an attorney of his or her choice" "as soon as possible upon being taken into police custody, but no later than 3 hours of arrival at the first place of detention").

*Fourth*, these alternatives would have a *de minimis* impact on Broadview's staff and resources. *See Turner*, 482 U.S. at 93. According to Defendants' own audits of Broadview, the layout of the facility would readily accommodate these measures: Broadview already has "a visiting room with booths to accommodate legal/public visitation," and detainees can make "a private call in the office adjacent to the medical room" while officers "observe through the glass outside the office." Ex. 4, 2018 Audit at 2, 5; *see also* Ex. 3, 2023 Audit at 2, 17 (2023 audit referring to "attorney/detainee visiting rooms" and "the Attorney/Detainee Visitation Area"). To the extent that Defendants currently use these parts of the Broadview facility for other purposes, "that is not an adequate justification for the barriers to attorney-client communication imposed." *Barco Mercado*, 2025 WL 2658779, at *34. Like in *Barco Mercado*, Defendants may not "elect[]

40

to use [Broadview] as a *de facto* detention site," and "then use the inadequacies of the facility as a justification to deprive detainees of meaningful, confidential access to legal counsel to the extent demanded by the Constitution." *Id.*

Because all four *Turner* factors weigh in their favor, Plaintiffs are likely to succeed on the merits of their claim that Broadview's restrictions on attorney access violate the First Amendment.

### 2. Defendants violate the Fifth Amendment Substantive Due Process Rights by denying access to counsel

Defendants' denial of access to counsel at Broadview is also an additional, "objectively unreasonable" and abusive condition of confinement that violates detainees' substantive due process rights under the Fifth Amendment. *Kingsley*, 576 U.S. at 397; *Hardeman*, 933 F.3d at 823.

Courts have repeatedly held less severe limits on access to counsel to be objectively unreasonable and unconstitutional in the context of civil immigration detention. *See Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 565 (9th Cir. 1990) (affirming injunction halting government practices "the cumulative effect of which was to prevent [non-citizens] from contacting counsel and receiving any legal advice"); *Torres*, 411 F. Supp. 3d at 1044-45; *Innovation Law Lab v. Nielsen*, 310 F. Supp. 3d 1150, 1163 (D. Or. 2018). Thus, for example, courts elsewhere have found conditions at an immigration detention facility unconstitutional where the government impeded attorney-client communication by restricting legal calls and in-person legal visits, (*see, e.g., Torres*, 411 F. Supp. 3d at 1044-45, 1064-65; *Innovation L. Lab*, 310 F. Supp. 3d at 1163), or restricting virtual legal visits during the COVID-19 pandemic but allowing in-person legal visits, *S. Poverty L. Ctr*, 2020 WL 3265533, at *2.

In recent cases arising out of ICE holding facilities in New York and Los Angeles, courts have found that similar, near-total bans on legal visits and other forms of confidential client-

attorney communications likewise violate substantive due process rights. *See Barco Mercado*, 2025 WL 2658779, at *35; *Vasquez Perdomo*, 2025 WL 1915964, at *12.

In any case, the denial of access to counsel, alone and in combination with the other conditions at Broadview, fail the minimal due process standards required under *Hardeman*, 933 F.3d at 823, and *Kingsley*, 576 U.S. at 397. *First,* the Defendants' interference with counsel access is "objectively serious." *Id.* Defendants are preventing detainees from obtaining legal advice for the entire time they are held at the facility. Detainees have no ability to make confidential outgoing phone calls to an attorney and no ability to schedule a call with an attorney. Even detainees who already have attorneys who are trying to reach them are thwarted: Defendants have banned in-person visits and ignore repeated phone calls and emails from counsel. *See supra* II.B.2.

These limits are harming detainees in numerous ways. They severely restrict detainees' ability to challenge the legality of their detention through habeas petitions. They deprive detainees the ability to promptly seek release from immigration court. They prevent detainees from deciding whether to sign documents and waive their rights knowingly and voluntarily. And they prevent detainees from obtaining counsel to vindicate other rights—such as arranging guardianship for children from whom they are separated, *see* Ex. 6, Guevara Decl. ¶¶ 23, 56, or seeking redress for constitutionally inadequate conditions of confinement. Indeed, because of Defendants' blackout on attorney-client communications at Broadview, attorneys generally are not able to speak with their clients about the horrible conditions they face there until after they are transferred to another facility. *See, e.g.,* Ex. 10, Osuna Decl. ¶¶ 8-10; Ex. 9, Carhart Decl. ¶¶ 5-8.

*Second*, Defendants are acting "purposefully, knowingly, or recklessly" with respect to the denial of counsel access. *Hardeman*, 933 F.3d at 823. Attorneys who try to contact their clients are literally turned away at the door by Broadview officials. *See supra* II.B.2. Defendants make

42

no provision for detainees to call attorneys and, in fact, respond with anger and insults when detainees tell officers they would like to do so. *See supra* II.B.1. In one rare instance where a detainee got his lawyer on the line by a stroke of luck—the lawyer happened to be standing next to his wife at a press conference outside the facility—a senior officer who was listening to the call acted to end the call as soon as he realized that it was a lawyer on the line, going so far as to reach for the phone and hang up the call himself. *See* Ex. 13, Giménez González Decl. ¶¶ 38-43; Ex. 24, Herrera Decl. ¶ 12. Defendants are purposefully isolating detainees at Broadview from legal counsel.

*Finally*, there is no legitimate government interest that justifies Defendants' near-complete denial of access to counsel at Broadview. *See supra* IV.B.1. Defendants ban in-person attorney visits and legal calls, so Plaintiffs and putative Class members lack any alternative means of exercising their right to counsel. *See supra* IV.B.1. Defendants' restrictions on detainees' ability to access counsel has "effectively blocked attorney-access *in toto*, [and] there is no constitutionally sufficient justification to avoid finding such a restriction 'excessive' and, therefore, punitive." *Americans for Immigrant Justice v. U.S. Dep't of Homeland Sec'y*, 22-cv-3118, 2023 WL 1438376, at *17 (D.D.C. Feb. 1, 2023). And as discussed above, less restrictive alternative measures for attorney access at Broadview are readily available for Defendants to implement. *See supra* IV.B.1.

Ultimately, civil immigration detainees are entitled to conditions that are at least as good as those held pretrial on criminal charges, *see Ochoa*, 464 F. Supp. at 986, and may in fact be entitled to "more considerate" treatment, *see Torres*, 411 F. Supp. 3d. at 1064; *Belbachir*, 726 F.3d at 979 (suggesting that civil immigration detainees might be governed by standards applicable to individuals involuntarily committed). Here, Broadview detainees' access to counsel is

substantially worse than conditions for people detained prior to their criminal trials in the Chicago area, including at the Cook County Jail. There, the "individual in custody locator" is updated regularly.[19] Attorneys are permitted to visit clients in person or virtually by videoconference, and in-person visits can happen at any time and need not be scheduled in advance.[20] This is in stark contrast with Broadview's near-complete denial of access to confidential communications and visits with counsel at Broadview. Because Defendants' denial of access to counsel is objectively unreasonable and there is no legitimate government interest justifying these abusive conditions, Plaintiffs are likely to succeed on the merits of their claim that Defendants are violating the Fifth Amendment Substantive Due Process rights of Plaintiffs and the putative class.

### C. Plaintiffs are Likely to Continue to Suffer Irreparable Harm

Plaintiffs demonstrate that the barriers to attorney access and conditions at Broadview will continue to cause them irreparable harm for which there is no adequate remedy at law. Truly, the harms at stake here are some of the most serious presented to the court system to resolve— violations of physical integrity, denial of fundamental constitutional rights, and systemic transfers of people from their country of residence, without process or legal remedy. "Harm is irreparable if legal remedies are inadequate to cure it. Inadequate does not mean wholly ineffectual; rather, the remedy must be seriously deficient as compared to the harm suffered." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (citation modified); *see also Am. Hosp. Supply v. Hosp. Prods. Ltd.*, 780 F.2d 589, 594 (7th Cir. 1985) ("The premise of the preliminary injunction

---

[19] *See* Cook County Jail, Individual in Custody Locator, https://iic.ccsheriff.org/ (last visited October 23, 2025); *see also* Loyola Center for Criminal Justice, *Tracking the Cook County Jail and Community Corrections Population* (Nov. 21, 2023), https://loyolaccj.org/blog/tracking-the-cook-county-jail-and-community-corrections-population [https://perma.cc/8EV3-DDJR].

[20] *Individual In Custody Virtual Visitation Request Application System*, Cook County Sheriff, https://avv.ccsheriff.org/ [https://perma.cc/XG8A-KB6R] (last visited Oct. 23, 2025).

is that the remedy available at the end of trial will not make the plaintiff whole . . . ."); *Foster v. Ghosh*, 4 F. Supp. 3d 974, 983 (N.D. Ill. 2013) ("[H]arm is irreparable if it cannot be undone following the adjudication and a final determination on the merits of [plaintiff's] underlying claim."). Absent an injunction, Plaintiffs and the putative class are likely to continue to suffer a range of irreparable harms—ongoing deprivations of their constitutional rights, denial of needed legal representation at critical moments in their immigration proceedings, and continued psychological and physical distress caused by the conditions at Broadview.

 *First*, the harm to Plaintiffs and the putative class is a serious and "continuing constitutional violation" and therefore "constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 (7th Cir. 1978) (affirming grant of preliminary injunction in prison conditions case); *see also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary") (quoting 11A Wright et al., Federal Practice & Procedure § 2948.1 (2d ed. 1995)). Plaintiffs have shown that the continuing conditions and restrictions on attorney access at Broadview violate their Fifth and First Amendment rights. *See supra* IV.B. "[T]he ongoing deprivation of Plaintiff[s' constitutional] rights discussed above is an irreparable harm sufficient to warrant a preliminary injunction." *Tay v. Dennison*, 457 F. Supp. 3d 657, 687 (S.D. Ill. 2020) (prison conditions case). Courts regularly apply this principle to grant TROs and preliminary injunctions when immigration detention facilities restrict attorney access and impose unconstitutional conditions of confinement. *See*, *e.g.*, *Americans for Immigrant Justice*, 2023 WL 1438376, at *17, 20; *S. Poverty L. Ctr.*, 2020 WL 3265533, at *35; *Innovation L. Lab*, 342 F. Supp. 3d at 1081; *Castillo v. Nielsen*, No. 18-cv-01317, 2018 WL 6131172 (C.D. Cal. June 21, 2018).

*Second*, even if ongoing constitutional violations did not suffice to establish irreparable harm, "the consequences of these conditions and restrictions, such as delays and substantially restricted access to counsel, can cause irreparable injuries related to the proceedings for which Plaintiff[s] are preparing." *S. Poverty L. Ctr.*, 2020 WL 3265533, at \*32. As the Supreme Court has explained, "the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important." *Ardestani v. I.N.S.*, 502 U.S. 129, 138 (1991); *see also, e.g.*, *Detroit Free Press v. Ashcroft*, 303 F.3d 681, 698 (6th Cir. 2002) (courts "emphasiz[e] the importance of counsel at deportation proceedings"). For that reason, "[t]he harms likely to arise from the denial of access to legal representation in the context of [immigration proceedings] are particularly concrete and irreparable." *Innovation L. Lab*, 342 F. Supp. 3d at 1081.

For example, delays in accessing counsel prolong the time individuals stay in detention. *See, e.g.*, Ex. 9, Carhart Decl. ¶ 6; Ex. 8, Smith Decl. ¶ 12. Delays may also "harm clients' chances of winning release" from detention, both because counsel plays a crucial role in preparing for a bond hearing, and because "[o]ne factor an immigration judge considers in a release motion is the applicant's flight risk" and the "closer a person's final individual or merits hearing is, the more of a flight risk she is considered to be." *S. Poverty L. Ctr.*, 2020 WL 3265533, at \*32 (quoting evidence to support the court's finding that "delays may have serious consequences for [detainees] that are seeking to be released"). Delays may also cause irreparable harm to individuals who wish to file asylum applications, which must be filed "within 1 year of the date of the [person's] arrival in the United States." 8 C.F.R § 208.4.

At its worst, inability to retain counsel can lead to wrongful deportation and an inability to assert potentially meritorious claims before removal. *See Innovation L. Lab*, 342 F. Supp. 3d at

1081 ("The denial of access to legal assistance is likely to lead to the denial of asylum and ultimately to the deportation of detainees with meritorious asylum claims"); *see also, e.g.*, *Barco Mercado*, 2025 WL 2658779, at *23 (describing how a detainee's "inability to communicate" with his attorney at New York holding facility "delayed his filing of motions to reopen and for a stay," and the detainee was then "removed from the United States before the Executive Office of Immigration Review ruled on the motions submitted"); *Make the Rd. New York v. Noem,* No. 25-cv-190*,* 2025 WL 2494908, at *14 (noting that plaintiff had "put forward substantial evidence" of "recurring errors" in removal process, including "instances in which citizens, unaccompanied minors[], and those claiming asylum have been unlawfully removed"); *Lyttle v. United States*, 867 F. Supp. 2d 1256, 1266 (M.D. Ga. 2012) (U.S. citizen without counsel erroneously deported to Mexico); *see also supra* II.B.3.

The risk of these harms is magnified at Broadview, where Defendants often transfer detainees within days to out-of-state detention facilities or out of the country altogether. *See, e.g.*, Ex. 8, Smith Decl. ¶ 12; Ex. 37, Peyton Decl. ¶¶ 7-8. Broadview detainees may have only a short window of time to contact counsel before they end up miles away from their homes, families, and this court system, making it more difficult to find and consult with an attorney. *See supra* II.B.3. Detainees who are transferred before they can speak with an attorney also lose the ability to file habeas proceedings in their home district, which may effectively prevent them from challenging their detention under habeas corpus altogether. *See id.* This is particularly true given that the pro bono immigration resources available in the Northern District of Illinois, like the Habeas Project of Illinois, are likely not available in other districts with less robust and well-funded immigration organizations. *See* Compl. ¶ 140.

The time-sensitivity of removal proceedings makes this a particularly urgent concern. *See* 8 U.S.C § 1231 (noncitizens "shall [b]e remove[d] from the United States within a period of 90 days");[21] *see also Innovation L. Lab*, 342 F. Supp. 3d at 1081 ("Early representation is particularly important" for individuals with potential asylum claims given the "serious harm—including persecution, torture, and death—that may result if asylum is improperly denied"). Release determinations for detainees also hinge in part on their ability to gather and present evidence of ties to their community, *see, e.g.*, *Hernandez-Lara v. Lyons*, 10 F.4th 19, 31 (1st Cir. 2021) (evidence of "a settled place in the community" supports release)—a far more difficult task for a person who has been forced to leave their community before consulting with a lawyer. As a result, "[l]ack of access to counsel during detention at [holding facilities] . . . can have irreversible consequences." *Barco Mercado*, 2025 WL 2658779, at *23.

Defendants' troubling practice of demanding that the detainee sign forms agreeing to voluntary departure makes the harms suffered at Broadview particularly irreparable and acute. *See supra* II.B.4. Without access to counsel, detainees may have no idea what they are signing or that they have a valid basis for relief from detention or removal until they have already left the country.

*Third*, the inhumane conditions at Broadview subject detainees to irreparable harm in the form of extreme psychological, physical, and emotional distress and even long-term medical consequences. *See, e.g.*, *Foster*, 4 F. Supp. 3d at 983 (irreparable harm established when prisoner did not receive needed medical attention, which created "a known risk to his health that could be presently addressed"); *Jones'El v. Berge*, 164 F. Supp. 2d 1096, 1123 (W.D. Wis. 2001)

---

[21] Defendants are also working to shorten this timeline by expanding the scope of expedited removal, which has long applied to noncitizens arrested near the border, to allow removal within 14 days of noncitizens apprehended *anywhere* in the United States. *See* Designating Aliens for Expedited Removal, 90 Fed. Reg. 8139, 8139 (Jan. 24, 2025). A federal court recently stayed this policy change pending a challenge to its constitutionality. *See Make the Rd. New York v. Noem*, No. 25-cv-190, 2025 WL 2494908, at *14 (D.D.C. Aug. 29, 2025).

(irreparable harm established when prison conditions "create or exacerbate" psychological damage); *see also Barco Mercado*, 2025 WL 2658779, at \*23 (plaintiff established irreparable harm in hold room case when "by demonstrating that putative class members face imminent risk to their health, safety, and lives") (citation modified) (collecting cases). When a plaintiff's mental and physical health is at risk, "money will not make [them] whole or protect [them] from physical and emotional abuse." *Tay*, 457 F. Supp. 3d at 687–88. Plaintiffs have therefore established irreparable harm by "present[ing] ample evidence that they suffered emotional and psychological injury" at Broadview. *Dupuy v. Samuels*, 462 F. Supp. 2d 859, 896 (N.D. Ill. 2005), *aff'd*, 465 F.3d 757 (7th Cir. 2006).

### D. The Balance of Equities Favors Plaintiffs

Defendants are flouting the rule of law and the rights of the people in their custody for the sake of enhancing their deportation efforts. Given Defendants' cruel treatment of the people in their custody—and the fact that no non-judicial intervention has thus far worked to inhibit this conduct, *see* Compl. § E— there is a decided public interest in ensuring the Defendants comply with constitutional guarantees through the issuance of an emergency order.

Because "protecting civil and constitutional rights is in the public interest," the balance of equities and public interest favor Plaintiffs. *A.C. by M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 774 (7th Cir. 2023); *see also Joelner v. Village of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("[U]pholding constitutional rights serves the public interest") (citation modified). This principle applies with special force to constitutional violations in detention facilities. *See, e.g.*, *Mitchell v. Baker*, No. 13-cv-0860, 2015 WL 278852, at \*7 (S.D. Ill. Jan. 21, 2015) ("Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest"); *Jones'El*, 164 F. Supp. 2d at 1125 (same).

As discussed above, the attorney access restrictions and inhumane conditions at Broadview will continue to cause a range of significant hardships to Plaintiffs. *See supra* IV.C. There is also "no suggestion by [D]efendants that . . . the pressure to increase [immigration] arrests has diminished" or that "the strain from accommodating increasing numbers of detainees has lessened." *Barco Mercado*, 2025 WL 2658779, at *25. By contrast, Defendants would suffer no harm from a mandate to comply with the Constitution and their own regulations. *See Joelner*, 378 F.3d at 628 ("[T]here would be no harm at all" to Defendant if enjoined from practice "found to be unconstitutional"). "[T]he public has a strong interest in having a [government] that conducts itself fairly and according to its stated regulations and policies." *Doe #1 v. Trump*, No. 25-cv-4188, 2025 WL 1341711, at *14 (N.D. Ill. May 8, 2025) (citation modified); *Chen v. Noem*, No. 25-cv-00733, 2025 WL 1163653, at *12 (S.D. Ind. Apr. 21, 2025) ("[T]he public interest would be served by ensuring that [DHS and ICE terminate immigration visas] occur only pursuant to applicable law").

Even if allowing attorney access and improving conditions at Broadview imposes some administrative burden on Defendants, "[c]ourts may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Brown v. Plata*, 563 U.S. 493, 511 (2011); *see also Jones'El*, 164 F. Supp. 2d at 1125 ("[T]his Court is bound by law to keep a balance between efficient prison management and keeping prisons a humane place: in this case, there is a glaring need for the latter goal"). The balance of equities therefore weighs strongly in Plaintiffs' favor.

### E. The Court Should Order a Ten Dollar Bond Under Rule 65(c)

Federal Rule of Civil Procedure 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the

court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  However, "[u]nder appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c)."  *Wayne Chem., Inc. v. Columbus Agency Serv. Corp.*, 567 F.2d 692, 700 (7th Cir. 1977); *Doe #1*, 2025 WL 1341711, at *14.

In determining an appropriate bond amount, courts recognize that "[w]aiver of the bond requirement has been recognized to be particularly appropriate when the infringement of a fundamental constitutional right is alleged or when appropriate circumstances such as indigence exist." *Aurora Chicago Lakeshore Hosp. v. Azar*, No. 18-cv-8162, 2019 WL 8231646, at *2 (N.D. Ill. Mar. 4, 2019); *see also Smith v. Bd. of Election Comm'rs for City of Chicago*, 591 F. Supp. 70, 71–72 (N.D. Ill. 1984) ("[C]ourts have declined to require plaintiffs to post a bond in cases involving constitutional rights" or involving "circumstances [] such as indigence").

Here, both circumstances warrant a $10 security.  *See Barco Mercado*, 2025 WL 2658779, at *37 (in New York hold room case involving similar putative class and constitutional claims, court "conditions the continuation of the preliminary injunction on the post of a bond or other security in the amount of ten dollars").

## V.    CONCLUSION

Plaintiffs respectfully request that the Court grant a temporary restraining order to remedy these constitutional violations. Specifically, Plaintiffs request that the Court enter the [Proposed] Temporary Restraining Order attached to the Motion as Exhibit A.

## VI.    REQUEST FOR ORAL ARGUMENT

If oral argument would assist the Court in resolving this motion, Plaintiffs stand ready for argument at the Court's convenience.

DATED: October 30, 2025       Respectfully submitted,

/s/ Kevin M. Fee
Kevin M. Fee
Michelle T. García
Rebecca K. Glenberg
Samuel Cole
Jennifer Stark
Kathleen Hickey
**ROGER BALDWIN FOUNDATION OF ACLU, INC.**
150 N. Michigan, Suite 600
Chicago, IL 60601
Phone: (312) 201-9740
Fax: (312) 288-5225
kfee@aclu-il.org
mgarcia@aclu-il.org
rglenberg@aclu-il.org
scole@aclu-il.org
jstark@aclu-il.org
khickey@aclu-il.org


Alexa Van Brunt
Jonathan Manes
Danielle Berkowsky
Chisato Kimura (license pending)
**MACARTHUR JUSTICE CENTER**
160 E. Grand Avenue, 6th floor
Chicago, Illinois 60611
Phone:  312-503-1336
alexa.vanbrunt@macarthurjustice.org
jonathan.manes@macarthurjustice.org
danielle.berkowsky@macarthurjustice.org
chisato.kimura@macarthurjustice.org


Nathan P. Eimer
Scott C. Solberg
Michael L. McCluggage
James B. Speta
Lisa S. Meyer
Brent R. Austin
**EIMER STAHL LLP**
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604

Phone:  312-660-7600
neimer@eimerstahl.com
ssolberg@eimerstahl.com
mmccluggage@eimerstahl.com
jspeta@eimerstahl.com
lmeyer@eimerstahl.com
baustin@eimerstahl.com