UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PABLO MORENO GONZALEZ, *et al.*, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 25 C 13323 |
| v. | ) | |
| | ) | Judge Gettleman |
| KRISTI NOEM, Secretary U.S. Department | ) | |
| of Homeland Security, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Introduction**

Plaintiffs bring this case on behalf of a proposed putative class of unlawfully present aliens, who seek the extraordinary remedy of a temporary restraining order and preliminary injunction, challenging the conditions of confinement and access to counsel[1] at the U.S. Immigration and Customs Enforcement's ("ICE") Broadview Processing Center ("Broadview" or "BSSA") located at 1930 Beach Street, Broadview, Illinois. *See* Complaint, ECF No. 1; Pls.' Mot. for TRO, ECF Nos. 17, 20-1. The court should deny plaintiffs' request for a TRO or a PI because they cannot satisfy any of the requirements necessary for the extraordinary relief they seek.

First, plaintiffs have no likelihood of success on the merits of their Fifth Amendment conditions-of-confinement claim because the named plaintiffs lack standing to proceed. But even if they could proceed, they still have no likelihood of success because they cannot show that the conditions at Broadview are sufficiently serious to invoke the Constitution, and they cannot show that Defendants have been objectively unreasonable in maintaining the conditions at Broadview.

---

[1] The District Court for the District of Oregon recently denied a motion to temporarily restrain ICE from purportedly obstructing and delaying attorneys from meeting with detained aliens. *See Clear Clinic, et al., v. Noem, et al.*, Civ. No. 25-cv-1906-AA (D. Ore., Oct. 29, 2025). This court should do the same here.

Moreover, plaintiffs have no likelihood of success on their First Amendment and Fifth Amendment access to counsel claims because detainees at Broadview are provided adequate resources to preserve their access to counsel.

Second, plaintiffs have failed to establish any irreparable injury. Broadview is a temporary holding facility, and aliens are held there for a short time. Indeed, both plaintiffs were already been transferred to a detention facility in Missouri before this court ordered them returned. And, while in temporary short periods of custody at Broadview, aliens are adequately provided with food, clothing, shelter, and medical care before they are transferred to another detention facility.

Finally, the public interest weighs heavily against the declaratory and injunctive relief sought here because the Executive's ability to enforce U.S. immigration laws is not only significant but also a sovereign prerogative. The influx of illegal aliens now requires enforcement operations, which results in the need to detain and temporarily house aliens at Broadview before transferring them to long-term detention facilities. The public interest weighs heavily for defendants to accomplish this mission.

For these reasons, as set forth below, the court should deny plaintiffs' request for a temporary restraining order and preliminary injunction in its entirety.

**Facts**

ICE's Broadview Processing Center ("Broadview or BSSA") is a service staging facility where an alien who is recently arrested by DHS is processed and temporarily staged prior to being transported to a detention facility, other holding facility or, in certain circumstances, for removal from the United States. Ex. A., Declaration of Deputy Field Office Director Shawn Byers ("Byers Decl."), at ¶ 10.

BSSA is a central intake for all civil immigration detainees in the region. *Id*. But in 2021, the Illinois General Assembly passed the Illinois Way Forward Act, which, in part, ended immigration detention in Illinois, effective January 1, 2022. *Id*. at ¶ 11. Prior to the passage of the Illinois Way Forward Act, county jails across the state were able to contract with the federal government to house detained aliens awaiting their immigration court hearings or removal. *Id*. The Act also strengthened restrictions put in place by the Illinois TRUST Act in 2017, limiting ICE access to police facilities and equipment. *Id*. Now, without the capability to detain in Illinois, aliens are initially held at the BSSA and transported to facilities throughout the United States. *Id*. Detention standards at Broadview are governed by ICE Directive No. 11087.2, *Operations of ERO Holding Facilities* (Jan. 31, 2024), and Memorandum from Monica S. Burke, Assistant Director, Custody Management, *Nationwide Hold Room Waiver* ("Waiver Memorandum") (June 24, 2025). *Id*.

Prior to June 24,2025, Broadview was primarily a 12-hour facility; however, more recently, it has been operating within the parameters of the Waiver Memorandum. *Id*. at ¶ 12. When an alien is brought to Broadview for intake, ICE personnel will first collect the alien's biometrics and biographical information, document and store any personal property, and place the person in a temporary holding cell to await further processing. *Id*. at 13. Thereafter, the alien is brought from the holding cell to the processing rooms where DHS conducts various records checks and serves certain immigration documents on the alien. *Id*. During processing, the alien's information is entered into various ICE systems, including in most cases, the ICE Online Detainee Locator System (ODLS). *Id*. The ODLS is updated as soon as practicable after the alien is booked into ICE custody, typically within hours. *Id*. at ¶ 14. Delays can occur due to high-volume operations or technical issues, but ICE strives for accuracy and timely updates. *Id*. Finding the location of

an alien from the ODLS does require that the person searching the database, such as their attorney, be able to provide basic information concerning the detainee, including either the detainee's A-number or first and last name and country of birth. *Id.*

**Conditions at Broadview**

There are six temporary holding cells in BSSA. *Id.* at ¶ 15. Each cell has at least one window of approximately four feet by four feet. *Id.* Due to the positioning and size of the windows, there is limited visibility for detainees in different holding cells to be able to view the interior of other holding cells. *Id.* There is currently one temporary holding cell dedicated to female detainees, and the windows in that holding cell are covered with paper to ensure privacy. *Id.*

Each temporary holding cell has several bench-style seating areas, and the seats are filled with hard foam material, which detainees utilize to lay down or sleep. *Id.* at ¶ 16. Bunks, cots, beds, and other sleeping apparatus are not permitted inside hold rooms. *Id.* However, all detainees are issued foil blankets because foil blankets are preferred to ensure the health and safety of the detainees, as fabric blankets are susceptible to lice, scabies, and other transmittable diseases. *Id.* All temporary holding cells, processing areas, and other frequently used areas of BSSA are cleaned daily by professional janitorial staff, and aliens are briefly moved from one temporary holding cell to another during cleaning, to ensure janitorial staff can clean each room safely and thoroughly. *Id.* at 17.

Each temporary holding cell has at least one toilet; some cells may have as many as three. Id. at ¶ 18. One temporary holding cell at BSSA has three shower spaces. *Id.*

Menstrual products are free and available upon request; there are no limits on the issuance of menstrual products. *Id.* at ¶ 19. Soap and shampoo may be provided upon request, also free of

charge. *Id*. ICE also provides seasonally appropriate clothing if the alien arrived in damaged or soiled clothing. *Id*.

All cells have drinking water readily available through wall-mounted fountains, except for the two smallest temporary holding cells. *Id*. at ¶ 20. Bottled water is available upon request and free of charge, and 16-ounce bottles of water are provided at all meals. *Id*. All detainees are provided three meals a day; at least one of those meals is a hot meal. *Id*. at 21.

Upon intake, ICE personnel document if an alien has any known or reported disability or any other special vulnerability. *Id*. at ¶ 22. ICE personnel monitor detainees for any apparent indication of a mental or physical health condition that may require closer supervision or emergency medical care. *Id*. In case of medical emergency, ICE personnel will ensure the detainee is transported, with appropriate ERO escort, to one of the nearby emergency rooms and/or hospitals. *Id*. However, there are no permanent medical personnel stationed at BSSA. *Id*.

Prescribed medication that was in the alien's possession when arrested is maintained with other personal effects while the alien is at BSSA and is provided upon request by the detainee. *Id*. at ¶ 23. Family members may also drop off prescribed medication at BSSA for inclusion in the detainee's personal property. *Id*. ICE follows necessary storage requirements, such as refrigerating medications that require it. *Id*. Medications are provided to the aliens upon request. *Id*.

There are two phones in each of the temporary holding cells, except for the two smallest cells, which are commonly used as isolation cells for security purposes. *Id*. at ¶ 24. These phones have pre-programmed phone numbers to the consulates of foreign countries, which are posted on the wall in the cells by the phones. *Id*. Otherwise, the detainees can dial collect or use a calling card. *Id*. Phones are also available in the processing room, and detainees may utilize them upon request. *Id*. Detainees are afforded at least one free call during processing and ERO officers

document who the detainee calls. *Id.* Detainees may use these phones for personal and legal calls; there are no separate phones utilized solely for legal calls. *Id.* ICE does not monitor the legal calls that occur on these phones. *Id.* Detainees are not limited in number or duration for paid phone calls made from the holding cells. *Id.* BSSA has four non-contact stations for private visitation, including attorney visits. *Id.* However, during ongoing violent protests, ICE does not permit any visitors into the facility due to safety concerns. *Id.*

**Access to Counsel**

All detainees who are served with charging documents and those that claim a fear of return are provided their notice of rights and a list of pro bono attorneys available in this region during processing. *Id.* at ¶ 26. The pro bono list is available in both English and Spanish, and if a detainee cannot read or speaks a different language, the ERO officer explains these forms, and all other forms served on the detainee, in a language the detainee understands, using an interpreter if necessary. *Id.* Attorney access to an individual in ICE custody is limited while ERO is actively booking and processing the individual, which often accounts for the majority of time spent in BSSA prior to transfer to a long-term holding facility. *Id.* During processing, individuals are routinely asked if they have an attorney. *Id.*

An attorney seeking to visit an individual in custody at the BSSA must establish that they have an attorney-client relationship with the alien. *Id.* at ¶ 27. This relationship may be established by various means, the easiest being a Notice of Attorney or Representative (Form G-28) signed by the alien, indicating that individual has agreed for that attorney to represent him or her in immigration proceedings. *Id.* However, ICE will also accept other evidence, including but not limited to, copies of retainer agreements, or having a Notice of Entry of Appearance as an Attorney (Form EOIR-28 or EOIR Form-27) on file with the Executive Office for Immigration Review. *Id.*

The form G-28 contains a number of biographic fields of information to be provided about the alien that the attorney represents, including the individual's first and last name, A-number, date of birth, country of birth, and address. *Id.* It also contains a section for the alien to sign specifically waiving their privacy rights under the Privacy Act. ERO will generally accept unsigned G-28s in detained cases where the attorney can provide a minimum basic amount of biographic information concerning the individual in custody, such as name and A-number or name and date of birth, as required on the form. *Id.* However, in all cases, ERO will confirm with the detainee that they want to speak with the attorney. *Id.*

ICE does not systematically deny access to counsel. *Id.* at ¶ 28. Denial of an attorney's access to an alien, if any, occurs only for legitimate reasons, such as incomplete documentation demonstrating an attorney-client relationship, ongoing processing (e.g., fingerprinting or interviews), security risks such as violent protests, or the detainee's refusal. *Id.* In addition, if a detainee is in transit or has already been transferred to a different facility, in-person access at BSSA is not possible, but counsel can coordinate communication or visits at the receiving facility, which generally offer robust legal access programs, including a Virtual Attorney Visitation program that enables legal representatives to schedule client meetings in advance and add interpreters to calls, video teleconferencing for attorney visits, and legal orientation programs. *Id.*

Safety and security concerns may also impact attorney access at BSSA. *Id.* at ¶ 29. For example, during the COVID-19 pandemic, ERO offices were closed to the public due to health and safety concerns, and attorney-client consultation could only be handled remotely by phone. *Id.* Since August of 2025, disruptive protesters have targeted BSSA, periodically forcing ICE to strictly limit access to the facility by visitors, including attorneys, in order to protect the safety of detainees and officers. *Id.*

As a result of these types of operational challenges, ICE has also prioritized the efficient and speedy processing of aliens arrested in Chicago to minimize risk to the safety of its officers and individuals in ICE custody. *Id*. at ¶ 30. However, ICE officers and transport vehicles in Chicago have become a particularly frequent target of protesters, who harass, block, vandalize, and generally attempt to prevent ICE from promptly and safely transporting detainees to other facilities. *Id*. Both virtual and in-person visitation is generally available after the individual is transferred to a long-term detention facility. *Id*. at ¶ 31. Virtual visitation options, including the VAV program, allow legal representatives, assistants, and interpreters to schedule confidential meetings via video platforms such as Zoom or WebEx through ICE's online Detention Facility Appointment Scheduler or by email in exigent circumstances, with no audio or video recording permitted. *Id*. Phones and electronic tablets enabled to permit virtual calls are also provided for detainee use. *Id*.

## Legal Standard

The standards for issuing a temporary restraining order and a preliminary injunction are often viewed as identical. *E.g., Bevis v. City of Naperville, Illinois*, 657 F. Supp. 3d 1052, 1058–59 (N.D. Ill.), *aff'd*, 85 F.4th 1175 (7th Cir. 2023). But the standards for issuing a TRO may be more demanding. *Chicago Housing Authority v. Scott Turner, Sec'y of the U.S. Dep't of Hous. & Urb. Development,* No. 25 C 12670, 2025 WL 2972665, at *1 (N.D. Ill. Oct. 20, 2025). In any event, a "preliminary injunction is an extraordinary remedy never awarded as of right." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 791 (7th Cir. 2022) (quoting *Winter v. Nat. Res. Def. Council*, *Inc*., 555 U.S. 7, 24 (2008)). "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

the public interest." *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1324 (7th Cir. 2022) (quoting *Winter*, 555 U.S. at 20). If the plaintiff fails to meet any of those threshold requirements, the court must deny preliminary injunctive relief. *See GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). Moreover, courts in this circuit employ a "sliding-scale approach." *Id.* This means that the more likely the movant is to prevail on the merits, the less the balance of harms must weigh in his or her favor, while correspondingly, the less likely the movant is to prevail on the merits the more the balance must weigh in his or her favor. *Id.*

Argument

The court should deny plaintiffs' request for a temporary restraining order and preliminary injunction because they fail to satisfy any of the factors necessary for the extraordinary remedy they seek. Plaintiffs have no substantial likelihood of success on the merits, they fail to demonstrate an irreparable injury, and the public interest factors weigh in Defendants' favor.

## I.    The Court Lack Subject Matter Jurisdiction Over Plaintiffs' Claims

The Court lacks subjection matter jurisdiction over plaintiffs' claims because 8 U.S.C. § 1252(g) precludes review over challenges to DHS's operation of Broadview. Section 1252(g) categorically bars jurisdiction over "*any* cause or claim by or on behalf of any alien *arising from* the decision or action by the [Secretary of Homeland Security] to *commence proceedings*, adjudicate cases, or execute removal orders against any alien." 8 U.S.C. § 1252(g) (emphasis added). The Secretary of Homeland Security's decision to *commence removal proceedings*, including the decision to detain an alien at a temporary facility such as Broadview pending such removal proceedings, squarely falls within this jurisdictional bar. In other words, DHS's operation of Broadview, where they decide to temporarily detain aliens before transferring them to long-term detention facilities, clearly "aris[es] from" the decision to commence removal proceedings against

9

an alien. *See Alvarez v. ICE*, 818 F.3d 1194, 1203 (11th Cir. 2016) ("By its plain terms, [§ 1252(g)] bars us from questioning ICE's discretionary decisions to commence removal" and also to review "ICE's decision to take [plaintiff] into custody and to detain him during removal proceedings"). *Herrera-Correra v. United States*, No. CV 08-2941 DSF (JCx), 2008 WL 11336833, at *3 (C.D. Cal. Sept. 11, 2008) (citing *Sissoko v. Rocha*, 509 F.3d 947, 949 (9th Cir. 2007) ("The [Secretary] may arrest the alien against whom proceedings are commenced and detain that individual until the conclusion of those proceedings. . . . Thus, an alien's detention throughout this process *arises from* the [Secretary]'s decision to commence proceedings[]" and review of claims arising from such detention is barred under § 1252(g)) (emphasis added). Put in the Supreme Court's words, detention pending removal is a "specification" of the decision to commence proceedings. *See Reno v. Am.-Arab Anti-Discrimination Comm.* ("*AADC*"), 525 U.S. 471, 485 n.9 (1999) ("§ 1252(g) covers" a "specification of the decision to 'commence proceedings'").

Here, Plaintiffs challenge the procedures by which DHS operates Broadview to temporarily detain aliens before they are transferred to longer-term detention facilities. As this is a challenge to DHS's decision to commence removal proceedings against the aliens detained at Broadview, judicial review of Plaintiffs' claims are barred by § 1252(g).

## II.     Plaintiffs Have No Likelihood of Success on the Merits.

### A.   Plaintiffs are Unlikely to Prevail on their Fifth Amendment Conditions-of-Confinement Claim.

The court should deny a temporary restraining order with respect to Plaintiffs' conditions-of-confinement claim. For one thing, the named plaintiffs have not established their standing to bring such a claim. But even if the conditions-of-confinement claim is considered on the merits, plaintiffs have not shown that they are likely to prevail in establishing that the conditions at Broadview violate the Fifth Amendment.

**1. The Named Plaintiffs Lack Standing to Bring a Challenge to their Conditions of Confinement.**

The two named plaintiffs have not established their standing to bring a Fifth Amendment conditions-of-confinement claim. "To establish Article III standing, a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likel[ihood] that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-58 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "[A]n injury can satisfy Article III's requirements so long as it is 'imminent, not conjectural or hypothetical.'" *Ochoa,* 464 F. Supp. 3d at 982 (quoting *Susan B. Anthony List*, 573 U.S. at 158). To qualify as imminent, an injury must be "certainly impending, or there [must be] a substantial risk that the harm will occur." *Id*.

Here, the named plaintiffs lack standing to challenge the conditions of detention at Broadview because neither their complaint nor their motion for a temporary restraining order adduces sufficient facts to establish a cognizable injury on behalf of either named plaintiff. There are no factual allegations — let alone declaratory support — indicating that Moreno Gonzalez and Zamacona in particular have suffered from the numerous deleterious conditions that they allege generally occur at Broadview. *See* Complaint at ¶¶ 14, 15, 23, 24.[2] Without such factual or declaratory support to establish that they have been injured with respect to the detention conditions at Broadview, the court should find that the named plaintiffs lack standing to pursue their Fifth Amendment conditions-of-confinement challenge.

---

[2] As part of their prayer for relief, plaintiffs request that defendants be enjoined from "procuring Plaintiff Moreno Gonzalez's signature on an untranslated document written in a language he does not read and understand" and assert that this practice violates the Fifth Amendment, *see* Complaint, p.74, but there are no factual allegations elsewhere in the complaint indicating that Defendants have actually done such a thing against Moreno Gonzalez in particular.

**2. Plaintiffs Are Unlikely to Succeed on the Merits of their Claim that Conditions at Broadview Violate the Fifth Amendment.**

However, even if the named plaintiffs were found to possess the requisite standing to pursue such a challenge, it is clear that they are unlikely to prevail on the merits of their Fifth Amendment claim because they cannot show that the conditions at Broadview are sufficiently serious to invoke the Constitution, and they cannot show that defendants have been objectively unreasonable in maintaining the conditions at Broadview.

Immigration detainees may bring challenges to the conditions of their detention under the Fifth Amendment's Due Process Clause. *See, e.g., Belbachir v. Cty. of McHenry*, 726 F.3d 975, 979 (7th Cir. 2013); *Ochoa v. Kolitwenzew*, 464 F. Supp. 3d 972, 986 (C.D. Ill. 2020); *Hernandez v. Kolitwenzew*, No. 20-cv-2088-SLD, 2020 U.S. Dist. LEXIS 97874, at *23 (C.D. Ill. Apr. 23, 2020). Such claims are considered under an "objective reasonableness" standard, which is less demanding (from the plaintiff's perspective) than the Eighth Amendment's subjective "deliberate indifference" inquiry but identical to the standard governing condition-of-confinement claims brought by state pretrial detainees under the Fourteenth Amendment. *See Kingsley v. Hendrickson,* 576 U.S. 389, 352-54 (2015); *Hardeman v. Curran*, 933 F.3d 816, 822-23 (7th Cir. 2019); *Pittman v. Madison Cty.*, 108 F.4th 561, 570 (7th Cir. 2024); *Ochoa*, 464 F. Supp. 3d at 982.

To prevail on a conditions-of-confinement claim, Plaintiffs must prove: "(1) the conditions in question are or were objectively serious (or if the claim is for inadequate medical care, his medical condition is or was objectively serious); (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, 'not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose.'" *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (quoting *Kingsley*, 135 S. Ct. at 2473-74).

Even assuming *arguendo* that plaintiffs can satisfy the second of the *Hardeman* requirements, it is clear thattheir conditions-of-confinement claim fails on the first and third requirements. First, while plaintiffs have alleged a number of distressing conditions at Broadview, they have not identified detention conditions that are "sufficiently serious" to successfully state a claim of constitutional dimension under the Due Process Clause. *See Hardeman*, 933 F.3d at 827; *Ochoa*, 464 F. Supp. 3d at 986-87.

To be sufficiently serious, the defendant's "act or omission must result in the denial of the minimal civilized measure of life's necessities. Therefore, extreme deprivations are required to make out a conditions-of-confinement claim." *Henderson v. Sheahan*, 196 F.3d 839, 845 (7th Cir. 1999) (cleaned up). "As the Supreme Court has stressed, there is, of course, a de minimis level of imposition with which the Constitution is not concerned." *Tesch v. Cty. of Green Lake*, 157 F.3d 465, 476 (7th Cir. 1998) (cleaned up). "In determining whether an imposition is de minimis, it is appropriate to evaluate both its severity and its duration." *Tesch*, 157 F.3d at 476; *see also id.* (explaining that pretrial detention conditions did not rise to the level of severity necessary to state a constitutional violation where petitioner "was not denied any of his basic human necessities; he just did not receive the level of comfort that he demanded. Correctional officials are not required to provide comfortable jails, even for pretrial detainees. These short-term impositions are simply part of the general level of discomfort anyone can expect to experience while in custody."); *see also Villanova v. Abrams*, 972 F.2d 792, 797 (7th Cir. 1992) ("[T]he cost of confinement to the person confined . . . is smaller the shorter the detention . . . .").

Plaintiffs have alleged a number of problematic conditions at Broadview, but while these conditions may be distressing, they lack the objective seriousness necessary to rise to a constitutional violation. This becomes clear if we consider case law distinguishing "sufficiently

serious" detention conditions from those that lack constitutional concern. For instance, courts in the Seventh Circuit have determined that a detainee's sleeping on the floor with or without a mattress for short periods does not have constitutional dimension. *See Antonelli v. Sheahan,* 81 F.3d 1422, 1430 (7th Cir. 1996) (sleeping on the floor for one night not unconstitutional); *see also Powell v. Cook County Jail*, 814 F. Supp. 757, 759 (N.D. Ill. 1993) (holding that the Constitution is indifferent as to whether the mattress is on the floor or on the bed). Nor does requiring a detainee "to wear the same clothes, or receive beverages only with meals, or sleep on his mattress on the floor for less than two full days rise[] to the level of severity necessary to state a constitutional violation." *Tesch*, 157 F.3d at 476.

Likewise, in *Hardeman*, the Seventh Circuit explained that "[a] single clogged toilet does not violate the Constitution, and prisoners are not entitled to Fiji Water on demand," but on the other hand, "[e]xposure to hundreds of unflushable toilets" as part of a three-day water shut-down "[wa]s objectively unreasonable." 933 F.3d at 823, 824. And in *Stead v. Skinner*, No. 10-4526, 2011 U.S. Dist. LEXIS 99347 (N.D. Ill. Sep. 2, 2011), the court held that a female detainee's inability to take a shower for approximately five days did not violate her due process rights where she otherwise had access to a working toilet and sink. *Id.* at *11. Moreover, while the plaintiff in the same case alleged that she had also had insufficient access to sanitary pads during her detention, the court disagreed, noting that "[she] received a maxi pad at the start of her detention, another a few days later, and a couple more near the end of her menstrual cycle," she had full access to toilet paper at all times, and — while she may have preferred to have more maxi pads — there was "no evidence that her health was ever in danger." *Id.* (citing inter alia *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1998) (failure to provide plaintiff with toilet paper for five days, or with soap, toothbrush, and toothpaste for 10 days was not a violation of his constitutional rights because

14

plaintiff suffered no physical harm and the conditions were temporary)). This case law makes clear that only extreme conditions of detention are sufficient to establish a Fifth Amendment claim. Thus, while plaintiffs have alleged problematic conditions at Broadview, in line with this case law, they have not identified conditions that are sufficiently serious to give rise to a constitutional violation.

Finally, Plaintiffs have also failed to show that defendants' actions at Broadview are "objectively unreasonable," the third requirement under *Hardeman*, 933 F.3d at 822-23. This is because defendants have a legitimate nonpunitive interest in detaining individuals like the amed plaintiffs at Broadview, as immigration detention serves the important purpose of ensuring that noncitizens attend their removal proceedings and comply with any removal efforts (if necessary). *See Demore v. Kim*, 538 U.S. 510, 528 (2003). Coupled with the fact that detainees at Broadview are being held for relatively short periods of time and not being subjected to "sufficiently serious" conditions to raise constitutional concerns, the court should recognize that defendants' conduct here is objectively reasonable in the totality of the facts and circumstances.

### B. Plaintiffs Are Unlikely to Prevail on Their First and Fifth Amendment Access-to-Counsel Claims.

Plaintiffs contend that in violation of the First and Fifth Amendments, putative class members have been restricted from receiving the benefit of counsel through limitations on their out-going phone usage; practical restrictions on their counsels' ability to contact them by phone within the facility; bars on in-person consultation with counsel; and inaccuracies in DHS databases regarding the location of detainees. Because of this contended lack of access to counsel, plaintiffs assert that temporary detainees are coerced into relinquishing their ability to challenge their removability in administrative removal proceedings. But plaintiffs are incorrect. In both paper and practice, detainees at Broadview are provided adequate resources to preserve their access to

15

counsel. And another court has recently upheld ICE's practices and procedures for giving detained aliens access to counsel in a similar case. *See Clear Clinic, et al., v. Noem, et al.*, No. 25-cv-1906 (D. Ore., Oct. 29, 2025). Plaintiffs have thus failed to demonstrate a likelihood of success on the merits under either the First or the Fifth Amendment and, like the *Clear Clinic* case, this court should deny plaintiffs' request for emergency relief.

### 1. Plaintiffs Are Unlikely to Succeed on the Merits of their First Amendment Access-to-Counsel Claim.

"The right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition." *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000); *United Mine Workers of America, Dist. 12 v. Ill. State Bar Ass'n*, 389 U.S. 217, 221-22 (1967) (observing that the rights to assemble and petition for redress of grievances guarantees the right of persons to hire an attorney on a salary basis). In the context of civilly detained aliens, the restrictions on access to and communication with counsel must be "rationally connected" to the government's legitimate interests of the Broadview in affecting the removal of alien detainees. *Brown v. Phillips*, 801 F.3d 849, 854 (7th Cir. 2015) (applying a modified version of the test set forth in *Turner v. Safley*, 482 U.S, 78 (1987), for penological regulations to civil detention of sexually violent persons).

As described above, Broadview's policies and practices regarding communications with counsel are not directed at the substance of those communications, and plaintiffs do not contend otherwise. *See TikTok Inc. v. Garland*, 604 U.S. 56, 66-67 (2025) (noting differing limitations on regulation aimed at content of speech as opposed to content-neutral limitations); *see also Turner*, 482 U.S. at 90 ("We have found it important to inquire whether prison regulations restricting inmates' First Amendment rights operated in a neutral fashion, without regard to the content of the expression."). Rather, the instant limitations on communication are content-neutral time, place or

manner restrictions on when and how detained aliens may engage with counsel, grounded in the government's Congressionally mandated goal to seek the removal of aliens who are in violation of the immigration laws. *See Weinberg v. City of Chicago*, 310 F.3d 1029, 1037-38 (7th Cir. 2002).

Broadview is a field office processing and holding facility with rooms designed to temporarily hold individuals during arrest processing and while awaiting transport to detention facilities or release. In this respect, it operates as waypoint for apprehended aliens who are processed by the government for removal at a staging area; for detention at a long-term facility while their removal is awaited, assessed or adjudicated; or for release during the pendency of removal proceedings. That is, aliens are brought to Broadview temporarily with the purpose of getting them out of Broadview when initial processing is complete and then moved to another detention facility somewhere else. The procedures and policies in place at Broadview legitimately further those goals and permit the government to "impose reasonable restrictions" on the right of access to counsel. *See Massey v. Wheeler*, 221 F.3d 1030, 1036 (7th Cir. 2000).

Further, its policies are "rationally connected" these goals. *See Brown*, 801 F.3d at 854. Limitations on the availability of counsel are in concert with the goal of moving the aliens expeditiously. For instance, in-person communication with counsel takes up space that must be dedicated to individual officer interviews with aliens, processing removal or holding plans, and temporarily holding aliens. It further means an alien who may be moved or removed continues to take up room at the facility to await in-person communication. In short, making accommodations to increase detainees' in-person communication with counsel would likely result in aliens being held *longer* in what is supposed to be a temporary setting. *See Turner*, 482 U.S. at 91 (observing that one consideration in evaluating limitations on constitutional rights in the prison context is whether "accommodation of an asserted right will have a significant 'ripple effect' on fellow

17

inmates or on prison staff"); *cf. Woods v. O'Leary*, 890 F.2d 883, 885 (7th Cir. 1989) (denying first amendment claim that prisoner had right to send out religious mail in part due to effects on other inmate's mail).

### 2. Plaintiffs Are Unlikely to Succeed on the Merits of Their Fifth Amendment Access-to-Counsel Claim.

For the same reasons, plaintiffs' claim that aliens held at Broadview have limited ability to communicate with counsel in violation of their Fifth Amendment due process rights fails. As with their First Amendment claim, courts generally uphold detention regulations as long as they are "reasonably related to legitimate . . . interests," considering (1) whether there is a "valid, rational connection between the [prison] regulation and a legitimate and neutral governmental interest put forward to justify it," (2) "whether there are alternative means of exercising the asserted constitutional right that remain open to prison inmates," (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally," and (4) "the absence of ready alternatives." *Turner*, 482 U.S. at 89.[3] Under the circumstances, the detainees' lack of access to in-person legal visits does not violate their constitutional rights given the availability of confidential communications with legal access through the telephone, the lack of ready alternatives because of the layout of the Broadview holding area, and the short-term nature of the purported deprivation. *See Massey*, 221 F.3d at 1036. In-person visits with attorneys are not a constitutional requirement when other means of communication are available. *See id.*; *Lyon v. ICE*, 171 F. Supp. 3d 961, 983 (N.D. Cal. 2016) (challenging only protocols for telephone access because the location of the facilities makes in-

---

[3] Plaintiff's citation to ICE's Performance-Based National Detention Standards ("PBNDS") governing attorney communication and access in immigration detention facilities nationwide is misplaced. Broadview is a holding facility, not a detention facility; accordingly, the PBNDS standards do not apply.

person visits "impractical at best," making telephonic access "critical") *cf. Turkmen v. Ashcroft*, No. 02-CV-2307 (JG), 2006 WL 1662663, at *49 (E.D.N.Y. June 14, 2006), *aff'd in part, vacated in part, remanded*, 589 F.3d 542 (2d Cir. 2009) (finding facts showing total "communications blackout" prior to immigration court hearings was sufficient to state a claim for relief).

*     *     *

As demonstrated, Plaintiffs have no likelihood of success on their Fifth Amendment conditions of confinement claim and on their First and Fifth Amendment access to counsel claims.

### III.    Plaintiffs Do Not Suffer from Any Irreparable Injury.

The Seventh Circuit has held that "[t]he finding of irreparable harm to the plaintiff if the injunction is denied is a threshold requirement for granting a preliminary injunction." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003). Here, Plaintiffs cannot make this threshold showing.

Because Broadview is a short-term, temporary processing and holding facility, any alleged injury by the plaintiffs cannot by definition be irreparable. Aliens are only initially held at Broadview for processing, they are then transported to other detention facilities throughout the United States. Byers Decl. at ¶ 11.

The allegations of purported irreparable injury relating to conditions of confinement and access to counsel are refuted directly by the declaration provided by Deputy Field Office Director Shawn Byers. For instance, the six separate holding cells at Broadview are cleaned each day by a professional janitorial staff. Byers Dec. at ¶ 17. This directly rebuts plaintiffs' assertion of "harrowing" conditions based on the unsupported assertion that the cells are "rarely, if ever, cleaned." P. Mem. at 28. The cells also contain padded benches for resting and the detainees are provided with foil blankets—and not fabric blankets out of a concern for lice and transmittable

19

diseases. Byers Decl. at ¶ 15, 16. This undermines plaintiffs' assertion of *no* bedding and only occasional foil blankets. P. Mem. at 28. Moreover, all but the smallest cells have water fountains, with bottled water being provided to detainees for free upon request, and with meals, which are served three times a day, one being hot. Byers Decl. at ¶¶ 20, 21. Plaintiffs' fail to mention the existence of water fountains and access to bottled water. P. Mem. at 28. And they omit that three meals (including one hot meal) are provided to detainees each day. *Id*. But these necessities are provided, and this refutes plaintiffs' claims of purported injury based on claims of lack of food and water. *See* P. Mem. at 28. Finally, defendants provide detainees with menstrual products for free without limitation, and provide soap and shampoo upon request. Byers Decl. at ¶ 19. Defendants also provide seasonally appropriate clothing to detainees if the alien arrives in damaged or soiled clothing. *Id*. This undermines the unsupported assertions that defendants do not provide such materials. P. Mem. at 28.

Likewise, plaintiffs assertions of purported irreparable injury related to access to counsel are refuted directly by the Byers Declaration. Indeed, plaintiffs make vague, generic assertions—that completely ignore the ongoing violent protests outside Broadview that cause ongoing security concerns—that defendants routinely deny access to attorneys. P. Mem. at 17-18. But this is not the case. Detainees are provided with the opportunity to make a phone call upon detention. Byers Decl. at ¶ 24. The four larger cells include phones that detainees can use to make collect calls or use phone cards, and detainees may use the phone in the processing area upon request. Byers Decl. at ¶ 24. Attorneys are provided at least phone access to their clients once an attorney-client relationship has been established, and defendants do not systematically deny access to attorneys. Byers Decl. at ¶ 27-28. However, necessary limitations may be put in place due to safety concerns, such as those caused by ongoing violent protests outside the facility. Byers Decl. at ¶ 29. Of course,

20

once a detainee is transferred out of Broadview to a long-term facility, then attorney access through other video and telephone systems. Byers Decl. at ¶ 31. These conditions undermine the generic assertions—assertions that ignore the ongoing violent protests—that defendants routinely deny access to attorneys. P. Mem. at 17-18.

Moreover, plaintiffs only vaguely discuss how short delays in accessing an attorney while they are being processed at Broadview might harm detained individuals. P. Mem. at 46-47. But these short delays are temporary in nature and cannot constitute an irreparable injury to any specific individual. Plaintiffs suggest that aliens being temporarily detained at Broadview face an irreparable injury based on an apparent deadline to file an application for asylum. *Id*. But even if that was true, that deadline would have existed prior to the alien being detained at Broadview, and plaintiffs provide no specific facts demonstrating that they have a viable asylum application and that they were unable to meet the purported filing deadline prior to being picked up and temporarily detained at Broadview.

Beyond that, plaintiffs make generic allegations of purported harm related to potential health matters and pre-existing health conditions. P. Mem. at 48. But plaintiffs' allegations are mere conjecture and speculation, as they provide no specific facts or medical evidence that aliens' temporary detention at Broadview results in an irreparable injury.

Plaintiffs have thus failed to demonstrate that they suffer from any irreparable injury that requires the extraordinary remedy they seek from the Court.

## IV.     The Public Interest Factor Weighs in Defendants' Favor.

The public interest weighs heavily against granting plaintiffs the emergency injunctive relief they seek.  "Once an applicant satisfies the first two factors, the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest.  These factors merge when the Government is the opposing party."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  Here, those factors favor the Government.

The public interest in enforcement of United States immigration laws is significant. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 556-58 (1976); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d 1211, 1221 (D.C. Cir. 1981). And, "[c]ontrol over immigration is a sovereign prerogative." *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 750 (9th Cir. 1992); *see also Landon v. Plasencia*, 459 U.S. 21, 34 (1982) ("[I]t must weigh heavily in the balance that control over matters of immigration is a sovereign prerogative, largely within the control of the executive and the legislature.").

Furthermore, in the context of detention, the Supreme Court has recognized that "the problems of prisons . . . require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1973). "[C]ourts," by contrast, "are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Id*. 416 U.S. at 405.  Running a prison (or in this case, a temporary processing facility) "is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Safley*, 482 U.S. at 85.  The "formidable task of running a prison" falls to those

22

other two branches, and "separation of powers concerns counsel a policy of judicial restraint" and "deference to the appropriate prison authorities." *Id.*

With respect specifically to plaintiffs' requests, the relief sought would prevent defendants' from being able to effectively manage its operations at the facility. Plaintiffs list of demands on sanitation, land phone lines, and space merely provide a list of requests without regard to how these specific demands would prevent management of the facility. *See* Proposed TRO, "Mandatory Baseline Conditions,". Indeed, laintiffs' demands go further than managing the Broadview facility—to include mandating Defendants provide access to telephone if they are not even going to be held more than three hours at Broadview. *See* Proposed TRO, "Mandatory Baseline Conditions," subsection i. Ultimately, the laundry list of demands is intended to limit defendants' ability to manage the short-term detention of individuals and, if granted, would effectively prevent the currently ongoing enforcement of immigration laws in this region. Once again, the Government has a compelling interest in the steady enforcement of its immigration laws and remedying problems caused by illegal immigration. *See Noem v. Vasquez Perdomo*, 606 U.S. —, 2025 WL 2585637, at *4-5 (2025) (Kavanaugh, J., concurring). The public interest clearly favors denying the request for injunctive relief.

## V.     The Court Should Require Plaintiffs to Post a Bond.

Pursuant to Rule 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c); *see also Habitat Educ. Ctr. v. U.S. Forest Serv.*, 607 F.3d 453, 455 (7th Cir. 2010). A bond posted for a preliminary injunction is viewed as a contract in which "the court and the plaintiff 'agree' to the bond amount as the 'price' of a wrongful injunction."

*Global NAPs, Inc. v. Verizon New England, Inc.,* 489 F.3d 13, 20-21 n.5 (1st Cir. 2007) (internal citation omitted). As a result of the posting of the bond, a presumption arises that damages will be awarded from those posted bond amounts in order for defendants "to receive compensation for their damages in cases where it is later determined that a party was wrongfully enjoined." *Nintendo of America, Inc. v. Lewis Galoob Toys, Inc.*, 16 F.3d 1032, 1036 (9th Cir. 1994); *see also Global NAPs, Inc.*, 489 F.3d at 23. The risk of harm here is not insubstantial, and if the court were to grant a temporary restraining order or preliminary injunctive relief, the court should require the plaintiffs post security of an appropriate amount during the pendency of the court's order, in the event it is later determined that defendants were wrongfully enjoined.

### Conclusion

For these reasons, the court should deny plaintiffs' requests for a temporary restraining order and a preliminary injunction in its entirety.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: s/ Jana L. Brady
    JANA L. BRADY
    Assistant United States Attorney
    327 S. Church Street, Suite 3300
    Rockford, Illinois 61101
    (815) 987-4444
    jana.brady@usdoj.gov

Exhibit A

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**Pablo Moreno Gonzalez, et al.**

*Plaintiffs,*

v.

**Kristi Noem, et al.,**

*Defendants*

Case No.: 1:25-cv-13323-RWG

**DECLARATION OF DEPUTY FIELD OFFICE DIRECTOR SHAWN BYERS**

### DECLARATION OF DEPUTY FIELD OFFICE DIRECTOR SHAWN BYERS

I, Shawn Byers, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.     I am employed by the United States Department of Homeland Security (DHS),

U.S. Immigration and Customs Enforcement (ICE), Enforcement and Removal Operations

(ERO) as the Deputy Field Office Director (DFOD) of the ERO Chicago Field Office. This

includes oversight of ICE's Broadview Processing Center (BSSA), in Broadview, Illinois. I have

held this position since August 2022. My duties include overseeing the intake, processing, and

transfer of noncitizens detained in Chicago, ensuring compliance with ICE policies, federal laws,

and local agreements. I am familiar with the operations of the Chicago Field Office located at

1930 Beach Street, Broadview, Illinois, as well as ICE's processing, detention and transfer

policies, guidance and protocols.

2.     I have been employed by ICE since November 2, 2003. In my 20+ years of

service with ERO, I have held multiple positions, including Deputy Field Office Director, Acting

Field Office Director, Assistant Field Office Director, Unit Chief, Detention and Deportation

Officer, Supervisory Detention and Deportation Officer, Deportation Officer, and Immigration Enforcement Agent.

3.      Currently, as a Deputy Field Office Director, I supervise the subordinate managers and mid-level supervisors of the law enforcement officers and support staff who are charged with identifying, locating, and arresting aliens present in the United States in violation of the law. I also supervise the subordinates who are charged with handling the cases of aliens who are in removal proceedings. My supervisory duties include the review of immigration files and records; the review of decisions to detain or release noncitizens in ICE custody; the review of progress of cases through the removal hearing process; and the review of the enforcement of immigration court decisions, including the execution of final orders of removal. My additional duties include the supervision of the presentment of criminal immigration cases to the United States Attorney's Office for prosecution.

4.      The Chicago Field Office has approximately 180 officers covering six states (Illinois, Indiana, Wisconsin, Kansas, Kentucky, and Missouri) across two time zones. In the City of Chicago and its immediate environment. ERO has approximately 65 officers, including 31 at BSSA.

5.      This declaration is submitted in support of Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order (TRO) and sets out the current conditions and the operational constraints that make the requested relief infeasible. I have reviewed Plaintiff's application for a TRO and supporting exhibits.

6.      The statements in this declaration are based on my personal knowledge and information provided to me in the course of my official duties

**Background**

7.      ICE is the largest investigative branch of DHS and is charged with enforcement of more than 400 federal statutes. The agency was created after the September 11, 2001, terrorist attacks, by combining components of the former Immigration and Naturalization Service and the former U.S. Customs Service, among other agencies, to more effectively enforce federal immigration and customs laws and to protect the United States against terrorist attacks. The mission of ICE is to protect the United States from the cross-border crime and illegal immigration that threaten national security and public safety. To carry out that mission, ICE focuses on enforcing immigration laws, preventing terrorism, and combating transnational criminal threats.

8.      ERO is one of three core operational directorates in ICE. ERO deportation officers are immigration officers under 8 U.S.C. § 1357. It is the mission of ERO to identify, arrest, and remove aliens who present a danger to national security or are a risk to public safety, as well as those who enter the United States illegally—including those who cross the border illegally, which is a federal misdemeanor, 8 U.S.C. § 1325, and those who illegally reenter after having been removed, which is a federal felony, 8 U.S.C. § 1326—or otherwise undermine the integrity of our immigration laws and our border control efforts.

9.      The majority of ERO's immigration enforcement operations take place in the interior of the country. ERO manages all logistical aspects of the removal process by identifying, apprehending, and, when appropriate, detaining removable aliens during the course of immigration proceedings and pending physical removal from the United States. This includes locating and taking into custody fugitive aliens and at-large criminal aliens, as well as identifying aliens in federal, state, and local prisons and jails and working with those authorities to transfer them to ICE custody without releasing them into the community. When aliens are ordered

removed, ERO is responsible for safely repatriating them, or otherwise overseeing their departure from the United States.

10.     BSSA is a service staging facility where an alien who is recently arrested by DHS is processed and temporarily staged prior to being transported to a detention facility, other holding facility or, in certain circumstances, for removal from the United States.  BSSA is a central intake for all civil immigration detainees in the region.

11.     In 2021, the Illinois General Assembly passed the Illinois Way Forward Act which, in part, ended immigration detention in Illinois, effective January 1, 2022. Prior to the passage of the Illinois Way Forward Act, county jails across the state were able to contract with the federal government to house detained aliens awaiting their immigration court hearings or removal. The Act also strengthened restrictions put in place by the Illinois TRUST Act in 2017, limiting ICE access to police facilities and equipment. Now, without the capability to detain in Illinois, aliens are initially held at the BSSA and transported to facilities throughout the United States.   Detention standards at Broadview are governed by ICE Directive No. 11087.2, *Operations of ERO Holding Facilities* (Jan. 31, 2024) and Memorandum from Monica S. Burke, Assistant Director, Custody Management, *Nationwide Hold Room Waiver* (Waiver Memorandum) (June 24, 2025).

12.     Prior to June 24, 2025, Broadview was primarily a 12-hour facility; however, more recently, it has been operating within the parameters of the Waiver Memorandum.

13.     When an alien is brought to Broadview for intake, ICE personnel will first collect the alien's biometrics and biographical information, document and store any personal property, and place the person in a temporary holding cell to await further processing. Thereafter, the alien is brought from the holding cell to the processing rooms where DHS conducts various records checks and serves certain immigration documents on the alien. During processing, the alien's

information is entered into various ICE systems, including the ICE Online Detainee Locator System (ODLS).

14.     The ODLS is updated as soon as practicable after the alien is booked into ICE custody, typically within hours. Delays can occur due to high-volume operations or technical issues, but ICE strives for accuracy and timely updates. Finding the location of an alien from the ODLS does require that the person searching the database, such as their attorney, be able to provide basic information concerning the detainee, including either the detainee's A-number or first and last name and country of birth.

**Conditions at Broadview**

15.     There are six temporary holding cells in BSSA. Below is the layout of the area where detainees are held:



Each cell has at least one window of approximately four feet by four feet. Due to the positioning and size of the windows, there is limited visibility for detainees in different holding cells to be able to view the interior of other holding cells. There is currently one temporary holding cell dedicated to female detainees. The windows in that holding cell are covered with paper to ensure privacy.

16.     Each temporary holding cell has several bench-style seating areas. The seats are filled with hard foam material, which detainees utilize to lay down or sleep on. Bunks, cots, beds, and other sleeping apparatus are not permitted inside hold rooms. However, all detainees are issued foil blankets. Foil blankets are preferred to ensure the health and safety of the detainees. Fabric blankets are susceptible to lice, scabies, and other transmittable diseases.

17.     All temporary holding cells, processing areas, and other frequently used areas of BSSA are cleaned daily by professional janitorial staff. Aliens are briefly moved from one temporary holding cell to another during cleaning, to ensure janitorial staff can clean each room safely and thoroughly.

18.     As depicted above, each temporary holding cell has at least one toilet; some cells may have as many as three. One temporary holding cell at BSSA has three shower spaces.

19.     Menstrual products are free and available upon request; there are no limits on the issuance of menstrual products. Soap and shampoo may be provided upon request, also free of charge. ICE also provides seasonally appropriate clothing if the alien arrived in damaged or soiled clothing.

20.     All cells have drinking water readily available through wall-mounted fountains, except for the two smallest temporary holding cells. Bottled water is available upon request and free of charge, and 16-ounce bottles of water are provided at all meals.

21.     All detainees are provided three meals a day; at least one of those meals is a hot meal.

22.     Upon intake, ICE personnel document if an alien has any known or reported disability, other special vulnerability, or medical condition requiring prescribed medications. ICE personnel monitor detainees for any apparent indication of a mental or physical health condition that may require closer supervision or emergency medical care.   In case of medical emergency, ICE personnel will ensure  the detainee is transported, with appropriate ERO escort, to one of the nearby emergency rooms and/or hospitals. However, there are no permanent medical personnel stationed at BSSA.

23.     Prescribed medication that was in the alien's possession when arrested is maintained with other personal effects while the alien is at BSSA and is provided upon request by the detainee. Family members may also drop off prescribed medication at BSSA for inclusion in the detainee's personal property. ICE follows necessary storage requirements, such as refrigerating medications that require it. Medications are provided to the aliens upon request.

24.     There are two phones in each of the temporary holding cells, except for the two smallest cells, which are commonly used as isolation cells for security purposes.  These phones have pre-programmed phone numbers to the consulates, which are posted on the wall in the cells by the phones. Otherwise, the detainees can dial collect or use a calling card. Phones are also available in the processing room, and detainees may utilize them upon request. Detainees are afforded at least one free call during processing and ERO officers document who the detainee calls. Detainees may use these phones for personal and legal calls; there are no separate phones utilized solely for legal calls. ICE does not monitor the legal calls that occur on these phones. Detainees are not limited in number or duration for paid phone calls made from the holding cells.

25.     BSSA has four non-contact stations for private visitation, including attorney visits. However, during ongoing violent protests, ICE does not permit any visitors into the facility due to safety concerns.

**Attorney Access**

26.     All detainees who are served with charging documents and those that claim a fear of return are provided their notice of rights and a list of pro bono attorneys available in this region during processing. The pro bono list is available in both English and Spanish. If a detainee cannot read or speaks a different language, the ERO officer explains these forms, and all other forms served on the detainee, in a language the detainee understands, using an interpreter if necessary. Attorney access to an individual in ICE custody is limited while ERO is actively booking and processing the individual, which often accounts for the majority of time spent in BSSA prior to transfer to a long-term holding facility. During processing, individuals are routinely asked if they have an attorney.

27.     An attorney seeking to visit an individual in custody at the BSSA must establish that they have an attorney-client relationship with the alien. This relationship may be established by various means, the easiest being a Notice of Attorney or Representative (Form G-28) signed by the alien, indicating that individual has agreed for that attorney to represent him or her in immigration proceedings. However, ICE will also accept other evidence, including but not limited to, copies of retainer agreements, or having a Notice of Entry of Appearance as an Attorney (Form EOIR-28 or EOIR Form-27) on file with the Executive Office for Immigration Review. The form G-28 contains a number of biographic fields of information to be provided about the alien that the attorney represents, including the individual's first and last name, A-number, date of birth, country of birth, and address. It also contains a section for the alien to sign specifically waiving their privacy rights under the Privacy Act. ERO will generally accept

unsigned G-28s in detained cases where the attorney can provide a minimum basic amount of biographic information concerning the individual in custody, such as name and A-number or name and date of birth, as required on the form. However, in all cases, ERO will confirm with the detainee that they want to speak with the attorney.

28.     ICE does not systematically deny access to counsel. Denial of an attorney's access to an alien, if any, occurs only for legitimate reasons, such as incomplete documentation demonstrating an attorney-client relationship, ongoing processing (e.g., fingerprinting or interviews), security risks such as violent protests, or the detainee's refusal. In addition, if a detainee is in transit or has already been transferred to a different facility, in-person access at BSSA is not possible, but counsel can coordinate communication or visits at the receiving facility, which generally offer robust legal access programs, including a Virtual Attorney Visitation program that enables legal representatives to schedule client meetings in advance and add interpreters to calls, video teleconferencing for attorney visits, and legal orientation programs.

29.     Safety and security concerns may also impact attorney access at BSSA. For example, during the COVID-19 pandemic, ERO offices were closed to the public due to health and safety concerns, and attorney-client consultation could only be handled remotely by phone. Since August of 2025, disruptive protesters have targeted BSSA, periodically forcing ICE to strictly limit access to the facility by visitors in order to protect the safety of detainees and officers.

30.     As a result of these types of operational challenges, ICE has also prioritized the efficient and speedy processing of aliens arrested in Chicago to minimize risk to the safety of its officers and individuals in ICE custody. However, ICE officers and transport vehicles in Chicago have become a particularly frequent target of protesters, who harass, block, vandalize, and

generally attempt to prevent ICE from promptly and safely transporting detainees to other facilities.

31.     Both virtual and in-person visitation is generally available after the individual is transferred to a long-term detention facility. Virtual visitation options, including the VAV program, allow legal representatives, assistants, and interpreters to schedule confidential meetings via video platforms such as Zoom or WebEx through ICE's online Detention Facility Appointment Scheduler or by email in exigent circumstances, with no audio or video recording permitted. Phones and electronic tablets enabled to permit virtual calls are also provided for detainee use.

**Burdens of the Requested TRO Relief**

32.     The requested relief would impose undue burden on ICE and would effectively prohibit ICE from temporarily holding any individual in the state of Illinois.

33.     First, ICE cannot increase the square footage, number of toilets and showers, or the number of secure phone lines, or private visitation rooms, as that would require significant and permanent alteration of the physical structure. Such significant construction and renovations would require the agency to solicit bids and otherwise comply with federal contracting law and, especially during the lapse in appropriations, would be a lengthy and burdensome process. The population of BSSA fluctuates daily and the proposed TRO provides no flexibility to allow for times when the population may briefly increase due to large-scale operations. Based on the current square footage available in the facility, Plaintiff's proposed dimensions would limit BSSA to hold no more than approximately 50 detainees at any given time.

34.     The proposed TRO would also require ICE to provide mattresses, soft blankets, towels, and other materials that are not currently stocked at BSSA. Soft fabrics may facilitate the transmission of disease, and without proper laundry services, which BSSA does not offer, such a

requirement may jeopardize the health and safety of detainees. Again, these detainees are only briefly held at BSSA prior to their transfer to a facility which does provide the requested amenities.

35.     Regarding unlimited access to the facility, the volatile situation involving protestors at BSSA has required the intervention of the Illinois State Police. The State Police screen and at times limit who may access the facility, thus ICE cannot guarantee that visitors would be permitted to enter, especially when there are combative subjects obstructing the entrances and exits of the facility.

36.     The proposed TRO also seeks to require regular and ad hoc inspections, including permitting photographic and video documentation, of the facility. These proposed inspections would undermine the safety and security of the facility as (1) it seeks unfettered access to all areas of the facility, not just the areas where detainees are located, (2) divert limited staff resources away from processing.  Documenting the inspection with photographs/video equipment raises significant privacy concerns both for the detainees and officers, in addition to undermining the security of the facility by potentially recording sensitive information such as alarm/ventilation locations, emergency evacuation routes, and other law enforcement privileged information critical to ensure the safety of the facility, its residents, and its employees.

37.     The conditions at BSSA comply with federal law and ICE policies and guidance. The TRO would severely compromise DHS's ability to carry out its enforcement responsibilities in the region. It would also create irreparable harm to government operations while providing no meaningful benefit, as detainees are promptly transferred to facilities designed for long-term detention.

I declare under penalty of perjury that the foregoing declaration is true and correct to the best of my knowledge and belief.

Executed at Chicago, Illinois on November 3, 2025.

_____

Shawn Byers
Deputy Field Office Director
U.S. Department of Homeland Security
U.S. Immigration and Customs Enforcement
Chicago, Illinois