IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PABLO MORENO GONZALEZ and FELIPE AGUSTIN ZAMACONA, ) Case No. 25 C 13323
)
Plaintiffs, )
)
v. )
)
KRISTI NOEM, et al., ) Chicago, Illinois
) November 4, 2025
Defendants. ) 9:32 a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiffs: RODERICK and SOLANGE MacARTHUR JUSTICE CENTER
BY: MS. ALEXA VAN BRUNT
MR. JONATHAN MANES
MS. DANIELLE BERKOWSKY
MS. JAMIA RUSSELL
160 East Grand Avenue, 6th Floor
Chicago, Illinois 60611

THE ROGER BALDWIN FOUNDATION OF ACLU, INC.
BY: MR. KEVIN M. FEE
MS. MICHELLE T. GARCIA
MR. SAMUEL COLE
MS. JENNIFER STARK
MS. KATHLEEN HICKEY
150 North Michigan Avenue, Suite 600
Chicago, Illinois 60601

EIMER STAHL
BY: MR. NATHAN P. EIMER
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604-2516

For the Defendants: UNITED STATES ATTORNEYS' OFFICE
BY: MS. JANA L. BRADY
327 South Church Street, Suite 3300
Rockford, Illinois 61101

MR. PATRICK WALTER JOHNSON
219 South Dearborn Street
Chicago, Illinois 60604

ALSO PRESENT: MR. JORGE LUIS CARBAJOSA
Certified Spanish Interpreter

Court Reporter: NANCY L. BISTANY, CSR, RPR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 1706
Chicago, Illinois 60604
(312) 435-7626
bistanyofficialtranscripts@gmail.com

* * * * *

PROCEEDINGS REPORTED BY STENOTYPE
TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

THE CLERK: 25 C 13323, Gonzalez versus Noem.

Counsel can approach.

MS. VAN BRUNT: Good morning, Your Honor.

Alexa Van Brunt, the MacArthur Justice Center, for the individual plaintiffs and the putative class.

MS. BRADY: Good morning, Your Honor.

Jana Brady and Patrick Johnson on behalf of the government.

THE COURT: Good morning, folks. There are obviously other counsel present here today, so maybe they can introduce themselves.

MR. MANES: Your Honor, Jonathan Manes, MacArthur Justice Center, for the plaintiffs.

MS. GARCIA: Your Honor, Michelle Garcia on behalf of the plaintiffs with The Roger Baldwin Foundation of ACLU Inc., ACLU of Illinois.

MR. COLE: Good morning, Your Honor.

Samuel Cole from the ACLU, also on behalf of the ACLU.

MR. EIMER: Good morning, Your Honor.

Nate Eimer of Eimer Stahl on behalf of the plaintiffs and putative class plaintiffs.

MS. BERKOWSKY: Good morning, Your Honor.

Danielle Berkowsky for the plaintiffs with MacArthur Justice Center.

MS. HICKEY: Good morning.

Katie Hickey on behalf of the plaintiffs, also from the ACLU.

THE COURT: All right. Good morning, folks.

This is here on the plaintiffs' motion for a temporary restraining order. We have received a response that was the -- the plaintiffs had submitted a number of declarations. The defendants have submitted a declaration as well.

So this isn't a TRO without notice, obviously. This is more like a preliminary injunction proceeding at this point.

We have a couple of things. One of my first questions was, where are the plaintiffs? And I was told that they are actually here.

MS. VAN BRUNT: Your Honor, they are at plaintiffs' table right now. Mr. Pablo Moreno Gonzalez and Mr. Felipe Agustin Zamacona.

THE COURT: Could you introduce them, please?

MS. VAN BRUNT: Pablo.

MR. GONZALEZ: Pablo Moreno Gonzalez.

MS. VAN BRUNT: And Felipe.

MR. ZAMACONA: Felipe Agustin Zamacona Saboeranis.

THE COURT: Do each of them need translators?

MS. VAN BRUNT: No.

MR. ZAMACONA: I don't need translators.

THE COURT: Good. Thank you.

MS. VAN BRUNT: Mr. Moreno Gonzalez does, and we have provided one today, a certified court interpreter.

THE COURT: All right. Good.

All right. So we have to proceed today, I think, on the papers that I have, and there's a couple of things we could take care of, some housekeeping things.

There is a motion for class certification. I just got a response to that. I assume you want to reply to that.

MS. VAN BRUNT: We do, Your Honor, if possible.

THE COURT: Sure. I don't think we're going to get to that today, obviously.

MS. VAN BRUNT: Thank you, Your Honor.

THE COURT: So how soon can you reply?

MS. VAN BRUNT: Team? Three days, Your Honor.

THE COURT: Fine.

MS. VAN BRUNT: We'll take three days. Thank you.

THE COURT: Well, let's say by Friday then, by Friday.

MS. VAN BRUNT: Sounds good.

THE COURT: There's also a motion for an expedited discovery, but I think we should talk about that later today.

MS. VAN BRUNT: Of course.

THE COURT: Is there anything that either side wants to say before I get to my agenda here?

MS. VAN BRUNT: Well, Your Honor, a couple things.

If it pleases you, I have an opening statement. We

can ditch it altogether if that's not helpful.

I'll also say that we do have witnesses ready and willing to testify; the plaintiffs, of course, and then three other people who are recently detained in Broadview and two attorneys. And we think their testimony is important, particularly given the response we received last night.

So we would put them on but only with Your Honor's leave.

THE COURT: Well, I think we're going to have to get to that. I wanted to go through the issues that I thought were contested and the issues that may not be contested.

Does the defendant have anything?

MS. BRADY: Yeah, just briefly. And I apologize. I was just assigned to the case on Sunday evening, so I'm trying to play catchup. And we only today received the plaintiffs' exhibits. I haven't had an opportunity to review any of them.

THE COURT: Most of those exhibits are the declarations.

MS. BRADY: So about 40 of the 60 exhibits. So there's still that extra 20 that I haven't even taken a look at.

THE COURT: Okay. Well, we'll do what we can today. I think you all know that I swore in a jury yesterday in a criminal case, and we adjourned it for today's proceeding in this case, but we're going to be proceeding in that case

tomorrow, Thursday, and Friday.

It is possible -- we have Veterans Day next week, which gets in the way of things. It's possible, almost likely, that that case will be concluded by the middle of next week sometime, Thursday probably, hopefully Friday.

So if we have to continue this proceeding, we'll be able to give you a date to do that, but I really won't know that until probably Friday of this week. The government might rest on Friday. And if they do, then I think we probably would be able to conclude that case by next Thursday and set this for Friday. That's just a possibility.

All right. Did you want to make an opening statement?

MS. VAN BRUNT: Your Honor, if it would please you, I would, because I hope it will address some of the issues that we do think are contested and highlight the ones that are not.

THE COURT: Well, let me do this, because I was prepared to go through the issues that were raised by the plaintiffs in their motion and in the declarations that we did get last Friday. And, of course, those are the ones -- I just got the other exhibits today, so I'm with you on that one. But I wanted to go just go through some of these, the more consequential ones and the ones that I think are either uncontested and have not been addressed by the defendants.

So let me just do that, and then you can --

MS. VAN BRUNT: Of course.

THE COURT: -- you can make your statements -- your opening statement off of what I'm about to do.

So I have sworn declarations by the plaintiff. I will say that I recognize some of those declarations contain inadmissible hearsay. Some of them are anonymous. Some of them I am not going to be able to actually consider as evidentiary declarations, but most of them I think I can. And the ones that I'm talking about now are ones that I think I can recognize as appropriate declarations in support of an injunction.

So, first of all -- and I'll try to mention where all of them are contested by the defendants' submission as well.

So the first ones are that -- we'll talk about counsel. There's a number of declarations that claim that the detainees at Broadview were not allowed to speak with their lawyers. They're not allowed to use the telephones or unable to -- we could talk about that in a moment -- that the lawyers are not allowed access to the clients, either by phone or in person, and that the clients were not listed on the ICE locator, so they couldn't even determine that they were in Broadview or where they were.

This is contested by the defendants.

So the whole issue of counsel is very important, obviously, under the First and Fifth Amendments and Sixth Amendment, for that matter, for those who are facing criminal

charges. So we have to deal with that.

I also have sworn declarations that the detainees are just given one bottle of water with each meal, and that's two or three times a day and that they're only given two meals a day consisting of, generally speaking, a small Subway sandwich. None of them mention a hot meal at all, and they say that there are -- it's not sufficient food for them or water for them.

They also claim that if they ask for more water, they're denied any additional water or food, and sometimes they are harassed by the staff when they do ask for more water or food. That's contested by the defendants as well.

There are many declarations that say they're not given -- that the detainees are not given any toothpaste or brushes or soap or other cleaning materials; that female detainees are not given feminine hygiene products. This, again, is contested by the defense.

They also claim that there are a number of them -- in fact, a great number of them, claim that they were coerced into signing documents that they didn't understand because they were in English, and the detainees did not read English and that these documents were documents that agreed to voluntary departure. Many of the declarations say that the people declined to sign them. Some of them say that they did sign them, and some of them say as a result, they were deported based on those documents.

That really is not mentioned in the government's submission that I could find anyway. I know we all are dealing with these issues on a very expedited basis. So if I miss something, you could correct me, but I didn't see anything in the government's submission that actually dealt with that issue.

There are declarations that claim that there are no beds or mattresses in the holding rooms and that people are held there for a fair amount of time, days, sometimes even longer than that, for many days; that there is no room to sleep, that they have to sleep on the floor or in plastic chairs, that they have -- the floors are concrete and cold, that the air conditioners are turned on -- remember, most of these were from September when it was quite warm -- the air conditioning was turned on, and it was very cold, and people were unable to sleep who were held overnight.

There were no blankets or pillows. They were given -- some people were given the plastic blankets, but they were not sufficient to keep the people warm. And they were also very noisy at night and were -- and the noise of the blankets, along with the air conditioning and the lighting, made it impossible or very, very difficult to sleep; that some people -- that there wasn't even room on any of the benches or chairs or even the floors to sleep properly for those people who were held overnight.

The defendants have submitted in their declaration that there are benches that can be used to sleep or sit on that are padded, but there's really nothing in that declaration to inform the Court about how many people were in the room and how many -- how much room was on the benches, which required people to sleep on the floor.

Some of those areas on the floor were next to toilets that had overflowed, and there was human waste around those toilets and near where the people had to sleep. That really isn't addressed in the defendants' submission either.

There are many declarations that say the cells are not cleaned at all and that some of the declarants had asked for cleaning material that was denied to them.

That is contested. They said -- the defendants say that the cells -- I call them cells; they're called holding rooms -- are cleaned every day. So that's a contested fact.

The defendants agree that there are toilets in the holding rooms. They're exposed. We don't -- there are some declarations that say they're either clogged or not working or they're not cleaned, and there's human excrement in the area of the toilets. And there are cameras everywhere.

There's really nothing in the defendants' submission that I saw about cameras and how those cameras are being used or whether -- whatever they record or whatever they are seeing is recorded or not. I think that's something we want to talk

about.

There are some declarations that say that the toilet use can be seen by members of the opposite sex, but there's also some declarations that say the women's holding area has been covered to prevent that, so that may be a moot point at this -- at least for now it might be.

There are many declarations that say the detainees are not allowed to keep medications and other -- well, to keep the medications that they brought with them for diabetes or other medical conditions and that when their family brings the medications to the institution to give to the detainees, they're not allowed to do so.

The government -- I keep calling it the government.

The defendants here contest that, but they agree there are no medical services at the detention center.

Obviously, the declarants also say that the rooms are terribly overcrowded, and I think that's probably the leading cause of all of these conditions.

They say that the showers do not work. The defendants say in their declaration that there are showers, but they're out of order. Showers that are -- there may be showers, but if they don't work, they're not showers. One is reminded of Auschwitz when one thinks about that. There were showers there that didn't work.

So there's a contest about whether these showers work.

They don't -- even though the defendants say there are showers there, they don't say they were working showers. Just like the toilets may be working.

As far as phones go, the defendants say there are phones there, but the declarants -- the plaintiffs' declarants say that those phones don't work, that the calling cards aren't able to get through to family or attorneys and that the -- contrary to what the government says, any attorney communications, according to the plaintiffs, are observed by the officers.

There are a couple of declarations that say when the officers have allowed the detainee to use the detainee's cell phone to call family to tell them where they are and the family hands the phone to the lawyer, there's some declarations that say the officer will hang up the phone and prevent that communication. So that's a contested fact as well.

The declarants say there are no changes of clothes. Some of them say -- there's a few that say they did get a change of clothes, but many say that they were there for many days without any change of clothes. And they came in wearing summer clothes, and they were exposed to very cold conditions.

They say the lights are on 24 hours a day, which I mentioned before.

I also got three declarations from Congressmen Davis, Garcia, and Ramirez, but that's not really part of this case

that I can see. They may have their own -- their own claims to make, but that's not -- they're not detainees, obviously. And their complaints, however legitimate, are not -- should be properly asserted elsewhere, I would think.

So that's my summary of where we are at. So, counsel, if you want to add anything to that, please feel free to do so.

MS. VAN BRUNT: Your Honor, that was a very fulsome summary of the record. I would just make a couple additional points about what is not contested.

I think one of the most important claims in this case is about the denial of access to counsel at Broadview, and that is particularly because federal agents are forcing detainees to sign forms relinquishing their rights, including voluntary departure forms.

And we also know from these declarations that detainees have signed these forms to get away from the conditions in Broadview. Declarations have on the record say this. We also have witnesses today who will say this.

The defendants do not actually deny that attorney access is a problem in Broadview. They say in their TRO response from last night, page 6, quote: Attorney access to an individual in ICE custody is limited while ERO is actively booking and processing the individual, which accounts for the majority of time spent in BSSA, otherwise known as Broadview, prior transfer -- to transfer to a long-term holding facility.

The defendants also don't dispute that confidentiality is a key part of the attorney-client relationship, and they don't dispute that confidential client-attorney consultation is impossible at Broadview because, as they acknowledge, there are no unmonitored lines anywhere in the facility.

As a result, detainees cannot consult lawyers about their rights or legal pleadings or about what they should do if someone signs -- pushes a form in front of their face in a language they don't understand.

We also would contest the defendants' claims about the ICE locator, which goes to the matter of attorney access. Attorney after attorney who has represented somebody inside Broadview will say it is not updated; it is not accurate.

Indeed, right now Mr. Zamacona is not accurately in the ICE locator. It does not show him in the locator if you type his name in. And we have witnesses today who will say the same.

And part of the problem is because detainees are not processed very quickly, and we have declarations speaking to that. So it may take days for them to get updated. And in that time, families don't know where they are; attorneys don't know where they are. The result of this is a denial of the right to hire and consult with counsel in violation of the First Amendment and a violation of substantive due process as well.

It's also very clear that no visits are happening, and the defendants don't really contest this. They suggest that there's an emergency in the form of protests happening at Broadview that make visits unsafe. But that's a red herring, because we have declarations from the summer prior to the protests in which people were not getting lawyers, in which lawyers could not access their clients.

We also know that the protests happen largely on Friday and Saturday, and denial of access to counsel is a problem 24 hours a day, 7 days a week. The witnesses today can speak to that.

And in any event, protests outside do not warrant the depravation of the rights of the people inside, particularly when their most fundamental due process rights are at stake.

The defendants suggest that the denial of access to counsel at the point of initial detention is not such a big deal because they're going to be transferred soon. This is a major part of their argument.

The problem is the defendants cannot trample on the right to counsel at this crucial stage in the process, the initial detention, when government officials are demanding that people sign forms that relinquish their due process rights forever more, where the government is trying so doggedly to deport people such -- at such a fast rate. And they say that is, in fact, the reason that they are processing people so

quickly in Broadview and trying to get them out of the facility. Where they are doing that so quickly, access to counsel is more imperative than ever. Because once somebody signs away their rights, it's done; it's unreviewable. We have declarations to that effect, and witnesses, again, can testify to that today.

I will also say that there's no legitimate government interest in holding people in the punitive conditions here. This is not an issue of a single clogged toilet or of not getting a Fiji water bottle, as the defendants suggest in their responses. Your government -- as Your Honor laid out, these are a set of dire conditions when taken together paint a harrowing picture.

As the Seventh Circuit said so clearly in *Budd v. Motley*, multiple conditions of confinement may violate the Constitution in combination when they have a mutually enforcing effect that produces a depravation of a single identifiable need. And the joint effect of conditions at Broadview is to deprive the putative class and plaintiffs of the basic human needs, water, sleep, medical care, sanitation, warmth, and reasonable safety.

Given that, there is just no reasonable basis for the defendants to be treating the class this way, and that is further evident from the fact that most of the conditions here violate their own policies, both their detention standards and

the policies governing the hold room, the 12-hour policies, which goes to show there are other ways to be treating people in these conditions.

If Your Honor would like, I'm happy to also address the 1252(g) issues that the defendant raised, because I know that is a jurisdictional question at issue today, but we can also hold off on that if that is appropriate for later.

THE COURT: Well, go ahead.

MS. VAN BRUNT: Okay. Well, the government in their TRO response argues briefly that 8 U.S.C. 1252(g) categorically bars jurisdiction here. And that provision provides that no court shall have jurisdiction to hear claims arising from the decision or action by DHS to commence proceedings, adjudicate cases, or execute removal orders. Those are the three categories covered by 1252.

The government states that our case about the right to basic living conditions and the right to have an attorney at a crucial stage in the process somehow challenges the government's decision to commence removal proceedings, but that does not hold water with the Supreme Court's decision decades ago in *Reno v. AADC* that we should interpret 1252(g) narrowly and only as it applies to the three discrete actions I just laid out; commencement of proceedings, adjudication of cases, or execution of removal orders.

Indeed, in a court in this district just weeks ago in

*Ochoa Ochoa v. Noem* held that 1252(g) did not bar the kind of conditions claimed here.

And the Seventh Circuit has held that 1252(g) does not foreclose review of claims that, like these, concern detention while the administrative process lasts, as these may be resolved without affecting pending removal proceedings. And that's from *Parra v. Perryman*, a 1999 Seventh Circuit case. *Parra* is straight Black Letter Law here. We're talking about conditions. We're talking about the right to access counsel.

It does not get at whether the government can still retain the power to instigate removal proceedings. Clearly they are. We are not challenging those. It is about the basic rights of people once they are in detention.

We are seeking an immediate restraining order to enjoin the defendants from keeping immigrant detainees in these current conditions, including in overcrowded conditions, without sleeping supplies, and without medical care or adequate food and water and without hygiene and access to bathing facilities.

And we are requesting that the defendants provide immediately access to unmonitored phone lines and attorney visit rooms so that it is not longer operating like the black site that it has been operating as in the past months.

We provided the Court a proposed TRO, and it tracks very closely the TRO that was entered in *Barco Mercado*. And in

that case, the judge also found that the detention conditions alleged by the plaintiff declarations were sufficient to find a TRO was appropriate and then later a preliminary injunction.

And the last thing I'll say is that the defendants' only source of factual disagreement comes through the declaration of a -- of Shawn Byers, who is a -- I just want to make sure I get his title correct -- deputy field officer who -- give me one second, Your Honor, please -- he is the Chicago Deputy Field Officer Shawn Byers, but according to his declaration, he's responsible for overseeing the identification and arrests of noncitizens and supervising removal proceedings.

He is not responsible for overseeing Broadview operations. There's nothing in his declaration to suggest he has firsthand knowledge of all the information that he purports to provide in that declaration. He does not.

THE COURT: Well, he says his duties include intake processing and transfer of the detainees, ensuring compliance with the ICE policies, and that he's familiar with the Broadview facility and can testify about the conditions there.

MS. VAN BRUNT: Well, he does say that generally, Your Honor, but his specific duties don't suggest that he has that actual knowledge on the ground. He's also not here today, so we can't test his knowledge in that way, but I will say he doesn't --

THE COURT: You'll have a chance.

MS. VAN BRUNT: He does not dispute the specific evidence supported by the 36 declarations.

The case *Barco Mercado*, there was a similar declaration put forward by a similar Portland -- a similar assistant field office director. And the court there found that the plaintiffs' declarations were sufficient to overcome that declaration, were sufficient to establish that a TRO was warranted, that the plaintiffs have shown a likelihood of success on the merits.

So, too, here we have done, and we would like the opportunity to put on further evidence this morning and then welcome the chance to discuss what relief would be warranted in a TRO.

THE COURT: All right. Thank you.

MS. VAN BRUNT: Thank you.

THE COURT: Counsel.

MS. BRADY: That was a lot, Your Honor. Okay. So it seems as though counsel did a twofold response to your invitation to speak. First, we talk about what facts are contested, and then she put on her legal argument.

So I'd like to have the opportunity to do the same, if it's okay with Your Honor.

THE COURT: Sure.

MS. BRADY: Wonderful. Thank you.

Now, first and foremost, the declaration of Mr. Byers

is not going to be able to refute every single fact laid out in 40 declarations when we've only had hours to respond. That's the issue -- one of the issues with a TRO and why the burden is so high for the plaintiff to meet, because they're ahead of the game.

Some of these declarations were dated last month. We're just still catching up. And so in order for the Court to have a more robust and developed understanding of the case, that would require additional time for us to be able to fact check everything that is stated in the declarations. So I just want to put that out there, that we haven't had the same opportunity to develop the facts that the plaintiffs had.

So with that said, all right, yes, we do contest that they're only limited to one bottle of water with meals. It's our understanding that there's water fountains in the holding cells, and they're able to get water upon request.

THE COURT: Okay. There's one declaration that says the only water available was undrinkable.

MS. BRADY: That was from the sink. I don't know the circumstances. Again, you know, we haven't been able to fact check everything.

But in terms of the hot meal, it's my understanding that every day there is a hot meal in the form of burrito. They're offered Jimmy John's, but they are offered three meals a day that --

THE COURT: Subways. They were offered Subways.

MS. BRADY: I was told Jimmy John's. So I guess that is a contested issue then.

THE COURT: Okay.

MS. BRADY: Now, in terms of hygiene products, I was told that those things are also available upon request.

I'm not sure what requests were made with a lot of these declarants. In terms of the signed document, the declarations were very vague in terms of what these documents are that they're allegedly being coerced to sign.

I do believe that Mr. Byers' declaration tries to address that issue in paragraph 26 of docket 39, where he talks about how the detainees are served with charging documents, and they're also talking about any documents that might be used to process any claims of asylum.

I don't know specifically what they're talking about, but it may be that they were presented with the opportunity to self-deport in exchange for $1,000. And that is something that the officers are duty bound to offer.

What amounts to coercion, I don't know. That hasn't been developed. That's a legal conclusion. But it's my understanding from the government that that is not a coerced document. So that is a contested issue, but I do want to just put forward to the Court that we did our best under the time constraints to address that issue and without knowing what

specific documents they were referring to.

THE COURT: Well, it would be nice to see what those documents are.

MS. BRADY: We were able to confirm that the plaintiffs here did not sign those documents. It's my understanding that they were just issued notices to appear. Those are the only documents, along with their rights. So that's not a specific issue for these plaintiffs.

THE COURT: But the document -- remember, this is a putative class action, which we will get to in due course, but it would be good for the Court to see what documents were -- even if they didn't sign them, what documents they were presented with.

MS. BRADY: I agree 100 percent, Your Honor. The record isn't developed. We don't know. There's a lot of unknowns here.

THE COURT: I agree with that.

MS. BRADY: All right. In terms of beds, it is true there are not beds in the holding cells. They are not intended to be accommodations. It's not intended to be a long-term detention facility. We agree that's, you know, an issue that we address legally.

Now, in terms of --

THE COURT: Legally or factually?

MS. BRADY: Well, I mean, it's not contested that

there are no beds in the cells. That's not contested. So we do have a legal argument, because -- and I'm going to get to that -- this is Seventh Circuit case law that says sleeping without a bed, even sleeping on the floor overnight, is not such an objectively serious depravation to amount to a violation of the Constitution when it's a limited time frame.

THE COURT: I'm interrupting you. Why don't you finish your presentation, and then I'll have some questions.

MS. BRADY: Thank you. Now, in terms of the toilets in the holding cells being exposed, there have always been half-wall partitions that you can actually see on the diagram of Mr. Byers' declaration. But as you said, it's probably a moot point at this time because the windows are covered for privacy.

You know, and I think that's one thing that you might come to learn as the evidence comes out. The government has improved the operations at the Broadview facility over the past couple of months because it's been a learning curve. It is true that historically it's been a 12-hour facility where some of these issues haven't come to light, but there has been a waiver which allows up to 72 hours for, you know, stays while they're being processed. And so they have learned some things along the line.

For example, I was told yesterday, in terms of cleanliness, the Broadview facility ordered wipes so people

could sanitize themselves. These are little things that they're trying to do along the way.

And I've been told that to the extent that there were any delays in processing the detainees early on, those delays are not happening now because they've improved their efficiency. But these are all things that we'd have to flush out with additional evidence.

But getting back to the contested issues, medications, the detainees were allowed to have medications brought into the facility. Whether or not these detainees called to have family members pick them up and drop them off, I don't know; but I'm not aware of any situation where a detainee was denied medications that were absolutely brought to the facility. So that's one thing.

And in terms of medical care, it is true there is not a doctor on-site, but there are references in the records to detainees being brought to the hospital. So if medical treatment was necessary, it was provided.

Now, in terms of the phones, this is my understanding of the phone situation.

They are -- the detainees are allowed a phone call when they get in to whomever they choose. Once they're in the holding cells, they have access to a phone. They could make collect calls. They could make free calls to, I understand, pro bono attorneys. They're provided a list of pro bono

attorneys. And I think that's important to know.

And then also, if they need to speak with their attorney, they could make arrangements to do that by calling them. I understand that the phone lines might not have been as open for the attorneys to initiate those visits, but the detainees have been able to initiate those visits if they so choose.

The in-person visits have been somewhat restricted in the last couple of months because of what is going on outside. There are a lot of security issues. And I think as you see in our briefs, there's no right to an in-person visit with an attorney, particularly when this is just a short transfer facility.

Clothes are permitted to detainees if they come in soiled clothes. If their clothes are soiled, they're going to get new clothes. And that might have been what's referenced in the declarations. But you're right, they don't get new clothes when they're there just for a short period of time.

Now, the ICE locator, I mean, that seems to be an IT issue. When they process these people, it's supposed to cycle within hours. To the extent that it might have been slow, it's not a human error. It might have just been because the systems have been busier than usual, but it's not something that is backed by ill intent or any kind of intent to deprive the detainees of a right to counsel.

All right. And as you kind of alluded to, Your Honor, Mr. Byers is on-site at Broadview. He's very much familiar. He's the one that ordered the wipes for the detainees, and he's the one that told me that they're going to be there today.

Now, getting to the legal issues, as you know, three-part test for a TRO: It's a high burden; particularly given the quick and the short notice that we've been given, we haven't been able to develop the facts.

Likely to succeed on the merits, irreparable harm without a TRO and the balance of the equities. First I'd like to address a threshold issue, being the plaintiffs do not have standing.

Their claims are actually moot. They're no longer at the Broadview facility. There are no plans to return them. So I think that is a major issue, both in terms of their ability to bring this lawsuit. No TRO is going to provide them with relief.

And then it's also an issue for them being representative class -- class representatives for their motion for certification.

THE COURT: Where are they being held now?

MS. BRADY: I'm sorry?

THE COURT: I said, where are they being held now?

MS. BRADY: The MCC. In fact, it is my understanding that the plaintiffs were only at Broadview for less than 24

hours in one case, less than 48 hours in another case. And I believe they might have been transferred out of Broadview before this lawsuit was filed, if not on the same day. They went to Greenville --

MS. VAN BRUNT: Oh, I have to correct that record, Your Honor.

MS. BRADY: Okay.

MS. VAN BRUNT: They were transferred five or six hours after we filed. They also showed back up at Broadview yesterday. There's a very strong likelihood they could end up there again, because it is the main processing facility.

THE COURT: We'll hear from them. Why don't you let her finish, please.

MS. BRADY: Thank you. In any case, it was just within hours of the complaint being filed. I believe they were sent to Missouri where they were intended to be for a long-term stay.

They were only returned because this lawsuit was filed, and they were ordered to appear. So they had to get processed through Broadview, and then they were placed in the MCC.

It was never the intent to have them be processed at Broadview again. So their claims are moot, and they're not good class representatives, not just because the TRO cannot provide them any relief but also because their experiences at

Broadview are different than the ones of the other class members. But I will hold that. I will put a pin in those arguments later.

Now, also the conditions that we discussed, whether they're contested or not contested, they do not violate the Fifth Amendment. First of all, the conditions are not sufficiently serious on an objective basis. Our brief cites the cases where the Seventh Circuit has said sleeping on the floor for a short period of time is not enough, not being able to shower for five days is not enough.

There was not any sort of long-term, serious depravation. It was more in the line of a de minimis short-term depravation, even if you believe everything the declarations say.

The government's actions were not objectively unreasonable because they have a purpose, not of harming people but of processing these people so they can move them on their way to a long-term facility where more resources are available.

And, again, in terms of the communications with the attorney, any restrictions that are there, if they're there, particularly with respect to in-person visits, is because allowing in-person visits would actually delay the transfer process.

If somebody is just going to be there for six hours and they're demanding to meet with their client for one hour,

that's going to slow everything down. There's no Constitutional right to in-person visits.

The clients are able to call the attorneys, and particularly, they could call their attorneys once they get to the facility. But as soon as they're there, they get that one call, so that if there's any alleged coercion with the paperwork, they could make that call to their attorney.

THE COURT: That's obviously contested.

MS. BRADY: I agree. I agree.

Again, we don't have a robust and developed record given this stage. I've only known about the case for about 24 hours.

Now -- and, again, there is no irreparable injury to the plaintiffs if the injunction is denied, because this injunction, if it's granted, will not affect them at all. And the balancing of the equities, I think that's a particularly important consideration, particularly in this case, which makes them *Mercado* case that counsel cited to different.

Illinois is unique, because it has laws that prevent other facilities from housing detainees. Okay? Broadview is it, right? So if they don't go to Broadview, we can't just send them to McHenry, which would speed things up.

The reason why we were able to process people within 12 hours in the past is because there were places like McHenry County that could house these people, but now we're in a

situation where there's nowhere to put them in Illinois.

Granting this TRO as it's proposed currently would effectively halt the government's ability to enforce immigration laws in Illinois. There's nowhere to put them in Illinois. It does take longer to find beds in other states.

Now, in that -- and if it holds, enforcement of immigration laws in Illinois, that presents other issues, like separation of powers. It gets into the point of subject matter jurisdiction and 8 U.S.C. 1252(g), which counsel mentioned, because any way that this TRO is entered, it would effectively halt operations. So it does fit within that section.

The government has a mandated goal of seeking the removal of individuals who are violating immigration laws. Whether it's popular belief, they do have that ability to do it, and they are doing what they believe their job to do.

And for those reasons and because any TRO entered by this Court would not provide relief to the plaintiffs, we ask that the TRO be denied.

THE COURT: Would you like to reply briefly?

MS. VAN BRUNT: Just very briefly, Your Honor.

On the objectively serious question, a few points. Defense counsel cites repeatedly to *Antonelli v. Sheahan*, which is the case about sleeping on the floor for one night not being a violation of the Constitution.

We are not talking about one person sleeping on the

floor for one night. This is a combination of horrific conditions when put together in the form of *Wilson v. Snyder* causes a great human catastrophe. And talking about sleeping on the floor, not having hygiene, being near a toilet, lights on all night, not having sufficient clothing, not having sufficient food, it's all of the conditions taken together that are the issue. And pulling them out one by one misstates what this case is about.

Many of the cases the defendants state are also brought under the Eighth Amendment. That's a deliberate indifference standard. That's not what we're dealing with here.

It's a Fourteenth Amendment case in the jail context, a Fifth Amendment case here. It's objective reasonableness. The burden is not as high in the Eighth Amendment.

Here we just have to show the conditions are objectively unreasonable and that the defendants acted knowingly or recklessly. We have much evidence in our complaint to show that they did and that is all the results of their very intentional immigration policies, including mandatory detention, enhanced arrests, and the waiver policy that counsel referenced.

And we have to show that there's not a legitimate government reason for it. And the fact that they want to deport people more quickly does not give them a legitimate

reason to deny basic rights to be heard in court. Due process is the most basic, the most fundamental of all rights. And what is happening now in Broadview is removing those rights altogether.

I would say that we have to remember a TRO is emergency relief because it's an emergency. So, no, we have not flushed out the record. That will happen in good time. We've asked for a motion for expedited discovery to do that prior to a preliminary injunction hearing.

A TRO is meant to improve things for a short period of time, usually 14 days, so people are not suffering as they have been suffering for months and so people are not forced to sign things that waive away their rights for the rest of their life. That is what we are seeking here.

And it is, in fact, worse than in *Barco Mercado,* because, as counsel said, Broadview is the show. This is it. Everyone is going to Broadview. So the rights that are denied at Broadview mean that they're affecting the large portion of people that are arrested in the State of Illinois.

The defendant says that they're going to halt all operations in the state if they have to improve people's conditions by getting them beds, getting them proper food, and perhaps allowing them to bathe. But that is a fully unfounded statement, and it is belied by the fact that they have been able to comply with these exact same kinds of fixes in other

cases across the country, most recently in *Barco Mercado* where there's been a tremendous support or tremendous improvement in conditions since the TRO and PI went into effect.

THE COURT: Their point is that there are no state facilities available for them to use as there were in New York.

MS. VAN BRUNT: Your Honor, we can discuss that fully, but I would say a couple things.

First, they were able to whisk away our clients overnight at a moment's notice in three hours across many state lines, so that they were no longer in Broadview, no longer in the State of Illinois. It is hard to see why they are, you know, hamstrung from doing the same with other people.

There's also been much talk of them expanding their operations beyond the building of Broadview. I don't know if that is, in fact, true. But Kristi Noem, a defendant in the this case, has been seen, you know, giving a tour at a building across the street that is much larger from Broadview.

I just don't want us to take it at their word that there's no other option here to treat people with basic human decency and respect.

Pardon me.

(Counsel conferring.)

MS. VAN BRUNT: Oh, and as -- yeah, as my co-counsel points out and is clear for the named plaintiffs, there are federal facilities here. Our named plaintiffs are in the MCC

right now. They are downtown. They are being held appropriately. They are being fed. They had a bed to sleep in. They were able to have clothes here today.

So there are other options, and I would not -- I would not defer to the government on this story of terribles where we don't know the actual facts about what could else be done to protect those who are in immigration custody in Illinois.

MS. BRADY: May I just follow up quickly?

THE COURT: Sure.

MS. BRADY: Okay. If you look at their TRO and you apply their person-per-square-foot analysis, which is -- which we understand is probably from the jail detention standards, that would only allow 10 people in what I believe is their largest holding cell. It would absolutely shut down their operations.

And in terms of the federal facilities, 14 days, we are not going to be able to just ship them to other facilities overnight. It's just things don't work that fast.

What I suggest that we do is we focus on what, if anything, could be fixed without shutting down the entire facility. We can't help despite the fact that we have a certain amount of space, but we could do things, which what we're actively doing is decreasing the amount of time that detainees spend in the facility. We could do things like provide baby wipes to the detainees so they could clean

themselves.

So, again, I urge you not to enter the TRO as it's presented by the plaintiffs, because it would shut down the facility. I urge you instead to talk about the things that we can fix.

MS. VAN BRUNT: Your Honor, apologies. I forgot to mention a couple things.

Waukesha Jail, Dodge County Jail, Clay County jail are very close by and have been used prodigiously by the defendants to transfer people from Illinois. So clearly, they are options very -- very close and right outside the state borders.

MS. BRADY: One follow-up. There needs to be available beds in order to send them there.

THE COURT: Do we know whether they are?

MS. BRADY: I asked yesterday whether there's available beds, and I was told it is something that they have to struggle with. There's not always available beds, so that is something -- there are things that need to be put into place.

MS. VAN BRUNT: Our named plaintiffs were brought to Waukesha yesterday before being brought to the MCC. Before that, they were in -- were they in Clay County? No, they were in Missouri.

There are many, many, many of our client declarations, our plaintiff declarations came out of Clay County where they

were transferred after Broadview. There are obviously options beyond Broadview if that presents a problem.

And the 50 square feet was also part of the *Barco Mercado* TRO.

THE COURT: That's where you got it from.

Okay. Let me just make one observation here, put this behind us. I agree with the plaintiffs that the 1252(g) doesn't deprive the Court of jurisdiction. This is a conditions case. This isn't a procedures case. If the conditions are unconstitutional, so be it. Then the defendants here will have to figure out another way to comply with the Constitution. That's my job, to determine whether or not the conditions are unconstitutional.

Obviously, some of these conditions are, in my word, I guess, disgusting to have to sleep on the floor next to an overflowed toilet. That's obviously unconstitutional.

The cases that we had years ago really about sleeping on the floors in the Cook County Jail, for instance -- Mr. Antonelli was a frequent litigant in this court before your time -- those were because the Cook County Jail was totally overcrowded. And they were sleeping in the day room, and they were being provided basically with mattresses on the floor, and they were complaining about that. There were occasions where they didn't have the mattresses, and the Court of Appeals said that wasn't an unconstitutional condition. But it was very

brief, and luckily the Cook County Jail did increase its size and lessen its population.

So those cases, they're similar, but they really don't -- in my view, they don't have the precedential value that I think the defendants are claiming at this point.

So that takes care of the 1252(g) issue as far as I'm concerned, and we have to get to the merits of this right now.

So you have witnesses here?

MS. VAN BRUNT: We do, Your Honor. The named plaintiffs will also be able to address some of the certification and standing issues that counsel has raised. And so we would like to start with Mr. Moreno Gonzalez and then go to Mr. Agustin Zamacona.

THE COURT: Okay. What other witnesses do you plan to present today?

MS. VAN BRUNT: Then we have three other detainee witnesses. Two are live, Ruben Torres Maldonado, Sam Ochoa Ochoa. And one Claudia Guevara, we hope to present by the Webex link. She was removed from the country, is in Honduras. We've tested it out. It should work. And two attorneys, Shelby Vcelka, immigration attorney, and Kevin Herrera.

THE COURT: Sounds like a full day to me.

MS. VAN BRUNT: We'll be super efficient, Your Honor, but in light of the contestation of our allegations by the defense, we think it's important to really underscore the

emergency at stake here and the merits of our position.

THE COURT: All right. I just want to make another observation. I appreciate government counsel's position here having just received this emergency motion. I mean, I got it on Friday night myself, so I know how difficult it is to get your hands around something of this complexity and consequence. So I understand that, and that's why I gave the government an opportunity to respond.

But for some of these conditions, if they are, in fact, happening now, every day that goes by would be irreparably harming the putative class. So I would like to get this done as quickly as possible, given the Court's schedule and given the realities of the nature of the evidence here.

I would like to hear from the declarant -- the defendants' declarant, obviously, or somebody in his position. So let's go ahead and put your first witness on.

MS. VAN BRUNT: Thank you, Your Honor.

(Brief pause.)

MS. GARCIA: Good morning, Your Honor.

Michelle Garcia on behalf of plaintiffs.

Where would you like Mr. Moreno Gonzalez to sit?

THE COURT: On the witness stand. That's the whole point of the witness stand is to have witnesses on it.

THE CLERK: Please raise your right hand.

MS. GARCIA: We have a court interpreter.

THE CLERK: I know, but I still do my --

MS. GARCIA: Okay. Go ahead.

THE CLERK: Do you swear or affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes, I do.

(Witness duly sworn.)

THE COURT: Did you introduce yourself?

THE INTERPRETER: Jorge Carbajosa, certified Spanish interpreter.

THE COURT: Okay. Thank you, sir.

MS. GARCIA: Thank you, Your Honor.

Mr. Gonzalez, you can sit.

PABLO MORENO GONZALEZ, PLAINTIFF HEREIN,
DULY SWORN THROUGH AN INTERPRETER:

DIRECT EXAMINATION

BY MS. GARCIA:

Q. Mr. Moreno Gonzalez, what is your full name?
A. Pablo Moreno Gonzalez.
Q. And how old are you?
A. I'm 56 years old.
Q. And where were you born?
A. In Mexico.
Q. How long have you been in the United States?
A. It's been 35 years.

THE COURT: One moment, please. My clerk has a microphone and headphones that might actually help make this a littler smoother.

MS. GARCIA: Court reporter, do you need me to repeat those last questions?

THE COURT REPORTER: No, I'm good. Thank you.

BY MS. GARCIA:

Q. So you were telling us how long you lived in the United States. How long have you lived in Chicago?

A. 35 years.

Q. And in the time that you've lived in Chicago, 35 years, have you lived with your family?

A. Yes, I've lived with my family.

Q. Are you married?

A. Yes.

Q. And do you have two children?

A. I do have two children.

Q. And what are their ages?

A. I have a son, Efrain Moreno. He's 31 years old.

And I have a daughter, Alexandra Moreno. She's 21 years old.

Q. And are your adult children U.S. citizens?

A. Yes, they are citizens. They were born here in the U.S.

Q. Mr. Moreno Gonzalez, do you work for a living?

A. Yes, I do.

Q. And what do you do?
A. I work in construction.
Q. Is your construction job how you support your family?
A. Yes.
Q. Now, Mr. Moreno Gonzalez, you've been testifying in Spanish. Is that your first language?
A. Yes, it is my first language.
Q. How comfortable are you speaking English?
A. Well, it's a little bit difficult for me.
Q. Mr. Moreno Gonzalez, can you write in English?
A. No.
Q. Mr. Moreno Gonzalez, can you read English?
A. No.
Q. Mr. Moreno Gonzalez, let me direct your attention to Wednesday, October 29th. Do you remember that day?
A. Yes, I do.
Q. Did federal agents, ICE, arrest you on that date?
A. I was waiting for my boss to go to work.
Q. Was that in the morning?
A. Yes, in the morning.
Q. Approximately what time?
A. At 8:00, 8:00 or 9:00, more or less.
Q. And where were you waiting for your boss so that you could go to work?
A. I was waiting at Pulaski and Foster.

Q. And that is when the federal agents arrested you?
A. Yes, because I saw people running, and I got scared, and I ran.
Q. Okay. Now, Mr. Moreno Gonzalez, after they arrested you, did they take you to Broadview?
A. Yes, they did take me over there.
Q. And when you arrived at Broadview, did anyone let you call an attorney?
A. They only gave me this piece of paper. That's it.
Q. Okay. Did anyone let you visit an attorney?
A. No, they never told me that.
Q. Did you want to speak with an attorney?
A. Yes, of course, and I also wanted to speak to my family.
Q. Did you call your family?
A. I did call my family afterwards.
Q. Okay. And I wonder if you could describe that call.
Were there people around when you made that call to your family?
A. There were a lot of people.
Q. Was it difficult to hear your family on the call?
A. Yes, yes, it was difficult.
Q. And how long were you able to call and speak to your family, approximately?
A. About four or six minutes only.
Q. Was that enough time to speak to your family?

A. Yes, yes.
Q. Mr. Moreno Gonzalez, you mentioned some documents earlier.
Did anyone give you -- did any of the federal agents give you documents to sign?
A. They did, and they asked me if I wanted to leave, and they asked where I was from. I said I'm from Mexico.
And so why don't you want to go?
And I said, well, I have my family here. I don't have anyone in Mexico. I have my son and daughter here, and I don't want to leave. I don't want to go back to my country. I don't want to leave.
Q. Did the federal agents tell you anything else when they gave you the documents?
A. No, no. They just gave me that and then put me inside where everybody else was.
Q. So let's talk about where they put you.
Did the federal agents place you in a cell?
A. A cell where there were a lot of people.
Q. Approximately how many people were in the cell?
A. When I got there, there were, like, 150 or 170 people.
Q. And you said people. Were women in the same cell with you?
A. There were women across in front of where we were.
Q. In a different cell?
A. In another cell, yes.
Q. Were you able to see the number of women in the women's

cell?
A. I could only hear the voices of the women.
Q. And what did you hear from the women -- the voices of the women?
A. They were talking.
Q. Okay. So let's talk about the cell that you were placed in. You said 150 people at least, 150 men.
Were there any beds?
A. There were no beds.
Q. Were there mattresses?
A. There was nothing. They just had these chairs, and we were sitting like this (indicating), all of us, like this (indicating). Some were lying like this (indicating) and others like that (indicating).
And sometimes the bathroom being over here (indicating) and the bathroom being over there (indicating), then they would be lying down like there (indicating). It was just really bad.
Q. So let's talk about that a little bit.
Did you receive blankets?
A. Nothing. Nothing.
Q. And where did you sit?
A. I would sit like this (indicating) and sleep like this (indicating). And then the next guy, he would be like this (indicating), and then the next guy over here like this

(indicating).
Q. Mr. Moreno Gonzalez, are you describing a situation where the men were right next to each other?
A. Yes.
Q. And when you say you were sitting, did you sit down in a chair?
A. In a chair like this.
Q. Okay. Were there enough chairs for everyone?
A. No, there wasn't enough. Most of the stuff was down; the chairs were down.
Q. Where did other people lie down?
A. They would be lying on the floor. Then there would be somebody right here (indicating). Then there would be someone stuck right next to you. There were just too many people.
Q. Could you walk in the cell?
A. When I would stand up like this (indicating), then I would have to jump with my feet like this (indicating) so I would not step on the next person.
Q. Are you -- did you have to step over people who were lying down on the floor?
A. Yes, correct.
Q. Okay. At night where did you sleep?
A. Sitting.
Q. Could you sleep?
A. No.

Q. Why not?
A. I would sleep three or four minutes, because I could fall down on top of the -- of the fellow in front of me.
Q. Were you exhausted?
A. Yes, too much.
MS. GARCIA: Your Honor, can we take a moment?
BY THE WITNESS:
A. It was too much. It was too much. It's just too much. I just can't deal with it.
BY MS. GARCIA:
Q. It's okay, Mr. Moreno Gonzalez. Take a moment.
Your time in Broadview, did it affect you emotionally?
A. It did affect me.
Q. Did it cause you distress?
A. A little, yes.
Q. Mr. Moreno Gonzalez, I'm going to ask you to talk to us about the toilet in the cell.
Where was the toilet in the cell?
A. The toilet, the toilet was here (indicating), and then there was a small wall next to it, and then there was another toilet next to it.
Q. How far away were the people from the toilet?
A. Close by, like this (indicating). Everybody was just there.
Q. Could you estimate in terms of inches?

A. It was -- it was like this (indicating). The thing is when you go to the bathroom, you can't go because everybody is seeing you.
Q. Were the people just inches away from the toilets?
A. Yes, like this, like here (indicating). So like I sit down on it, and there's somebody right here (indicating).
THE COURT: If he's gesturing, you may want to put on the record what the gestures are.
MS. GARCIA: Thank you, Your Honor.
BY MS. GARCIA:
Q. Mr. Moreno Gonzalez, you made a gesture of the distance between the people and the toilet?
A. Yes.
Q. Would you say that the people were less than an arm's length away from the toilet?
A. An arm.
Q. Okay. So could people in the cell see the people using the toilet?
A. Yes, yes.
Q. And was there a sink attached to the toilet?
A. Yes, there was a sink.
Q. Was there soap there to wash your hands in the sink attached to the toilet?
A. No, nothing, nothing.
Q. Did anyone at any time that you were at Broadview give you

soap?
A. No one, no.
Q. Could people drink the water from the sink attached to the toilet?
A. If you were thirsty, yes.
Q. Did you drink the water in the sink?
A. No, no.
Q. Why not?
A. I resisted from doing so, because people would go there and, you know, they'd brush their teeth there. They'd spit, you know, and it's just all that, you know. They use the bathroom.
Q. Did you think it was dirty?
A. It was dirty, because I was seeing it when they would brush their teeth and rinse their mouth and spit all over the place.
Q. During the time you were at Broadview, were you given a toothbrush?
A. No.
Q. Were you given toothpaste?
A. No.
THE COURT: Can we establish how long he was at Broadview?
MS. GARCIA: We can, Your Honor. We were going to talk about that at the end.
THE COURT: Okay. Go ahead.

BY MS. GARCIA:
Q. Mr. Moreno Gonzalez, you were at Broadview from Wednesday, October 29th, through Friday, October 31st?
A. Yes.
Q. During the time that you were at Broadview, Wednesday threw Friday, did you receive food?
A. I did receive food in the morning.
Q. Okay. Did you have to eat your food in a cell?
A. Yes.
Q. And what food were you given?
A. A small sandwich like this (indicating).
Q. At any time did you receive a hot meal?
A. No.
Q. Were you hungry?
A. Yes, of course, yes.
Q. Did you lose weight?
A. Yes.
Q. Now, during the time that you were at Broadview from Wednesday through Friday, did you receive water?
A. One water. They would give us three waters during the day -- per day.
Q. When you say "three waters," are you referring to bottles of water?
A. Bottles of water.
Q. And what size were the water bottles?

A. Like that little bottle right there (indicating).
THE COURT: Can you for the record --
BY MS. GARCIA:
Q. Mr. Moreno Gonzalez, you're pointing to a bottle right here?
A. Yes, yes, like this (indicating).
Q. So this bottle is about --
A. Yes, yes, it was like from here to there (indicating).
Q. So approximately 10 ounces of water?
A. Yeah.
Q. Was that enough water for you? Were you thirsty?
A. Oh, yes, we were thirsty.
Q. Did anyone in the cell ask for more water?
A. Everyone did. They would ask for it all the time, but there was no water.
Q. Did anyone in the cell ask for more food?
A. That, too, yes.
Q. And what was the response?
A. They wouldn't give you an answer. Sometimes they would get angry at you.
Q. During the time that you were at Broadview, could you take a shower?
A. No, no, there was no place where you could bathe.
Q. During -- from Wednesday to Friday that you were at Broadview, could you change your clothes?

A. No.
Q. During the time that you were at Broadview, was the cell cleaned?
A. One time, but all they did was just go like this (indicating) this way, and that's it.
Q. When you say all they did was go like this one way, what do you mean? Can you explain?
A. That they took this mop, and then they went from here to over there, and that's it. But they didn't go the other way because there was just too many sandwiches and bottles everywhere. Everything was just thrown about, papers and --
Q. So they did not clean the entire cell?
A. No, no.
Q. Did the cell smell?
A. Yes.
Q. How would you describe the smell?
A. It was because people were sweating, because people would arrive, and they would be sweating, all the sweat, all the people.
Q. Did it smell bad?
A. Yes.
Q. Now, you mentioned that you were at Broadview from Wednesday through Friday?
A. Yes.
Q. Do you know how long some of the other men, the 149 other

men in your cell, were at Broadview?
A. Well, I did talk to one fellow, because when you get there you ask: Well, where did they catch you?
And then later I asked him: Well, how long have you been here?
And he says: It's already been three -- two days, three days, four days. And one person told me he'd been there for a week.
MS. BRADY: Your Honor, just move to strike. It's hearsay.
THE COURT: It is hearsay.
MS. GARCIA: Your Honor, at this stage you can consider hearsay under the Seventh Circuit precedent.
THE COURT: This is a TRO hearing, and I know I can, but I'll give it the weight that it deserves.
MS. GARCIA: Thank you.
BY MS. GARCIA:
Q. Well, Mr. Moreno Gonzalez, can you share with the Court how you felt being held at Broadview?
A. Well, I felt bad, you know, seeing all -- so many people. I felt bad.
Q. Okay. Do you understand that you are bringing this case on behalf of yourself and all the other people who are at Broadview?
A. Yes.

Q. And do you believe that you can represent what is happening at Broadview for yourself and those other people?
A. Yes.
MS. GARCIA: Can I have just one moment, please?
(Counsel conferring.)
MS. GARCIA: Mr. Moreno Gonzalez, I have no further questions for you. The other side may ask you some questions. Just wait.
THE COURT: Let's take a five-minute break.
THE CLERK: All rise.
(Recess at 11:00 a.m. to 11:11 a.m.)
MS. BRADY: Your Honor, may I proceed?
THE COURT: Please.

CROSS-EXAMINATION

BY MS. BRADY:
Q. Good morning, Mr. Moreno Gonzalez.
A. Good morning.
Q. My name is Jana Brady. I'm an Assistant United States Attorney, and I represent the government in this case.
A. Very nice to meet you.
Q. I just want to -- you, too. I just want to ask a few follow-up questions so that I understand the testimony that you gave to your attorney. Okay?
A. Yes, agree.
Q. Earlier in your testimony you said that an officer gave you

a document that would have you return to Mexico. Do I understand that correctly?
A. Yes.
Q. Am I correct in saying that you did not sign that document?
A. I did not sign that document.
Q. Earlier in your testimony you indicated that you were able to call home and speak with your family; am I correct?
A. Yes.
Q. When you spoke with your family, did you speak with them about any medications?
A. No.
Q. No. At any time did you ask your family to bring in any medications that you were taking?
A. No.
Q. At any time did you ask your family to reach out to an attorney that can help you?
A. No.
Q. Now, Mr. Moreno Gonzalez, when you made that phone call, was it using the telephone that was in the holding cell?
A. No.
Q. Was there a phone in the holding cell?
A. There was a phone in the holding cell, but it didn't work.
Q. Did you try to use it?
A. I did try, but it didn't.
Q. Okay. When you say it didn't work, what do you mean?

A. Because the phone wasn't working. It would just go like zing, zing, zing. Nothing else.
Q. And did you tell the officers this?
A. I did tell one of the officers that it didn't -- didn't work. And I was asked: Well, do you want to speak to your relatives -- to your family?
And I said yes. And he said, wait, wait.
Q. Okay. And now let's talk about waiting and the time you were at the facility.
Earlier you testified that you were at the facility from October 29th to October 31st; is that correct?
A. Yes.
Q. Do you agree that you were at the facility for less than 42 hours?
A. I was -- I was, like, 42 hours, I think.
Q. Earlier in your testimony you said that there were 150 to 170 people, and I just want to get some clarity on that. Okay?
A. Yes, yes.
Q. At the facility there's more than one holding room; is that right?
A. There were more, yes.
Q. Okay. Were you still speaking?
A. All at the other side, and there were more people as well.
Q. Okay. Now, in terms of the people that were actually in your holding cell, did you count them one by one?

A. There were -- I mean, I saw there were that quantity of people. There were a lot of people. It was packed.
Q. But in terms of how many people were actually in your holding cell, do you agree that you're speculating because you did not count them?
A. Yes, but there were a lot of people. There were.
MS. BRADY: Thank you, Mr. Moreno Gonzalez. I appreciate it.
MS. GARCIA: Your Honor, no redirect.
THE COURT: All right. You're excused, sir. Thank you.
(Witness excused.)
THE COURT: Before we call the next witness, I just want to take a bit of the housekeeping matters here.
There's an unopposed motion by the plaintiffs to seal certain exhibits, and we'll go ahead and grant that.
MS. VAN BRUNT: Thank you, Your Honor.
THE COURT: Okay.
THE CLERK: Please raise your right hand.
Do you swear or affirm that the testimony you are about to give in this matter before the Court is the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes, I do.
THE CLERK: Thank you.
(Witness duly sworn.)

FELIPE AGUSTIN ZAMACONA SABOERANIS,
PLAINTIFF HEREIN, DULY SWORN,
DIRECT EXAMINATION

BY MS. VAN BRUNT:
Q. Good morning, sir. Could you please state your name for the record?
A. My name is Felipe Agustin Zamacona Saboeranis.
Q. And you speak English?
A. Yes, I do.
Q. And do you understand English?
A. Yes, I do.
Q. How old are you?
A. I'm 47 years old.
Q. Where were you born?
A. I was born in Mexico.
Q. And where do you live now or where did you live before being detained?
A. In Chicago, Illinois.
Q. How long have you lived in the U.S.?
A. 31 years.
Q. You are currently in ICE custody, correct?
A. Yes.
Q. Before you were detained, what part of Chicago did you live in?
A. I lived in the City of Chicago in Portage Park.

Q. Portage Park. And --

THE COURT: Speak a little bit slower. Okay?

THE WITNESS: Okay.

THE COURT: You're going pretty quickly here.

THE WITNESS: Sorry.

BY MS. VAN BRUNT:

Q. Did you have a job?

A. Yes, I do.

Q. And what is that?

A. I'm a package delivery for Amazon Flex.

Q. For Amazon Flex?

A. Yeah.

Q. Okay. Did you go to high school in Chicago?

A. Yes, I did.

Q. Where?

A. Wells High School.

Q. And did you get any college education in Chicago?

A. Yes, I got an associate degree and almost finished my bachelor's.

Q. And what was your associate's degree in?

A. Computer information systems.

Q. Okay. What day were you arrested recently, sir, by ICE?

A. Thursday.

Q. So October 30th?

A. October 30th, yeah.

Q. And where did that happen?
A. It happened Wheeling, Illinois.
Q. Where did you go after your arrest? Where were you taken?
A. They took me to the Broadview facility.
Q. And about what time did you arrive at Broadview?
A. Around 10:00 in the morning.
Q. What happened after you arrived at Broadview?
A. They proceed to take my strings out, procedures. They just asked me if I had any allergies or anything like that. And then they put me in the holding cell.
Q. Did they take things away from you?
A. Yeah, all my belongings, yeah. My phones, my wallets, everything.
Q. They took your cell phone away from you?
A. Yeah.
Q. When somebody asked you if you had allergies, was that person a doctor?
A. No.
Q. Was that person a nurse?
A. No.
Q. At any point when you arrived at Broadview, did you see a medical person or receive a medical screening?
A. No.
Q. I want to ask you a few questions about where you went after processing once you were in the cells.

Can you describe how large that cell was?
A. The cell seems to be around 30 by 30.
Q. And can you estimate -- estimate how many people were in that cell?
A. Around 120 to 150.
Q. And how do you know it was that many?
A. At one point they took 50 people out, and it wasn't even -- it was more -- like it was still packed. Like there still wasn't room to sit down or anything. You still had to fight for a seat.
Q. Could you sit down once you were in that room?
A. When I first got in, no. When I first got in, the only standing room -- I had stand by the washroom. I had to, like, by the wall. Like if someone had to come in the washroom, I had to get out of the wall.
Q. When was it possible for you sit down?
A. After -- after they took the 50 people, I was able to cut a seat.
Q. I see. Was it possible for you to lay down ever?
A. No, not first.
Q. Why was that?
A. There was no space. There was people laying down. There was people sitting down and people standing up.
I mean, you had to wait for them to get out so you can find a spot.

Q. Okay. At some point you were standing near the bathrooms?
A. Yeah.
Q. And can you describe what those bathrooms looked like?
A. Well, they were dirty. Seems like they never cleaned them or anything. There were stains everywhere.
Q. Were they --
A. They was not never wiped or some -- or anything.
Q. Were they private?
A. No.
Q. Why do you say that?
A. Because there was people -- people standing right there. Even though there was a little wall like that, people were standing inside the wall where the washrooms is. You had to ask people to please move so you can use the washrooms.
Q. So you made a gesture with your hand and suggested that there was a wall about halfway up your body; is that correct?
A. Yeah, yeah, about that size.
Q. Did that wall protect your privacy when using the toilet?
A. No.
Q. And why was that?
A. Because there were people on the other side of the wall, and you had stand like -- there were people standing in the wall, on either side of the wall like right next to the toilet.
Q. So they were next to you at the toilet?
A. Yeah.

Q. Were you able to sleep on the floor at night?
A. At one point I was able to lay down, yes.
Q. And how did you manage that?
A. I just lay down on the floor. Someone stand up to use the washroom, and I took his spot.
Q. I see. Were you given a pillow?
A. No.
Q. Were you given a bed mat?
A. No.
Q. In all the time you were there, did you see anybody with a bed mat or a pillow in the facility?
A. There was none.
Q. Okay.
A. No one had any.
Q. How was the shell in the facility?
A. The smell was sweat, stale. I mean, like it was really bad. It smelled like it was like a -- like a stale, like you breathing, breathing, breathing over.
Q. Did it -- can you explain that a little bit more?
A. I don't know how to describe it. It smelled like dirty washroom, like sweat, like a dirty locker. Like when you done playing and you left a shirt like smell like stale, like *puta* fat. Like, I don't know how to say it.
Q. Did you see anybody sleeping near the toilets?
A. Yeah. At one point at night I had to go to use the

washroom, and I had to ask -- had to wake up the guy to get off his head because I had use the washroom.
Q. Did you have to move his head from away from the toilet?
A. I had to wake him up and tell him to move because I had to use the washroom.
Q. Could you bathe when you were at Broadview?
A. No.
Q. Why not?
A. Because there was no water -- there was two sips for showers, but there were no water in there. That you press the button, nothing came out.
Q. Did you get any soap at Broadview?
A. No.
Q. Any toothpaste?
A. No.
Q. A toothbrush?
A. No.
Q. What about a towel?
A. Neither.
Q. How was the cleanliness of the facility?
A. Seems like they never mop or they never swept. There was garbage everywhere. There was a garbage can, but it was overflowed and just like people throwing garbage everywhere.
Q. Could you see into other rooms beyond where you were being held?

A. Yeah, you could see the other rooms.
Q. And could you see into the women's cell?
A. You could see where the womens were holding, yeah.
Q. What was the condition of the women's cell?
A. Seemed to be very similar. They seemed to be packed and seemed like those conditions.
Q. What food did you receive while you were there?
A. We received Subway sandwiches.
Q. And how many did you actually eat while you were there?
A. I only eat the first one.
Q. And why is that?
A. Because after I got sick.
Q. What happened?
A. I got diarrhea.
Q. Is it your belief that it was from the sandwich?
A. I think so.
Q. Did you receive water while you were there?
A. With the sandwich, they will give you an 8-ounce bottle of water.
Q. So how many 8-ounce bottles of water did you get a day?
A. Three.
Q. Did you ask for others?
A. I didn't ask anymore, because I saw that people -- when people ask, they just ignore you or they just told you to shut up or they will not give you anymore.

Q. Was there a fountain on top of the toilet or near the toilet that you could use for drinking?
A. There was a fountain on top of the toilet.
Q. Was it drinkable water?
A. No. It tasted like sewer. I tried once. It tasted like sewer.
Q. Okay. Could you change your clothes while you were there?
A. No.
Q. You arrived on October 30th, right?
A. Yes.
Q. And when did you leave, sir? When were you taken away?
A. They took us the Friday, almost 2:00 in the morning.
Q. Okay. And when was the first time you changed your clothes between when you were arrested on October 30th?
A. I didn't change my clothes until Friday around 10:00 at night when we arrived Green County, Missouri.
Q. Okay. Did you see anybody change their clothes when you were at Broadview?
A. No. I mean, you got there, and you kept the clothes you got there.
Q. Did you see anyone get medical treatment while they were at Broadview?
A. I personally did not see anyone even though I was sick myself, but I was afraid to ask for anything because I was afraid they were going to make me sign something.

Q. And we'll get to that one sec.

At any point were you offered a hot meal at Broadview?

A. No.

Q. Were you able to talk to an attorney while you were at Broadview?

A. No.

Q. Would you have wanted to talk to an attorney?

A. Yeah.

Q. Why?

A. Because -- because I don't know what my situation was. I wasn't told why I was getting arrested or anything. And I wanted to see what my possibilities to get out was, so I just wanted to see an attorney to see what was going on.

Q. Were you ever able to call anyone while you're in Broadview?

A. At one point they let me use my phone to call someone.

Q. Did they give you your phone back?

A. No, just to make the phone call.

Q. I see. And who did you call?

A. I called my brother.

Q. And where did that phone call take place?

A. Right in front of the person who was interviewing me.

Q. I see. And was that call private?

A. No.

Q. And how do you know?

A. Well, because there was someone right in front of me, and there's people all around me that could hear -- that could hear what I was saying.
Q. All right. Did anyone -- any federal agent ever ask you to sign anything?
A. When I first got there, they give me two options, to sign my deportation or to see a judge.
I told the guy that I wasn't going to sign anything, that I wanted to go in front of a judge.
Q. Did they say -- I'm sorry.
A. And he said okay. And he started talking to me, and he told me that my possibilities were minimal.
And I still told him I want my court date. And he told me my court date, and he told me to sign the court papers. But I saw that it wasn't court papers. It was deportation, so I didn't sign it.
Q. So he gave you papers to sign and told you they were court papers?
A. (Indicating.)
Q. And you can read English, correct?
A. Yeah.
Q. What did the papers actually say on them?
A. It said that it was self-deportation with no -- no -- that I couldn't come back to the United States in 10 years.
Q. And you had no interest in signing that form, correct?

A. No.
Q. And why is that?
A. Because my whole life is here. I don't want --
Q. You intended to fight removal?
A. Yep.
Q. What do you think could have happened had you signed that paper?
A. They would have taken me to the airport and to Mexico.
Q. You were transferred early on Friday, October 30th, right?
A. Yes.
Q. Did they tell you why you were being transferred so suddenly in the early morning hours?
A. No.
Q. But you were brought back to Broadview, correct?
A. Yes.
Q. And that was yesterday?
A. Yes, I think so. I'm not -- I don't even know sure about the dates. That was yesterday -- yesterday or the day before. I don't remember.
Q. Is it fair to say that if you're detained again at Broadview, you would want to be able to consult with attorneys confidently in private?
A. Yes.
Q. Is it also fair to say that you would want access to basic necessities, like soap, water, and hygiene products?

A. Yes.
Q. You would also want access to food?
A. Some different -- some different, yeah.
Q. Enough food and something different than sandwiches?
A. Yes.
Q. You understand, sir, that you are a class representative in a class action, right?
A. Yes.
Q. And as a result, you are representing a whole group of people who are detained inside Broadview on immigration charges, right?
A. Yes.
Q. And you know this is not a monetary action; there's no money at stake here, right?
A. Yes.
Q. And you are interested in representing a class here today, right?
A. Yes.
Q. Can you say why you're interested in doing that?
A. Yes. I don't want anyone else to live what I lived through.
MS. VAN BRUNT: Thank you, sir.

CROSS-EXAMINATION

BY MS. BRADY:
Q. Good morning, sir.

A. Good morning.
Q. My name is Jana Brady, and I'm an Assistant United States Attorney, and I represent the government in this matter.
I just want to ask you some clarifying questions to follow up on what your counsel said. Okay?
A. Okay.
Q. All right. You testified that you were brought into Broadview on October 30th, and then you were released on the 31st, correct?
A. Yes.
Q. Is it accurate that you were at the Broadview facility for less than 21 hours?
A. That's about right.
Q. Okay. Now, when you were processed at Broadview, did someone interview you?
A. Yes.
Q. Okay. And did you tell them that you were in good health and didn't take medications?
A. Yes, I told them that.
Q. You talked about there being a lot of people in your holding cell. Do you remember that line of testimony?
A. Yes, I do.
Q. And you said at one point 50 people were removed from the cell; is that correct?
A. Yes.

Q. Is it your understanding that when the officers at Broadview clean a cell, they need to put the detainees that were in that cell in another cell temporarily so that they are able to clean that cell?
A. Yes, I do.
Q. Is it correct that you didn't actually count the number of people in the cell at any given time?
A. No, I didn't count them.
Q. When you were able to use your phone and call your brother, did you tell your brother that you wanted to speak with an attorney?
A. I told him to get me attorney.
Q. Okay. And did he do that for you?
A. I think so.
Q. Okay. And then before you were able to have an opportunity to speak with your attorney, you were transferred to Green County. Is that in Missouri?
A. Yeah, before I -- before I talked to my attorney, I was transferred to Green County, Missouri.
Q. Okay. Now, when you got to Green County, were you able to speak with counsel?
A. No.
Q. Were you able to speak with anyone?
A. No.
Q. How long were you there?

A. I got there -- I don't know what time I got there. I left around -- they picked me up around 5:00 in the morning.
Q. Was it your understanding that you were transferred to Green County because that was going to be your long-term detention facility?
MS. VAN BRUNT: Objection, confidence.
THE COURT: Well, what was his understanding? I'll let him answer.
BY THE WITNESS:
A. No, I didn't -- I didn't know. I didn't know what was going on. I just -- they just transfer there, and I just didn't know what's going on.
BY MS. BRADY:
Q. Do you understand or did you at any time understand that you were brought back to Broadview because you filed a lawsuit, and the Court ordered that?
A. I didn't know they was -- I didn't know they was bringing back to Broadview. They just told me to go with them. I didn't know where I was going.
Q. Is it correct that you were only at Broadview briefly before you were transferred to MCC?
A. Yeah.
Q. Earlier you gave testimony about documents that you were presented with. Do you recall that line of testimony?
A. Yes, I do.

Q. You didn't sign either of the documents; is that correct?
A. I didn't sign anything.

MS. BRADY: Thank you.

MS. VAN BRUNT: No redirect, Your Honor.

THE COURT: All right. You're excused, sir.

(Witness excused.)

MR. MANES: Your Honor, next we'd like to call a remote witness, Claudia Pereiera Gonzalez -- Guevara. Sorry.

THE COURT: All right.

MS. BRADY: I'm sorry, who is being called?

MR. MANES: Claudia Carolina Pereiera Guevara.

MS. BRADY: Thank you.

THE COURT: Was she one of the people who submitted a declaration?

MR. MANES: She did, yes.

THE COURT: Do you know what number it was?

MR. MANES: I do. It's declaration document No. 2-6, Exhibit 6.

THE COURT: Exhibit 6?

MR. MANES: The 6th, yes.

CLAUDIA CAROLINA PEREIRA GUEVARA,
PLAINTIFFS' WITNESS, DULY SWORN,
TESTIFIED VIA VIDEOCONFERENCE AS FOLLOWS:

DIRECT EXAMINATION

BY MR. MANES:

Q. Good morning. Ms. Pereira, can you hear me?
A. Yes.
Q. Okay.
MR. MANES: Could you swear the witness in?
THE WITNESS: Good morning.
THE CLERK: Can you please raise your right hand? Do you swear or affirm that the statements and testimony you are about to give in the matter before this Court are the truth, the whole truth, and nothing but the truth?
THE WITNESS: Yes.
THE CLERK: Thank you.
BY MR. MANES:
Q. Thank you. Can you state and spell your name, please?
A. My name is Claudia Carolina Pereira Guevara.
MR. MANES: For the court reporter, do you need that spelled?
THE COURT REPORTER: Yes, please.
BY MR. MANES:
Q. Could you spell that, please?
A. Claudia, C-l-a-u-d-i-a; Carolina, C-a-r-o-l-i-n-a.
Q. You can continue.
A. Pereira, P-e-r-e-i-r-a.
Q. And your last name -- your final --
A. Guevara.
Q. Can you spell --

A. Guevara, G-u-e-v-a-r-a.
Q. Thank you very much.
Did you provide a declaration in this case?
A. Yes.
Q. And where are you located right now?
A. In Honduras.
Q. Tell me, do you have any children?
A. Two children.
Q. And how old are your kids?
A. I have a nine-month-old baby, and I have a five-year-old girl.
Q. And where are your kids living right now?
A. In Chicago with my brother.
Q. Are your kids U.S. citizens?
A. Only the boy.
Q. The younger one?
A. Yes.
Q. Were you living with your kids in the United States until recently?
A. Yes.
Q. Were you in Chicago?
A. Yes, in Joliet.
Q. And how long did you live in the United States for?
A. Five.
Q. Five years?

A. Yes.
Q. Thanks. At some point recently, were you arrested by immigration officials in the Chicago area?
A. Yes.
Q. Do you remember what date you were arrested?
A. October 2nd at 5:00 a.m.
Q. And where were your kids when you were arrested?
A. With the babysitter.
Q. And where were you going when you were arrested?
A. To my job.
Q. After you were arrested, were you eventually taken to the ICE detention center in Broadview?
A. Yes.
MR. MANES: We lost the video. Is that -- should I continue?
THE CLERK: It might be on her side.
MR. MANES: Okay. We'll continue.
BY MR. MANES:
Q. I want to ask you some questions now about what you experienced when you were detained at Broadview.
How many days were you kept at Broadview in total?
A. Five days.
Q. Can you describe -- were there different holding cells inside Broadview?
A. There were four big ones, and there were two personal

ones -- well, for one person.
Q. Where were you kept while you were at Broadview?
A. They had me four days in the big one, and then they transferred me to the personal one.
Q. Okay. I'm going to ask you about the conditions inside one of the -- when you were in the larger holding cell.
Can you tell me about the -- can you tell me about the cleanliness of the holding cell?
A. There was no cleaning. They never cleaned the bathroom.
Q. Was it dirty?
A. Yes.
Q. If someone told you that all holding cells are cleaned daily by professional janitorial staff, would that be an accurate statement?
A. No.
Q. Did any staff ever clean inside your holding cell?
A. No. One time we asked for a broom so that we ourselves could clean, and they -- they refused.
Q. Did you see any staff clean the area outside of your cell where the officers were?
A. Yes.
Q. But those cleaning staff never came inside to clean your cell?
A. No.
Q. Did you ever have to --

A. It was just one man.
Q. Did you -- did you ever have to clean the toilet in your cell?
A. One time it did get plugged up, and we had to use garbage bags so we could unplug it.
Q. So do I have it clear that you and the other detainees had to unplug and clean the toilet?
A. Yes, because it was overflowing, and so we kind of half cleaned. There was paper there, and we were drying up with the paper.
Q. Did the staff help you clean it?
A. No.
Q. Was there any privacy in the cell?
A. No.
Q. Continue.
A. There were cameras. We didn't know who was looking at the cameras. They were looking towards the bathroom and everything, the cameras.
Q. Was there any privacy from the other detainees when you were using the toilet?
A. No.
Q. Were you able to shower during the five days you were there?
A. No.
Q. Were any other detainees able to shower, to your knowledge?

A. Well, there were no showers where one could bathe.
Q. Did you ever get any soap or sanitizer?
A. No.
Q. Did you get toothpaste?
A. No.
Q. Did you get a toothbrush?
THE COURT: You may want to repeat that.
BY MR. MANES:
Q. Did you get a toothbrush?
A. No. They wouldn't give us anything that had to do with cleaning, absolutely nothing.
Q. If somebody told you that soap and shampoo may be provided on request at Broadview, would that be true, in your experience?
A. No, it's not true.
Q. Did people ask for soap?
A. Yes, we would ask them to give us something, because, you know, having been there for so many days, you know, we just couldn't put up with the smell anymore. But they would say, no, they didn't have any.
Q. Can you tell me about the smell? How did it smell?
A. Well, there was, like, a barrel there for the garbage; and, you know, there was also bread thrown around because it was cold, cold bread. And, you know, it would stink. And, you know, us being women, we require daily hygiene.

Q. Were you or any other detainees given any clothes?
A. (Inaudible.)
Q. Sorry. Can you repeat your answer?
A. No, no, they didn't give us clothing or anything.
Q. So you stayed in the same clothes for five days?
A. With what I had when I was arrested, I wore that every day.
Q. Okay. I'm going to ask you about the food and water situation. I'll have a series of questions.
If someone were to say that all detainees are provided three meals a day, would that be accurate, based on your experience?
A. No, because sometimes they would only give us two meals and sometimes three.
Q. And what were the meals?
A. It was Subway, and it was cold, because it was very cold in there. Sometimes they only had vegetable. It would have, like, little peppers, lettuce.
Q. Did it seem to you that the sandwiches had been refrigerated or frozen?
A. Yes.
Q. If someone were to say that all detainees got at least one hot meal per day, would that be accurate, in your experience?
A. No, they never gave us a warm meal.
Q. How much water did you get?
A. They would give us a bottle per meal. If it was three

meals, it was three bottles. If it was two meals, it was two bottles.
Q. How big were those bottles?
A. It's the regular ones that you buy, the normal ones. I don't know.
Q. If someone were to say that bottled water is available upon request, would that be accurate?
A. No.
Q. Did you ever ask --
THE INTERPRETER: The interpreter didn't hear.
BY MR. MANES:
Q. Could you repeat the answer?
A. They would say we had to wait for the meal to get a bottle of water.
Q. Was there a wall-mounted water fountain or a sink in the cell?
(Videoconference feed lost.)
BY MR. MANES:
Q. Can you hear me?
Could we continue the testimony? What should we do?
MS. VAN BRUNT: Just give it a second.
MR. MANES: Just give it a second.
THE COURT: Is there any way to get ahold of her?
MR. MANES: Yeah, I can text her.
(Brief pause.)

THE COURT: There she is.

MR. MANES: Can you hear me?

I'm messaging with her here, just for the record.

THE WITNESS: Hello? Sorry.

MR. MANES: No problem. Thank you.

BY MR. MANES:

Q. So the last question I asked you is, was there a wall-mounted fountain or a sink in the cell?

A. No. There was a sink right where the toilet was, but that water was not for drinking, because one time I wanted to drink water, and that water was really bad.

Q. Can you describe the water?

A. Well, it did look clear and clean, but when you tasted it, it was a really bad taste.

Q. Did other people drink the water from the sink?

A. No.

Q. Why not?

A. Because I told them it was bad.

Q. All right. Were there beds or mattresses to sleep on?

A. No. They had these seats.

Q. Where did you sleep?

A. Oh, in those benches and those chairs, but one day I lay down on the floor to sleep because my body was already hurting bad.

Q. When you slept on the floor, was the floor dirty?

A. Yes, yes.
Q. Were you ever able to sleep well there?
A. No.
Q. Did they turn off the lights at night while you were sleeping?
A. No.
Q. What was the temperature -- continue. Sorry. Continue.
A. And it was always quite cold.
Q. What was the temperature like at night?
A. Cold. I don't know how much, but it was cold.
Q. At any point did you get sick while you were at Broadview?
A. Yes.
Q. Tell me about that.
A. It was that day that I slept on the floor. The next day I had pain from my waist down, couldn't feel my feet, and I was vomiting.
Q. Did you ask to see a doctor or go to the hospital?
A. Yes, but they said no. They just took me out of the cell, and they sat me there with the computers on a wheelchair.
Q. Was there any doctor, nurse, or other medical professional in the facility?
A. No, no. Just one of the immigration officers, he gave me his medication, which was apparently for vomiting, and that's it.
Q. Did the officer tell you what the medication was that they

gave you?
A. For vomiting.
Q. Did he tell you the name of the medicine that you were given?
A. No.
Q. Was the officer who gave you that medicine a medical professional?
A. No.
Q. Did you receive any treatment for -- medical treatment for your symptoms not feeling the lower half of your body?
A. No. They said just to, you know, stretch out my feet and walk and that it had to do with, you know, being in the same place sitting down for so long.
Q. While you were there, do you know if anyone else had any medical emergencies?
MS. BRADY: Foundation.
BY MR. MANES:
Q. One second.
MS. BRADY: I'm going to object. She doesn't have any foundation to testify as to the conditions of others.
THE COURT: Well, what she observed.
MR. MANES: I could lay a foundation.
BY MR. MANES:
Q. While you were at Broadview, did you observe anybody else having a medical emergency?

A. Yes, there was one person. He was getting, like, a heart attack.
Q. Why did you think he was getting a heart attack?
A. Because of the way that -- of what was happening, he was lying on the floor, and his face was changing color.
Q. How did the officers respond to that man?
A. No, they just surrounded him, and they were just looking at him, like they thought it was a lie. I don't know, not believing him.
Q. Earlier you told me that at some point you were moved into a smaller single-person cell. Do you remember that?
A. They transferred us there, the other ladies and I. There were, like, seven of us.
Q. Can you tell me -- so strike that.
Were there seven people inside the single-person cell?
A. Yes. And I told one of the immigration officers that it said maximum one person. And why were there seven people there? But they never cared about anything that you would tell them.
Q. What were the conditions like inside that single-person cell?
A. It was very small. There was hardly any space. We were all standing, like, on a line, all of us, very tight.
Q. And how long were you in that cell for?
A. It was just the time of the day.

Q. So was it the whole day you spent there?
A. Yes, during the day, and then at night they put us back to where we were.
Q. How did the officers treat you and the other detainees?
A. Well, bad, because if you said anything to them, they just wouldn't pay attention to you. They would say yes, but they just wouldn't pay any attention.
Q. Were you ever able to observe the conditions inside other holding cells?
A. I could only see it when I was transferred to the small cell.
Q. And what did you observe?
A. Just that the conditions were bad where all the men were in and that they were really packed in there, all of them really together.
Q. Could you tell if the men were standing or sitting or lying down?
A. Some were sitting on the floor. Some were standing.
Q. Could you tell how crowded it was?
A. Yes. Yes.
Q. Okay. I now want to ask you some questions about how you were processed by deportation officers at Broadview.
At some point did an immigration officer process you at the facility?
A. Yes.

Q. Tell me what happened when the immigration officer processed you.
A. They came to my cell. They called out -- they came to my cell. They called out my name. They put me there where the computers were. They took my prints.
Q. At any point did they ask you to sign forms?
A. First they asked for my prints. Then they asked me to sign my deportation.
Q. Could you read or understand the deportation papers?
A. No. They were in English, and I don't know English.
Q. Did anyone translate the deportation papers for you?
A. No.
Q. Did -- go ahead.
A. The officer only said that that was my deportation paper and that I already had a deportation.
Q. Did the immigration officer -- sorry. Let me ask the question.
Did the immigration officer tell you that you had to sign the deportation paper?
A. Yes, because if I didn't sign, I was going to be held there until I signed.
Q. Did you feel like you had the option not to sign the papers?
A. No, because they would have me there locked up.
Q. Did you ever ask to speak with a lawyer?

A. Yes. But they said, "Well, what for?" Because I didn't have anything I could do anymore.
Q. Why did you want to speak with a lawyer?
A. Because I didn't want to come here. I have my children -- I have my children there, and I didn't want to leave them behind.
Q. Did the deportation officer tell you anything about whether you would be able to come back to the United States if you signed?
A. He told me that I would be able to return in five years, that they would take away that punishment that I had of five years.
Q. When you were taken out of Broadview after five days, where did you go?
A. To Kayo (phonetic), the place in Louisiana.
Q. How long were you there?
A. I was there for two days.
Q. Were you able to talk to a lawyer while you were in Louisiana?
A. No, I didn't want to anymore, because I was going to sign my deportation, and then I was going to be sent over here to Honduras.
Q. Were you deported from Honduras, Louisiana?
A. Yes.
Q. Did you try to find an American lawyer after you got back

to Honduras?
A. Yes.
Q. Why did you want to talk to a U.S. lawyer?
A. Well, I first told him that I wanted to return to the U.S. because I had my children there and that the officer had said I had five years of punishment.
Q. You can continue.
A. Then the lawyer said that we had to begin with the pardon, and I said that that was fine.
Q. Did you send this lawyer money?
A. Yes, I sent him $650 because he said the pardon costs 1200, 1200.
Q. At some point did you learn that this lawyer was defrauding you?
A. Yes.
Q. Did you eventually speak with an actual U.S. lawyer who was able to give you good legal advice?
A. Yes, with an attorney who was a woman who told me that I wasn't going to be able to see my child until he was 22 years of age --
THE INTERPRETER: And the interpreter didn't catch the rest.
BY MR. MANES:
Q. Do you believe the officer at Broadview lied to you when they told you you could return in five years?

A. Yes, because he only said five years, and then when I spoke to the attorney, she said it wasn't five. It was ten.
Q. Do you think you would have had more legal options to stay with your kids in the United States if you'd been able to consult with a lawyer while you were still detained here in the United States?
A. Yes.
Q. And you're now separated from your kids?
A. Yes. My children, who are so young, I really don't know.
Q. Do you know when you'll be able to see them again in person?
A. I don't think so. I don't know when.
MR. MANES: One second.
(Counsel conferring.)
MR. MANES: No further questions, Your Honor.
THE COURT: About how long do you think you'll have with her?
MS. BRADY: Maybe about five or ten minutes.
THE COURT: Fine.

CROSS-EXAMINATION.

BY MS. BRADY:
Q. Hello, Mrs. Pereira Guevara. My name is Jana Brady. I'm an Assistant United States Attorney, and I represent the government in this case.
A. Okay.

Q. Am I correct that you have not been at the Broadview facility since the first week of October?
A. No, I'm not understanding.
Q. Sure. You were processed at the Broadview facility on October 2nd, and you testified that you stayed there for five days?
A. Yes.
Q. Is it correct that you do not have any knowledge of the conditions at the Broadview facility today or how they're treating other people?
A. No, not right now, I don't know anymore what's going on over there.
Q. You gave testimony that an officer processed you and asked you questions when you were admitted to the Broadway -- Broadview facility; is that correct?
A. Yes.
Q. Did the officer speak with you in your native language?
A. He only spoke a little bit of Spanish.
Q. Were you able to understand what he was saying?
A. What he did say, he said in Spanish.
Q. And did you understand what he did say?
A. Yes.
Q. Do you know the name of the officer who interviewed you and talked to you about the papers that you signed?
A. No.

Q. Is it correct that you had deportation proceedings pending between 2021 and the time that you were processed at the Broadview facility?
A. I did not know about it until I was processed. They told me that I already had a deportation.
Q. So is it fair to say that you don't know 100 percent whether you had a final order of removal when you were processed at the Broadview facility?
A. Yes, because I didn't know. I had had a problem in L.A. because my case was in L.A.
Q. You gave testimony that you became sick while you were at the Broadview facility; is that right?
A. Yes.
Q. The officer gave you medicine to help with the vomiting?
A. Yes.
Q. Did the medicine help you?
A. Yes, because the vomiting calmed down.
Q. And then you did get better; is that correct?
A. Yes.
Q. You mentioned in the declaration that you had signed on October 21st, 2025, and in your testimony today that you witnessed other individuals at the facility having medical issues; is that correct?
A. Yes.
Q. You described one gentleman as being gravely ill, and you

described another gentleman as having a heart attack; is that correct?
A. Yes.
Q. Do you agree that you do not have education, training, or experience in the area of medicine or nursing?
A. Yes.
Q. Do you agree that you do not have personal knowledge as to what, if anything, was wrong with the gentlemen that you described?
A. Yes, because I don't know about medicine or anything like that, but I have seen cases like that before.
Q. In your declaration you indicated that you were in a holding cell with eight to ten women; is that correct?
A. Yes.
Q. And then at one point, the women were transferred to a single holding cell; is that correct?
A. Yes.
Q. Do you know specifically what time you were transferred to the single cell and what time you were taken back to the larger holding cell?
A. No, we didn't have a place to see the time.
Q. Do you know why you were placed in the single cell?
A. No.
Q. Do you know or were you able to see inside the holding cell that the women were in before you were sent to the single cell?

THE INTERPRETER: The interpreter would like you to ask it again. Sorry.

BY MS. BRADY:

Q. Sure. I'll rephrase, too.

Were you able to see the larger holding cell while you were in the single cell?

A. No.

Q. So it's fair to say that you don't know if the officers took you in the single cell so that they could clean the holding cell that you were in; is that correct?

A. No, no, because when we returned, it was just as dirty.

Q. Is it fair to say that you don't know whether the officers placed the women in the single cell because they needed to put other people in the holding cell that housed the women at least temporarily?

A. I don't know.

MS. BRADY: All right. Thank you so much.

THE COURT: Any redirect?

MR. MANES: No, Your Honor. Thank you.

THE COURT: All right. Thank you very much.

(Witness excused.)

THE COURT: We will take our lunch break. Let's be back at 1:30.

THE CLERK: All rise.

(Recess at 12:24 p.m. until 1:30 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PABLO MORENO GONZALEZ and FELIPE AGUSTIN ZAMACONA, | ) | Case No. 25 C 13323 |
| Plaintiffs, | ) | |
| v. | ) | |
| KRISTI NOEM, et al., | ) | Chicago, Illinois |
| | ) | November 4, 2025 |
| Defendants. | ) | 1:35 p.m. |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE ROBERT W. GETTLEMAN

APPEARANCES:

For the Plaintiffs: RODERICK and SOLANGE MacARTHUR JUSTICE CENTER
BY: MS. ALEXA VAN BRUNT
MR. JONATHAN MANES
MS. DANIELLE BERKOWSKY
MS. JAMIA RUSSELL
160 East Grand Avenue, 6th Floor
Chicago, Illinois 60611

THE ROGER BALDWIN FOUNDATION OF ACLU, INC.
BY: MR. KEVIN M. FEE
MS. MICHELLE T. GARCIA
MR. SAMUEL COLE
MS. JENNIFER STARK
MS. KATHLEEN HICKEY
150 North Michigan Avenue, Suite 600
Chicago, Illinois 60601

EIMER STAHL
BY: MR. NATHAN P. EIMER
224 South Michigan Avenue, Suite 1100
Chicago, Illinois 60604-2516

For the Defendants: UNITED STATES ATTORNEYS' OFFICE
BY: MS. JANA L. BRADY
327 South Church Street, Suite 3300
Rockford, Illinois 61101

MR. PATRICK WALTER JOHNSON
219 South Dearborn Street
Chicago, Illinois 60604

ALSO PRESENT: MR. JORGE LUIS CARBAJOSA
Certified Spanish Interpreter

Court Reporter: NANCY L. BISTANY, CSR, RPR, FCRR
Official Court Reporter
219 South Dearborn Street, Room 1706
Chicago, Illinois 60604
(312) 435-7626
bistanyofficialtranscripts@gmail.com

(Proceedings heard in open court:)

THE COURT: All right. Before we begin today with the next witness, I wanted to ask, if I refer to you as the government, is that all right?

MS. BRADY: I'll understand.

THE COURT: Okay. It's a lot easier.

There's been a lot of testimony about cameras and declaration about cameras. Do you know whether those cameras are recording anything that has been preserved so that we could at least see it?

MS. BRADY: I do not know. I know yesterday I sent an email asking for confirmation. They sent out a litigation hold, and I would follow up with that today.

THE COURT: Okay. By the end of the day today, maybe we could get some --

MS. BRADY: I could send an email.

THE COURT: -- answer to that.

MS. BRADY: Okay. We got him sending an email.

THE COURT: Okay. Great. Thank you very much.

All right. We have a new witness.

THE CLERK: Please stand and raise your right hand.

Do you swear or affirm that the testimony you are about to give in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

(Witness duly sworn.)

MR. VAN BRUNT: And, Your Honor, before we begin, to facilitate things and move them along a little bit, we are going to move on to the two attorney witnesses and not do the two detainee witnesses we had planned. So hopefully we can get to requested relief.

MS. HICKEY: Hello. Katie Hickey for plaintiffs.

THE COURT: Okay. Let's get the name of the witness.

MS. HICKEY: This is Shelby Vcelka.

SHELBY VCELKA, PLAINTIFFS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. HICKEY:

Q. Please state your name for the record.

A. Shelby Vcelka, V-c-e-l-k-a.

Q. And what is your occupation?

A. I'm the managing partner at Victory Law Office. I specialize in deportation defense and detention.

Q. Did you provide a declaration in this matter?

A. I did.

Q. Have you represented clients detained at Broadview?

A. I have.

THE COURT: Can you give me the number of the declaration, please?

MS. HICKEY: Yes.

MS. BRADY: It's 2-34.

THE COURT: 34. Okay.

MS. HICKEY: Thank you.

BY MS. HICKEY:

Q. How recently have you represented clients detained at Broadview?

A. As of last week, I believe.

Q. And when did you begin representing clients detained at Broadview?

A. I've been representing clients in Broadview approximately since June this year.

Q. And how has the number of clients being detained at Broadview changed between June and now?

A. In June I only had one client at the Broadview facility. Since September it has drastically increased.

Q. I'd like to talk to you about a few specific clients who were detained at Broadview. But first, can you generally describe how you track a detained client's location?

A. Absolutely. So there is an online platform called "The ICE Detainee Locator." It's publicly available. So if you have a client's "A" number and the country of birth, you can type in the "A" number, the country of birth, and it should appear with their location.

If you do not have their "A" number, you need their date of birth and country of birth as well as their full legal name as it is spelled, including things like hyphens or spaces.

It should give you the same information if you type them in that way.
Q. What has been your experience using the online detainee locator to track clients detained at Broadview?
A. It is not accurate. So when you go to look up clients in the ICE detainee locator, it will pop up with a screen that says, like, "In custody. Call ICE ERO for details." And it will have underneath the location of the field office that should have administrative control over the client.
So in this case, usually the way I tell somebody is located in Broadview, because it will say Chicago ICE ERO with a phone number and the field office located downtown.
Q. What happens when you call that phone number?
A. It doesn't work.
Q. What kind of information do you typically need to provide in order to speak to a detained client?
A. So you have to have something called a G-28 filed. So that is a notice of entry of appearance. In some cases you do have to provide a copy of your bar card and driver's license, but typically the G-28 is the operative thing that lets you speak to a detainee.
Q. And how do you get that G-28 filed?
A. So there is an online platform called "ICE ERO eFile." It works for detained clients and non-detained clients. But when they're -- when they're in detention, you're supposed to use

their "A" number, their country of birth, or their date of birth and country of birth to find them, as it will say "Subject Found" when you go to look them up. And then you're able to file your G-28 that way.

Q. What has been your experience trying to get those appearances filed on behalf of detained clients at Broadview?

A. It can take several hours or several days after they've been detained by ICE in order to file a G-28.

Q. Can you describe your experience communicating with your clients while they're detained inside Broadview?

A. I have had extremely limited communications with my clients while they're in Broadview. If I'm able to speak with them, it's typically through happenstance. So a family member is physically in my office at the time they receive a phone call from a client.

In other circumstances, if they have my phone number memorized, they are able to call, but it's a very limited conversation, typically less than 10 minutes. On average, I would say it's more about five minutes long.

It is very difficult for me to hear my client. So there's a lot of background noise, a lot of voices. You can tell this is not in a private setting, and it is not on a nonrecorded line.

Q. And what kind of efforts do you make to talk to your clients while they're detained at Broadview?

A. I've made numerous attempts at trying to contact my clients.

So I have called the Broadview phone number that's listed on Google numerous times. I actually attempted to call that number this morning from -- from my phone, and the line was disconnected.

I have called the ICE ERO Chicago line at least, I would say, approximately 15 times to try to get a deportation officer on the phone or somebody that I can speak to about the case. That number, once you go through the main -- the main menu, that number is also disconnected, and it hangs up when you -- when you try to get somebody on the phone.

I have also sent emails to the ICE ERO Chicago field office location, both the Chicago Outreach email, the ICE ERO detained unit email, and legal detention access, which is a national email address.

I have received very few communications back from ICE when I have reached out via email.

Q. And why do you send emails to those addresses?

A. So previously during prior administrations, you could send an email to the Chicago Outreach email inbox or specifically the detained unit if a client is in detention, and they would get back to you within 24 to 48 hours.

Usually they were able to provide you with the name of a deportation officer that's handling the person's case or they

could -- the person who is responding in the email could give you information directly.
Q. And do you ever receive that kind of information now?
A. No. So I did -- I did receive a response from ICE ERO yesterday asking for name and date of birth. I had already provided the name. I was -- I was seeking specific information about a client.
On a separate instance, they did confirm that my client was located at Broadview but did not provide any contact information for how it could get into contact with that client or the name of the deportation officer, like I had requested to speak to my -- about my client's case.
Q. Have you ever gone to Broadview in person to see any clients?
A. Yes, on two occasions.
Q. And when you have gone to Broadview, have you gotten inside to speak with them?
A. No.
Q. Why do you want to speak to your clients while they're inside Broadview?
A. For numerous reasons. So when somebody is detained, there are steps that need to be taken immediately to address their legal situation.
So first off, obviously as an attorney, I want to provide my clients with information about their legal rights

and the pathways they can take to -- to resolve their case.

In some instances, if they have a prior order of removal, you need to file an I-246, a stay of removal, immediately to prevent that removal order from being executed.

If there's an in absentia removal order, I could file a motion to reopen right away to try to rescind that removal order and put them back into deportation proceedings.

In they're -- if there are minor children at issue and the parents are in custody, it is really important to get the parents' signatures, so that way we can start taking care of those kids while the parents are in custody, so things like temporary guardianship, getting school records, getting them signed up for things like therapy.

I mean, there are numerous instances where getting in touch with your clients is -- is incredibly important to the resolution of these cases.

THE COURT: Let me just interrupt for a second.

You said you were there two times. Was that recently?

THE WITNESS: Correct, yes.

THE COURT: Can you give us approximate dates?

THE WITNESS: Sure. So the first time was on October 14th, 2025. It was approximately noon when I arrived.

And then the second time was October 21st at about 10:00 in the morning.

THE COURT: Thank you.

BY MS. HICKEY:
Q. Let's talk about with one of those instances.
A. Sure.
Q. So on October 21st, why did you go to Broadview?
A. I had a client who was detained at her ICE check-in in Milwaukee, Wisconsin. She was transferred down to the Broadview location.
Her family called me because she was -- they were extremely concerned because she was a nursing mother to a four-month-old U.S. citizen child.
Q. And what is that client's name?
A. Maria del Carmen Garcia Rodriguez.
Q. Tell me about Ms. Garcia Rodriguez's immigration status.
A. Sure. So in October 2020, she did have a prior removal order, but she re-entered the United States in approximately -- approximately March 2023 with a new basis for asylum.
She entered with her husband and her one-year-old Mexican citizen son.
Q. Before you went to Broadview, did you take any steps to try to contact her?
A. Yes. So I sent emails to the ICE ERO email address, the Chicago Outreach email address, and the -- the legal detention access email.
I stated in that email that she was a nursing mother, and it was incredibly important that she have the ability to

express milk while she was in detention.

Q. Did you receive any response to those emails?

A. No.

Q. What did you do next?

A. So the following morning, I went to Target and bought her a breast pump and nipple cream and then drove over to the Broadview facility to drop it off myself.

Q. And what happened when you arrived there?

A. So I was stopped by Illinois state troopers who told me I did not have permission to be there.

I informed them I was an attorney who represented somebody that was detained in Broadview, and I was there to drop off a breast pump because she was nursing.

The Illinois state troopers took a look at my G-28 that had been previously executed while she was not detained, as I had represented her for approximately two years before her detention. So they -- they looked at my G-28. They called the ICE officers inside and told me to wait.

And then once I was granted permission to approach the front door, I was allowed to walk out to the front door and pass off the breast pump and the nipple cream.

Q. What did you ask the officers when you spoke to them?

A. I asked the officers if I could get in touch with my client, because I was incredibly worried about the fact that she probably hadn't had the opportunity to express milk in

about 24 hours.

They said they were not doing visitation that day. And I said, "Even if I'm her attorney?" And they said, "No."

So I asked if I could get a phone call from her, and they said -- they asked me for my phone number. I gave my phone number to them, and I said I -- I spoke to a deportation officer, an ICE officer, yesterday while she was being detained, and I've given them my email address twice already.

They indicated to me that they were going to email me some paperwork, but I never received the paperwork. So I provided the officer with my email yet again and told him it was very important that I get copies of the documents my client was receiving.

Q. Did anyone ever contact you?

A. No.

Q. Did you receive any of that paperwork?

A. No.

Q. Were you able to speak with your client at all while she was at Broadview?

A. No.

Q. And how important was it for you to speak with her?

A. It was -- it was very important. We were -- we were dealing with -- well, we were dealing with the family trying to figure out what was going to happen with the four-month-old, the other -- and the other two children. Her husband and her

oldest child are currently in deportation proceedings. So, you know, I was speaking with them about the impact that this could have on their case.

But I wanted my client to understand what her legal options were before accepting paperwork, signing anything, or being transferred out of the jurisdiction where it would be harder for me to get in contact with her.

Q. And what happened after she left Broadview?

A. It was -- according to the Mexican Consulate, she was transferred somewhere in Indiana. And then I was able to file my G-28 via that ERO G-28 eFiler about two days after she was detained.

So by the time I had filed my G-28, I got a notification that she was being transferred to Louisiana. I emailed and called the area of responsibility of the New Orleans office and never got a response from the New Orleans office.

I was able to speak with an Officer Jackson at the south Louisiana detention facility where the ERO eFiler indicated that my client was located, and she said she could not confirm or deny that my client was currently at that location; but if she was there, she would pass on the message.

Q. And what happened to your client next?

A. She was removed from the United States. The next time I heard from her, she was in Matamoros, Mexico.

Q. And did she ever receive that breast pump while she was in Broadview?
A. No.
Q. Let's talk about the other visit you made to Broadview.
When you tried to see your client at Broadview, was there a protest going on outside?
A. There were -- there was a small handful of protestors, but there was not a loud protest going on. There were people with signs, but it was not violent. It was not rowdy.
Q. When you tried to see your client, did you bring documentation that showed that you were his attorney?
A. Yes, I brought a copy of my G-28, my passport, and my Real ID.
Q. And were you permitted to visit your client?
A. No.
Q. Let's talk about your client, Bellarmino Ayala Rodriguez. How did he become your client?
A. I had another client refer his --
THE COURT: Can you spell that for us, the first name?
MS. HICKEY: Sure. B-e-l-l-a-r-m-i-n-o; Ayala, A-y-a-l-a; Rodriguez, R-o-d-r-i-g-u-e-z.
And I hope Ms. Vcelka will tell me if that's not correct.
THE WITNESS: It's correct.
BY MS. HICKEY:

Q. So tell me about how Mr. Ayala Rodriguez became your client.

A. Yes. So another one of my clients had referred his daughter to me right after he was detained. He was detained at work.

His daughter made a phone call about midday to my office asking if we did habeas corpus petitions or requests for voluntary departure. We told her that, yes, we handle both types of cases, and she was more than free to come into our office to discuss it further.

We gave her the pricing. She said in the meantime between this phone call and when she entered my office, she was going to try to come up with the funds to pay for us to represent her father.

She came back to my office at about 7:00 p.m., and she was visibly struggling with what path she should take, because she had not been able to speak with her dad, but she didn't want to make that decision for him without hearing from him.

Q. Did you ever hear from that client?

A. Yes. So while -- while I was meeting with the daughter and her wife discussing the different options, he happened to call her cell phone from his cell phone. And the phone call was very short.

And she asked him do you want -- in Spanish: Do you want to -- do you want to go or do you want to fight?

And he responded with one word, "*Pelear*," which in Spanish means to fight. And then she told him "We don't know how long this is going to take. Are you okay with waiting in detention for the time being?"

And he said, "Yes, I'm fine with that. I want to stay. *Mi quiero quedar*," which means "I want to stay."

And he said, "I have to go" and hung up the phone.

Q. And how did his daughter react?
A. The daughter and her wife started crying immediately. The wife said, "We hadn't heard from him all day. We were very worried about him. It's like God intervened so that way you could speak to him and explain what we were going to do."
Q. Let's talk about one set of clients, the Enciso family.
A. Yes.
Q. Tell me about Mr. and Mrs. Enciso.
A. So they are long --

THE COURT: Could you spell that?

MS. HICKEY: Yes. E-n-c-i-s-o.

BY MS. HICKEY:
Q. Tell me about the Enciso family, please.
A. So they are long-term residents of Cicero, Illinois. They are parents of four children. The two older children, Moises and Yurithsi, are pending DACA status, and the two younger children are minors, and they are U.S. citizens.
Q. How long did the Encisos stay at Broadview?

A. They were approximately there for three-and-a-half days.
Q. What steps did you take to contact the Encisos while they were at Broadview?
THE COURT: Wait. You say there were two people?
MS. HICKEY: Yes.
THE COURT: Being held there?
MS. HICKEY: Yes.
THE WITNESS: Correct, yes.
THE COURT: The father and the mother?
THE WITNESS: Correct.
MS. HICKEY: Yes.
THE COURT: Okay.
BY THE WITNESS:
A. So I called the ICE ERO office numerous times and from different phones, because I wasn't sure if it was one phone not working or one phone number being blocked because I'm a legal representative, but I called from different phones and just kept trying to get in touch with somebody.
I again sent emails to the ICE ERO email addresses that I had and did not receive a response.
BY MS. HICKEY:
Q. Were you ever able to schedule any confidential calls or visits with the Encisos over those three-and-a-half days?
A. No.
Q. Were you ever able to speak with them at all?

A. Yes, I was able to speak with Constantina. Again, happenstance where the children were in my office, and Constantina happened to call, and I was able to inform her don't -- don't sign anything until we're able to have a more private conversation, and we can explain what the next steps are.
Q. Was that a private call?
A. No.
Q. How do you know?
A. There was lots of noise in the background. My client is a quieter women, but her voice was so low in contrast to the noise that was happening behind her that it was very difficult to hear what she was saying.
Q. How long was that call?
A. It was certainly less than ten minutes. I'd say around five.
Q. Is that long enough to advise your clients of their legal options?
A. Absolutely not.
Q. What happened to the Enciso family after they left Broadview?
A. So the -- both parents were sent to separate detention facilities. So Moises was sent to the North Lake facility in Baldwin, Michigan. Constantina was sent to the Grayson facility in Leitchfield, Kentucky.

Q. Why did they go to separate facilities?
A. So Constantina was told that because she did not sign certain paperwork, they were sent to separate facilities.
Q. What papers were those?
MS. BRADY: Your Honor, objection, hearsay.
MS. HICKEY: Your Honor, because it's a TRO hearing, I believe you can consider hearsay.
THE COURT: Well, it's still hearsay. I'll give it the weight it deserves. Go ahead.
BY MS. HICKEY:
Q. What papers were those?
A. I don't know.
MS. HICKEY: Your Honor, may I have just a moment?
(Counsel conferring.)
MS. HICKEY: No further questions. Thank you.
THE WITNESS: Thank you.
MS. BRADY: No questions, Your Honor.
THE COURT: All right. You're excused. Thank you.
(Witness excused.)
THE COURT: Call your next witness, please.
You're excused. You can step down.
THE WITNESS: Thank you.
MS. VAN BRUNT: We are going to call Kevin Herrera to the stand.
THE CLERK: Please raise your right hand.

Do you swear or affirm that the testimony you are about to give in the matter before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do swear.

THE CLERK: Thank you.

(Witness duly sworn.)

KEVIN HERRERA, PLAINTIFFS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MS. VAN BRUNT:

Q. Good afternoon, sir. Could you please state and spell your name for the record?

A. Yes. My name is Kevin Herrera, H-e-r-r-e-r-a. First name K-e-v-i-n.

Q. What is your occupation?

A. I am an attorney. I'm the legal director at Raise the Floor Alliance, which is a coalition of worker centers. My organization provides legal support to low-wage workers on a variety of issues that intersect with their workplace.

Q. And what areas of practice do you cover in the law?

A. Typically my office engages in work in wage theft, work in sexual harassment, discrimination, collective bargaining. But more recently, given the needs of the community, we've expanded our work to include certain immigration-related work for our clients that intersects with the work that they do to make money for their families.

Q. And did you provide a declaration in this matter?
A. I did. I believe it's attached as Exhibit 24 to the plaintiffs' complaint.
Q. That's correct. And did one of your clients, Willian Giménez González, also provide a declaration in this matter?
A. That's correct. That was Exhibit 13, I believe.
Willian Giménez González is W-i-l-l-i-a-n, G-i-m-é-n-e-z, G-o-n-z-á-l-e-z.
Q. Thank you. Have you represented clients who are detained recently at Broadview?
A. Yes. I've represented two clients detained at Broadview, one in September, one in October.
Q. Let's talk about your September client first.
Who was that?
A. That was Willian, Mr. Giménez González.
Q. How you did come to represent Mr. Giménez González?
A. Mr. Giménez González has been a client of mine for over two years. Initially my office began to represent him in a civil rights case against The Home Depot Corporation as well as the City of Chicago, individual officers, and individual employees of The Home Depot.
The complaint that we filed for him and several other day laborers alleges that he was targeted based on his nationality, dragged into The Home Depot, beaten, forced to sign false charges, and then held in detention by CPD based on

those charges. We've been pursuing that case since 2023.
Q. When was he detained by ICE in September?
A. Mr. Giménez González was detained on September 12th, 2025.
Q. And what is your understanding, sitting here today, as to why he was detained?
A. I am not entirely clear as to why he was detained that day.
Later responses by the government, particularly in media, alleged that Mr. Giménez González was detained based on trespassing charges and also based on an order of removal *in absentia* from an immigration court in Memphis.
Q. What happened to that order of *absentia*?
A. I actually assisted Mr. Giménez González with that -- that order. He was instructed by individuals in Chicago to go to the court in Chicago on the date he was supposed to go to a master calendar hearing in the Memphis court.
Because he missed his court date in Memphis, that immigration judge ordered him removed *in absentia*. I assisted him with a semi-*pro se* motion to reopen his immigration proceedings, which were successful.
His case was eventually transferred back to Chicago. So at the time of his arrest, he had no pending order of removal.
Q. You were able to clear it up?
A. That's correct.
Q. How did you learn that he had been detained in September by

ICE?
A. So Mr. Giménez González came to our office through an organizing collaboration with one member of our coalition, Latino Union of Chicago. I learned, based on text messages from organizers with Latino Union, that Mr. Giménez González had been detained while on the way to a haircut in the Little Village neighborhood.
His wife had called the organizers from Latino Union because she was distraught and left alone. And so that's how I learned that he was detained.
Q. Did you know where he had been taken to at that point?
A. I had -- no, I did not know where he had been taken.
Q. Did you try to find out where he had been taken?
A. I asked the organizers if they knew where he had been taken. I asked his wife whether she knew where he had been taken and --
Q. Did they know?
A. They did not know.
Q. Did you undertake any other efforts to try to locate him at that point?
A. Yes. Based on media reports and what I've known of procedures after individuals are detained in the Chicago area, I drove immediately to the Broadview detention facility in an effort to try and locate Mr. Giménez González.
Q. Before doing that, did you look up the ICE locator -- look

up his name in the ICE locator to see if he was in the system?
A. Yes, I actually looked up his name in two locations, one in the executive office for immigration reviews database to see whether anything had changed with regard to his immigration case, which we did not represent him on initially -- Mr. Giménez González is an asylum seeker -- to see whether anything had changed with regard to his immigration case. Nothing had changed. The EOIR database still showed a 2026 hearing date.

I then looked at the ICE detainee locator using his "A" number. The query returned no results.
Q. And when you say "no results," do you mean his name didn't show up in any capacity?
A. As I recall, the ICE detainee locator screen that came up after I entered his "A" number was no results found.
Q. And how long after that -- how long did you look him up after you had found out he had been detained?
A. I looked him up immediately thereafter. I learned he had been detained at approximately 11:00 a.m. on September 12th, and I believe within the next 30 minutes I was seeking out where he might have been.
Q. And so you said you went to Broadview after that?
A. That's correct.
Q. And that was just based on -- on what information?
A. Again, media reports that I had read regarding where people

might go if they were detained in Chicago, also conversations with colleagues about where they tended to find their clients in the event that they were detained by immigration agents.
Q. Did you go to Broadview to make contact with your client?
A. I did.
Q. Why did you want to make contact with your client?
A. First of all, I wanted to ensure his well-being and safety. I understood that at times individuals are detained, there are sometimes injuries. So I wanted to make sure that he was okay.
Secondarily, I wanted to make sure that he did not sign anything or was not coerced into signing anything because of fear that he might forego rights that he had.
Third, I wanted to make sure that he was -- I had the opportunity to try and fight transfer, because I was concerned that I might lose contact with him or that his wife might lose contact with him.
And then finally, I wanted to make sure that I had the opportunity to inform him of his rights as a person detained.
Q. Did you think it was important to contact him while he was still at the first point of detention?
A. I thought it was extremely important to do so. Again, to reiterate, my concern about transfer was primarily to avoid a circumstance in which I would have no ability to travel to see my client or to visit him in detention and also no ability to facilitate connections between him and his community and his

loved ones.

Mr. Giménez González has quite a strong community support network here, and I wanted to ensure that he remained connected to that community support network.

Q. Once you arrived at Broadview, what did you do?

A. I approached the building. Having parked a couple of blocks away to the west of it, I walked about five minutes.

As I approached the building, which I had only seen in media reports -- again, I had never seen the physical building, but I did recognize the boarded-up windows and the crowd of protestors that were in front -- I walked toward the building. I was wearing a suit.

One protestor asked me what I was doing there. I said that I was a lawyer for a person who was detained in Broadview, and I believe I received some cheers of support from the protestors.

As I walked to the front, I wasn't sure how an individual might access the building, so I approached the front door, and I knocked.

Q. Did the protestors threaten you in any way -- in any way that day?

A. No. The protestors, again, were quite supportive and saying "good luck" as I tried to do this. One did mock me and say, "I never thought to knock on the front door."

But I felt quite supported by the protestors that were

there.
Q. And what happened when you knocked on the front door?
A. No one answered. There was also a key pad on the bottom left of the front door. I tried to hit the pound button and the star button hoping that it might trigger a response, but no one responded to that either.
Q. Did you believe that was an intercom system?
A. That's what I believed to be true, yes.
Q. Did you see any ICE agents or other federal agents at that point?
A. No, there was no one at the front door. The interior of the building was completely obscured by plywood covering windows. I had not seen any officials at all to that point.
So I waited at the front door for two or three minutes hoping that a camera might capture my image. Again, I was wearing a suit, hoping that there would be recognition that I was a legal counsel for someone who had been detained there.
Q. Were you ever able to see Mr. Giménez González in custody at Broadview?
A. I never was. That same day I did hear protestors calling out about people entering a side gate, and as they called out about that, I ran to try to catch them. I yelled to them that I was an attorney representing someone I believed to be detained there and asked whether they could confirm that my client was in custody.

They acknowledged my presence but didn't say any words. One turned as if to say something. The other, as I recall, grabbed his shoulder, turned him back around, and they walked into the building.
Q. So to clarify, when you went to the side gate, this was a second attempt to access Broadview that same day?
A. That's correct.
Q. And the two people you saw, were they federal agents?
A. I believe them to be federal agents. As I recall, they were wearing uniforms. There was no identification on said uniforms, and I was only looking at their backs, so I can't be sure.
But given their access to the building and that it's a federal immigration detention facility or processing facility, I believe that they were federal agents.
Q. What did you say to them exactly?
A. I said, "Excuse me. I'm an attorney. I have a client who I believe is detained in this facility. Can I please ask you to let me know whether my client is in Broadview?"
Q. And what was their response?
A. Again, acknowledgment of my presence but no response. As they walked away, one person -- I believe it was the official on the right -- waved the back of his hand at me.
Q. In a wave good-bye?
A. In a dismissive fashion, is the best I can say.

Q. What did you do after that?
A. Immediately thereafter, I informed the community of supporters that Mr. Gonzalez has that I was not able to access him at Broadview, and we sought to regroup to think through what to do next.
Q. And what did you decide to do?
A. The following day, so September 13th, supporters of Mr. Giménez González, his legal counsel as well as members of Latino Union, elected officials such as Jesus Chuy Gonzalez, Delia Ramirez, members of his clergy, which is an Episcopalian church in the Chicago of Chicago, gathered to hold a press conference in Broadview, again not knowing whether he was detained there but believing so.
And the purpose of the press conference was to demand his release or, at minimum, the opportunity to speak with him.
Q. Did the press conference have its desired effect?
A. I can't say whether it was causal, but ultimately, as the press conference was ending around 2:00 p.m., his wife Mari did receive a phone call from Mr. Giménez González and was able to speak with him briefly.
Q. Were you able to speak with him at that time?
A. Only by happenstance. Through the crowd, an individual helped Mari find me, and Mari passed me the phone.
My only questions to Mr. Giménez González were about his well-being, was he okay, had they told him anything. And

then briefly I told him -- I asked him whether he had signed anything, and he said that he had not. And I told him not to sign anything.

Q. Was that call confidential, to your knowledge?

A. At the time I could hear a din in the background. I did not believe it was confidential.

Later Mr. Giménez González informed me that he was made to put the call on speaker phone and that an individual officer was listening in to the entire conversation between us.

Q. Was that call a sufficient length for you to provide full legal counsel to your client?

A. I was only able to speak with Mr. Giménez González for about three minutes. When he told me that he needed to go, I passed the phone back to his wife, because I thought it was very important for her to have contact with him.

But, no, I was not able to give sufficient legal advice to Mr. Giménez González with the amount of time I was allotted.

Q. Did you have any further contact with him at Broadview?

A. I did not have any further contact with him at Broadview.

Q. During the time he was at Broadview, how did you feel not being able to communicate with him?

A. I was extremely nervous and concerned, primarily because I had no ability to help him think through decision-making that's critical in the initial moments of detention for an immigrant

client.

I was also not able to check in about the conditions of his confinement, whether he was, you know, healthy or not.

I was also not able to give him a sense of what the next steps might be in his case nor really get the permission that I typically seek to pursue legal remedies for my clients.

Q. What ended up happening to Mr. Giménez González after he left Broadview?

A. Mr. Giménez González was transferred to North Lake detention facility in Baldwin, Michigan, which is about four-and-a-half hours away from Chicago.

Q. Did you file anything on his behalf?

A. Yes, I filed a petition for habeas corpus in the Northern District of Illinois on, I believe, Saturday evening or the evening of the press conference, intending to keep him in the Seventh Circuit or ideally near Chicago, again based on my concerns about transfer.

Ultimately that case went before Judge Blakey in the Northern District of Illinois, but because Mr. Giménez González had been transferred about -- I believe he arrived five hours before the habeas petition was filed -- his case was ultimately transferred to the Western District of Michigan.

Q. Is it fair to say you didn't know he had been transferred when you filed the habeas here in the Northern District?

A. No. The order of events was, I spoke with him out -- via

the three-minute phone call outside of Broadview.

I returned to my office to prep a habeas petition. I filed it at 1:00 in the morning. That same morning at 8:00 a.m., his wife called me to say that he had been transferred to Michigan.

Q. And did you end up litigating the case there?

A. Ultimately, I did litigate the case in Michigan, not the Western District. Because ICE would not agree to an immediate custodian being the warden of the North Lake detention facility, which is a private GEO prison, we transferred venue -- or dismissed the case in Western District of Michigan, excuse me, and litigated it in the Eastern District of Michigan.

Q. Fair to say it would have been easier to litigate it in the Northern District of Illinois?

A. Based on subsequent experiences, yes, I would say it would have been much easier.

Q. Would it have been better for his case?

A. I believe so.

Q. Have you had other clients who were detained recently at Broadview?

A. Yes, October 16th, one client, Diego Ijom, I-j-o-m, Matom, M-a-o-t -- M-a-t-o-m, excuse me, was detained at Broadview.

Q. How did you come to represent Mr. Ijom Matom?

A. Mr. Ijom Matom was eligible for a form of deferred action

in 2023. It is a form of deferred action that my office has significant expertise in, and so we assisted him applying for and receiving that deferred action.
Q. How did you come to find out he had been detained by ICE?
A. Once again, my clients benefit from their strong connections to organizers. A group, Arise Chicago, has helped Mr. Ijom Matom fight for his rights in various circumstances. And their organizers texted me -- actually, called, I believe, I'm sorry -- called me on October 16th to let me know that he had been detained outside of his workplace.
Q. Did you know at that point where he was located?
A. I did not know where he was located. I learned three hours later via a phone call from his uncle that he had been detained in Broadview.
Q. Did you search the locators you testified about earlier to try to find him before learning that information from the uncle?
A. Yes. I again checked the EOIR database because, to my knowledge, based on my prior experiences with him as a client, Mr. Ijom Matom had no interaction with the immigration system. And, again, given his legal status as a recipient of deferred action, I thought it was very doubtful that he'd received a notice to appear.
Secondarily, I checked the ICE locator system. Again, the ICE locator system received no results.

In addition, in this instance, based on learning new approaches to the work via colleagues, I emailed the ICE ERO detained email address as well as an email address for Broadview facility, Broadview INS, I believe.

Q. Did you receive responses to either of those emails?

A. No, I did not. And in those emails I provided evidence of Mr. Ijom Matom's deferred action as well as my G-28, which had been executed as I was assisting him with his deferred action application.

Q. Once you found out he was detained at Broadview, did you try to contact him there?

A. I did. The following morning, I was accompanied by an organizer from Arise, sought to enter the facility to speak with him, this time with greater urgency given the fact I'd brought with me evidence of Mr. Ijom Matom's legal status, evidence of my representation of him.

This documentation included his approval letter for deferred action, an extension letter for deferred action which extended his deferred action from two years to four, a social security card that he had received, a copy of the work permit, essentially the entire immigration file that my office had in our possession.

As I approached again, perhaps foolishly trying to go to the front door, I was intercepted by four or five state troopers.

Q. Let me walk back one second.
Was it your belief that with that paperwork you could show that your client had been wrongfully detained by ICE?
A. That was my goal. I thought that I could more efficiently resolve his case, given the clarity with -- that his -- that these documents -- that these documents had about the fact that he was wrongfully detained.
So my goal was to demonstrate that quickly and ideally have him released the same day as opposed to go through the same experience that I had had with Mr. Giménez González, including transfer and, you know, a long time detained for someone who probably shouldn't have been.
Q. And once you entered the front door with the immigration file and your G-28, what happened?
A. Again, I was intercepted by four or five state troopers who informed me that there were no visitors to Broadview. I explained that I was an attorney representing a person detained at Broadview and that I, at minimum, wanted to pass along papers to functionaries there who might consider them and whether it was appropriate to continue detaining Mr. Ijom Matom.
Those individuals sent me around to a side door, which is -- which was one-and-a-half blocks away maybe. Again, the folks I was accompanied by -- at this point, it was one organizer, two members of clergy, and a member of the National

Lawyers Guild -- jumped over a barrier, walked through grass, and arrived at a sort of back alley street where we, again, met more state troopers asking what we were hoping to accomplish or do.

Q. So once you arrived at the second location on what you called the back alley street, you spoke to the state troopers, you said?

A. Yes. I spoke to one state trooper who was standing, explained the situation, that I was an attorney representing an individual who I believed to be wrongly detained in Broadview.

He passed me along to a state trooper sitting in a state police vehicle. I gave that individual Mr. Ijom Matom's "A" number, his date of birth, his country of origin, and the spelling of his name. And that state trooper rolled up the window, and I waited for probably five minutes there.

Q. And then what happened?

A. The state trooper rolled down the window, instructed the state trooper who was standing outside of the vehicle to escort me through a parking lot to a back area of the building -- I believe it's the rear of Broadview -- which was enclosed by a chain link fence and where there was a gate where vehicles could enter and exit Broadview.

Q. Did you talk to anyone at that fence?

A. Yes, there was an individual. I do not know what agency he was from. I believe he was a federal official, perhaps with

ICE or Customs and Border Protection.

However, as I approached that individual, he covered his face with a neckie, and then he also had no visible identification on his vest. And that individual asked me what I was hoping to do.

Q. And what did you respond to that individual?

A. I said I had three goals, one of which was to figure out whether my client was detained at Broadview.

The second was to talk to my client to make sure that he understood his legal rights.

And the third was to pass along paperwork showing that he had lawful status in the United States or at least deferred action and that his detention was inappropriate or incorrect.

Q. And what was the agent's response?

A. The agent took a copy which I had of Mr. Ijom Matom's work permit as well as the letter showing approval for deferred action and that that approval expired in 2027, walked away with a walkie-talkie, and I was left standing, I think, for around 10 minutes.

Q. And did he come back at some point?

A. He did come back.

Q. Did he say anything to you?

A. Yes. He said -- I'm paraphrasing, but I recall that this was the gist -- that because of all the craziness, no one is getting in or out of Broadview today.

Q. And what did you take that to mean?
A. I took it to mean that I could not visit Mr. Ijom Matom and that I could not secure his release that day.
Q. Did he provide you any information about your client when he spoke to you that last time?
A. I followed up with a question of whether he could confirm or deny that Mr. Ijom Matom was detained. He told me that he could, that he was there.
I asked him again, because of concern about transfer given my experience with Mr. Giménez González, whether it was likely that he would be transferred during the weekend. He again used the word "crazy" to say, "It's too crazy. I don't think anybody's moving this weekend."
And then I asked if there was a way to monitor Mr. Ijom Matom's whereabouts, at which point he showed me a piece of paper with a URL. I took a picture of that, believing it to be something more accurate or updated than the ICE detainee locator, but when I checked that later, nothing came up. There was -- and let me walk back if you don't mind.
Q. Of course.
A. I -- when he gave me that link, he said, "This will show that he's here."
And so when I checked it later, there was still no results for Mr. Ijom Matom's whereabouts.
Q. So when you checked it later, it did not, in fact, show he

was at Broadview?
A. That's correct.
Q. Even though he was at Broadview by the federal agent's admission?
A. Yes.
Q. And you were never permitted to provide legal documents to anyone at Broadview showing your client had deferred action?
A. No. That was one of the final questions I asked the functionary who was at the front of that gate.
I said, "I have several copies of immigration documents which I believe show that my client should not be detained here. Is it possible for you to pass those on?"
Q. And his response was?
A. "No, I can't pass these on."
I asked him if there was any way for me to get these documents to someone.
Q. And what was his response?
A. His response was -- he asked me whether I had the phone number to Broadview. I said that I did not.
And at that point he pulled out his cell phone, I believe looking for the phone number to Broadview, told me he also didn't have the number to Broadview.
And so at that point I did not have very many options left.
Q. Did you ever get to get to talk to your client while he was

in Broadview?
A. I did not speak to my client while he was in Broadview.
Q. During the time he was at Broadview, were you concerned about not being able to speak to him?
A. Extremely concerned about not being able to speak to him, primarily because I did not know what proof of his immigration status he had or what he'd been able to communicate to the people at Broadview.
Q. Were you worried that the lack of communication would negatively impact his legal case?
A. I was terrified that that might be the case because I had heard -- and, you know, I've had experience as an immigration attorney with pressure to sign legal documents while individuals are in detention.
Q. Did the lack of communication, in fact, negatively impact his legal case?
A. In my opinion, it did. I was told after Mr. Ijom Matom was transferred to Clay County in Indiana that he had signed a voluntary departure form. And that I learned later was based on conversations that he had with -- with -- with the -- the functionaries at Broadview.
I will say that when I filed a habeas petition also now on Mr. Ijom Matom's behalf in the Northern District of Illinois, one response from the government was Mr. Ijom Matom had signed papers requesting voluntary departure.

Q. So, in other words, they used it against him in his legal proceedings?
A. That's correct.
Q. And had you been able to contact him in Broadview when you went there that day, would your counsel -- what would your counsel have been to him?
A. Again, I would refer back to my testimony regarding Willian Giménez González. My first priority in speaking to him, if only for three minutes, was asking him whether he had signed anything and encouraging him not to to avoid this very circumstance.
So the happenstance that I had in speaking with Mr. Giménez González helped me avoid this possibility.
In the case of Mr. Ijom Matom, because I was able to have no phone conversations with him, I was not able to counsel him not to sign documents. And I believe that's why he ended up in the situation he was in.
Q. And you have clients who are in other detention facilities across the country?
A. I do not have clients at this moment in other detention facilities, but I have represented immigrant clients for about a decade, and so I have previously had immigration -- or clients in other immigration facilities.
Q. As an attorney is your experience attempting to access your clients at Broadview that past two months different from your

experience attempting to access your clients at other detention facilities?
A. It is significantly different. At Broadview I have -- it has been virtually impossible to contact any individual who is detained at that facility during the course of their detention there.
I generally receive no conversations with those individuals until they are transferred to another state, sometimes many miles away.
Even in detention facilities that were extremely high security, for example, in Texas, in Georgia, in New York, and in New Jersey, I had typically been able to schedule immigration counseling appointments that were secure and confidential within one to two days of my efforts to do so.
MS. VAN BRUNT: That's all I have. Thank you.
THE COURT: Thank you.
MS. BRADY: No questions from the government.
THE COURT: I have a question.
In your declaration, which is document 24, on paragraph 13, you stated that in the second call with Mr. Giménez González, he informed you that a guard was observing his call and instructed him to get off the phone when he learned that he was speaking to his attorney.
THE WITNESS: That's correct.
THE COURT: When you testified earlier today, you told

me that he said to you that he had to get off the phone and pass it to his wife, but you didn't mention anything about an instruction from an officer that he should get off the phone when he learned that he was speaking to you.

THE WITNESS: Yes, I believe I offered more detail in my testimony than in my declaration.

When he told me that the individual officer had told him he needed to get off the phone, my hope was for him to speak to his wife before the phone call was cut off.

THE COURT: All right. So you're not changing anything in your declaration then. You're just saying that when he told him that -- you say when he learned that Mr. Giménez González was speaking to his attorney, that implies that he wouldn't allow him to talk to a lawyer.

THE WITNESS: Yes, Your Honor.

THE COURT: Was that your impression?

THE WITNESS: That was my impression.

THE COURT: All right. Thank you. That's all I have.

Anything else based on what I asked him?

MS. VAN BRUNT: Your Honor, at this point, I think we'll waive --

THE COURT: Wait. Are you through with this witness?

MS. VAN BRUNT: Oh, I am through with the witness. I'm sorry.

THE COURT: It sounds like *My Cousin Vinny*. "I'm done

with this guy."

(Laughter.)

MR. VAN BRUNT: I'm done with this guy.

THE COURT: All right. You're excused. Thank you.

MS. VAN BRUNT: You're excused. Thank you.

(Witness excused.)

THE COURT: Do we have any other witnesses?

MS. VAN BRUNT: Your Honor, we do have two other detainee witnesses, but we also recognize we're short on time, given your trial, so --

THE COURT: We can stay here until 5:45 today.

MS. VAN BRUNT: Okay. Could I confer for one second with plaintiffs' counsel, please?

THE COURT: Sure. While you're doing that, let me ask the government. Do you have any witnesses here today?

MS. BRADY: We weren't able to arrange for any witnesses today, no, Your Honor.

THE COURT: Okay.

MS. VAN BRUNT: Okay. Your Honor, we are going to put on Mr. Ochoa Ochoa. Just one second, please.

(Brief pause.)

THE CLERK: Can you please raise your right hand? Do you swear or affirm that the testimony you're about to give in this matter will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: (Through interpreter.) Yes.

THE CLERK: Let me get you a microphone.

MR. COLE: One moment, please.

THE CLERK: Please raise your right hand.

Do you swear or affirm that the testimony you are about to give in this matter before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: (Through interpreter.) Yes.

(Witness duly sworn.)

MR. COLE: Sam Cole for the plaintiffs.

SAMUEL OCHOA OCHOA,

PLAINTIFFS' WITNESS, DULY SWORN

DIRECT EXAMINATION

BY MR. COLE:

Q. Please state your name.

A. Samuel Ochoa Ochoa.

Q. I see you're using an interpreter today. Is Spanish your best language?

A. Yes.

Q. Mr. Ochoa, where were you born?

A. In Venezuela.

Q. And when did you come to the United States?

A. In 2023.

Q. And where did you settle when you came here?

A. I've here in Chicago.

Q. You have family in the Chicago area?
A. Yes.
Q. So you actually were in the Broadview detention center on two different times; is that correct?
A. Yes.
Q. And when was the first time?
A. First time was June 12th.
Q. And when was the second time?
A. From the 8th to the 9th of October.
Q. Is it September or is it October?
A. September. I'm sorry.
Q. And you were actually detained by immigration the entire time between the June and September; is that correct?
A. Correct.
Q. But you actually made essentially an around-the-country trip and ended up back in Broadview; is that fair to say?
A. Correct.
Q. I want to talk to you about your experience at the Broadview Detention Center in September of 2025.
A. Okay.
Q. How many nights were you there?
A. First time it was two days and the second occasion, 24 hours.
Q. So in September you were there for one night; is that fair to say?

A. Correct.
Q. Now, when you arrived at the Broadview Detention Center in September, were you asked -- did you ask to make a phone call with an attorney?
A. Yes.
Q. Can you please tell the Judge what happened -- what the response was when you asked that?
A. The ICE agents denied me to have a phone call with my lawyer and asked me to use the public phone.
Q. And when -- can you describe for the Court what the public phone was that you had available to you?
A. These were inside the cell. One -- there were two phones. One was damaged. The other one did work, and they would give you a 20-second phone call.
Q. And did you have any opportunity to make a phone call that no one else could hear that was in private?
A. No, it was public. It was not confidential.
Q. Who was able to hear any phone call you'd make?
A. The ICE agents who were in the area and the detained people.
Q. So I want to talk about the number of people who were detained with you in that holding room.
How many people were in that room with you?
A. About 40 or 50 people.
Q. And what kind of furniture was in that room?

A. The furniture was plastic colored.
Q. And were you able to get a seat?
A. Yes.
Q. Was everyone able to get a seat?
A. No. Some were on the floor. Some were on the seats.
Q. And if you -- were you able to get up from your seat at any time?
A. When I went to the bathroom, I would have the risk of losing my seat, and that's how we would be rotating.
Q. I want to talk to you about sleeping that night in Broadview. Where did you sleep?
A. I slept sitting on the chair. You could say half sleep, because it was impossible to sleep.
Q. Why not?
A. Because it was too cold. The light was intense, and it was just impossible to sleep sitting down.
Q. Let's talk about the temperature.
What was the temperature of the room like?
A. It really was very cold.
Q. Well, did you have a blanket?
A. No.
Q. What about one of these little foil sheets? Were you given a foil sheet?
A. Only some people had those, not everybody.
Q. Well, if someone had testified, sir, that everyone is given

a blanket, would that be a true statement?
A. I'm not understanding very well.
Q. If someone had told you that everyone was given a blanket, is that true?
A. Well, it wasn't like that. They weren't giving out blankets. They were just recycling the ones that were already inside the cell. They weren't issuing you a blanket when you got there.
Q. And many people didn't have one; is that correct?
A. Many people did not have one, and they would be cold.
Q. And you said you were trying to sleep on a seat, right?
A. Yes.
Q. So what about the people that weren't lucky enough to have a seat, where did they sleep?
A. On the floor, cold.
Q. What kind of floor was that?
A. It was concrete floor, flat.
Q. Was there carpet or anything on top of the floor?
A. No.
Q. Were the people who were sleeping on the floor given a blanket to sleep on or a mattress or any sort of pad?
A. No.
Q. I want to talk to you about the food you were given when you were in Broadview that second time.
A. Okay.

Q. How many meals were you given?
A. Three meals a day.
Q. And what -- can you describe for the Court what the meals were?
A. Breakfast was this bread from Subway with lettuce and ham and water.
Then for lunch, the same thing, a bottle of water, bread from Subway with lettuce and ham.
And then for dinner, it was the same thing, a bottle of water, piece of bread with lettuce and ham.
Q. So if someone said that you were given one hot meal a day, would that be a true statement?
A. No, it isn't. It is not true.
Q. Now, did you notice the type of clothes that people -- other people were wearing that you were detained with?
A. Yes, of course.
Q. Now, were they clothes that were given to them by the jail or were they clothes they were wearing when they were detained?
A. These were the clothing that they had when they were arrested by the agents.
Q. And what type of clothes were they?
A. Some had work clothes on. Some had sport clothes on. They just had all different kinds.
Q. And were people who were there longer given changes of clothes and changes of underwear?

A. No.

MS. BRADY: Foundation.

THE COURT: Excuse me. What he observed.

MS. BRADY: What?

THE COURT: It's what he observed. That's all.

BY MR. COLE:

Q. I think you -- let me talk to you about how that room smelled. Like, can you describe for the Court the smell of the room of the people you were detained with?

A. The 24 hours that I was there, I didn't see them do any kind of maintenance or cleaning. The bathrooms were dirty, and they did smell a bit bad, not hygienic.

Q. You mentioned a little about the lighting at night. Can you talk about that a little bit more?

When you tried to sleep at night, what was the lighting?

A. The lights were always on to the max.

Q. Did you -- did people try to cover their eyes to sleep?

A. Some people would cover their eyes. They would, you know, cover themselves with a shirt or something to -- in order to stop the light from going on their eyes.

Q. I want to talk to you about the bathroom facilities there.

Can you describe for the Court what the toilets were like?

A. Well, I was only in two cells. One had a shower; one did

not. But the shower didn't work; it wasn't activated. And the bathrooms were dirty.
It's not just one person using the bathrooms. There's many people using them.
Q. Well, what kind of -- what kind of privacy did you have to use the toilet?
A. There is no privacy. It's in the same cell. They're just divided up with this half barrier.
Q. And during the time that you were there, did you ever see someone clean the toilets?
A. No.
Q. Anyone ever give you soap that you could use to wash your hands?
A. No.
Q. Did you see anyone else with soap?
A. I did see -- I did see, but in my case, I was never issued any soap. And the people that had been there longer, they did have a little bars -- bar of soap.
Q. Now, you talked about water with your -- with your food.
Can you describe the amount of water that you had with each meal?
A. It was just one bottle with every meal. And if you would run out of water, then you would have to refill it at the bathroom sink.
Q. And did you actually do that, use the bathroom sink to

refill your water?
A. Yes.
Q. And how did that water taste?
A. The taste of iron, rust.
Q. And did you drink it anyway?
A. Yes, I was already coming from prisons where you do the same. You drink that kind of water.
Q. Now, when you were at Broadview, do you receive any health care?
A. No. And actually, I came from Texas, and I was ill, and I did have a medical prescription. I had medication I had to take every eight hours, but they only gave it to me the first time and never again.
Q. When you say you were ill, can you explain what that means?
A. I possibly had COVID. I had a sore throat, and I had fever. But then when I was in Texas and I was going to be seen the next day, they took me away from there in the early morning hours, so I was not seen.
Q. When you -- you said you had medicine with you when you arrived at Broadview?
A. Yes, medication and my personal belongings.
Q. And how many times a day were you supposed to take that medication?
A. Every eight hours for six days, five days.
Q. During the day that you were there, how many times did you

take it?
A. Only one time when I got there.
Q. Why didn't you take it additional times?
A. Because I was telling the ICE agents, but they were just not paying attention to me because, you know, the place was so packed.
Q. Now, did you see anyone else who was sick when you were at Broadview?
A. Yes, I did see a girl who was pregnant. She was crying, tears coming out of her eyes, who was asking for her medication.
Q. Can you describe for the Court what you heard?
A. Well, they were asking her what kind of medication was it, if she had a prescription.
And she was saying, yes, that it was -- she did have a prescription and that it was in her belongings.
Q. And do you know whether she was able to get her medication or not?
A. No, wasn't able --
Q. You don't know or she wasn't able to get it?
A. And then they put me back in my cell, and I wasn't able to see anything else.
MR. COLE: May I have a moment, Your Honor?
(Counsel conferring.)
MR. COLE: I have no other questions.

CROSS-EXAMINATION

BY MS. BRADY:

Q. Good afternoon. My name is Jana Brady, and I'm an Assistant United States Attorney, and I represent the government in this matter.

To clarify, you were only at the Broadview facility for less than 24 hours in early September; is that accurate?

A. Correct.

Q. You're no longer detained there, correct?

A. Correct.

Q. Is it also correct that you do not have any personal knowledge as to how the facility is currently treating the detainees there?

A. Correct. But in the cell when people would come in, they were telling me their stories and what had happened at the -- at that place.

Q. But that wouldn't have been since September 9th of 2025, correct?

A. Correct.

Q. What medication are you testifying that you should have been taking while you're at Broadview?

A. Amoxicillin and acetaminophen.

Q. I'm sorry. I'm not sure what that medication is.

Do you have any other name for it?

A. It's Ibuprofen for the soreness of the throat and then for

an infection.
Q. Okay. Amoxicillin, is that what you're trying to say?
A. Amoxicillin and Ibuprofen.
Q. Okay. And you recovered from whatever illness that you had at that time; is that correct?
A. I did and recovering when I arrived to the detention center in Indiana.
Q. In terms of the girl that you described that was pregnant and wanted her medication, I'm just going to refer you back to that. Do you recall that line of testimony?
A. Well, I was outside. I was asking for my medication, and then she took advantage of that moment, and then she started to ask for medication, too.
Q. So is it fair, then, that you don't actually know if the girl ever received her medication?
A. Well, there was a window there you can see through, but you cannot hear.
Q. But you would have only been able to observe that window for the less than 24 hours that you were present at the facility; isn't that correct?
A. Correct.
Q. Okay. So you don't know if the girl received her medication after you left the facility; is that right?
A. Correct.
MS. BRADY: Thank you so much.

MR. COLE: Just briefly on redirect, Your Honor.

THE COURT: Okay.

REDIRECT EXAMINATION

BY MR. COLE:

Q. Sir, you were asked some questions on cross-examination about your sickness when you were at Broadview in September.

Do you remember those questions?

A. They didn't ask me any questions. I was the one that told them that I was ill and that I have some medication they prescribed in Texas.

Q. Were you concerned that you had COVID?

A. Yes. I also asked for a COVID test, but it was not given to me.

MR. COLE: That's all, Your Honor. Thank you.

May the witness be excused?

THE COURT: I have a question.

When you were in the cells on either occasion, did you see any wall-mounted water fountains?

THE WITNESS: No. All of us were drinking water from the shower or from the sink.

THE COURT: From the shower? I thought you said the shower wasn't working.

THE WITNESS: From the shower or from the sink where you washed your hands. It's because you said in any of the detention centers.

THE COURT: No. I meant the two in Broadview.

THE WITNESS: Oh, in those two cells, from the -- from the faucet in the sink.

THE COURT: Okay.

THE WITNESS: There was no water -- drinkable water dispenser.

THE COURT: All right. That's all I have.

Anything based on that?

MR. COLE: No, Your Honor.

MS. BRADY: No, nothing further.

THE COURT: All right. You're excused. Thank you.

(Witness excused.)

MR. COLE: Your Honor, we have one additional witness, unless you want to take a break first.

THE COURT: Yes. Why don't we take a short break, about 10 minutes.

(Recess from 3:03 p.m. until 3:11 p.m.)

THE COURT: Folks, I just want to tell you at 4:15 today, we have a very brief habeas proceeding. So we will break just for that and then return to this.

MS. GARCIA: Very good, Your Honor. We have one issue to raise before we go to the next witness.

Your Honor, as you recall, your order from last Friday directed defendants to return our clients to the Northern District and keep them in the Northern District.

We've learned from defense counsel that our clients may be moved to outside of the district, including to facilities in Wisconsin or Indiana.

During this whole time that you've had this order, I just wanted to raise to your attention, every time our client is moved -- been moved, whether it's from Broadview to Wisconsin to back, it has limited our ability to have contact with our clients. We've never had an in-person visit with our clients. And we would ask that you direct that our clients remain at the district and at the MCC.

THE COURT: Counsel, any problem that, because I was doing to do that anyway?

MR. JOHNSON: Your Honor, whatever the Court obviously wants to order us to do. I was told that the MCC was not an option. I don't have a great explanation for you as to why and that they were otherwise, short of a court order, going to be moved today.

THE COURT: Well, it won't be short of a court order.

MR. JOHNSON: I understand.

THE COURT: And also while on that subject, we have -- we're in the middle of a government shutdown, as you know. A lot of you are working without being paid, and you have the gratitude, I think, of the entire nation for that, all of you government folks, including my own staff. And our marshal service has been taxed greatly, as you know as well, I'm sure,

even from where you are.

I would request the plaintiffs -- if they would agree to allow the plaintiffs -- plaintiffs' counsel to agree to allow the plaintiffs to appear remotely from the MCC tomorrow, which we do all the time. In other words, they can appear by video.

MR. COLE: What was the Court's anticipation -- anticipation of tomorrow's schedule?

THE COURT: Okay. Tomorrow's schedule is going to be, I'd like you -- as you know I'm trying a jury case. I'm going to let them go a little early, and I think if we could reconvene tomorrow -- because I've got a lot to think about here, and I don't want to do anything precipitously, and we'll be discussing some of those things this afternoon -- but I would like you to come back tomorrow around 4:15 or something like that, and I will be prepared to discuss what relief, if any, I am prepared to order tomorrow. So that's my thinking right now.

MR. JOHNSON: Sure.

THE COURT: It's obviously interrupting the jury trial to some degree, but I normally knock off at 4:30 anyway. So we'll knock off at 4:00 and reconvene around 4:15 tomorrow.

MR. JOHNSON: That's fine with us, Your Honor.

THE COURT: Okay. So we will include in the order today, Claire, that the plaintiffs in this case are to be kept

at the MCC until further order of Court and will appear virtually.

MR. COLE: No objection, Your Honor.

THE COURT: Okay. Great.

MR. JOHNSON: Thank you, Your Honor.

THE COURT: Thank you.

Your next witness.

MR. COLE: Your Honor, the plaintiffs call Ruben Torres Maldonado.

THE CLERK: Sir, please stand and raise your right hand.

Do you swear or affirm that the testimony you are about to give in this matter before the Court will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: Yes.

THE CLERK: Thank you.

(Witness duly sworn.)

MR. COLE: You may be seated.

RUBEN TORRES MALDONADO, PLAINTIFFS' WITNESS, DULY SWORN,

DIRECT EXAMINATION

BY MR. COLE:

Q. Please state your name and spell it.

A. Ruben Torres Maldonado, R-u-b-e-n, T-o-r-r-e-s, M-a-l-d-o-n-a-d-o.

Q. Now, you're here in court today with your daughter who is

the back; is that correct?
A. Correct.
Q. And you were just in the newspaper recently after getting released on an immigration court bond; is that right?
A. Correct.
Q. Thank you for coming to court for today.
Can you tell the Court where were you born, please?
A. I was born in Minatitlán, Veracruz, Mexico.
Q. And when did you come to the United States?
A. March of 2003.
Q. How old were you, approximately?
A. 18.
Q. And you have quite a few family members in the United States; is that right?
A. Yes.
Q. Tell the Court about your immediate family.
A. Well, I have my brother and two children, my nephews and nieces -- three children, I'm sorry. Juan Garcia, Jorge Luis Garcia, and Brenda.
I have my sister, Delia Perez, and I have three nieces, Judy Perez and Helica Perez, and I forgot the next one.
Q. I don't mean to make it a test. I'm sorry.
THE COURT: Did he say he was 18 years old?
MR. COLE: He came to the United States in 2003 when he was 18 years old.

THE COURT: Oh, when he was 18 years old.
MR. COLE: Yes.
THE WITNESS: Correct.
BY MR. COLE:
Q. And you have -- how many children do you have?
A. Two.
Q. And one of them is in the court today.
How old is -- how old is your daughter?
A. 16.
Q. And you have another child as well; is that correct?
A. Correct.
Q. How old is he?
A. Four.
Q. And you have a partner as well?
A. Yes.
Q. And how long have you been together with your partner?
A. 20 years.
Q. Okay. Can you tell the Court about the type of work that you do?
A. I work for a painting company, and I also work on my own doing remodeling.
Q. And how long have you worked for that same painting company?
A. 20 years.
Q. Now, I want to just briefly discuss how you were detained

and ended up Broadview.

Can you just describe for the Court what happened?

A. Of course. I went to Home Depot, like, at 2:00 p.m. I had already been there, like, at 12:00. I went back to pick up some material that I had forgotten.

So I went up on my truck, and I turned it on, and I put it on reverse, and then two persons came up.

Q. And you were detained at that time?

A. Yes.

Q. Okay. And what day was that?

A. Saturday.

Q. And was it October 18th?

A. Correct.

Q. And where were you taken once you were detained?

A. They took me to the Broadview Detention Center.

Q. And how many nights were you there?

A. Five.

Q. And when you first arrived at Broadview, can you describe for the Court what happened?

A. Well, they took me out, handcuffed. They put me in these offices, and I got there, and there was, like, a supervisor.

And he asked me, like, if I was okay because my T-shirt was like ripped, and my neck was, like, scratched.

Q. And did you ever receive any medical care for the scratches on your neck?

A. No.
Q. Now, were you offered the opportunity to make phone calls when you arrived at Broadview?
A. No.
Q. And at some point were you able to call your partner?
A. Yes, from some of the phones that were on the inside that I was told worked.
Q. And describe that phone call for the Court, please.
A. Well, some of the ones that the people there that had already used the phone explained to me how to do it, to make a phone call.
Q. Was it -- was it self-explanatory? Were the directions on the wall that you could understand?
A. No.
Q. Well, did anyone provide you with any information on how to make that phone call other than the other people who were detained there?
A. No.
Q. So what happened when you called your wife?
A. Well, I just told her that ICE had detained me and that my truck had been left at The Home Depot parking lot.
Q. Now, were you ever -- did you ever speak with an attorney when you were detained?
A. Not directly. It was a coincidence. It was the second time when I called my wife, the lawyer was there, and then we

connected with three phone lines.
Q. And when you -- at that point you were actually able to speak with your lawyer through that three-way phone call?
A. Yes.
Q. Was it a private phone call or were there other people around?
A. No, there were more people around us.
Q. Well, who was around you?
A. A lot of people that were detained.
Q. Now, when you arrived at Broadview, were you given a list of attorney names, sometimes called a pro bono list of attorneys?
A. No.
Q. How many times were you able to speak with your attorney?
A. Only that time.
Q. Okay. Now, I want to talk about how many other people were detained with you in that holding room.
How many rooms -- first of all, how many rooms in total were you -- were you detained in during your time there?
A. Well, there were three rooms.
Q. And -- sorry.
A. And one specially for women.
Q. How many people were detained with you at Broadview in the same room?
A. In the first room that was smaller, when I was detained,

there were like 40 people.
Q. And approximately how long were you in that one room?
A. About six hours.
Q. And then what about the next room that you were detained in? How many people were with you in that room?
A. More than 100.
Q. And how long did you stay in that room?
A. In that room, I was, like, two days until -- two days.
Q. And then did you go to another room?
A. Yes, they would move us from one room to another.
Q. And how many people were in that third room?
A. Well, the thing is that in one room there were, like, 80, and then in the other there were, like, 100. So wherever they would put us, there were a lot of us.
Q. Okay. Now, did you ever sleep in one of these overcrowded rooms?
A. Yes.
Q. Where did you sleep?
A. For some days I slept on, like, these sofas that they have and then the other days on the floor.
Q. Can you describe the sofas?
A. It's like only -- like this plastic chair.
Q. And is there a back to the chair? Is there a back to it?
A. Yes, like halfway, like this side (indicating) to the shoulder.

Q. Could you lie down on the chair?
A. No.
Q. Why not?
A. Because it's only a small space where you can sit down, a small space.
Q. Now, you said sometimes you slept on the floor. How many nights was that?
A. It was, like, three nights.
Q. What kind of floor was it?
A. Concrete.
Q. And was there anything over the concrete, like a carpet or a mattress or a pad, anything?
A. No, nothing.
Q. Did they give you a pillow?
A. No.
Q. Was there anything that you could use as a pillow?
A. We were using -- we would take the bottles of water and fill them up with water and then put them back here (indicating) so your head wouldn't be touching the concrete floor.
Q. How big were these bottles of water?
A. The regular ones. It's like the one there in front.
Q. And what about a blanket, were you given a blanket to use?
A. No.
Q. Some people have talked about foil blankets. Did you see

anyone with a foil blanket there?
A. Not the time that I was there -- not for the time that I was there.
Q. So if someone said that all detainees are issued foil blankets, that would be false; is that correct?
A. Correct.
Q. Now, describe how crowded the floor was with people sleeping on it. Describe that for the Judge.
A. It was full. At night you couldn't walk. You had to be careful, like, if you had to use the bathroom, so you wouldn't step on somebody's hand.
Q. Now, I want to talk to you about the toilets.
How many toilets did you have access to?
A. So in one of the rooms, they only had one small toilet. And then in the other one, they had a toilet, and then they had -- they had some, like, these bathtubs made out of metal. They had two toilets and some bathtubs made out of metal, and then in another one they only had one bathroom.
Q. Okay. And would you describe the toilet facilities as clean?
A. No.
Q. How would you describe them?
A. Very dirty with paper thrown about, toilet paper.
Q. Now, when you arrived at Broadview, did they provide you with a change of clothes?

A. No.
Q. And what kind of clothes were you wearing when you -- when you arrived?
A. I had my work boots, my work pants, and this white T-shirt.
Q. Now, during the five nights you were there, did they give you new socks or new underwear?
A. No.
Q. Can you describe for the Court what the smell of the room that you were -- the rooms you were detained in were like?
A. A very bad smell.
Q. Can you describe it?
A. Well, it smelled like excrement.
Q. I want to talk about now the food that you were given.
Can you describe for the Court how many meals a day you were given?
A. In the time that I was there, they would give it me three times.
Q. And tell the Court what you were given to eat.
A. In the morning, they would give us this bottle of water and this piece of Subway sandwich with one lettuce and one -- one slice of ham.
And for lunch it was the same thing, and then dinner it was the same thing.
Q. Were you full after eating?
A. No.

Q. If someone said that you were given at least one hot meal a day, would that be -- would that be true?
A. No.
Q. In fact, were you ever given a hot meal any time you were at Broadview?
A. No.
Q. Now, if you wanted additional water bottles, did you ever ask for -- ask for that?
A. Yes.
Q. And what was the response?
A. They didn't have any.
Q. If someone said bottled water is available upon request and free of charge, is that an accurate statement?
A. No.
Q. Now, did you ever receive medical care when you were at Broadview?
A. No.
Q. You ever see anyone else get medical care?
A. Only one person who had convulsions.
Q. What about were there any people who were coughing when you were there?
A. Yes.
Q. And what about sneezing?
A. Yes.
Q. How common were the coughing and sneezing when you were

detained there?
A. Very common.
Q. And did you ever see anyone get medical care?
A. No.
Q. Now, when you were at Broadview, did you talk to other people about how long they were -- had stayed there?
A. Yes.
Q. And anyone there longer than you?
A. Yes.
Q. Can you describe that for the Court, please?
A. Well, when you get there, you know, you start asking: "Well, how long have you been here?"
There were people that had been there 12 days, 5 days.
Q. The people who were there for 12 days, did they try to get more information about how long they were going to be there for?
A. Yes.
Q. And what was the response?
A. They would just say that they were going -- well, we're going to check, and then they would close the door.
Q. Now, did people who agreed to leave the United States stay in Broadview just as long as people who wanted to fight their case?
A. No. The people that would sign their departure or deportation, they would leave earlier.

Q. Did the guards -- did the officers at Broadview tell people that if they agreed to leave the country, they'd be able to leave Broadview quicker; otherwise, they'd have to stay there longer?

A. Possibly, but when people were seeing that the people signing were leaving faster, that's why they were signing.

Q. And you saw that? People -- people were signing because they felt they wanted to leave; is that correct?

A. Yes, yes.

MR. COLE: Okay. May I have a moment, Your Honor?

(Counsel conferring.)

MR. COLE: No further questions.

MS. BRADY: No questions.

THE COURT: You're excused. Thank you, sir.

THE WITNESS: Thank you.

(Witness excused.)

THE COURT: Is that the plaintiffs' last witness then?

MS. VAN BRUNT: It is, Your Honor.

THE COURT: And there's no witnesses here for the government?

MS. BRADY: That is correct. We weren't able to line up witnesses in the short time that we've had.

THE COURT: All right. I'll turn it over to the plaintiffs.

MS. VAN BRUNT: Your Honor, at this point I think

Mr. Manes would like to go through the requested relief, which we submitted as Exhibit A to the motion for a temporary restraining order.

MR. MANES: Good afternoon, Your Honor.

As my colleague -- actually, let me make sure I have the documents here.

As my colleague mentioned, we have submitted proposed relief at Exhibit 17.1. The relief is simple. It's meant to ensure minimal basic standards at the Broadview detention conditions -- at the Broadview Detention Center. The relief is patterned on the court's order in the *Barco Mercado* case in the Southern District of New York, and it narrowly targets the violations that we've been hearing about in testimony today.

In summary, section 1 asks for minimum basic standards of cleanliness, hygiene, food, water, not crowding, sufficient space for people to live decently, and counsel access, ability to make confidential calls.

Section 2 specifies the rights that people at the facility should be notified about, and it includes all the rights that are specified in section 1 in addition to the provision of a list of immigration attorneys to detainees, the provision of licensed medical and mental health care, the ability to access medication, and the ability for people to request more water if they need it, more food, an additional meal if they -- if they need it.

What we've proposed in section 5 is that if the facility can't come into compliance with these basic requirements within 3 days, 72 hours, then people shouldn't be held there for more than 12 hours. It should go back to being what the government claims this facility was, is, should be, a 12-hour holding facility where people are held briefly on their way to a place that is set up and able to hold people overnight for longer.

We also seek additional relief. We'd like the Court to post a copy of the notice of rights. We'd like to have regular inspections on the facility, which we think is important, to monitor how the facility is being run on an ongoing basis.

With respect to counsel access, sections 6 and 8 address the concerns that you heard about today, Your Honor, from the attorneys; that the online detainee section -- section 6 addresses the online detainee locator system which, as you've heard, does not list people in the -- as being detained at Broadview in a contemporaneous fashion.

We heard at the beginning of the day that this may be a tech issue. I don't think that adds up. What we've heard from the former detainees is that people are processed into the system in front of computers. And it stands to reason that once people are booked in, they would show up in the detainee locator. There is no evidence in the record that there is some

kind of computer or technological issue that causes people to not show up in a system for days when they're at Broadview.

Based on the evidence that Your Honor has heard, the trouble seems to be that people are not just being logged in at Broadview.

We ask for people to be logged in in realtime and within three hours at the outside at Broadview.

We're also asking for Your Honor to order the defendants to permit attorneys to schedule calls. We'd like some basic things: A working monitored phone number where attorneys can call to set up a time to talk to their clients, a call within three hours of a request under ordinary circumstances, and also to be able to visit.

There's uncontested evidence in the record that there are attorney visit rooms in this facility. That was contained in an audit that -- the government audit shows that there are, in fact, purpose built attorney visit rooms at the facility. We think that the defendants should be required to allow those to be used for attorney visits.

Finally -- well, not finally. A couple more items.

We'd like for the notice of rights to be translated so people can understand it, so detainees coming into the facility understand what their rights are, what they can insist on in terms of the conditions, and an oral translation, if necessary, if a detainee can't read or if the -- or if they don't speak

Spanish or English.

Finally, we'd ask for a prohibition on retaliation. I can tell Your Honor that, as you can tell from the record before you, we've spoken to many people who were detained at Broadview. We spoke to many more who did not want to come forward with their experience because they fear retaliation from agents of the defendants, immigration officials in the immigration system. We could have had more witnesses here today, but people were afraid to testify.

So what we're asking for is an order from the Court prohibiting retaliation against the plaintiffs, witnesses, and any declarants so that they don't -- they will have some measure of comfort they're not going to experience retaliation at the hands of the government for coming forward and asserting their constitutional rights and those of other people who are held at Broadview.

Finally, one issue that's come up in the testimony is the question of forced signatures, of people having signatures, being asked to provide signatures under coercion, threats, or on documents that aren't translated. The proposed hero doesn't seek relief specifically on that at this point, but we think there is now plenty of evidence in the record from -- I think we have five examples of detainees being told that they have to sign documents under some kind of threat, that they won't be able to leave unless they sign, that they'll be held for longer

unless they sign.

Mr. Herrera's client apparently signed his voluntary deportation paperwork despite having deferred action because he wasn't allowed to speak with an attorney. He couldn't get that advice not to sign.

Attorney Vcelka's client, the nursing mother, was removed from the country. You may recall that testimony.

And one of our plaintiffs, Mr. Moreno, was asked to sign deportation work.

We're concerned that this is a grave, ongoing violation of due process that's happening at the facility. We don't have great insight into it because people are being shipped out of the country quicker and without lawyers than we can figure out what's going on.

We don't really know what papers these are, what the processes are. We need quick discovery in order to figure this out and determine whether there is, in fact, a due process violation that's happening. There's a grave concern that defendants are trying to coerce people to sign these voluntary departure paper -- departure documents in order to waive their rights and scare people out of the country even if they may have a right to stay or claims for relief.

I'd be glad to talk in more detail about the specific, more immediate things, like overcrowding, clean bedding, basic hygiene, showers, toilet, food, water, confidential phone

calls, but that's my brief overview of the relief we're seeking.

THE COURT: Okay. Would you like to respond?

MS. BRADY: Very briefly. I was just going to reiterate that the government is asking for operational flexibility so that the temporary restraining order, if entered, does not interfere with the executive branch's ability to enforce immigration laws.

And I just want to rest on our brief that we filed with the Court, that being docket No. 39. And then specifically the declaration of Mr. Byers discusses the undue burdens that the TRO relief would have upon the government's operations in paragraphs 32 through 37. And, again, that's docket 39, and those are pages 35 and 36.

Thank you, Your Honor.

THE COURT: Well, let me just make some observations here. It appears to me that we wouldn't even be here today if the level of immigration enforcement had remained as it was in the past, that this facility was built and maintained to accommodate far fewer people than it has been forced to accommodate or not accommodate at this time.

And I am not doing anything that intends to interfere with the executive's decision to increase the enforcement of the immigration laws in the manner that has happened in the last few months, particularly in this city and in the suburbs

of this city.

But this is a conditions case, and this facility -- I think the evidence has been pretty strong that this facility is no longer just a temporary holding facility that processes people and then ships them out to more appropriate places, as we've heard today and as we've been hearing in the habeas cases that we've been dealing with.

It has really become a prison. And when somebody is being held for five days or longer, it is no longer just a processing center. If it was just for 12 hours or maybe even just 24 hours, that would be a whole different picture.

There's a lot of case law that has allowed conditions that we would ordinarily find unconstitutional even in the context of prisons that are holding convicted felons. And these are not convicted felons. These are civil detainees.

So there's been a change of circumstances that brings this whole case to the Court today.

And the declaration of Mr. Byers, as much as I appreciate your, I'm sure, going to a lot of trouble getting what you did, has been contradicted pretty thoroughly, or at least a lot of it has, by the witnesses that we've heard today and by the declarations that have been submitted by the plaintiffs. He says that they're offered as much water as they want on demand. That's not what I've heard. That's just not correct as far as I can tell.

Declarant after declarant, witness after witness says they can't get water. They have to drink rusty water out of the sink if they want extra water and put it in the bottles that they've been given two or three times a day with their meals.

They are not given a hot meal. He says they've been given a hot meal. I haven't heard one person say that they got a hot meal.

Mr. Byers has claimed that there are bench-style seating areas where people can sleep. All I've heard about are these plastic chairs that people are trying to sleep on or floors that are cold and are kept cold by air conditioning and bright lights.

And I'm not sure about these foil blankets. I guess there are some foil blankets being handed out but not to everybody. This last witness said he hadn't seen any.

So the fact that people are being kept overnight, not just for one night, sometimes for multiple nights, in conditions that are unnecessarily cruel, if you want to put a word on it, sleeping shoulder to shoulder, next to filthy toilets that have been overflowing and surrounded by human waste, that's just unacceptable.

Now, maybe things have gotten better there. I hope they have. And if they have, then any type of order that I do enter -- and I want to really think about this, because I think

it should be as narrow as possible to satisfy the requirements of a temporary restraining order. You may be asking for a little bit too much, so I want to really give this some thought. That's why I want you to come back tomorrow, and I'll have something that I can think about, even though I'll be trying a jury case between now and then.

The nice thing about jury cases is it gives the Judge a lot of time to think about other things.

(Laughter.)

THE COURT: If Mr. Byers were here, I would be able to ask him about some of these things. I'm not ordering him to be here. I'm going to rule on the record that I have.

And it's a disturbing -- it's a disturbing record. I think everybody can admit that we don't want to treat people the way that I've heard people are being treated today. Whether there's 40 or 50 or 60 or 100 or 120 people in these rooms, they're not very big.

Mr. Byers was kind enough to give us a diagram of the rooms, but I don't know -- he didn't include the size of those rooms, but they don't look particularly big, because they weren't constructed to be very big and hold the number of people that they're bringing in to process. I mean, that's just the reality of the situation that we're dealing with.

So I want to -- I don't want to fashion an order that is impossible to comply with. I want to really think about a

narrow order that at least temporarily provides the type of relief that avoids the conditions that we've been hearing about. I honestly don't think anybody in this room would like to see that continue, if possible. So I want to think about that.

Now, in the meantime, you also have a motion for expedited discovery, which I think you're entitled to but not particular -- not to the extent -- at least between now and when we get to the next stage of this proceeding, I think that you should be able to take some depositions so that we can actually get to the bottom of some of these questions that remain open. I don't want to tell you how many depositions or who to depose.

I think you could have a conversation. I think you've all acted very professionally today, and I really appreciate that. I think you should have a conference the way we always encourage counsel to do and see if you can agree on the individuals at the facility or otherwise having knowledge of the facility at Broadview that you need to depose.

I think you should keep the depositions to a particular length if you can, but I think that's something you should discuss and we can talk about tomorrow. So I think I'm going to allow expedited discovery on that basis.

You wanted a limited document request, too. I think you should be able to get more information. I would like to

know how many people are actually being held or were being held or are being held or can be held under certain conditions. We just don't have those numbers now.

We have lay witnesses testifying about how many people they thought were in these cells. There must be records about how many people were processed on a particular day. So I think that's something you should talk about when we break today and see if you can come up with a discovery plan, both for timing and scope. And if there are disagreements, which there very well may be, we'll deal with them when I see you tomorrow.

As far as inspections go, I want to hold off on that at this point. I think we have certainly had a lot of prison conditions cases in this court, as you know, and we have allowed inspections from time to time. We've had some cases where there are decrees, either consent decrees or court-imposed decrees which have monitors and that sort of thing. I don't think we're at that point yet. But that's something that you might think about going forward. I'm not ordering that now. I'm just telling you that that's a possibility in the future.

So what I want to do is give this some more thought and try to draft something. I do think the plaintiffs have made a case that justifies the entry of some sort of temporary restraining order, and I want to just be able to fashion that in the most appropriate way I can between now and when I see

you tomorrow.

I don't think there's anything else pending at this time. So the motion for expedited discovery is granted for the -- limited to the limitations that I've expressed today.

And I'm ordering the plaintiffs to remain at the MCC and appear tomorrow at 4:15 by videoconference, by Webex, or whatever they do over there. And I think it's Webex. Claire is saying yes.

MS. VAN BRUNT: Your Honor, one note. Is it okay to add to the order, just to facilitate, interpretation? We'll pay for it --

THE COURT: Sure.

MS. VAN BRUNT: -- but just so they can have it during the hearing.

THE COURT: Sure. They can do it simultaneous -- there are some translators who can do that simultaneously. I don't know if you can get that, but they have them on the phone.

MS. VAN BRUNT: We can look into that. We'll explore the options.

THE COURT: Our official interpreters might be able to help you arrange that. Otherwise, we'll do it the way we did it today.

MS. VAN BRUNT: Thank you.

THE COURT: Obviously, that lengthens any kind of

proceeding. It's not as efficient.

MS. VAN BRUNT: Yes.

MR. EIMER: Your Honor, if I may approach the Court. Nate Eimer on behalf of the plaintiffs.

I understand Your Honor's position on inspections, and we'll let that go. But I think we're all wondering what this looks like on the inside. We've been told about benches or plastic chairs.

Can we go have somebody go in and take photographs of this facility?

THE COURT: Okay. I'm glad you said that, because I did ask a question earlier to see whether or not these cameras actually recorded anything, so we -- I don't know what it looks like inside.

MR. EIMER: Thank you, Your Honor. Yes.

THE COURT: Have you gotten an answer to that?

MR. JOHNSON: Sort of, Your Honor. There are things being recorded.

My understanding is they're in the process of buying some new computer equipment that will allow it to be saved properly. I think there is a month or two that's already saved, but then every day that's recorded, it records over the oldest stuff.

I'm trying to get some confirmation on that and when we can get -- I don't know; we can talk about this -- but when

we can get some snapshots of arbitrary days. I assume that's what the Court and plaintiffs would --

THE COURT: Well, at least that's a good start --

MR. JOHNSON: Yes.

THE COURT: -- because we can see what it looks like in there.

MR. EIMER: Yeah, it would be help if you --

THE COURT: Since the lawyers haven't been able to get in, the ones we've heard from at least, unless you have somebody else that can describe it, it would be very helpful to have a picture.

Maybe we can ask AI how to do it. I don't know.

MR. JOHNSON: I should be able to update you by tomorrow.

THE COURT: That would be great. That would be great. That would be a good start, obviously.

MR. EIMER: Right. So, Your Honor, I'm wondering if we can send just a photographer in there to take pictures of the facilities. We know there's four rooms, apparently. There are attorney rooms. I'm not sure what this looks like.

THE COURT: Let's see tomorrow whether they're able to get you some pictures. Because if they have cameras all over the place, as you say, you can just get a snapshot of the various rooms, the intake room, that sort of thing.

MR. EIMER: Okay. Thank you, Your Honor.

Can I ask one other thing; and that is, a preservation order to make sure that records are maintained until --

THE COURT: Is there any problem with preserving?

MR. JOHNSON: There's no problem. We've already sent that out, Your Honor.

THE COURT: Okay. That's good enough for me.

MR. EIMER: That's good enough for me. Thank you.

THE COURT: All right. Well, we're breaking earlier than I was hoping -- not hoping -- expecting.

We will see you tomorrow at 4:15. And if there's any problems that arise between now and then about the MCC or anything like that, let me know as soon as you can. We'll adjourn for the day then.

THE CLERK: All rise.

(Adjournment at 4:15 p.m.)

* * * * *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/S/Nancy L. Bistany* *November 8, 2025*

Nancy L. Bistany Date
Official Court Reporter

I N D E X

| WITNESS | PAGE |
|---|---|
| PABLO MORENO GONZALEZ | |
| DIRECT EXAMINATION | 41 |
| CROSS-EXAMINATION BY MS. BRADY | 55 |
| FELIPE AGUSTIN ZAMACONA SABOERANIS | |
| DIRECT EXAMINATION BY MS. VAN BRUNT | 59 |
| CROSS-EXAMINATION BY MS. BRADY | 71 |
| CLAUDIA CAROLINA PEREIRA GUEVARA | |
| DIRECT EXAMINATION BY MR. MANES | 75 |
| CROSS-EXAMINATION. BY MS. BRADY | 92 |
| SHELBY VCELKA | |
| DIRECT EXAMINATION BY MS. HICKEY | 100 |
| KEVIN HERRERA | |
| DIRECT EXAMINATION BY MS. VAN BRUNT | 117 |
| BY THE COURT | 139 |
| SAMUEL OCHOA OCHOA | |
| DIRECT EXAMINATION BY MR. COLE | 142 |
| CROSS-EXAMINATION BY MS. BRADY | 152 |
| REDIRECT EXAMINATION BY MR. COLE | 154 |
| RUBEN TORRES MALDONADO | |
| DIRECT EXAMINATION BY MR. COLE | 158 |