# EXHIBIT A

1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   PABLO MORENO GONZALEZ and      )  Case No. 25 C 13323
     FELIPE AGUSTIN ZAMACONA,       )
 4                                  )
                     Plaintiffs,    )
 5                                  )
             v.                     )
 6                                  )
     KRISTI NOEM, et al.,           )  Chicago, Illinois
 7                                  )  November 4, 2025
                     Defendants.    )  9:32 a.m.
 8

 9                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE ROBERT W. GETTLEMAN
10
     APPEARANCES:
11
     For the Plaintiffs:    RODERICK and SOLANGE MacARTHUR
12                              JUSTICE CENTER
                            BY:  MS. ALEXA VAN BRUNT
13                               MR. JONATHAN MANES
                                 MS. DANIELLE BERKOWSKY
14                               MS. JAMIA RUSSELL
                            160 East Grand Avenue, 6th Floor
15                          Chicago, Illinois 60611

16
                            THE ROGER BALDWIN FOUNDATION OF
17                              ACLU, INC.
                            BY:  MR. KEVIN M. FEE
18                               MS. MICHELLE T. GARCIA
                                 MR. SAMUEL COLE
19                               MS. JENNIFER STARK
                                 MS. KATHLEEN HICKEY
20                          150 North Michigan Avenue, Suite 600
                            Chicago, Illinois 60601
21

22                          EIMER STAHL
                            BY:  MR. NATHAN P. EIMER
23                          224 South Michigan Avenue, Suite 1100
                            Chicago, Illinois 60604-2516
24

25
```

2

```
1   For the Defendants:      UNITED STATES ATTORNEYS' OFFICE
                             BY:  MS. JANA L. BRADY
2                            327 South Church Street, Suite 3300
                             Rockford, Illinois 61101
3
                             MR. PATRICK WALTER JOHNSON
4                            219 South Dearborn Street
                             Chicago, Illinois 60604
5

6   ALSO PRESENT:            MR. JORGE LUIS CARBAJOSA
                             Certified Spanish Interpreter
7

8

9

10

11  Court Reporter:          NANCY L. BISTANY, CSR, RPR, FCRR
                             Official Court Reporter
12                           219 South Dearborn Street, Room 1706
                             Chicago, Illinois 60604
13                           (312) 435-7626
                             bistanyofficialtranscripts@gmail.com
14

15

16                          *   *   *   *   *

17
                   PROCEEDINGS REPORTED BY STENOTYPE
18       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

19

20

21

22

23

24

25
```

1          (Proceedings heard in open court:)

2               THE CLERK:  25 C 13323, Gonzalez versus Noem.

3               Counsel can approach.

4               MS. VAN BRUNT:  Good morning, Your Honor.

5               Alexa Van Brunt, the MacArthur Justice Center, for the

6     individual plaintiffs and the putative class.

7               MS. BRADY:  Good morning, Your Honor.

8               Jana Brady and Patrick Johnson on behalf of the

9     government.

10              THE COURT:  Good morning, folks.  There are obviously

11    other counsel present here today, so maybe they can introduce

12    themselves.

13              MR. MANES:  Your Honor, Jonathan Manes, MacArthur

14    Justice Center, for the plaintiffs.

15              MS. GARCIA:  Your Honor, Michelle Garcia on behalf of

16    the plaintiffs with The Roger Baldwin Foundation of ACLU Inc.,

17    ACLU of Illinois.

18              MR. COLE:  Good morning, Your Honor.

19              Samuel Cole from the ACLU, also on behalf of the ACLU.

20              MR. EIMER:  Good morning, Your Honor.

21              Nate Eimer of Eimer Stahl on behalf of the plaintiffs

22    and putative class plaintiffs.

23              MS. BERKOWSKY:  Good morning, Your Honor.

24              Danielle Berkowsky for the plaintiffs with MacArthur

25    Justice Center.

1          MS. HICKEY:  Good morning.

2          Katie Hickey on behalf of the plaintiffs, also from

3     the ACLU.

4          THE COURT:  All right.  Good morning, folks.

5          This is here on the plaintiffs' motion for a temporary

6     restraining order.  We have received a response that was the --

7     the plaintiffs had submitted a number of declarations.  The

8     defendants have submitted a declaration as well.

9          So this isn't a TRO without notice, obviously.  This

10    is more like a preliminary injunction proceeding at this point.

11         We have a couple of things.  One of my first questions

12    was, where are the plaintiffs?  And I was told that they are

13    actually here.

14         MS. VAN BRUNT:  Your Honor, they are at plaintiffs'

15    table right now.  Mr. Pablo Moreno Gonzalez and Mr. Felipe

16    Agustin Zamacona.

17         THE COURT:  Could you introduce them, please?

18         MS. VAN BRUNT:  Pablo.

19         MR. GONZALEZ:  Pablo Moreno Gonzalez.

20         MS. VAN BRUNT:  And Felipe.

21         MR. ZAMACONA:  Felipe Agustin Zamacona Saboeranis.

22         THE COURT:  Do each of them need translators?

23         MS. VAN BRUNT:  No.

24         MR. ZAMACONA:  I don't need translators.

25         THE COURT:  Good.  Thank you.

1        MS. VAN BRUNT:  Mr. Moreno Gonzalez does, and we have

2   provided one today, a certified court interpreter.

3        THE COURT:  All right.  Good.

4        All right.  So we have to proceed today, I think, on

5   the papers that I have, and there's a couple of things we could

6   take care of, some housekeeping things.

7        There is a motion for class certification.  I just got

8   a response to that.  I assume you want to reply to that.

9        MS. VAN BRUNT:  We do, Your Honor, if possible.

10       THE COURT:  Sure.  I don't think we're going to get to

11  that today, obviously.

12       MS. VAN BRUNT:  Thank you, Your Honor.

13       THE COURT:  So how soon can you reply?

14       MS. VAN BRUNT:  Team?  Three days, Your Honor.

15       THE COURT:  Fine.

16       MS. VAN BRUNT:  We'll take three days.  Thank you.

17       THE COURT:  Well, let's say by Friday then, by Friday.

18       MS. VAN BRUNT:  Sounds good.

19       THE COURT:  There's also a motion for an expedited

20  discovery, but I think we should talk about that later today.

21       MS. VAN BRUNT:  Of course.

22       THE COURT:  Is there anything that either side wants

23  to say before I get to my agenda here?

24       MS. VAN BRUNT:  Well, Your Honor, a couple things.

25       If it pleases you, I have an opening statement.  We

1  can ditch it altogether if that's not helpful.

2          I'll also say that we do have witnesses ready and

3  willing to testify; the plaintiffs, of course, and then three

4  other people who are recently detained in Broadview and two

5  attorneys.  And we think their testimony is important,

6  particularly given the response we received last night.

7          So we would put them on but only with Your Honor's

8  leave.

9          THE COURT:  Well, I think we're going to have to get

10  to that.  I wanted to go through the issues that I thought were

11  contested and the issues that may not be contested.

12          Does the defendant have anything?

13          MS. BRADY:  Yeah, just briefly.  And I apologize.  I

14  was just assigned to the case on Sunday evening, so I'm trying

15  to play catchup.  And we only today received the plaintiffs'

16  exhibits.  I haven't had an opportunity to review any of them.

17          THE COURT:  Most of those exhibits are the

18  declarations.

19          MS. BRADY:  So about 40 of the 60 exhibits.  So

20  there's still that extra 20 that I haven't even taken a look

21  at.

22          THE COURT:  Okay.  Well, we'll do what we can today.

23  I think you all know that I swore in a jury yesterday in a

24  criminal case, and we adjourned it for today's proceeding in

25  this case, but we're going to be proceeding in that case

7

1    tomorrow, Thursday, and Friday.

2         It is possible -- we have Veterans Day next week,

3    which gets in the way of things.  It's possible, almost likely,

4    that that case will be concluded by the middle of next week

5    sometime, Thursday probably, hopefully Friday.

6         So if we have to continue this proceeding, we'll be

7    able to give you a date to do that, but I really won't know

8    that until probably Friday of this week.  The government might

9    rest on Friday.  And if they do, then I think we probably would

10   be able to conclude that case by next Thursday and set this for

11   Friday.  That's just a possibility.

12        All right.  Did you want to make an opening statement?

13        MS. VAN BRUNT:  Your Honor, if it would please you, I

14   would, because I hope it will address some of the issues that

15   we do think are contested and highlight the ones that are not.

16        THE COURT:  Well, let me do this, because I was

17   prepared to go through the issues that were raised by the

18   plaintiffs in their motion and in the declarations that we did

19   get last Friday.  And, of course, those are the ones -- I just

20   got the other exhibits today, so I'm with you on that one.  But

21   I wanted to go just go through some of these, the more

22   consequential ones and the ones that I think are either

23   uncontested and have not been addressed by the defendants.

24        So let me just do that, and then you can --

25        MS. VAN BRUNT:  Of course.

8

1       THE COURT:  -- you can make your statements -- your

2  opening statement off of what I'm about to do.

3       So I have sworn declarations by the plaintiff.  I will

4  say that I recognize some of those declarations contain

5  inadmissible hearsay.  Some of them are anonymous.  Some of

6  them I am not going to be able to actually consider as

7  evidentiary declarations, but most of them I think I can.  And

8  the ones that I'm talking about now are ones that I think I can

9  recognize as appropriate declarations in support of an

10  injunction.

11       So, first of all -- and I'll try to mention where all

12  of them are contested by the defendants' submission as well.

13       So the first ones are that -- we'll talk about

14  counsel.  There's a number of declarations that claim that the

15  detainees at Broadview were not allowed to speak with their

16  lawyers.  They're not allowed to use the telephones or unable

17  to -- we could talk about that in a moment -- that the lawyers

18  are not allowed access to the clients, either by phone or in

19  person, and that the clients were not listed on the ICE

20  locator, so they couldn't even determine that they were in

21  Broadview or where they were.

22       This is contested by the defendants.

23       So the whole issue of counsel is very important,

24  obviously, under the First and Fifth Amendments and Sixth

25  Amendment, for that matter, for those who are facing criminal

1    charges.  So we have to deal with that.

2          I also have sworn declarations that the detainees are

3    just given one bottle of water with each meal, and that's two

4    or three times a day and that they're only given two meals a

5    day consisting of, generally speaking, a small Subway sandwich.

6    None of them mention a hot meal at all, and they say that there

7    are -- it's not sufficient food for them or water for them.

8          They also claim that if they ask for more water,

9    they're denied any additional water or food, and sometimes they

10   are harassed by the staff when they do ask for more water or

11   food.  That's contested by the defendants as well.

12         There are many declarations that say they're not

13   given -- that the detainees are not given any toothpaste or

14   brushes or soap or other cleaning materials; that female

15   detainees are not given feminine hygiene products.  This,

16   again, is contested by the defense.

17         They also claim that there are a number of them -- in

18   fact, a great number of them, claim that they were coerced into

19   signing documents that they didn't understand because they were

20   in English, and the detainees did not read English and that

21   these documents were documents that agreed to voluntary

22   departure.  Many of the declarations say that the people

23   declined to sign them.  Some of them say that they did sign

24   them, and some of them say as a result, they were deported

25   based on those documents.

1      That really is not mentioned in the government's

2  submission that I could find anyway.  I know we all are dealing

3  with these issues on a very expedited basis.  So if I miss

4  something, you could correct me, but I didn't see anything in

5  the government's submission that actually dealt with that

6  issue.

7      There are declarations that claim that there are no

8  beds or mattresses in the holding rooms and that people are

9  held there for a fair amount of time, days, sometimes even

10  longer than that, for many days; that there is no room to

11  sleep, that they have to sleep on the floor or in plastic

12  chairs, that they have -- the floors are concrete and cold,

13  that the air conditioners are turned on -- remember, most of

14  these were from September when it was quite warm -- the air

15  conditioning was turned on, and it was very cold, and people

16  were unable to sleep who were held overnight.

17      There were no blankets or pillows.  They were given --

18  some people were given the plastic blankets, but they were not

19  sufficient to keep the people warm.  And they were also very

20  noisy at night and were -- and the noise of the blankets, along

21  with the air conditioning and the lighting, made it impossible

22  or very, very difficult to sleep; that some people -- that

23  there wasn't even room on any of the benches or chairs or even

24  the floors to sleep properly for those people who were held

25  overnight.

1       The defendants have submitted in their declaration

2   that there are benches that can be used to sleep or sit on that

3   are padded, but there's really nothing in that declaration to

4   inform the Court about how many people were in the room and how

5   many -- how much room was on the benches, which required people

6   to sleep on the floor.

7       Some of those areas on the floor were next to toilets

8   that had overflowed, and there was human waste around those

9   toilets and near where the people had to sleep.  That really

10  isn't addressed in the defendants' submission either.

11      There are many declarations that say the cells are not

12  cleaned at all and that some of the declarants had asked for

13  cleaning material that was denied to them.

14      That is contested.  They said -- the defendants say

15  that the cells -- I call them cells; they're called holding

16  rooms -- are cleaned every day.  So that's a contested fact.

17      The defendants agree that there are toilets in the

18  holding rooms.  They're exposed.  We don't -- there are some

19  declarations that say they're either clogged or not working or

20  they're not cleaned, and there's human excrement in the area of

21  the toilets.  And there are cameras everywhere.

22      There's really nothing in the defendants' submission

23  that I saw about cameras and how those cameras are being used

24  or whether -- whatever they record or whatever they are seeing

25  is recorded or not.  I think that's something we want to talk

12

1    about.

2           There are some declarations that say that the

3    toilet use can be seen by members of the opposite sex, but

4    there's also some declarations that say the women's holding

5    area has been covered to prevent that, so that may be a moot

6    point at this -- at least for now it might be.

7           There are many declarations that say the detainees are

8    not allowed to keep medications and other -- well, to keep the

9    medications that they brought with them for diabetes or other

10   medical conditions and that when their family brings the

11   medications to the institution to give to the detainees,

12   they're not allowed to do so.

13          The government -- I keep calling it the government.

14          The defendants here contest that, but they agree there

15   are no medical services at the detention center.

16          Obviously, the declarants also say that the rooms are

17   terribly overcrowded, and I think that's probably the leading

18   cause of all of these conditions.

19          They say that the showers do not work.  The defendants

20   say in their declaration that there are showers, but they're

21   out of order.  Showers that are -- there may be showers, but if

22   they don't work, they're not showers.  One is reminded of

23   Auschwitz when one thinks about that.  There were showers there

24   that didn't work.

25          So there's a contest about whether these showers work.

1    They don't -- even though the defendants say there are showers

2    there, they don't say they were working showers.  Just like the

3    toilets may be working.

4            As far as phones go, the defendants say there are

5    phones there, but the declarants -- the plaintiffs' declarants

6    say that those phones don't work, that the calling cards aren't

7    able to get through to family or attorneys and that the --

8    contrary to what the government says, any attorney

9    communications, according to the plaintiffs, are observed by

10   the officers.

11           There are a couple of declarations that say when the

12   officers have allowed the detainee to use the detainee's cell

13   phone to call family to tell them where they are and the family

14   hands the phone to the lawyer, there's some declarations that

15   say the officer will hang up the phone and prevent that

16   communication.  So that's a contested fact as well.

17           The declarants say there are no changes of clothes.

18   Some of them say -- there's a few that say they did get a

19   change of clothes, but many say that they were there for many

20   days without any change of clothes.  And they came in wearing

21   summer clothes, and they were exposed to very cold conditions.

22           They say the lights are on 24 hours a day, which I

23   mentioned before.

24           I also got three declarations from Congressmen Davis,

25   Garcia, and Ramirez, but that's not really part of this case

14

1     that I can see.  They may have their own -- their own claims to

2     make, but that's not -- they're not detainees, obviously.  And

3     their complaints, however legitimate, are not -- should be

4     properly asserted elsewhere, I would think.

5          So that's my summary of where we are at.  So, counsel,

6     if you want to add anything to that, please feel free to do so.

7          MS. VAN BRUNT:  Your Honor, that was a very fulsome

8     summary of the record.  I would just make a couple additional

9     points about what is not contested.

10         I think one of the most important claims in this case

11    is about the denial of access to counsel at Broadview, and that

12    is particularly because federal agents are forcing detainees to

13    sign forms relinquishing their rights, including voluntary

14    departure forms.

15         And we also know from these declarations that

16    detainees have signed these forms to get away from the

17    conditions in Broadview.  Declarations have on the record say

18    this.  We also have witnesses today who will say this.

19         The defendants do not actually deny that attorney

20    access is a problem in Broadview.  They say in their TRO

21    response from last night, page 6, quote:  Attorney access to an

22    individual in ICE custody is limited while ERO is actively

23    booking and processing the individual, which accounts for the

24    majority of time spent in BSSA, otherwise known as Broadview,

25    prior transfer -- to transfer to a long-term holding facility.

1           The defendants also don't dispute that confidentiality

2      is a key part of the attorney-client relationship, and they

3      don't dispute that confidential client-attorney consultation is

4      impossible at Broadview because, as they acknowledge, there are

5      no unmonitored lines anywhere in the facility.

6           As a result, detainees cannot consult lawyers about

7      their rights or legal pleadings or about what they should do if

8      someone signs -- pushes a form in front of their face in a

9      language they don't understand.

10          We also would contest the defendants' claims about the

11     ICE locator, which goes to the matter of attorney access.

12     Attorney after attorney who has represented somebody inside

13     Broadview will say it is not updated; it is not accurate.

14          Indeed, right now Mr. Zamacona is not accurately in

15     the ICE locator.  It does not show him in the locator if you

16     type his name in.  And we have witnesses today who will say the

17     same.

18          And part of the problem is because detainees are not

19     processed very quickly, and we have declarations speaking to

20     that.  So it may take days for them to get updated.  And in

21     that time, families don't know where they are; attorneys don't

22     know where they are.  The result of this is a denial of the

23     right to hire and consult with counsel in violation of the

24     First Amendment and a violation of substantive due process as

25     well.

1          It's also very clear that no visits are happening, and

2    the defendants don't really contest this.  They suggest that

3    there's an emergency in the form of protests happening at

4    Broadview that make visits unsafe.  But that's a red herring,

5    because we have declarations from the summer prior to the

6    protests in which people were not getting lawyers, in which

7    lawyers could not access their clients.

8          We also know that the protests happen largely on

9    Friday and Saturday, and denial of access to counsel is a

10   problem 24 hours a day, 7 days a week.  The witnesses today can

11   speak to that.

12         And in any event, protests outside do not warrant the

13   depravation of the rights of the people inside, particularly

14   when their most fundamental due process rights are at stake.

15         The defendants suggest that the denial of access to

16   counsel at the point of initial detention is not such a big

17   deal because they're going to be transferred soon.  This is a

18   major part of their argument.

19         The problem is the defendants cannot trample on the

20   right to counsel at this crucial stage in the process, the

21   initial detention, when government officials are demanding that

22   people sign forms that relinquish their due process rights

23   forever more, where the government is trying so doggedly to

24   deport people such -- at such a fast rate.  And they say that

25   is, in fact, the reason that they are processing people so

1    quickly in Broadview and trying to get them out of the

2    facility.  Where they are doing that so quickly, access to

3    counsel is more imperative than ever.  Because once somebody

4    signs away their rights, it's done; it's unreviewable.  We have

5    declarations to that effect, and witnesses, again, can testify

6    to that today.

7         I will also say that there's no legitimate government

8    interest in holding people in the punitive conditions here.

9    This is not an issue of a single clogged toilet or of not

10   getting a Fiji water bottle, as the defendants suggest in their

11   responses.  Your government -- as Your Honor laid out, these

12   are a set of dire conditions when taken together paint a

13   harrowing picture.

14        As the Seventh Circuit said so clearly in *Budd v.*

15   *Motley*, multiple conditions of confinement may violate the

16   Constitution in combination when they have a mutually enforcing

17   effect that produces a depravation of a single identifiable

18   need.  And the joint effect of conditions at Broadview is to

19   deprive the putative class and plaintiffs of the basic human

20   needs, water, sleep, medical care, sanitation, warmth, and

21   reasonable safety.

22        Given that, there is just no reasonable basis for the

23   defendants to be treating the class this way, and that is

24   further evident from the fact that most of the conditions here

25   violate their own policies, both their detention standards and

18

1    the policies governing the hold room, the 12-hour policies,

2    which goes to show there are other ways to be treating people

3    in these conditions.

4          If Your Honor would like, I'm happy to also address

5    the 1252(g) issues that the defendant raised, because I know

6    that is a jurisdictional question at issue today, but we can

7    also hold off on that if that is appropriate for later.

8          THE COURT:  Well, go ahead.

9          MS. VAN BRUNT:  Okay.  Well, the government in their

10   TRO response argues briefly that 8 U.S.C. 1252(g) categorically

11   bars jurisdiction here.  And that provision provides that no

12   court shall have jurisdiction to hear claims arising from the

13   decision or action by DHS to commence proceedings, adjudicate

14   cases, or execute removal orders.  Those are the three

15   categories covered by 1252.

16         The government states that our case about the right to

17   basic living conditions and the right to have an attorney at a

18   crucial stage in the process somehow challenges the

19   government's decision to commence removal proceedings, but that

20   does not hold water with the Supreme Court's decision decades

21   ago in *Reno v. AADC* that we should interpret 1252(g) narrowly

22   and only as it applies to the three discrete actions I just

23   laid out; commencement of proceedings, adjudication of cases,

24   or execution of removal orders.

25         Indeed, in a court in this district just weeks ago in

1   *Ochoa Ochoa v. Noem* held that 1252(g) did not bar the kind of

2   conditions claimed here.

3           And the Seventh Circuit has held that 1252(g) does not

4   foreclose review of claims that, like these, concern detention

5   while the administrative process lasts, as these may be

6   resolved without affecting pending removal proceedings.  And

7   that's from *Parra v. Perryman*, a 1999 Seventh Circuit case.

8   *Parra* is straight Black Letter Law here.  We're talking about

9   conditions.  We're talking about the right to access counsel.

10          It does not get at whether the government can still

11  retain the power to instigate removal proceedings.  Clearly

12  they are.  We are not challenging those.  It is about the basic

13  rights of people once they are in detention.

14          We are seeking an immediate restraining order to

15  enjoin the defendants from keeping immigrant detainees in these

16  current conditions, including in overcrowded conditions,

17  without sleeping supplies, and without medical care or adequate

18  food and water and without hygiene and access to bathing

19  facilities.

20          And we are requesting that the defendants provide

21  immediately access to unmonitored phone lines and attorney

22  visit rooms so that it is not longer operating like the black

23  site that it has been operating as in the past months.

24          We provided the Court a proposed TRO, and it tracks

25  very closely the TRO that was entered in *Barco Mercado*.  And in

1   that case, the judge also found that the detention conditions

2   alleged by the plaintiff declarations were sufficient to find a

3   TRO was appropriate and then later a preliminary injunction.

4          And the last thing I'll say is that the defendants'

5   only source of factual disagreement comes through the

6   declaration of a -- of Shawn Byers, who is a -- I just want to

7   make sure I get his title correct -- deputy field officer

8   who -- give me one second, Your Honor, please -- he is the

9   Chicago Deputy Field Officer Shawn Byers, but according to his

10  declaration, he's responsible for overseeing the identification

11  and arrests of noncitizens and supervising removal proceedings.

12         He is not responsible for overseeing Broadview

13  operations.  There's nothing in his declaration to suggest he

14  has firsthand knowledge of all the information that he purports

15  to provide in that declaration.  He does not.

16         THE COURT:  Well, he says his duties include intake

17  processing and transfer of the detainees, ensuring compliance

18  with the ICE policies, and that he's familiar with the

19  Broadview facility and can testify about the conditions there.

20         MS. VAN BRUNT:  Well, he does say that generally, Your

21  Honor, but his specific duties don't suggest that he has that

22  actual knowledge on the ground.  He's also not here today, so

23  we can't test his knowledge in that way, but I will say he

24  doesn't --

25         THE COURT:  You'll have a chance.

1      MS. VAN BRUNT:  He does not dispute the specific

2  evidence supported by the 36 declarations.

3      The case *Barco Mercado*, there was a similar

4  declaration put forward by a similar Portland -- a similar

5  assistant field office director.  And the court there found

6  that the plaintiffs' declarations were sufficient to overcome

7  that declaration, were sufficient to establish that a TRO was

8  warranted, that the plaintiffs have shown a likelihood of

9  success on the merits.

10      So, too, here we have done, and we would like the

11 opportunity to put on further evidence this morning and then

12 welcome the chance to discuss what relief would be warranted in

13 a TRO.

14      THE COURT:  All right.  Thank you.

15      MS. VAN BRUNT:  Thank you.

16      THE COURT:  Counsel.

17      MS. BRADY:  That was a lot, Your Honor.  Okay.  So it

18 seems as though counsel did a twofold response to your

19 invitation to speak.  First, we talk about what facts are

20 contested, and then she put on her legal argument.

21      So I'd like to have the opportunity to do the same, if

22 it's okay with Your Honor.

23      THE COURT:  Sure.

24      MS. BRADY:  Wonderful.  Thank you.

25      Now, first and foremost, the declaration of Mr. Byers

1    is not going to be able to refute every single fact laid out in

2    40 declarations when we've only had hours to respond.  That's

3    the issue -- one of the issues with a TRO and why the burden is

4    so high for the plaintiff to meet, because they're ahead of the

5    game.

6              Some of these declarations were dated last month.

7    We're just still catching up.  And so in order for the Court to

8    have a more robust and developed understanding of the case,

9    that would require additional time for us to be able to fact

10   check everything that is stated in the declarations.  So I just

11   want to put that out there, that we haven't had the same

12   opportunity to develop the facts that the plaintiffs had.

13             So with that said, all right, yes, we do contest that

14   they're only limited to one bottle of water with meals.  It's

15   our understanding that there's water fountains in the holding

16   cells, and they're able to get water upon request.

17             THE COURT:  Okay.  There's one declaration that says

18   the only water available was undrinkable.

19             MS. BRADY:  That was from the sink.  I don't know the

20   circumstances.  Again, you know, we haven't been able to fact

21   check everything.

22             But in terms of the hot meal, it's my understanding

23   that every day there is a hot meal in the form of burrito.

24   They're offered Jimmy John's, but they are offered three meals

25   a day that --

1          THE COURT:  Subways.  They were offered Subways.

2          MS. BRADY:  I was told Jimmy John's.  So I guess that

3    is a contested issue then.

4          THE COURT:  Okay.

5          MS. BRADY:  Now, in terms of hygiene products, I was

6    told that those things are also available upon request.

7          I'm not sure what requests were made with a lot of

8    these declarants.  In terms of the signed document, the

9    declarations were very vague in terms of what these documents

10   are that they're allegedly being coerced to sign.

11         I do believe that Mr. Byers' declaration tries to

12   address that issue in paragraph 26 of docket 39, where he talks

13   about how the detainees are served with charging documents, and

14   they're also talking about any documents that might be used to

15   process any claims of asylum.

16         I don't know specifically what they're talking about,

17   but it may be that they were presented with the opportunity to

18   self-deport in exchange for $1,000.  And that is something that

19   the officers are duty bound to offer.

20         What amounts to coercion, I don't know.  That hasn't

21   been developed.  That's a legal conclusion.  But it's my

22   understanding from the government that that is not a coerced

23   document.  So that is a contested issue, but I do want to just

24   put forward to the Court that we did our best under the time

25   constraints to address that issue and without knowing what

1    specific documents they were referring to.

2         THE COURT:  Well, it would be nice to see what those

3    documents are.

4         MS. BRADY:  We were able to confirm that the

5    plaintiffs here did not sign those documents.  It's my

6    understanding that they were just issued notices to appear.

7    Those are the only documents, along with their rights.  So

8    that's not a specific issue for these plaintiffs.

9         THE COURT:  But the document -- remember, this is a

10   putative class action, which we will get to in due course, but

11   it would be good for the Court to see what documents were --

12   even if they didn't sign them, what documents they were

13   presented with.

14        MS. BRADY:  I agree 100 percent, Your Honor.  The

15   record isn't developed.  We don't know.  There's a lot of

16   unknowns here.

17        THE COURT:  I agree with that.

18        MS. BRADY:  All right.  In terms of beds, it is true

19   there are not beds in the holding cells.  They are not intended

20   to be accommodations.  It's not intended to be a long-term

21   detention facility.  We agree that's, you know, an issue that

22   we address legally.

23        Now, in terms of --

24        THE COURT:  Legally or factually?

25        MS. BRADY:  Well, I mean, it's not contested that

1  there are no beds in the cells.  That's not contested.  So we

2  do have a legal argument, because -- and I'm going to get to

3  that -- this is Seventh Circuit case law that says sleeping

4  without a bed, even sleeping on the floor overnight, is not

5  such an objectively serious depravation to amount to a

6  violation of the Constitution when it's a limited time frame.

7        THE COURT:  I'm interrupting you.  Why don't you

8  finish your presentation, and then I'll have some questions.

9        MS. BRADY:  Thank you.  Now, in terms of the toilets

10  in the holding cells being exposed, there have always been

11  half-wall partitions that you can actually see on the diagram

12  of Mr. Byers' declaration.  But as you said, it's probably a

13  moot point at this time because the windows are covered for

14  privacy.

15        You know, and I think that's one thing that you might

16  come to learn as the evidence comes out.  The government has

17  improved the operations at the Broadview facility over the past

18  couple of months because it's been a learning curve.  It is

19  true that historically it's been a 12-hour facility where some

20  of these issues haven't come to light, but there has been a

21  waiver which allows up to 72 hours for, you know, stays while

22  they're being processed.  And so they have learned some things

23  along the line.

24        For example, I was told yesterday, in terms of

25  cleanliness, the Broadview facility ordered wipes so people

1    could sanitize themselves.  These are little things that

2    they're trying to do along the way.

3           And I've been told that to the extent that there were

4    any delays in processing the detainees early on, those delays

5    are not happening now because they've improved their

6    efficiency.  But these are all things that we'd have to flush

7    out with additional evidence.

8           But getting back to the contested issues, medications,

9    the detainees were allowed to have medications brought into the

10   facility.  Whether or not these detainees called to have family

11   members pick them up and drop them off, I don't know; but I'm

12   not aware of any situation where a detainee was denied

13   medications that were absolutely brought to the facility.  So

14   that's one thing.

15          And in terms of medical care, it is true there is not

16   a doctor on-site, but there are references in the records to

17   detainees being brought to the hospital.  So if medical

18   treatment was necessary, it was provided.

19          Now, in terms of the phones, this is my understanding

20   of the phone situation.

21          They are -- the detainees are allowed a phone call

22   when they get in to whomever they choose.  Once they're in the

23   holding cells, they have access to a phone.  They could make

24   collect calls.  They could make free calls to, I understand,

25   pro bono attorneys.  They're provided a list of pro bono

27

1    attorneys.  And I think that's important to know.

2            And then also, if they need to speak with their

3    attorney, they could make arrangements to do that by calling

4    them.  I understand that the phone lines might not have been as

5    open for the attorneys to initiate those visits, but the

6    detainees have been able to initiate those visits if they so

7    choose.

8            The in-person visits have been somewhat restricted in

9    the last couple of months because of what is going on outside.

10   There are a lot of security issues.  And I think as you see in

11   our briefs, there's no right to an in-person visit with an

12   attorney, particularly when this is just a short transfer

13   facility.

14           Clothes are permitted to detainees if they come in

15   soiled clothes.  If their clothes are soiled, they're going to

16   get new clothes.  And that might have been what's referenced in

17   the declarations.  But you're right, they don't get new clothes

18   when they're there just for a short period of time.

19           Now, the ICE locator, I mean, that seems to be an IT

20   issue.  When they process these people, it's supposed to cycle

21   within hours.  To the extent that it might have been slow, it's

22   not a human error.  It might have just been because the systems

23   have been busier than usual, but it's not something that is

24   backed by ill intent or any kind of intent to deprive the

25   detainees of a right to counsel.

1          All right.  And as you kind of alluded to, Your Honor,

2     Mr. Byers is on-site at Broadview.  He's very much familiar.

3     He's the one that ordered the wipes for the detainees, and he's

4     the one that told me that they're going to be there today.

5          Now, getting to the legal issues, as you know,

6     three-part test for a TRO:  It's a high burden; particularly

7     given the quick and the short notice that we've been given, we

8     haven't been able to develop the facts.

9          Likely to succeed on the merits, irreparable harm

10    without a TRO and the balance of the equities.  First I'd like

11    to address a threshold issue, being the plaintiffs do not have

12    standing.

13         Their claims are actually moot.  They're no longer at

14    the Broadview facility.  There are no plans to return them.  So

15    I think that is a major issue, both in terms of their ability

16    to bring this lawsuit.  No TRO is going to provide them with

17    relief.

18         And then it's also an issue for them being

19    representative class -- class representatives for their motion

20    for certification.

21         THE COURT:  Where are they being held now?

22         MS. BRADY:  I'm sorry?

23         THE COURT:  I said, where are they being held now?

24         MS. BRADY:  The MCC.  In fact, it is my understanding

25    that the plaintiffs were only at Broadview for less than 24

1   hours in one case, less than 48 hours in another case.  And I

2   believe they might have been transferred out of Broadview

3   before this lawsuit was filed, if not on the same day.  They

4   went to Greenville --

5          MS. VAN BRUNT:  Oh, I have to correct that record,

6   Your Honor.

7          MS. BRADY:  Okay.

8          MS. VAN BRUNT:  They were transferred five or six

9   hours after we filed.  They also showed back up at Broadview

10  yesterday.  There's a very strong likelihood they could end up

11  there again, because it is the main processing facility.

12         THE COURT:  We'll hear from them.  Why don't you let

13  her finish, please.

14         MS. BRADY:  Thank you.  In any case, it was just

15  within hours of the complaint being filed.  I believe they were

16  sent to Missouri where they were intended to be for a long-term

17  stay.

18         They were only returned because this lawsuit was

19  filed, and they were ordered to appear.  So they had to get

20  processed through Broadview, and then they were placed in the

21  MCC.

22         It was never the intent to have them be processed at

23  Broadview again.  So their claims are moot, and they're not

24  good class representatives, not just because the TRO cannot

25  provide them any relief but also because their experiences at

1    Broadview are different than the ones of the other class

2    members.  But I will hold that.  I will put a pin in those

3    arguments later.

4         Now, also the conditions that we discussed, whether

5    they're contested or not contested, they do not violate the

6    Fifth Amendment.  First of all, the conditions are not

7    sufficiently serious on an objective basis.  Our brief cites

8    the cases where the Seventh Circuit has said sleeping on the

9    floor for a short period of time is not enough, not being able

10   to shower for five days is not enough.

11        There was not any sort of long-term, serious

12   depravation.  It was more in the line of a de minimis

13   short-term depravation, even if you believe everything the

14   declarations say.

15        The government's actions were not objectively

16   unreasonable because they have a purpose, not of harming people

17   but of processing these people so they can move them on their

18   way to a long-term facility where more resources are available.

19        And, again, in terms of the communications with the

20   attorney, any restrictions that are there, if they're there,

21   particularly with respect to in-person visits, is because

22   allowing in-person visits would actually delay the transfer

23   process.

24        If somebody is just going to be there for six hours

25   and they're demanding to meet with their client for one hour,

1   that's going to slow everything down.  There's no

2   Constitutional right to in-person visits.

3        The clients are able to call the attorneys, and

4   particularly, they could call their attorneys once they get to

5   the facility.  But as soon as they're there, they get that one

6   call, so that if there's any alleged coercion with the

7   paperwork, they could make that call to their attorney.

8        THE COURT:  That's obviously contested.

9        MS. BRADY:  I agree.  I agree.

10       Again, we don't have a robust and developed record

11   given this stage.  I've only known about the case for about 24

12   hours.

13       Now -- and, again, there is no irreparable injury to

14   the plaintiffs if the injunction is denied, because this

15   injunction, if it's granted, will not affect them at all.  And

16   the balancing of the equities, I think that's a particularly

17   important consideration, particularly in this case, which makes

18   them *Mercado* case that counsel cited to different.

19       Illinois is unique, because it has laws that prevent

20   other facilities from housing detainees.  Okay?  Broadview is

21   it, right?  So if they don't go to Broadview, we can't just

22   send them to McHenry, which would speed things up.

23       The reason why we were able to process people within

24   12 hours in the past is because there were places like McHenry

25   County that could house these people, but now we're in a

1   situation where there's nowhere to put them in Illinois.

2          Granting this TRO as it's proposed currently would

3   effectively halt the government's ability to enforce

4   immigration laws in Illinois.  There's nowhere to put them in

5   Illinois.  It does take longer to find beds in other states.

6          Now, in that -- and if it holds, enforcement of

7   immigration laws in Illinois, that presents other issues, like

8   separation of powers.  It gets into the point of subject matter

9   jurisdiction and 8 U.S.C. 1252(g), which counsel mentioned,

10  because any way that this TRO is entered, it would effectively

11  halt operations.  So it does fit within that section.

12         The government has a mandated goal of seeking the

13  removal of individuals who are violating immigration laws.

14  Whether it's popular belief, they do have that ability to do

15  it, and they are doing what they believe their job to do.

16         And for those reasons and because any TRO entered by

17  this Court would not provide relief to the plaintiffs, we ask

18  that the TRO be denied.

19         THE COURT:  Would you like to reply briefly?

20         MS. VAN BRUNT:  Just very briefly, Your Honor.

21         On the objectively serious question, a few points.

22  Defense counsel cites repeatedly to *Antonelli v. Sheahan*, which

23  is the case about sleeping on the floor for one night not being

24  a violation of the Constitution.

25         We are not talking about one person sleeping on the

1    floor for one night.  This is a combination of horrific

2    conditions when put together in the form of *Wilson v. Snyder*

3    causes a great human catastrophe.  And talking about sleeping

4    on the floor, not having hygiene, being near a toilet, lights

5    on all night, not having sufficient clothing, not having

6    sufficient food, it's all of the conditions taken together that

7    are the issue.  And pulling them out one by one misstates what

8    this case is about.

9         Many of the cases the defendants state are also

10   brought under the Eighth Amendment.  That's a deliberate

11   indifference standard.  That's not what we're dealing with

12   here.

13        It's a Fourteenth Amendment case in the jail context,

14   a Fifth Amendment case here.  It's objective reasonableness.

15   The burden is not as high in the Eighth Amendment.

16        Here we just have to show the conditions are

17   objectively unreasonable and that the defendants acted

18   knowingly or recklessly.  We have much evidence in our

19   complaint to show that they did and that is all the results of

20   their very intentional immigration policies, including

21   mandatory detention, enhanced arrests, and the waiver policy

22   that counsel referenced.

23        And we have to show that there's not a legitimate

24   government reason for it.  And the fact that they want to

25   deport people more quickly does not give them a legitimate

1    reason to deny basic rights to be heard in court.  Due process

2    is the most basic, the most fundamental of all rights.  And

3    what is happening now in Broadview is removing those rights

4    altogether.

5         I would say that we have to remember a TRO is

6    emergency relief because it's an emergency.  So, no, we have

7    not flushed out the record.  That will happen in good time.

8    We've asked for a motion for expedited discovery to do that

9    prior to a preliminary injunction hearing.

10        A TRO is meant to improve things for a short period of

11   time, usually 14 days, so people are not suffering as they have

12   been suffering for months and so people are not forced to sign

13   things that waive away their rights for the rest of their life.

14   That is what we are seeking here.

15        And it is, in fact, worse than in *Barco Mercado,*

16   because, as counsel said, Broadview is the show.  This is it.

17   Everyone is going to Broadview.  So the rights that are denied

18   at Broadview mean that they're affecting the large portion of

19   people that are arrested in the State of Illinois.

20        The defendant says that they're going to halt all

21   operations in the state if they have to improve people's

22   conditions by getting them beds, getting them proper food, and

23   perhaps allowing them to bathe.  But that is a fully unfounded

24   statement, and it is belied by the fact that they have been

25   able to comply with these exact same kinds of fixes in other

1   cases across the country, most recently in *Barco Mercado* where

2   there's been a tremendous support or tremendous improvement in

3   conditions since the TRO and PI went into effect.

4           THE COURT:  Their point is that there are no state

5   facilities available for them to use as there were in New York.

6           MS. VAN BRUNT:  Your Honor, we can discuss that fully,

7   but I would say a couple things.

8           First, they were able to whisk away our clients

9   overnight at a moment's notice in three hours across many state

10   lines, so that they were no longer in Broadview, no longer in

11   the State of Illinois.  It is hard to see why they are, you

12   know, hamstrung from doing the same with other people.

13           There's also been much talk of them expanding their

14   operations beyond the building of Broadview.  I don't know if

15   that is, in fact, true.  But Kristi Noem, a defendant in the

16   this case, has been seen, you know, giving a tour at a building

17   across the street that is much larger from Broadview.

18           I just don't want us to take it at their word that

19   there's no other option here to treat people with basic human

20   decency and respect.

21           Pardon me.

22    (Counsel conferring.)

23           MS. VAN BRUNT:  Oh, and as -- yeah, as my co-counsel

24   points out and is clear for the named plaintiffs, there are

25   federal facilities here.  Our named plaintiffs are in the MCC

1    right now.  They are downtown.  They are being held

2    appropriately.  They are being fed.  They had a bed to sleep

3    in.  They were able to have clothes here today.

4            So there are other options, and I would not -- I would

5    not defer to the government on this story of terribles where we

6    don't know the actual facts about what could else be done to

7    protect those who are in immigration custody in Illinois.

8            MS. BRADY:  May I just follow up quickly?

9            THE COURT:  Sure.

10           MS. BRADY:  Okay.  If you look at their TRO and you

11   apply their person-per-square-foot analysis, which is -- which

12   we understand is probably from the jail detention standards,

13   that would only allow 10 people in what I believe is their

14   largest holding cell.  It would absolutely shut down their

15   operations.

16           And in terms of the federal facilities, 14 days, we

17   are not going to be able to just ship them to other facilities

18   overnight.  It's just things don't work that fast.

19           What I suggest that we do is we focus on what, if

20   anything, could be fixed without shutting down the entire

21   facility.  We can't help despite the fact that we have a

22   certain amount of space, but we could do things, which what

23   we're actively doing is decreasing the amount of time that

24   detainees spend in the facility.  We could do things like

25   provide baby wipes to the detainees so they could clean

37

1      themselves.

2              So, again, I urge you not to enter the TRO as it's

3      presented by the plaintiffs, because it would shut down the

4      facility.  I urge you instead to talk about the things that we

5      can fix.

6              MS. VAN BRUNT:  Your Honor, apologies.  I forgot to

7      mention a couple things.

8              Waukesha Jail, Dodge County Jail, Clay County jail are

9      very close by and have been used prodigiously by the defendants

10     to transfer people from Illinois.  So clearly, they are options

11     very -- very close and right outside the state borders.

12             MS. BRADY:  One follow-up.  There needs to be

13     available beds in order to send them there.

14             THE COURT:  Do we know whether they are?

15             MS. BRADY:  I asked yesterday whether there's

16     available beds, and I was told it is something that they have

17     to struggle with.  There's not always available beds, so that

18     is something -- there are things that need to be put into

19     place.

20             MS. VAN BRUNT:  Our named plaintiffs were brought to

21     Waukesha yesterday before being brought to the MCC.  Before

22     that, they were in -- were they in Clay County?  No, they were

23     in Missouri.

24             There are many, many, many of our client declarations,

25     our plaintiff declarations came out of Clay County where they

1    were transferred after Broadview.  There are obviously options

2    beyond Broadview if that presents a problem.

3           And the 50 square feet was also part of the *Barco*

4    *Mercado* TRO.

5           THE COURT:  That's where you got it from.

6           Okay.  Let me just make one observation here, put this

7    behind us.  I agree with the plaintiffs that the 1252(g)

8    doesn't deprive the Court of jurisdiction.  This is a

9    conditions case.  This isn't a procedures case.  If the

10   conditions are unconstitutional, so be it.  Then the defendants

11   here will have to figure out another way to comply with the

12   Constitution.  That's my job, to determine whether or not the

13   conditions are unconstitutional.

14          Obviously, some of these conditions are, in my word, I

15   guess, disgusting to have to sleep on the floor next to an

16   overflowed toilet.  That's obviously unconstitutional.

17          The cases that we had years ago really about sleeping

18   on the floors in the Cook County Jail, for instance --

19   Mr. Antonelli was a frequent litigant in this court before your

20   time -- those were because the Cook County Jail was totally

21   overcrowded.  And they were sleeping in the day room, and they

22   were being provided basically with mattresses on the floor, and

23   they were complaining about that.  There were occasions where

24   they didn't have the mattresses, and the Court of Appeals said

25   that wasn't an unconstitutional condition.  But it was very

```
1    brief, and luckily the Cook County Jail did increase its size
2    and lessen its population.
3            So those cases, they're similar, but they really
4    don't -- in my view, they don't have the precedential value
5    that I think the defendants are claiming at this point.
6            So that takes care of the 1252(g) issue as far as I'm
7    concerned, and we have to get to the merits of this right now.
8            So you have witnesses here?
9            MS. VAN BRUNT:  We do, Your Honor.  The named
10   plaintiffs will also be able to address some of the
11   certification and standing issues that counsel has raised.  And
12   so we would like to start with Mr. Moreno Gonzalez and then go
13   to Mr. Agustin Zamacona.
14           THE COURT:  Okay.  What other witnesses do you plan to
15   present today?
16           MS. VAN BRUNT:  Then we have three other detainee
17   witnesses.  Two are live, Ruben Torres Maldonado, Sam Ochoa
18   Ochoa.  And one Claudia Guevara, we hope to present by the
19   Webex link.  She was removed from the country, is in Honduras.
20   We've tested it out.  It should work.  And two attorneys,
21   Shelby Vcelka, immigration attorney, and Kevin Herrera.
22           THE COURT:  Sounds like a full day to me.
23           MS. VAN BRUNT:  We'll be super efficient, Your Honor,
24   but in light of the contestation of our allegations by the
25   defense, we think it's important to really underscore the
```

1    emergency at stake here and the merits of our position.

2           THE COURT:  All right.  I just want to make another

3    observation.  I appreciate government counsel's position here

4    having just received this emergency motion.  I mean, I got it

5    on Friday night myself, so I know how difficult it is to get

6    your hands around something of this complexity and consequence.

7    So I understand that, and that's why I gave the government an

8    opportunity to respond.

9           But for some of these conditions, if they are, in

10   fact, happening now, every day that goes by would be

11   irreparably harming the putative class.  So I would like to get

12   this done as quickly as possible, given the Court's schedule

13   and given the realities of the nature of the evidence here.

14          I would like to hear from the declarant -- the

15   defendants' declarant, obviously, or somebody in his position.

16   So let's go ahead and put your first witness on.

17          MS. VAN BRUNT:  Thank you, Your Honor.

18     (Brief pause.)

19          MS. GARCIA:  Good morning, Your Honor.

20          Michelle Garcia on behalf of plaintiffs.

21          Where would you like Mr. Moreno Gonzalez to sit?

22          THE COURT:  On the witness stand.  That's the whole

23   point of the witness stand is to have witnesses on it.

24          THE CLERK:  Please raise your right hand.

25          MS. GARCIA:  We have a court interpreter.

Moreno Gonzalez - direct

41

1        THE CLERK:  I know, but I still do my --

2        MS. GARCIA:  Okay.  Go ahead.

3        THE CLERK:  Do you swear or affirm that the testimony

4    you are about to give is the truth, the whole truth, and

5    nothing but the truth?

6        THE WITNESS:  Yes, I do.

7      (Witness duly sworn.)

8        THE COURT:  Did you introduce yourself?

9        THE INTERPRETER:  Jorge Carbajosa, certified Spanish

10   interpreter.

11       THE COURT:  Okay.  Thank you, sir.

12       MS. GARCIA:  Thank you, Your Honor.

13       Mr. Gonzalez, you can sit.

14            PABLO MORENO GONZALEZ, PLAINTIFF HEREIN,

15              DULY SWORN THROUGH AN INTERPRETER:

16                    DIRECT EXAMINATION

17   BY MS. GARCIA:

18   Q.  Mr. Moreno Gonzalez, what is your full name?

19   A.  Pablo Moreno Gonzalez.

20   Q.  And how old are you?

21   A.  I'm 56 years old.

22   Q.  And where were you born?

23   A.  In Mexico.

24   Q.  How long have you been in the United States?

25   A.  It's been 35 years.

Moreno Gonzalez - direct

42

1      THE COURT:  One moment, please.  My clerk has a

2  microphone and headphones that might actually help make this a

3  littler smoother.

4      MS. GARCIA:  Court reporter, do you need me to repeat

5  those last questions?

6      THE COURT REPORTER:  No, I'm good.  Thank you.

7  BY MS. GARCIA:

8  Q.  So you were telling us how long you lived in the United

9  States.  How long have you lived in Chicago?

10 A.  35 years.

11 Q.  And in the time that you've lived in Chicago, 35 years,

12 have you lived with your family?

13 A.  Yes, I've lived with my family.

14 Q.  Are you married?

15 A.  Yes.

16 Q.  And do you have two children?

17 A.  I do have two children.

18 Q.  And what are their ages?

19 A.  I have a son, Efrain Moreno.  He's 31 years old.

20      And I have a daughter, Alexandra Moreno.  She's 21

21 years old.

22 Q.  And are your adult children U.S. citizens?

23 A.  Yes, they are citizens.  They were born here in the U.S.

24 Q.  Mr. Moreno Gonzalez, do you work for a living?

25 A.  Yes, I do.

Moreno Gonzalez - direct

43

1    Q.   And what do you do?

2    A.   I work in construction.

3    Q.   Is your construction job how you support your family?

4    A.   Yes.

5    Q.   Now, Mr. Moreno Gonzalez, you've been testifying in

6    Spanish.  Is that your first language?

7    A.   Yes, it is my first language.

8    Q.   How comfortable are you speaking English?

9    A.   Well, it's a little bit difficult for me.

10   Q.   Mr. Moreno Gonzalez, can you write in English?

11   A.   No.

12   Q.   Mr. Moreno Gonzalez, can you read English?

13   A.   No.

14   Q.   Mr. Moreno Gonzalez, let me direct your attention to

15   Wednesday, October 29th.  Do you remember that day?

16   A.   Yes, I do.

17   Q.   Did federal agents, ICE, arrest you on that date?

18   A.   I was waiting for my boss to go to work.

19   Q.   Was that in the morning?

20   A.   Yes, in the morning.

21   Q.   Approximately what time?

22   A.   At 8:00, 8:00 or 9:00, more or less.

23   Q.   And where were you waiting for your boss so that you could

24   go to work?

25   A.   I was waiting at Pulaski and Foster.

Moreno Gonzalez - direct

44

1   Q.  And that is when the federal agents arrested you?

2   A.  Yes, because I saw people running, and I got scared, and I

3  ran.

4   Q.  Okay.  Now, Mr. Moreno Gonzalez, after they arrested you,

5  did they take you to Broadview?

6   A.  Yes, they did take me over there.

7   Q.  And when you arrived at Broadview, did anyone let you call

8  an attorney?

9   A.  They only gave me this piece of paper.  That's it.

10   Q.  Okay.  Did anyone let you visit an attorney?

11   A.  No, they never told me that.

12   Q.  Did you want to speak with an attorney?

13   A.  Yes, of course, and I also wanted to speak to my family.

14   Q.  Did you call your family?

15   A.  I did call my family afterwards.

16   Q.  Okay.  And I wonder if you could describe that call.

17       Were there people around when you made that call to

18  your family?

19   A.  There were a lot of people.

20   Q.  Was it difficult to hear your family on the call?

21   A.  Yes, yes, it was difficult.

22   Q.  And how long were you able to call and speak to your

23  family, approximately?

24   A.  About four or six minutes only.

25   Q.  Was that enough time to speak to your family?

Moreno Gonzalez - direct

45

1   A.   Yes, yes.

2   Q.   Mr. Moreno Gonzalez, you mentioned some documents earlier.

3        Did anyone give you -- did any of the federal agents

4   give you documents to sign?

5   A.   They did, and they asked me if I wanted to leave, and they

6   asked where I was from.  I said I'm from Mexico.

7        And so why don't you want to go?

8        And I said, well, I have my family here.  I don't have

9   anyone in Mexico.  I have my son and daughter here, and I don't

10  want to leave.  I don't want to go back to my country.  I don't

11  want to leave.

12  Q.   Did the federal agents tell you anything else when they

13  gave you the documents?

14  A.   No, no.  They just gave me that and then put me inside

15  where everybody else was.

16  Q.   So let's talk about where they put you.

17       Did the federal agents place you in a cell?

18  A.   A cell where there were a lot of people.

19  Q.   Approximately how many people were in the cell?

20  A.   When I got there, there were, like, 150 or 170 people.

21  Q.   And you said people.  Were women in the same cell with you?

22  A.   There were women across in front of where we were.

23  Q.   In a different cell?

24  A.   In another cell, yes.

25  Q.   Were you able to see the number of women in the women's

Moreno Gonzalez - direct

46

1   cell?

2   A.   I could only hear the voices of the women.

3   Q.   And what did you hear from the women -- the voices of the

4   women?

5   A.   They were talking.

6   Q.   Okay.  So let's talk about the cell that you were placed

7   in.  You said 150 people at least, 150 men.

8            Were there any beds?

9   A.   There were no beds.

10  Q.   Were there mattresses?

11  A.   There was nothing.  They just had these chairs, and we were

12  sitting like this (indicating), all of us, like this

13  (indicating).  Some were lying like this (indicating) and

14  others like that (indicating).

15           And sometimes the bathroom being over here

16  (indicating) and the bathroom being over there (indicating),

17  then they would be lying down like there (indicating).  It was

18  just really bad.

19  Q.   So let's talk about that a little bit.

20           Did you receive blankets?

21  A.   Nothing.  Nothing.

22  Q.   And where did you sit?

23  A.   I would sit like this (indicating) and sleep like this

24  (indicating).  And then the next guy, he would be like this

25  (indicating), and then the next guy over here like this

Moreno Gonzalez - direct

47

1    (indicating).

2    Q.   Mr. Moreno Gonzalez, are you describing a situation where

3    the men were right next to each other?

4    A.   Yes.

5    Q.   And when you say you were sitting, did you sit down in a

6    chair?

7    A.   In a chair like this.

8    Q.   Okay.  Were there enough chairs for everyone?

9    A.   No, there wasn't enough.  Most of the stuff was down; the

10   chairs were down.

11   Q.   Where did other people lie down?

12   A.   They would be lying on the floor.  Then there would be

13   somebody right here (indicating).  Then there would be someone

14   stuck right next to you.  There were just too many people.

15   Q.   Could you walk in the cell?

16   A.   When I would stand up like this (indicating), then I would

17   have to jump with my feet like this (indicating) so I would not

18   step on the next person.

19   Q.   Are you -- did you have to step over people who were lying

20   down on the floor?

21   A.   Yes, correct.

22   Q.   Okay.  At night where did you sleep?

23   A.   Sitting.

24   Q.   Could you sleep?

25   A.   No.

Moreno Gonzalez - direct

48

1    Q.   Why not?

2    A.   I would sleep three or four minutes, because I could fall

3    down on top of the -- of the fellow in front of me.

4    Q.   Were you exhausted?

5    A.   Yes, too much.

6            MS. GARCIA:   Your Honor, can we take a moment?

7    BY THE WITNESS:

8    A.   It was too much.  It was too much.  It's just too much.  I

9    just can't deal with it.

10   BY MS. GARCIA:

11   Q.   It's okay, Mr. Moreno Gonzalez.  Take a moment.

12           Your time in Broadview, did it affect you emotionally?

13   A.   It did affect me.

14   Q.   Did it cause you distress?

15   A.   A little, yes.

16   Q.   Mr. Moreno Gonzalez, I'm going to ask you to talk to us

17   about the toilet in the cell.

18           Where was the toilet in the cell?

19   A.   The toilet, the toilet was here (indicating), and then

20   there was a small wall next to it, and then there was another

21   toilet next to it.

22   Q.   How far away were the people from the toilet?

23   A.   Close by, like this (indicating).  Everybody was just

24   there.

25   Q.   Could you estimate in terms of inches?

Moreno Gonzalez - direct

49

1  A.  It was -- it was like this (indicating).  The thing is when

2  you go to the bathroom, you can't go because everybody is

3  seeing you.

4  Q.  Were the people just inches away from the toilets?

5  A.  Yes, like this, like here (indicating).  So like I sit down

6  on it, and there's somebody right here (indicating).

7         THE COURT:  If he's gesturing, you may want to put on

8  the record what the gestures are.

9         MS. GARCIA:  Thank you, Your Honor.

10  BY MS. GARCIA:

11  Q.  Mr. Moreno Gonzalez, you made a gesture of the distance

12  between the people and the toilet?

13  A.  Yes.

14  Q.  Would you say that the people were less than an arm's

15  length away from the toilet?

16  A.  An arm.

17  Q.  Okay.  So could people in the cell see the people using the

18  toilet?

19  A.  Yes, yes.

20  Q.  And was there a sink attached to the toilet?

21  A.  Yes, there was a sink.

22  Q.  Was there soap there to wash your hands in the sink

23  attached to the toilet?

24  A.  No, nothing, nothing.

25  Q.  Did anyone at any time that you were at Broadview give you

Moreno Gonzalez - direct

50

1   soap?

2   A.   No one, no.

3   Q.   Could people drink the water from the sink attached to the

4   toilet?

5   A.   If you were thirsty, yes.

6   Q.   Did you drink the water in the sink?

7   A.   No, no.

8   Q.   Why not?

9   A.   I resisted from doing so, because people would go there

10  and, you know, they'd brush their teeth there.  They'd spit,

11  you know, and it's just all that, you know.  They use the

12  bathroom.

13  Q.   Did you think it was dirty?

14  A.   It was dirty, because I was seeing it when they would brush

15  their teeth and rinse their mouth and spit all over the place.

16  Q.   During the time you were at Broadview, were you given a

17  toothbrush?

18  A.   No.

19  Q.   Were you given toothpaste?

20  A.   No.

21       THE COURT:  Can we establish how long he was at

22  Broadview?

23       MS. GARCIA:  We can, Your Honor.  We were going to

24  talk about that at the end.

25       THE COURT:  Okay.  Go ahead.

Moreno Gonzalez - direct

51

1   BY MS. GARCIA:

2   Q.  Mr. Moreno Gonzalez, you were at Broadview from Wednesday,

3   October 29th, through Friday, October 31st?

4   A.  Yes.

5   Q.  During the time that you were at Broadview, Wednesday threw

6   Friday, did you receive food?

7   A.  I did receive food in the morning.

8   Q.  Okay.  Did you have to eat your food in a cell?

9   A.  Yes.

10  Q.  And what food were you given?

11  A.  A small sandwich like this (indicating).

12  Q.  At any time did you receive a hot meal?

13  A.  No.

14  Q.  Were you hungry?

15  A.  Yes, of course, yes.

16  Q.  Did you lose weight?

17  A.  Yes.

18  Q.  Now, during the time that you were at Broadview from

19  Wednesday through Friday, did you receive water?

20  A.  One water.  They would give us three waters during the

21  day -- per day.

22  Q.  When you say "three waters," are you referring to bottles

23  of water?

24  A.  Bottles of water.

25  Q.  And what size were the water bottles?

Moreno Gonzalez - direct

52

1    A.   Like that little bottle right there (indicating).

2         THE COURT:   Can you for the record --

3    BY MS. GARCIA:

4    Q.   Mr. Moreno Gonzalez, you're pointing to a bottle right

5    here?

6    A.   Yes, yes, like this (indicating).

7    Q.   So this bottle is about --

8    A.   Yes, yes, it was like from here to there (indicating).

9    Q.   So approximately 10 ounces of water?

10   A.   Yeah.

11   Q.   Was that enough water for you?  Were you thirsty?

12   A.   Oh, yes, we were thirsty.

13   Q.   Did anyone in the cell ask for more water?

14   A.   Everyone did.  They would ask for it all the time, but

15   there was no water.

16   Q.   Did anyone in the cell ask for more food?

17   A.   That, too, yes.

18   Q.   And what was the response?

19   A.   They wouldn't give you an answer.  Sometimes they would get

20   angry at you.

21   Q.   During the time that you were at Broadview, could you take

22   a shower?

23   A.   No, no, there was no place where you could bathe.

24   Q.   During -- from Wednesday to Friday that you were at

25   Broadview, could you change your clothes?

Moreno Gonzalez - direct

53

1    A.   No.

2    Q.   During the time that you were at Broadview, was the cell

3    cleaned?

4    A.   One time, but all they did was just go like this

5    (indicating) this way, and that's it.

6    Q.   When you say all they did was go like this one way, what do

7    you mean?  Can you explain?

8    A.   That they took this mop, and then they went from here to

9    over there, and that's it.  But they didn't go the other way

10   because there was just too many sandwiches and bottles

11   everywhere.  Everything was just thrown about, papers and --

12   Q.   So they did not clean the entire cell?

13   A.   No, no.

14   Q.   Did the cell smell?

15   A.   Yes.

16   Q.   How would you describe the smell?

17   A.   It was because people were sweating, because people would

18   arrive, and they would be sweating, all the sweat, all the

19   people.

20   Q.   Did it smell bad?

21   A.   Yes.

22   Q.   Now, you mentioned that you were at Broadview from

23   Wednesday through Friday?

24   A.   Yes.

25   Q.   Do you know how long some of the other men, the 149 other

Moreno Gonzalez - direct

54

1   men in your cell, were at Broadview?

2   A.  Well, I did talk to one fellow, because when you get there

3   you ask:  Well, where did they catch you?

4         And then later I asked him:  Well, how long have you

5   been here?

6         And he says:  It's already been three -- two days,

7   three days, four days.  And one person told me he'd been there

8   for a week.

9         MS. BRADY:  Your Honor, just move to strike.  It's

10   hearsay.

11         THE COURT:  It is hearsay.

12         MS. GARCIA:  Your Honor, at this stage you can

13   consider hearsay under the Seventh Circuit precedent.

14         THE COURT:  This is a TRO hearing, and I know I can,

15   but I'll give it the weight that it deserves.

16         MS. GARCIA:  Thank you.

17   BY MS. GARCIA:

18   Q.  Well, Mr. Moreno Gonzalez, can you share with the Court how

19   you felt being held at Broadview?

20   A.  Well, I felt bad, you know, seeing all -- so many people.

21   I felt bad.

22   Q.  Okay.  Do you understand that you are bringing this case on

23   behalf of yourself and all the other people who are at

24   Broadview?

25   A.  Yes.

Moreno Gonzalez - cross

55

1  Q.  And do you believe that you can represent what is happening

2  at Broadview for yourself and those other people?

3  A.  Yes.

4        MS. GARCIA:  Can I have just one moment, please?

5    (Counsel conferring.)

6        MS. GARCIA:  Mr. Moreno Gonzalez, I have no further

7  questions for you.  The other side may ask you some questions.

8  Just wait.

9        THE COURT:  Let's take a five-minute break.

10        THE CLERK:  All rise.

11    (Recess at 11:00 a.m. to 11:11 a.m.)

12        MS. BRADY:  Your Honor, may I proceed?

13        THE COURT:  Please.

14                    CROSS-EXAMINATION

15  BY MS. BRADY:

16  Q.  Good morning, Mr. Moreno Gonzalez.

17  A.  Good morning.

18  Q.  My name is Jana Brady.  I'm an Assistant United States

19  Attorney, and I represent the government in this case.

20  A.  Very nice to meet you.

21  Q.  I just want to -- you, too.  I just want to ask a few

22  follow-up questions so that I understand the testimony that you

23  gave to your attorney.  Okay?

24  A.  Yes, agree.

25  Q.  Earlier in your testimony you said that an officer gave you

Moreno Gonzalez - cross

56

1  a document that would have you return to Mexico.  Do I

2  understand that correctly?

3  A.  Yes.

4  Q.  Am I correct in saying that you did not sign that document?

5  A.  I did not sign that document.

6  Q.  Earlier in your testimony you indicated that you were able

7  to call home and speak with your family; am I correct?

8  A.  Yes.

9  Q.  When you spoke with your family, did you speak with them

10  about any medications?

11  A.  No.

12  Q.  No.  At any time did you ask your family to bring in any

13  medications that you were taking?

14  A.  No.

15  Q.  At any time did you ask your family to reach out to an

16  attorney that can help you?

17  A.  No.

18  Q.  Now, Mr. Moreno Gonzalez, when you made that phone call,

19  was it using the telephone that was in the holding cell?

20  A.  No.

21  Q.  Was there a phone in the holding cell?

22  A.  There was a phone in the holding cell, but it didn't work.

23  Q.  Did you try to use it?

24  A.  I did try, but it didn't.

25  Q.  Okay.  When you say it didn't work, what do you mean?

Moreno Gonzalez - cross

57

1    A.   Because the phone wasn't working.  It would just go like

2    zing, zing, zing.  Nothing else.

3    Q.   And did you tell the officers this?

4    A.   I did tell one of the officers that it didn't -- didn't

5    work.  And I was asked:  Well, do you want to speak to your

6    relatives -- to your family?

7             And I said yes.  And he said, wait, wait.

8    Q.   Okay.  And now let's talk about waiting and the time you

9    were at the facility.

10            Earlier you testified that you were at the facility

11   from October 29th to October 31st; is that correct?

12   A.   Yes.

13   Q.   Do you agree that you were at the facility for less than 42

14   hours?

15   A.   I was -- I was, like, 42 hours, I think.

16   Q.   Earlier in your testimony you said that there were 150 to

17   170 people, and I just want to get some clarity on that.  Okay?

18   A.   Yes, yes.

19   Q.   At the facility there's more than one holding room; is that

20   right?

21   A.   There were more, yes.

22   Q.   Okay.  Were you still speaking?

23   A.   All at the other side, and there were more people as well.

24   Q.   Okay.  Now, in terms of the people that were actually in

25   your holding cell, did you count them one by one?

Moreno Gonzalez - cross

58

1   A.   There were -- I mean, I saw there were that quantity of

2   people.  There were a lot of people.  It was packed.

3   Q.   But in terms of how many people were actually in your

4   holding cell, do you agree that you're speculating because you

5   did not count them?

6   A.  Yes, but there were a lot of people.  There were.

7         MS. BRADY:  Thank you, Mr. Moreno Gonzalez.  I

8   appreciate it.

9         MS. GARCIA:  Your Honor, no redirect.

10        THE COURT:  All right.  You're excused, sir.  Thank

11   you.

12    (Witness excused.)

13        THE COURT:  Before we call the next witness, I just

14   want to take a bit of the housekeeping matters here.

15        There's an unopposed motion by the plaintiffs to seal

16   certain exhibits, and we'll go ahead and grant that.

17        MS. VAN BRUNT:  Thank you, Your Honor.

18        THE COURT:  Okay.

19        THE CLERK:  Please raise your right hand.

20        Do you swear or affirm that the testimony you are

21   about to give in this matter before the Court is the truth, the

22   whole truth, and nothing but the truth?

23        THE WITNESS:  Yes, I do.

24        THE CLERK:  Thank you.

25    (Witness duly sworn.)

Zamacona - direct

59

1               FELIPE AGUSTIN ZAMACONA SABOERANIS,

2                PLAINTIFF HEREIN, DULY SWORN,

3                 DIRECT EXAMINATION

4   BY MS. VAN BRUNT:

5   Q.  Good morning, sir.  Could you please state your name for

6   the record?

7   A.  My name is Felipe Agustin Zamacona Saboeranis.

8   Q.  And you speak English?

9   A.  Yes, I do.

10  Q.  And do you understand English?

11  A.  Yes, I do.

12  Q.  How old are you?

13  A.  I'm 47 years old.

14  Q.  Where were you born?

15  A.  I was born in Mexico.

16  Q.  And where do you live now or where did you live before

17  being detained?

18  A.  In Chicago, Illinois.

19  Q.  How long have you lived in the U.S.?

20  A.  31 years.

21  Q.  You are currently in ICE custody, correct?

22  A.  Yes.

23  Q.  Before you were detained, what part of Chicago did you live

24  in?

25  A.  I lived in the City of Chicago in Portage Park.

Zamacona - direct

60

```
1    Q.   Portage Park.  And --
2             THE COURT:  Speak a little bit slower.  Okay?
3             THE WITNESS:  Okay.
4             THE COURT:  You're going pretty quickly here.
5             THE WITNESS:  Sorry.
6    BY MS. VAN BRUNT:
7    Q.   Did you have a job?
8    A.   Yes, I do.
9    Q.   And what is that?
10   A.   I'm a package delivery for Amazon Flex.
11   Q.   For Amazon Flex?
12   A.   Yeah.
13   Q.   Okay.  Did you go to high school in Chicago?
14   A.   Yes, I did.
15   Q.   Where?
16   A.   Wells High School.
17   Q.   And did you get any college education in Chicago?
18   A.   Yes, I got an associate degree and almost finished my
19   bachelor's.
20   Q.   And what was your associate's degree in?
21   A.   Computer information systems.
22   Q.   Okay.  What day were you arrested recently, sir, by ICE?
23   A.   Thursday.
24   Q.   So October 30th?
25   A.   October 30th, yeah.
```

Zamacona - direct

61

1   Q.   And where did that happen?

2   A.   It happened Wheeling, Illinois.

3   Q.   Where did you go after your arrest?  Where were you taken?

4   A.   They took me to the Broadview facility.

5   Q.   And about what time did you arrive at Broadview?

6   A.   Around 10:00 in the morning.

7   Q.   What happened after you arrived at Broadview?

8   A.   They proceed to take my strings out, procedures.  They just

9   asked me if I had any allergies or anything like that.  And

10  then they put me in the holding cell.

11  Q.   Did they take things away from you?

12  A.   Yeah, all my belongings, yeah.  My phones, my wallets,

13  everything.

14  Q.   They took your cell phone away from you?

15  A.   Yeah.

16  Q.   When somebody asked you if you had allergies, was that

17  person a doctor?

18  A.   No.

19  Q.   Was that person a nurse?

20  A.   No.

21  Q.   At any point when you arrived at Broadview, did you see a

22  medical person or receive a medical screening?

23  A.   No.

24  Q.   I want to ask you a few questions about where you went

25  after processing once you were in the cells.

Zamacona - direct

62

1           Can you describe how large that cell was?

2   A.   The cell seems to be around 30 by 30.

3   Q.   And can you estimate -- estimate how many people were in

4   that cell?

5   A.   Around 120 to 150.

6   Q.   And how do you know it was that many?

7   A.   At one point they took 50 people out, and it wasn't even --

8   it was more -- like it was still packed.  Like there still

9   wasn't room to sit down or anything.  You still had to fight

10  for a seat.

11  Q.   Could you sit down once you were in that room?

12  A.   When I first got in, no.  When I first got in, the only

13  standing room -- I had stand by the washroom.  I had to, like,

14  by the wall.  Like if someone had to come in the washroom, I

15  had to get out of the wall.

16  Q.   When was it possible for you sit down?

17  A.   After -- after they took the 50 people, I was able to cut a

18  seat.

19  Q.   I see.  Was it possible for you to lay down ever?

20  A.   No, not first.

21  Q.   Why was that?

22  A.   There was no space.  There was people laying down.  There

23  was people sitting down and people standing up.

24           I mean, you had to wait for them to get out so you can

25  find a spot.

Zamacona - direct

63

1    Q.   Okay.  At some point you were standing near the bathrooms?

2    A.   Yeah.

3    Q.   And can you describe what those bathrooms looked like?

4    A.   Well, they were dirty.  Seems like they never cleaned them

5    or anything.  There were stains everywhere.

6    Q.   Were they --

7    A.   They was not never wiped or some -- or anything.

8    Q.   Were they private?

9    A.   No.

10   Q.   Why do you say that?

11   A.   Because there was people -- people standing right there.

12   Even though there was a little wall like that, people were

13   standing inside the wall where the washrooms is.  You had to

14   ask people to please move so you can use the washrooms.

15   Q.   So you made a gesture with your hand and suggested that

16   there was a wall about halfway up your body; is that correct?

17   A.   Yeah, yeah, about that size.

18   Q.   Did that wall protect your privacy when using the toilet?

19   A.   No.

20   Q.   And why was that?

21   A.   Because there were people on the other side of the wall,

22   and you had stand like -- there were people standing in the

23   wall, on either side of the wall like right next to the toilet.

24   Q.   So they were next to you at the toilet?

25   A.   Yeah.

Zamacona - direct

64

```
 1   Q.  Were you able to sleep on the floor at night?
 2   A.  At one point I was able to lay down, yes.
 3   Q.  And how did you manage that?
 4   A.  I just lay down on the floor.  Someone stand up to use the
 5   washroom, and I took his spot.
 6   Q.  I see.  Were you given a pillow?
 7   A.  No.
 8   Q.  Were you given a bed mat?
 9   A.  No.
10   Q.  In all the time you were there, did you see anybody with a
11   bed mat or a pillow in the facility?
12   A.  There was none.
13   Q.  Okay.
14   A.  No one had any.
15   Q.  How was the shell in the facility?
16   A.  The smell was sweat, stale.  I mean, like it was really
17   bad.  It smelled like it was like a -- like a stale, like you
18   breathing, breathing, breathing over.
19   Q.  Did it -- can you explain that a little bit more?
20   A.  I don't know how to describe it.  It smelled like dirty
21   washroom, like sweat, like a dirty locker.  Like when you done
22   playing and you left a shirt like smell like stale, like *puta*
23   fat.  Like, I don't know how to say it.
24   Q.  Did you see anybody sleeping near the toilets?
25   A.  Yeah.  At one point at night I had to go to use the
```

Zamacona - direct

65

1  washroom, and I had to ask -- had to wake up the guy to get off

2  his head because I had use the washroom.

3  Q.  Did you have to move his head from away from the toilet?

4  A.  I had to wake him up and tell him to move because I had to

5  use the washroom.

6  Q.  Could you bathe when you were at Broadview?

7  A.  No.

8  Q.  Why not?

9  A.  Because there was no water -- there was two sips for

10  showers, but there were no water in there.  That you press the

11  button, nothing came out.

12  Q.  Did you get any soap at Broadview?

13  A.  No.

14  Q.  Any toothpaste?

15  A.  No.

16  Q.  A toothbrush?

17  A.  No.

18  Q.  What about a towel?

19  A.  Neither.

20  Q.  How was the cleanliness of the facility?

21  A.  Seems like they never mop or they never swept.  There was

22  garbage everywhere.  There was a garbage can, but it was

23  overflowed and just like people throwing garbage everywhere.

24  Q.  Could you see into other rooms beyond where you were being

25  held?

Zamacona - direct

66

1   A.   Yeah, you could see the other rooms.

2   Q.   And could you see into the women's cell?

3   A.   You could see where the womens were holding, yeah.

4   Q.   What was the condition of the women's cell?

5   A.   Seemed to be very similar.  They seemed to be packed and

6   seemed like those conditions.

7   Q.   What food did you receive while you were there?

8   A.   We received Subway sandwiches.

9   Q.   And how many did you actually eat while you were there?

10  A.   I only eat the first one.

11  Q.   And why is that?

12  A.   Because after I got sick.

13  Q.   What happened?

14  A.   I got diarrhea.

15  Q.   Is it your belief that it was from the sandwich?

16  A.   I think so.

17  Q.   Did you receive water while you were there?

18  A.   With the sandwich, they will give you an 8-ounce bottle of

19  water.

20  Q.   So how many 8-ounce bottles of water did you get a day?

21  A.   Three.

22  Q.   Did you ask for others?

23  A.   I didn't ask anymore, because I saw that people -- when

24  people ask, they just ignore you or they just told you to shut

25  up or they will not give you anymore.

Zamacona - direct

67

1    Q.  Was there a fountain on top of the toilet or near the

2    toilet that you could use for drinking?

3    A.  There was a fountain on top of the toilet.

4    Q.  Was it drinkable water?

5    A.  No.  It tasted like sewer.  I tried once.  It tasted like

6    sewer.

7    Q.  Okay.  Could you change your clothes while you were there?

8    A.  No.

9    Q.  You arrived on October 30th, right?

10   A.  Yes.

11   Q.  And when did you leave, sir?  When were you taken away?

12   A.  They took us the Friday, almost 2:00 in the morning.

13   Q.  Okay.  And when was the first time you changed your clothes

14   between when you were arrested on October 30th?

15   A.  I didn't change my clothes until Friday around 10:00 at

16   night when we arrived Green County, Missouri.

17   Q.  Okay.  Did you see anybody change their clothes when you

18   were at Broadview?

19   A.  No.  I mean, you got there, and you kept the clothes you

20   got there.

21   Q.  Did you see anyone get medical treatment while they were at

22   Broadview?

23   A.  I personally did not see anyone even though I was sick

24   myself, but I was afraid to ask for anything because I was

25   afraid they were going to make me sign something.

Zamacona - direct

68

1   Q.   And we'll get to that one sec.

2          At any point were you offered a hot meal at Broadview?

3   A.   No.

4   Q.   Were you able to talk to an attorney while you were at

5   Broadview?

6   A.   No.

7   Q.   Would you have wanted to talk to an attorney?

8   A.   Yeah.

9   Q.   Why?

10  A.   Because -- because I don't know what my situation was.  I

11  wasn't told why I was getting arrested or anything.  And I

12  wanted to see what my possibilities to get out was, so I just

13  wanted to see an attorney to see what was going on.

14  Q.   Were you ever able to call anyone while you're in

15  Broadview?

16  A.   At one point they let me use my phone to call someone.

17  Q.   Did they give you your phone back?

18  A.   No, just to make the phone call.

19  Q.   I see.  And who did you call?

20  A.   I called my brother.

21  Q.   And where did that phone call take place?

22  A.   Right in front of the person who was interviewing me.

23  Q.   I see.  And was that call private?

24  A.   No.

25  Q.   And how do you know?

Zamacona - direct

69

1   A.  Well, because there was someone right in front of me, and

2   there's people all around me that could hear -- that could hear

3   what I was saying.

4   Q.  All right.  Did anyone -- any federal agent ever ask you to

5   sign anything?

6   A.  When I first got there, they give me two options, to sign

7   my deportation or to see a judge.

8           I told the guy that I wasn't going to sign anything,

9   that I wanted to go in front of a judge.

10  Q.  Did they say -- I'm sorry.

11  A.  And he said okay.  And he started talking to me, and he

12  told me that my possibilities were minimal.

13          And I still told him I want my court date.  And he

14  told me my court date, and he told me to sign the court papers.

15  But I saw that it wasn't court papers.  It was deportation, so

16  I didn't sign it.

17  Q.  So he gave you papers to sign and told you they were court

18  papers?

19  A.  (Indicating.)

20  Q.  And you can read English, correct?

21  A.  Yeah.

22  Q.  What did the papers actually say on them?

23  A.  It said that it was self-deportation with no -- no -- that

24  I couldn't come back to the United States in 10 years.

25  Q.  And you had no interest in signing that form, correct?

Zamacona - direct

70

1   A.   No.

2   Q.   And why is that?

3   A.   Because my whole life is here.  I don't want --

4   Q.   You intended to fight removal?

5   A.   Yep.

6   Q.   What do you think could have happened had you signed that

7   paper?

8   A.   They would have taken me to the airport and to Mexico.

9   Q.   You were transferred early on Friday, October 30th, right?

10  A.   Yes.

11  Q.   Did they tell you why you were being transferred so

12  suddenly in the early morning hours?

13  A.   No.

14  Q.   But you were brought back to Broadview, correct?

15  A.   Yes.

16  Q.   And that was yesterday?

17  A.   Yes, I think so.  I'm not -- I don't even know sure about

18  the dates.  That was yesterday -- yesterday or the day before.

19  I don't remember.

20  Q.   Is it fair to say that if you're detained again at

21  Broadview, you would want to be able to consult with attorneys

22  confidently in private?

23  A.   Yes.

24  Q.   Is it also fair to say that you would want access to basic

25  necessities, like soap, water, and hygiene products?

Zamacona - cross

71

1    A.  Yes.

2    Q.  You would also want access to food?

3    A.  Some different -- some different, yeah.

4    Q.  Enough food and something different than sandwiches?

5    A.  Yes.

6    Q.  You understand, sir, that you are a class representative in

7    a class action, right?

8    A.  Yes.

9    Q.  And as a result, you are representing a whole group of

10    people who are detained inside Broadview on immigration

11    charges, right?

12    A.  Yes.

13    Q.  And you know this is not a monetary action; there's no

14    money at stake here, right?

15    A.  Yes.

16    Q.  And you are interested in representing a class here today,

17    right?

18    A.  Yes.

19    Q.  Can you say why you're interested in doing that?

20    A.  Yes.  I don't want anyone else to live what I lived

21    through.

22          MS. VAN BRUNT:  Thank you, sir.

23                 CROSS-EXAMINATION

24    BY MS. BRADY:

25    Q.  Good morning, sir.

Zamacona - cross

72

1    A.   Good morning.

2    Q.   My name is Jana Brady, and I'm an Assistant United States

3    Attorney, and I represent the government in this matter.

4         I just want to ask you some clarifying questions to

5    follow up on what your counsel said.  Okay?

6    A.   Okay.

7    Q.   All right.  You testified that you were brought into

8    Broadview on October 30th, and then you were released on the

9    31st, correct?

10   A.   Yes.

11   Q.   Is it accurate that you were at the Broadview facility for

12   less than 21 hours?

13   A.   That's about right.

14   Q.   Okay.  Now, when you were processed at Broadview, did

15   someone interview you?

16   A.   Yes.

17   Q.   Okay.  And did you tell them that you were in good health

18   and didn't take medications?

19   A.   Yes, I told them that.

20   Q.   You talked about there being a lot of people in your

21   holding cell.  Do you remember that line of testimony?

22   A.   Yes, I do.

23   Q.   And you said at one point 50 people were removed from the

24   cell; is that correct?

25   A.   Yes.

Zamacona - cross

73

1   Q.   Is it your understanding that when the officers at

2   Broadview clean a cell, they need to put the detainees that

3   were in that cell in another cell temporarily so that they are

4   able to clean that cell?

5   A.   Yes, I do.

6   Q.   Is it correct that you didn't actually count the number of

7   people in the cell at any given time?

8   A.   No, I didn't count them.

9   Q.   When you were able to use your phone and call your brother,

10  did you tell your brother that you wanted to speak with an

11  attorney?

12  A.   I told him to get me attorney.

13  Q.   Okay.  And did he do that for you?

14  A.   I think so.

15  Q.   Okay.  And then before you were able to have an opportunity

16  to speak with your attorney, you were transferred to Green

17  County.  Is that in Missouri?

18  A.   Yeah, before I -- before I talked to my attorney, I was

19  transferred to Green County, Missouri.

20  Q.   Okay.  Now, when you got to Green County, were you able to

21  speak with counsel?

22  A.   No.

23  Q.   Were you able to speak with anyone?

24  A.   No.

25  Q.   How long were you there?

Zamacona - cross

74

1    A.  I got there -- I don't know what time I got there.  I left

2    around -- they picked me up around 5:00 in the morning.

3    Q.  Was it your understanding that you were transferred to

4    Green County because that was going to be your long-term

5    detention facility?

6              MS. VAN BRUNT:  Objection, confidence.

7              THE COURT:  Well, what was his understanding?  I'll

8    let him answer.

9    BY THE WITNESS:

10   A.  No, I didn't -- I didn't know.  I didn't know what was

11   going on.  I just -- they just transfer there, and I just

12   didn't know what's going on.

13   BY MS. BRADY:

14   Q.  Do you understand or did you at any time understand that

15   you were brought back to Broadview because you filed a lawsuit,

16   and the Court ordered that?

17   A.  I didn't know they was -- I didn't know they was bringing

18   back to Broadview.  They just told me to go with them.  I

19   didn't know where I was going.

20   Q.  Is it correct that you were only at Broadview briefly

21   before you were transferred to MCC?

22   A.  Yeah.

23   Q.  Earlier you gave testimony about documents that you were

24   presented with.  Do you recall that line of testimony?

25   A.  Yes, I do.

Pereira Guevara - direct

75

1  Q.  You didn't sign either of the documents; is that correct?

2  A.  I didn't sign anything.

3            MS. BRADY:  Thank you.

4            MS. VAN BRUNT:  No redirect, Your Honor.

5            THE COURT:  All right.  You're excused, sir.

6     (Witness excused.)

7            MR. MANES:  Your Honor, next we'd like to call a

8  remote witness, Claudia Pereiera Gonzalez -- Guevara.  Sorry.

9            THE COURT:  All right.

10           MS. BRADY:  I'm sorry, who is being called?

11           MR. MANES:  Claudia Carolina Pereiera Guevara.

12           MS. BRADY:  Thank you.

13           THE COURT:  Was she one of the people who submitted a

14  declaration?

15           MR. MANES:  She did, yes.

16           THE COURT:  Do you know what number it was?

17           MR. MANES:  I do.  It's declaration document No. 2-6,

18  Exhibit 6.

19           THE COURT:  Exhibit 6?

20           MR. MANES:  The 6th, yes.

21              CLAUDIA CAROLINA PEREIRA GUEVARA,

22              PLAINTIFFS' WITNESS, DULY SWORN,

23           TESTIFIED VIA VIDEOCONFERENCE AS FOLLOWS:

24                   DIRECT EXAMINATION

25  BY MR. MANES:

Pereira Guevara - direct

76

```
1   Q.  Good morning.  Ms. Pereira, can you hear me?
2   A.  Yes.
3   Q.  Okay.
4           MR. MANES:  Could you swear the witness in?
5           THE WITNESS:  Good morning.
6           THE CLERK:  Can you please raise your right hand?  Do
7   you swear or affirm that the statements and testimony you are
8   about to give in the matter before this Court are the truth,
9   the whole truth, and nothing but the truth?
10          THE WITNESS:  Yes.
11          THE CLERK:  Thank you.
12  BY MR. MANES:
13  Q.  Thank you.  Can you state and spell your name, please?
14  A.  My name is Claudia Carolina Pereira Guevara.
15          MR. MANES:  For the court reporter, do you need that
16  spelled?
17          THE COURT REPORTER:  Yes, please.
18  BY MR. MANES:
19  Q.  Could you spell that, please?
20  A.  Claudia, C-l-a-u-d-i-a; Carolina, C-a-r-o-l-i-n-a.
21  Q.  You can continue.
22  A.  Pereira, P-e-r-e-i-r-a.
23  Q.  And your last name -- your final --
24  A.  Guevara.
25  Q.  Can you spell --
```

Pereira Guevara - direct

1  A.   Guevara, G-u-e-v-a-r-a.

2  Q.   Thank you very much.

3       Did you provide a declaration in this case?

4  A.   Yes.

5  Q.   And where are you located right now?

6  A.   In Honduras.

7  Q.   Tell me, do you have any children?

8  A.   Two children.

9  Q.   And how old are your kids?

10 A.   I have a nine-month-old baby, and I have a five-year-old

11 girl.

12 Q.   And where are your kids living right now?

13 A.   In Chicago with my brother.

14 Q.   Are your kids U.S. citizens?

15 A.   Only the boy.

16 Q.   The younger one?

17 A.   Yes.

18 Q.   Were you living with your kids in the United States until

19 recently?

20 A.   Yes.

21 Q.   Were you in Chicago?

22 A.   Yes, in Joliet.

23 Q.   And how long did you live in the United States for?

24 A.   Five.

25 Q.   Five years?

Pereira Guevara - direct

78

1   A.  Yes.

2   Q.  Thanks.  At some point recently, were you arrested by

3   immigration officials in the Chicago area?

4   A.  Yes.

5   Q.  Do you remember what date you were arrested?

6   A.  October 2nd at 5:00 a.m.

7   Q.  And where were your kids when you were arrested?

8   A.  With the babysitter.

9   Q.  And where were you going when you were arrested?

10   A.  To my job.

11   Q.  After you were arrested, were you eventually taken to the

12   ICE detention center in Broadview?

13   A.  Yes.

14        MR. MANES:  We lost the video.  Is that -- should I

15   continue?

16        THE CLERK:  It might be on her side.

17        MR. MANES:  Okay.  We'll continue.

18   BY MR. MANES:

19   Q.  I want to ask you some questions now about what you

20   experienced when you were detained at Broadview.

21        How many days were you kept at Broadview in total?

22   A.  Five days.

23   Q.  Can you describe -- were there different holding cells

24   inside Broadview?

25   A.  There were four big ones, and there were two personal

Pereira Guevara - direct

79

1    ones -- well, for one person.

2    Q.   Where were you kept while you were at Broadview?

3    A.   They had me four days in the big one, and then they

4    transferred me to the personal one.

5    Q.   Okay.  I'm going to ask you about the conditions inside one

6    of the -- when you were in the larger holding cell.

7          Can you tell me about the -- can you tell me about the

8    cleanliness of the holding cell?

9    A.   There was no cleaning.  They never cleaned the bathroom.

10   Q.   Was it dirty?

11   A.   Yes.

12   Q.   If someone told you that all holding cells are cleaned

13   daily by professional janitorial staff, would that be an

14   accurate statement?

15   A.   No.

16   Q.   Did any staff ever clean inside your holding cell?

17   A.   No.  One time we asked for a broom so that we ourselves

18   could clean, and they -- they refused.

19   Q.   Did you see any staff clean the area outside of your cell

20   where the officers were?

21   A.   Yes.

22   Q.   But those cleaning staff never came inside to clean your

23   cell?

24   A.   No.

25   Q.   Did you ever have to --

Pereira Guevara - direct

1  A.  It was just one man.

2  Q.  Did you -- did you ever have to clean the toilet in your

3  cell?

4  A.  One time it did get plugged up, and we had to use garbage

5  bags so we could unplug it.

6  Q.  So do I have it clear that you and the other detainees had

7  to unplug and clean the toilet?

8  A.  Yes, because it was overflowing, and so we kind of half

9  cleaned.  There was paper there, and we were drying up with the

10  paper.

11  Q.  Did the staff help you clean it?

12  A.  No.

13  Q.  Was there any privacy in the cell?

14  A.  No.

15  Q.  Continue.

16  A.  There were cameras.  We didn't know who was looking at the

17  cameras.  They were looking towards the bathroom and

18  everything, the cameras.

19  Q.  Was there any privacy from the other detainees when you

20  were using the toilet?

21  A.  No.

22  Q.  Were you able to shower during the five days you were

23  there?

24  A.  No.

25  Q.  Were any other detainees able to shower, to your knowledge?

Pereira Guevara - direct

81

1   A.  Well, there were no showers where one could bathe.

2   Q.  Did you ever get any soap or sanitizer?

3   A.  No.

4   Q.  Did you get toothpaste?

5   A.  No.

6   Q.  Did you get a toothbrush?

7          THE COURT:  You may want to repeat that.

8   BY MR. MANES:

9   Q.  Did you get a toothbrush?

10  A.  No.  They wouldn't give us anything that had to do with

11  cleaning, absolutely nothing.

12  Q.  If somebody told you that soap and shampoo may be provided

13  on request at Broadview, would that be true, in your

14  experience?

15  A.  No, it's not true.

16  Q.  Did people ask for soap?

17  A.  Yes, we would ask them to give us something, because, you

18  know, having been there for so many days, you know, we just

19  couldn't put up with the smell anymore.  But they would say,

20  no, they didn't have any.

21  Q.  Can you tell me about the smell?  How did it smell?

22  A.  Well, there was, like, a barrel there for the garbage; and,

23  you know, there was also bread thrown around because it was

24  cold, cold bread.  And, you know, it would stink.  And, you

25  know, us being women, we require daily hygiene.

Pereira Guevara - direct

1    Q.   Were you or any other detainees given any clothes?

2    A.   (Inaudible.)

3    Q.   Sorry.  Can you repeat your answer?

4    A.   No, no, they didn't give us clothing or anything.

5    Q.   So you stayed in the same clothes for five days?

6    A.   With what I had when I was arrested, I wore that every day.

7    Q.   Okay.  I'm going to ask you about the food and water

8    situation.  I'll have a series of questions.

9         If someone were to say that all detainees are provided

10   three meals a day, would that be accurate, based on your

11   experience?

12   A.   No, because sometimes they would only give us two meals and

13   sometimes three.

14   Q.   And what were the meals?

15   A.   It was Subway, and it was cold, because it was very cold in

16   there.  Sometimes they only had vegetable.  It would have,

17   like, little peppers, lettuce.

18   Q.   Did it seem to you that the sandwiches had been

19   refrigerated or frozen?

20   A.   Yes.

21   Q.   If someone were to say that all detainees got at least one

22   hot meal per day, would that be accurate, in your experience?

23   A.   No, they never gave us a warm meal.

24   Q.   How much water did you get?

25   A.   They would give us a bottle per meal.  If it was three

Pereira Guevara - direct

1    meals, it was three bottles.  If it was two meals, it was two

2    bottles.

3    Q.  How big were those bottles?

4    A.  It's the regular ones that you buy, the normal ones.  I

5    don't know.

6    Q.  If someone were to say that bottled water is available upon

7    request, would that be accurate?

8    A.  No.

9    Q.  Did you ever ask --

10            THE INTERPRETER:  The interpreter didn't hear.

11   BY MR. MANES:

12   Q.  Could you repeat the answer?

13   A.  They would say we had to wait for the meal to get a bottle

14   of water.

15   Q.  Was there a wall-mounted water fountain or a sink in the

16   cell?

17     (Videoconference feed lost.)

18   BY MR. MANES:

19   Q.  Can you hear me?

20            Could we continue the testimony?  What should we do?

21            MS. VAN BRUNT:  Just give it a second.

22            MR. MANES:  Just give it a second.

23            THE COURT:  Is there any way to get ahold of her?

24            MR. MANES:  Yeah, I can text her.

25     (Brief pause.)

Pereira Guevara - direct

84

1              THE COURT:  There she is.

2              MR. MANES:  Can you hear me?

3              I'm messaging with her here, just for the record.

4              THE WITNESS:  Hello?  Sorry.

5              MR. MANES:  No problem.  Thank you.

6    BY MR. MANES:

7    Q.   So the last question I asked you is, was there a

8    wall-mounted fountain or a sink in the cell?

9    A.   No.  There was a sink right where the toilet was, but that

10   water was not for drinking, because one time I wanted to drink

11   water, and that water was really bad.

12   Q.   Can you describe the water?

13   A.   Well, it did look clear and clean, but when you tasted it,

14   it was a really bad taste.

15   Q.   Did other people drink the water from the sink?

16   A.   No.

17   Q.   Why not?

18   A.   Because I told them it was bad.

19   Q.   All right.  Were there beds or mattresses to sleep on?

20   A.   No.  They had these seats.

21   Q.   Where did you sleep?

22   A.   Oh, in those benches and those chairs, but one day I lay

23   down on the floor to sleep because my body was already hurting

24   bad.

25   Q.   When you slept on the floor, was the floor dirty?

Pereira Guevara - direct

85

1    A.  Yes, yes.

2    Q.  Were you ever able to sleep well there?

3    A.  No.

4    Q.  Did they turn off the lights at night while you were

5    sleeping?

6    A.  No.

7    Q.  What was the temperature -- continue.  Sorry.  Continue.

8    A.  And it was always quite cold.

9    Q.  What was the temperature like at night?

10   A.  Cold.  I don't know how much, but it was cold.

11   Q.  At any point did you get sick while you were at Broadview?

12   A.  Yes.

13   Q.  Tell me about that.

14   A.  It was that day that I slept on the floor.  The next day I

15   had pain from my waist down, couldn't feel my feet, and I was

16   vomiting.

17   Q.  Did you ask to see a doctor or go to the hospital?

18   A.  Yes, but they said no.  They just took me out of the cell,

19   and they sat me there with the computers on a wheelchair.

20   Q.  Was there any doctor, nurse, or other medical professional

21   in the facility?

22   A.  No, no.  Just one of the immigration officers, he gave me

23   his medication, which was apparently for vomiting, and that's

24   it.

25   Q.  Did the officer tell you what the medication was that they

Pereira Guevara - direct

86

1    gave you?

2    A.   For vomiting.

3    Q.   Did he tell you the name of the medicine that you were

4    given?

5    A.   No.

6    Q.   Was the officer who gave you that medicine a medical

7    professional?

8    A.   No.

9    Q.   Did you receive any treatment for -- medical treatment for

10   your symptoms not feeling the lower half of your body?

11   A.   No.  They said just to, you know, stretch out my feet and

12   walk and that it had to do with, you know, being in the same

13   place sitting down for so long.

14   Q.   While you were there, do you know if anyone else had any

15   medical emergencies?

16          MS. BRADY:  Foundation.

17   BY MR. MANES:

18   Q.   One second.

19          MS. BRADY:  I'm going to object.  She doesn't have any

20   foundation to testify as to the conditions of others.

21          THE COURT:  Well, what she observed.

22          MR. MANES:  I could lay a foundation.

23   BY MR. MANES:

24   Q.   While you were at Broadview, did you observe anybody else

25   having a medical emergency?

Pereira Guevara - direct

87

1   A.  Yes, there was one person.  He was getting, like, a heart

2   attack.

3   Q.  Why did you think he was getting a heart attack?

4   A.  Because of the way that -- of what was happening, he was

5   lying on the floor, and his face was changing color.

6   Q.  How did the officers respond to that man?

7   A.  No, they just surrounded him, and they were just looking at

8   him, like they thought it was a lie.  I don't know, not

9   believing him.

10   Q.  Earlier you told me that at some point you were moved into

11   a smaller single-person cell.  Do you remember that?

12   A.  They transferred us there, the other ladies and I.  There

13   were, like, seven of us.

14   Q.  Can you tell me -- so strike that.

15        Were there seven people inside the single-person cell?

16   A.  Yes.  And I told one of the immigration officers that it

17   said maximum one person.  And why were there seven people

18   there?  But they never cared about anything that you would tell

19   them.

20   Q.  What were the conditions like inside that single-person

21   cell?

22   A.  It was very small.  There was hardly any space.  We were

23   all standing, like, on a line, all of us, very tight.

24   Q.  And how long were you in that cell for?

25   A.  It was just the time of the day.

Pereira Guevara - direct

88

1  Q.  So was it the whole day you spent there?

2  A.  Yes, during the day, and then at night they put us back to

3  where we were.

4  Q.  How did the officers treat you and the other detainees?

5  A.  Well, bad, because if you said anything to them, they just

6  wouldn't pay attention to you.  They would say yes, but they

7  just wouldn't pay any attention.

8  Q.  Were you ever able to observe the conditions inside other

9  holding cells?

10  A.  I could only see it when I was transferred to the small

11  cell.

12  Q.  And what did you observe?

13  A.  Just that the conditions were bad where all the men were in

14  and that they were really packed in there, all of them really

15  together.

16  Q.  Could you tell if the men were standing or sitting or lying

17  down?

18  A.  Some were sitting on the floor.  Some were standing.

19  Q.  Could you tell how crowded it was?

20  A.  Yes.  Yes.

21  Q.  Okay.  I now want to ask you some questions about how you

22  were processed by deportation officers at Broadview.

23       At some point did an immigration officer process you

24  at the facility?

25  A.  Yes.

Pereira Guevara - direct

1   Q.  Tell me what happened when the immigration officer
2   processed you.
3   A.  They came to my cell.  They called out -- they came to my
4   cell.  They called out my name.  They put me there where the
5   computers were.  They took my prints.
6   Q.  At any point did they ask you to sign forms?
7   A.  First they asked for my prints.  Then they asked me to sign
8   my deportation.
9   Q.  Could you read or understand the deportation papers?
10  A.  No.  They were in English, and I don't know English.
11  Q.  Did anyone translate the deportation papers for you?
12  A.  No.
13  Q.  Did -- go ahead.
14  A.  The officer only said that that was my deportation paper
15  and that I already had a deportation.
16  Q.  Did the immigration officer -- sorry.  Let me ask the
17  question.
18          Did the immigration officer tell you that you had to
19  sign the deportation paper?
20  A.  Yes, because if I didn't sign, I was going to be held there
21  until I signed.
22  Q.  Did you feel like you had the option not to sign the
23  papers?
24  A.  No, because they would have me there locked up.
25  Q.  Did you ever ask to speak with a lawyer?

Pereira Guevara - direct

1  A.  Yes.  But they said, "Well, what for?"  Because I didn't

2  have anything I could do anymore.

3  Q.  Why did you want to speak with a lawyer?

4  A.  Because I didn't want to come here.  I have my children --

5  I have my children there, and I didn't want to leave them

6  behind.

7  Q.  Did the deportation officer tell you anything about whether

8  you would be able to come back to the United States if you

9  signed?

10 A.  He told me that I would be able to return in five years,

11 that they would take away that punishment that I had of five

12 years.

13 Q.  When you were taken out of Broadview after five days, where

14 did you go?

15 A.  To Kayo (phonetic), the place in Louisiana.

16 Q.  How long were you there?

17 A.  I was there for two days.

18 Q.  Were you able to talk to a lawyer while you were in

19 Louisiana?

20 A.  No, I didn't want to anymore, because I was going to sign

21 my deportation, and then I was going to be sent over here to

22 Honduras.

23 Q.  Were you deported from Honduras, Louisiana?

24 A.  Yes.

25 Q.  Did you try to find an American lawyer after you got back

Pereira Guevara - direct

91

1    to Honduras?

2    A.   Yes.

3    Q.   Why did you want to talk to a U.S. lawyer?

4    A.   Well, I first told him that I wanted to return to the U.S.

5    because I had my children there and that the officer had said I

6    had five years of punishment.

7    Q.   You can continue.

8    A.   Then the lawyer said that we had to begin with the pardon,

9    and I said that that was fine.

10   Q.   Did you send this lawyer money?

11   A.   Yes, I sent him $650 because he said the pardon costs 1200,

12   1200.

13   Q.   At some point did you learn that this lawyer was defrauding

14   you?

15   A.   Yes.

16   Q.   Did you eventually speak with an actual U.S. lawyer who was

17   able to give you good legal advice?

18   A.   Yes, with an attorney who was a woman who told me that I

19   wasn't going to be able to see my child until he was 22 years

20   of age --

21           THE INTERPRETER:  And the interpreter didn't catch the

22   rest.

23   BY MR. MANES:

24   Q.   Do you believe the officer at Broadview lied to you when

25   they told you you could return in five years?

Pereira Guevara - cross

92

1    A.   Yes, because he only said five years, and then when I spoke

2    to the attorney, she said it wasn't five.  It was ten.

3    Q.   Do you think you would have had more legal options to stay

4    with your kids in the United States if you'd been able to

5    consult with a lawyer while you were still detained here in the

6    United States?

7    A.   Yes.

8    Q.   And you're now separated from your kids?

9    A.   Yes.  My children, who are so young, I really don't know.

10   Q.   Do you know when you'll be able to see them again in

11   person?

12   A.   I don't think so.  I don't know when.

13        MR. MANES:  One second.

14     (Counsel conferring.)

15        MR. MANES:  No further questions, Your Honor.

16        THE COURT:  About how long do you think you'll have

17   with her?

18        MS. BRADY:  Maybe about five or ten minutes.

19        THE COURT:  Fine.

20                    CROSS-EXAMINATION.

21   BY MS. BRADY:

22   Q.   Hello, Mrs. Pereira Guevara.  My name is Jana Brady.  I'm

23   an Assistant United States Attorney, and I represent the

24   government in this case.

25   A.   Okay.

Pereira Guevara - cross

93

1   Q.   Am I correct that you have not been at the Broadview

2   facility since the first week of October?

3   A.   No, I'm not understanding.

4   Q.   Sure.  You were processed at the Broadview facility on

5   October 2nd, and you testified that you stayed there for five

6   days?

7   A.   Yes.

8   Q.   Is it correct that you do not have any knowledge of the

9   conditions at the Broadview facility today or how they're

10  treating other people?

11  A.   No, not right now, I don't know anymore what's going on

12  over there.

13  Q.   You gave testimony that an officer processed you and asked

14  you questions when you were admitted to the Broadway --

15  Broadview facility; is that correct?

16  A.   Yes.

17  Q.   Did the officer speak with you in your native language?

18  A.   He only spoke a little bit of Spanish.

19  Q.   Were you able to understand what he was saying?

20  A.   What he did say, he said in Spanish.

21  Q.   And did you understand what he did say?

22  A.   Yes.

23  Q.   Do you know the name of the officer who interviewed you and

24  talked to you about the papers that you signed?

25  A.   No.

Pereira Guevara - cross

94

1    Q.   Is it correct that you had deportation proceedings pending

2    between 2021 and the time that you were processed at the

3    Broadview facility?

4    A.   I did not know about it until I was processed.  They told

5    me that I already had a deportation.

6    Q.   So is it fair to say that you don't know 100 percent

7    whether you had a final order of removal when you were

8    processed at the Broadview facility?

9    A.   Yes, because I didn't know.  I had had a problem in L.A.

10   because my case was in L.A.

11   Q.   You gave testimony that you became sick while you were at

12   the Broadview facility; is that right?

13   A.   Yes.

14   Q.   The officer gave you medicine to help with the vomiting?

15   A.   Yes.

16   Q.   Did the medicine help you?

17   A.   Yes, because the vomiting calmed down.

18   Q.   And then you did get better; is that correct?

19   A.   Yes.

20   Q.   You mentioned in the declaration that you had signed on

21   October 21st, 2025, and in your testimony today that you

22   witnessed other individuals at the facility having medical

23   issues; is that correct?

24   A.   Yes.

25   Q.   You described one gentleman as being gravely ill, and you

Pereira Guevara - cross

95

1  described another gentleman as having a heart attack; is that

2  correct?

3  A.   Yes.

4  Q.   Do you agree that you do not have education, training, or

5  experience in the area of medicine or nursing?

6  A.   Yes.

7  Q.   Do you agree that you do not have personal knowledge as to

8  what, if anything, was wrong with the gentlemen that you

9  described?

10  A.   Yes, because I don't know about medicine or anything like

11  that, but I have seen cases like that before.

12  Q.   In your declaration you indicated that you were in a

13  holding cell with eight to ten women; is that correct?

14  A.   Yes.

15  Q.   And then at one point, the women were transferred to a

16  single holding cell; is that correct?

17  A.   Yes.

18  Q.   Do you know specifically what time you were transferred to

19  the single cell and what time you were taken back to the larger

20  holding cell?

21  A.   No, we didn't have a place to see the time.

22  Q.   Do you know why you were placed in the single cell?

23  A.   No.

24  Q.   Do you know or were you able to see inside the holding cell

25  that the women were in before you were sent to the single cell?

1      THE INTERPRETER:  The interpreter would like you to

2 ask it again.  Sorry.

3 BY MS. BRADY:

4 Q.  Sure.  I'll rephrase, too.

5      Were you able to see the larger holding cell while you

6 were in the single cell?

7 A.  No.

8 Q.  So it's fair to say that you don't know if the officers

9 took you in the single cell so that they could clean the

10 holding cell that you were in; is that correct?

11 A.  No, no, because when we returned, it was just as dirty.

12 Q.  Is it fair to say that you don't know whether the officers

13 placed the women in the single cell because they needed to put

14 other people in the holding cell that housed the women at least

15 temporarily?

16 A.  I don't know.

17      MS. BRADY:  All right.  Thank you so much.

18      THE COURT:  Any redirect?

19      MR. MANES:  No, Your Honor.  Thank you.

20      THE COURT:  All right.  Thank you very much.

21  (Witness excused.)

22      THE COURT:  We will take our lunch break.  Let's be

23 back at 1:30.

24      THE CLERK:  All rise.

25  (Recess at 12:24 p.m. until 1:30 p.m.)

97

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF ILLINOIS
 2                       EASTERN DIVISION

 3    PABLO MORENO GONZALEZ and     )  Case No. 25 C 13323
      FELIPE AGUSTIN ZAMACONA,      )
 4                                  )
                  Plaintiffs,       )
 5                                  )
             v.                     )
 6                                  )
      KRISTI NOEM, et al.,          )  Chicago, Illinois
 7                                  )  November 4, 2025
                  Defendants.       )  1:35 p.m.
 8

 9            EXCERPT OF THE TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE ROBERT W. GETTLEMAN
10
      APPEARANCES:
11
      For the Plaintiffs:    RODERICK and SOLANGE MacARTHUR
12                              JUSTICE CENTER
                             BY:  MS. ALEXA VAN BRUNT
13                               MR. JONATHAN MANES
                                 MS. DANIELLE BERKOWSKY
14                               MS. JAMIA RUSSELL
                             160 East Grand Avenue, 6th Floor
15                           Chicago, Illinois 60611

16
                             THE ROGER BALDWIN FOUNDATION OF
17                              ACLU, INC.
                             BY:  MR. KEVIN M. FEE
18                               MS. MICHELLE T. GARCIA
                                 MR. SAMUEL COLE
19                               MS. JENNIFER STARK
                                 MS. KATHLEEN HICKEY
20                           150 North Michigan Avenue, Suite 600
                             Chicago, Illinois 60601
21

22                           EIMER STAHL
                             BY:  MR. NATHAN P. EIMER
23                           224 South Michigan Avenue, Suite 1100
                             Chicago, Illinois 60604-2516
24

25
```

98

```
 1   For the Defendants:        UNITED STATES ATTORNEYS' OFFICE
                                BY:  MS. JANA L. BRADY
 2                              327 South Church Street, Suite 3300
                                Rockford, Illinois 61101
 3
                                MR. PATRICK WALTER JOHNSON
 4                              219 South Dearborn Street
                                Chicago, Illinois 60604
 5

 6   ALSO PRESENT:             MR. JORGE LUIS CARBAJOSA
                               Certified Spanish Interpreter
 7

 8

 9

10   Court Reporter:          NANCY L. BISTANY, CSR, RPR, FCRR
                              Official Court Reporter
11                            219 South Dearborn Street, Room 1706
                              Chicago, Illinois 60604
12                            (312) 435-7626
                              bistanyofficialtranscripts@gmail.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

1     (Proceedings heard in open court:)

2          THE COURT:  All right.  Before we begin today with the

3     next witness, I wanted to ask, if I refer to you as the

4     government, is that all right?

5          MS. BRADY:  I'll understand.

6          THE COURT:  Okay.  It's a lot easier.

7          There's been a lot of testimony about cameras and

8     declaration about cameras.  Do you know whether those cameras

9     are recording anything that has been preserved so that we could

10    at least see it?

11         MS. BRADY:  I do not know.  I know yesterday I sent an

12    email asking for confirmation.  They sent out a litigation

13    hold, and I would follow up with that today.

14         THE COURT:  Okay.  By the end of the day today, maybe

15    we could get some --

16         MS. BRADY:  I could send an email.

17         THE COURT:  -- answer to that.

18         MS. BRADY:  Okay.  We got him sending an email.

19         THE COURT:  Okay.  Great.  Thank you very much.

20         All right.  We have a new witness.

21         THE CLERK:  Please stand and raise your right hand.

22         Do you swear or affirm that the testimony you are

23    about to give in this matter will be the truth, the whole

24    truth, and nothing but the truth?

25         THE WITNESS:  I do.

Vcelka - direct

1    (Witness duly sworn.)

2         MR. VAN BRUNT:  And, Your Honor, before we begin, to

3    facilitate things and move them along a little bit, we are

4    going to move on to the two attorney witnesses and not do the

5    two detainee witnesses we had planned.  So hopefully we can get

6    to requested relief.

7         MS. HICKEY:  Hello.  Katie Hickey for plaintiffs.

8         THE COURT:  Okay.  Let's get the name of the witness.

9         MS. HICKEY:  This is Shelby Vcelka.

10         SHELBY VCELKA, PLAINTIFFS' WITNESS, DULY SWORN,

11                   DIRECT EXAMINATION

12   BY MS. HICKEY:

13   Q.   Please state your name for the record.

14   A.   Shelby Vcelka, V-c-e-l-k-a.

15   Q.   And what is your occupation?

16   A.   I'm the managing partner at Victory Law Office.  I

17   specialize in deportation defense and detention.

18   Q.   Did you provide a declaration in this matter?

19   A.   I did.

20   Q.   Have you represented clients detained at Broadview?

21   A.   I have.

22         THE COURT:  Can you give me the number of the

23   declaration, please?

24         MS. HICKEY:  Yes.

25         MS. BRADY:  It's 2-34.

Vcelka - direct

1          THE COURT:  34.  Okay.

2          MS. HICKEY:  Thank you.

3    BY MS. HICKEY:

4    Q.   How recently have you represented clients detained at

5    Broadview?

6    A.   As of last week, I believe.

7    Q.   And when did you begin representing clients detained at

8    Broadview?

9    A.   I've been representing clients in Broadview approximately

10   since June this year.

11   Q.   And how has the number of clients being detained at

12   Broadview changed between June and now?

13   A.   In June I only had one client at the Broadview facility.

14   Since September it has drastically increased.

15   Q.   I'd like to talk to you about a few specific clients who

16   were detained at Broadview.  But first, can you generally

17   describe how you track a detained client's location?

18   A.   Absolutely.  So there is an online platform called "The ICE

19   Detainee Locator."  It's publicly available.  So if you have a

20   client's "A" number and the country of birth, you can type in

21   the "A" number, the country of birth, and it should appear with

22   their location.

23          If you do not have their "A" number, you need their

24   date of birth and country of birth as well as their full legal

25   name as it is spelled, including things like hyphens or spaces.

Vcelka - direct

1   It should give you the same information if you type them in

2   that way.

3   Q.  What has been your experience using the online detainee

4   locator to track clients detained at Broadview?

5   A.  It is not accurate.  So when you go to look up clients in

6   the ICE detainee locator, it will pop up with a screen that

7   says, like, "In custody.  Call ICE ERO for details."  And it

8   will have underneath the location of the field office that

9   should have administrative control over the client.

10          So in this case, usually the way I tell somebody is

11  located in Broadview, because it will say Chicago ICE ERO with

12  a phone number and the field office located downtown.

13  Q.  What happens when you call that phone number?

14  A.  It doesn't work.

15  Q.  What kind of information do you typically need to provide

16  in order to speak to a detained client?

17  A.  So you have to have something called a G-28 filed.  So that

18  is a notice of entry of appearance.  In some cases you do have

19  to provide a copy of your bar card and driver's license, but

20  typically the G-28 is the operative thing that lets you speak

21  to a detainee.

22  Q.  And how do you get that G-28 filed?

23  A.  So there is an online platform called "ICE ERO eFile."  It

24  works for detained clients and non-detained clients.  But when

25  they're -- when they're in detention, you're supposed to use

Vcelka - direct

1    their "A" number, their country of birth, or their date of

2    birth and country of birth to find them, as it will say

3    "Subject Found" when you go to look them up.  And then you're

4    able to file your G-28 that way.

5    Q.  What has been your experience trying to get those

6    appearances filed on behalf of detained clients at Broadview?

7    A.  It can take several hours or several days after they've

8    been detained by ICE in order to file a G-28.

9    Q.  Can you describe your experience communicating with your

10   clients while they're detained inside Broadview?

11   A.  I have had extremely limited communications with my clients

12   while they're in Broadview.  If I'm able to speak with them,

13   it's typically through happenstance.  So a family member is

14   physically in my office at the time they receive a phone call

15   from a client.

16        In other circumstances, if they have my phone number

17   memorized, they are able to call, but it's a very limited

18   conversation, typically less than 10 minutes.  On average, I

19   would say it's more about five minutes long.

20        It is very difficult for me to hear my client.  So

21   there's a lot of background noise, a lot of voices.  You can

22   tell this is not in a private setting, and it is not on a

23   nonrecorded line.

24   Q.  And what kind of efforts do you make to talk to your

25   clients while they're detained at Broadview?

Vcelka - direct

104

1    A.  I've made numerous attempts at trying to contact my

2    clients.

3            So I have called the Broadview phone number that's

4    listed on Google numerous times.  I actually attempted to call

5    that number this morning from -- from my phone, and the line

6    was disconnected.

7            I have called the ICE ERO Chicago line at least, I

8    would say, approximately 15 times to try to get a deportation

9    officer on the phone or somebody that I can speak to about the

10   case.  That number, once you go through the main -- the main

11   menu, that number is also disconnected, and it hangs up when

12   you -- when you try to get somebody on the phone.

13           I have also sent emails to the ICE ERO Chicago field

14   office location, both the Chicago Outreach email, the ICE ERO

15   detained unit email, and legal detention access, which is a

16   national email address.

17           I have received very few communications back from ICE

18   when I have reached out via email.

19   Q.  And why do you send emails to those addresses?

20   A.  So previously during prior administrations, you could send

21   an email to the Chicago Outreach email inbox or specifically

22   the detained unit if a client is in detention, and they would

23   get back to you within 24 to 48 hours.

24           Usually they were able to provide you with the name of

25   a deportation officer that's handling the person's case or they

Vcelka - direct

105

1    could -- the person who is responding in the email could give

2    you information directly.

3    Q.   And do you ever receive that kind of information now?

4    A.   No.  So I did -- I did receive a response from ICE ERO

5    yesterday asking for name and date of birth.  I had already

6    provided the name.  I was -- I was seeking specific information

7    about a client.

8            On a separate instance, they did confirm that my

9    client was located at Broadview but did not provide any contact

10   information for how it could get into contact with that client

11   or the name of the deportation officer, like I had requested to

12   speak to my -- about my client's case.

13   Q.   Have you ever gone to Broadview in person to see any

14   clients?

15   A.   Yes, on two occasions.

16   Q.   And when you have gone to Broadview, have you gotten inside

17   to speak with them?

18   A.   No.

19   Q.   Why do you want to speak to your clients while they're

20   inside Broadview?

21   A.   For numerous reasons.  So when somebody is detained, there

22   are steps that need to be taken immediately to address their

23   legal situation.

24           So first off, obviously as an attorney, I want to

25   provide my clients with information about their legal rights

Vcelka - direct

106

1     and the pathways they can take to -- to resolve their case.

2          In some instances, if they have a prior order of

3     removal, you need to file an I-246, a stay of removal,

4     immediately to prevent that removal order from being executed.

5          If there's an in absentia removal order, I could file

6     a motion to reopen right away to try to rescind that removal

7     order and put them back into deportation proceedings.

8          In they're -- if there are minor children at issue and

9     the parents are in custody, it is really important to get the

10    parents' signatures, so that way we can start taking care of

11    those kids while the parents are in custody, so things like

12    temporary guardianship, getting school records, getting them

13    signed up for things like therapy.

14         I mean, there are numerous instances where getting in

15    touch with your clients is -- is incredibly important to the

16    resolution of these cases.

17         THE COURT:  Let me just interrupt for a second.

18         You said you were there two times.  Was that recently?

19         THE WITNESS:  Correct, yes.

20         THE COURT:  Can you give us approximate dates?

21         THE WITNESS:  Sure.  So the first time was on October

22    14th, 2025.  It was approximately noon when I arrived.

23         And then the second time was October 21st at about

24    10:00 in the morning.

25         THE COURT:  Thank you.

Vcelka - direct

107

1    BY MS. HICKEY:

2    Q.   Let's talk about with one of those instances.

3    A.   Sure.

4    Q.   So on October 21st, why did you go to Broadview?

5    A.   I had a client who was detained at her ICE check-in in

6    Milwaukee, Wisconsin.  She was transferred down to the

7    Broadview location.

8         Her family called me because she was -- they were

9    extremely concerned because she was a nursing mother to a

10   four-month-old U.S. citizen child.

11   Q.   And what is that client's name?

12   A.   Maria del Carmen Garcia Rodriguez.

13   Q.   Tell me about Ms. Garcia Rodriguez's immigration status.

14   A.   Sure.  So in October 2020, she did have a prior removal

15   order, but she re-entered the United States in approximately --

16   approximately March 2023 with a new basis for asylum.

17        She entered with her husband and her one-year-old

18   Mexican citizen son.

19   Q.   Before you went to Broadview, did you take any steps to try

20   to contact her?

21   A.   Yes.  So I sent emails to the ICE ERO email address, the

22   Chicago Outreach email address, and the -- the legal detention

23   access email.

24        I stated in that email that she was a nursing mother,

25   and it was incredibly important that she have the ability to

Vcelka - direct

1   express milk while she was in detention.

2   Q.   Did you receive any response to those emails?

3   A.   No.

4   Q.   What did you do next?

5   A.   So the following morning, I went to Target and bought her a

6   breast pump and nipple cream and then drove over to the

7   Broadview facility to drop it off myself.

8   Q.   And what happened when you arrived there?

9   A.   So I was stopped by Illinois state troopers who told me I

10  did not have permission to be there.

11       I informed them I was an attorney who represented

12  somebody that was detained in Broadview, and I was there to

13  drop off a breast pump because she was nursing.

14       The Illinois state troopers took a look at my G-28

15  that had been previously executed while she was not detained,

16  as I had represented her for approximately two years before her

17  detention.  So they -- they looked at my G-28.  They called the

18  ICE officers inside and told me to wait.

19       And then once I was granted permission to approach the

20  front door, I was allowed to walk out to the front door and

21  pass off the breast pump and the nipple cream.

22  Q.   What did you ask the officers when you spoke to them?

23  A.   I asked the officers if I could get in touch with my

24  client, because I was incredibly worried about the fact that

25  she probably hadn't had the opportunity to express milk in

Vcelka - direct

109

1    about 24 hours.

2          They said they were not doing visitation that day.

3    And I said, "Even if I'm her attorney?"  And they said, "No."

4          So I asked if I could get a phone call from her, and

5    they said -- they asked me for my phone number.  I gave my

6    phone number to them, and I said I -- I spoke to a deportation

7    officer, an ICE officer, yesterday while she was being

8    detained, and I've given them my email address twice already.

9          They indicated to me that they were going to email me

10   some paperwork, but I never received the paperwork.  So I

11   provided the officer with my email yet again and told him it

12   was very important that I get copies of the documents my client

13   was receiving.

14   Q.   Did anyone ever contact you?

15   A.   No.

16   Q.   Did you receive any of that paperwork?

17   A.   No.

18   Q.   Were you able to speak with your client at all while she

19   was at Broadview?

20   A.   No.

21   Q.   And how important was it for you to speak with her?

22   A.   It was -- it was very important.  We were -- we were

23   dealing with -- well, we were dealing with the family trying to

24   figure out what was going to happen with the four-month-old,

25   the other -- and the other two children.  Her husband and her

Vcelka - direct

1    oldest child are currently in deportation proceedings.  So, you

2    know, I was speaking with them about the impact that this could

3    have on their case.

4         But I wanted my client to understand what her legal

5    options were before accepting paperwork, signing anything, or

6    being transferred out of the jurisdiction where it would be

7    harder for me to get in contact with her.

8    Q.  And what happened after she left Broadview?

9    A.  It was -- according to the Mexican Consulate, she was

10   transferred somewhere in Indiana.  And then I was able to file

11   my G-28 via that ERO G-28 eFiler about two days after she was

12   detained.

13        So by the time I had filed my G-28, I got a

14   notification that she was being transferred to Louisiana.  I

15   emailed and called the area of responsibility of the New

16   Orleans office and never got a response from the New Orleans

17   office.

18        I was able to speak with an Officer Jackson at the

19   south Louisiana detention facility where the ERO eFiler

20   indicated that my client was located, and she said she could

21   not confirm or deny that my client was currently at that

22   location; but if she was there, she would pass on the message.

23   Q.  And what happened to your client next?

24   A.  She was removed from the United States.  The next time I

25   heard from her, she was in Matamoros, Mexico.

Vcelka - direct

1  Q.  And did she ever receive that breast pump while she was in

2  Broadview?

3  A.  No.

4  Q.  Let's talk about the other visit you made to Broadview.

5       When you tried to see your client at Broadview, was

6  there a protest going on outside?

7  A.  There were -- there was a small handful of protestors, but

8  there was not a loud protest going on.  There were people with

9  signs, but it was not violent.  It was not rowdy.

10 Q.  When you tried to see your client, did you bring

11 documentation that showed that you were his attorney?

12 A.  Yes, I brought a copy of my G-28, my passport, and my Real

13 ID.

14 Q.  And were you permitted to visit your client?

15 A.  No.

16 Q.  Let's talk about your client, Bellarmino Ayala Rodriguez.

17 How did he become your client?

18 A.  I had another client refer his --

19      THE COURT:  Can you spell that for us, the first name?

20      MS. HICKEY:  Sure.  B-e-l-l-a-r-m-i-n-o; Ayala,

21 A-y-a-l-a; Rodriguez, R-o-d-r-i-g-u-e-z.

22      And I hope Ms. Vcelka will tell me if that's not

23 correct.

24      THE WITNESS:  It's correct.

25 BY MS. HICKEY:

Vcelka - direct

1    Q.   So tell me about how Mr. Ayala Rodriguez became your

2    client.

3    A.   Yes.   So another one of my clients had referred his

4    daughter to me right after he was detained.   He was detained at

5    work.

6         His daughter made a phone call about midday to my

7    office asking if we did habeas corpus petitions or requests for

8    voluntary departure.   We told her that, yes, we handle both

9    types of cases, and she was more than free to come into our

10   office to discuss it further.

11        We gave her the pricing.   She said in the meantime

12   between this phone call and when she entered my office, she was

13   going to try to come up with the funds to pay for us to

14   represent her father.

15        She came back to my office at about 7:00 p.m., and she

16   was visibly struggling with what path she should take, because

17   she had not been able to speak with her dad, but she didn't

18   want to make that decision for him without hearing from him.

19   Q.   Did you ever hear from that client?

20   A.   Yes.   So while -- while I was meeting with the daughter and

21   her wife discussing the different options, he happened to call

22   her cell phone from his cell phone.   And the phone call was

23   very short.

24        And she asked him do you want -- in Spanish:   Do you

25   want to -- do you want to go or do you want to fight?

Vcelka - direct

113

1       And he responded with one word, "*Pelear*," which in

2   Spanish means to fight.  And then she told him "We don't know

3   how long this is going to take.  Are you okay with waiting in

4   detention for the time being?"

5       And he said, "Yes, I'm fine with that.  I want to

6   stay.  *Mi quiero quedar*," which means "I want to stay."

7       And he said, "I have to go" and hung up the phone.

8   Q.  And how did his daughter react?

9   A.  The daughter and her wife started crying immediately.  The

10  wife said, "We hadn't heard from him all day.  We were very

11  worried about him.  It's like God intervened so that way you

12  could speak to him and explain what we were going to do."

13  Q.  Let's talk about one set of clients, the Enciso family.

14  A.  Yes.

15  Q.  Tell me about Mr. and Mrs. Enciso.

16  A.  So they are long --

17          THE COURT:  Could you spell that?

18          MS. HICKEY:  Yes.  E-n-c-i-s-o.

19  BY MS. HICKEY:

20  Q.  Tell me about the Enciso family, please.

21  A.  So they are long-term residents of Cicero, Illinois.  They

22  are parents of four children.  The two older children, Moises

23  and Yurithsi, are pending DACA status, and the two younger

24  children are minors, and they are U.S. citizens.

25  Q.  How long did the Encisos stay at Broadview?

Vcelka - direct

114

1    A.   They were approximately there for three-and-a-half days.

2    Q.   What steps did you take to contact the Encisos while they

3    were at Broadview?

4                THE COURT:  Wait.  You say there were two people?

5                MS. HICKEY:  Yes.

6                THE COURT:  Being held there?

7                MS. HICKEY:  Yes.

8                THE WITNESS:  Correct, yes.

9                THE COURT:  The father and the mother?

10               THE WITNESS:  Correct.

11               MS. HICKEY:  Yes.

12               THE COURT:  Okay.

13   BY THE WITNESS:

14   A.   So I called the ICE ERO office numerous times and from

15   different phones, because I wasn't sure if it was one phone not

16   working or one phone number being blocked because I'm a legal

17   representative, but I called from different phones and just

18   kept trying to get in touch with somebody.

19               I again sent emails to the ICE ERO email addresses

20   that I had and did not receive a response.

21   BY MS. HICKEY:

22   Q.   Were you ever able to schedule any confidential calls or

23   visits with the Encisos over those three-and-a-half days?

24   A.   No.

25   Q.   Were you ever able to speak with them at all?

Vcelka - direct

1    A.   Yes, I was able to speak with Constantina.  Again,

2    happenstance where the children were in my office, and

3    Constantina happened to call, and I was able to inform her

4    don't -- don't sign anything until we're able to have a more

5    private conversation, and we can explain what the next steps

6    are.

7    Q.   Was that a private call?

8    A.   No.

9    Q.   How do you know?

10   A.   There was lots of noise in the background.  My client is a

11   quieter women, but her voice was so low in contrast to the

12   noise that was happening behind her that it was very difficult

13   to hear what she was saying.

14   Q.   How long was that call?

15   A.   It was certainly less than ten minutes.  I'd say around

16   five.

17   Q.   Is that long enough to advise your clients of their legal

18   options?

19   A.   Absolutely not.

20   Q.   What happened to the Enciso family after they left

21   Broadview?

22   A.   So the -- both parents were sent to separate detention

23   facilities.  So Moises was sent to the North Lake facility in

24   Baldwin, Michigan.  Constantina was sent to the Grayson

25   facility in Leitchfield, Kentucky.

Vcelka - direct

116

1    Q.  Why did they go to separate facilities?

2    A.  So Constantina was told that because she did not sign

3    certain paperwork, they were sent to separate facilities.

4    Q.  What papers were those?

5           MS. BRADY:  Your Honor, objection, hearsay.

6           MS. HICKEY:  Your Honor, because it's a TRO hearing, I

7    believe you can consider hearsay.

8           THE COURT:  Well, it's still hearsay.  I'll give it

9    the weight it deserves.  Go ahead.

10   BY MS. HICKEY:

11   Q.  What papers were those?

12   A.  I don't know.

13          MS. HICKEY:  Your Honor, may I have just a moment?

14     (Counsel conferring.)

15          MS. HICKEY:  No further questions.  Thank you.

16          THE WITNESS:  Thank you.

17          MS. BRADY:  No questions, Your Honor.

18          THE COURT:  All right.  You're excused.  Thank you.

19     (Witness excused.)

20          THE COURT:  Call your next witness, please.

21          You're excused.  You can step down.

22          THE WITNESS:  Thank you.

23          MS. VAN BRUNT:  We are going to call Kevin Herrera to

24   the stand.

25          THE CLERK:  Please raise your right hand.

Herrera - direct

117

1      Do you swear or affirm that the testimony you are

2  about to give in the matter before the Court will be the truth,

3  the whole truth, and nothing but the truth?

4      THE WITNESS:  I do swear.

5      THE CLERK:  Thank you.

6    (Witness duly sworn.)

7      KEVIN HERRERA, PLAINTIFFS' WITNESS, DULY SWORN,

8          DIRECT EXAMINATION

9  BY MS. VAN BRUNT:

10  Q.  Good afternoon, sir.  Could you please state and spell your

11  name for the record?

12  A.  Yes.  My name is Kevin Herrera, H-e-r-r-e-r-a.  First name

13  K-e-v-i-n.

14  Q.  What is your occupation?

15  A.  I am an attorney.  I'm the legal director at Raise the

16  Floor Alliance, which is a coalition of worker centers.  My

17  organization provides legal support to low-wage workers on a

18  variety of issues that intersect with their workplace.

19  Q.  And what areas of practice do you cover in the law?

20  A.  Typically my office engages in work in wage theft, work in

21  sexual harassment, discrimination, collective bargaining.  But

22  more recently, given the needs of the community, we've expanded

23  our work to include certain immigration-related work for our

24  clients that intersects with the work that they do to make

25  money for their families.

Herrera - direct

1    Q.   And did you provide a declaration in this matter?

2    A.   I did.  I believe it's attached as Exhibit 24 to the

3    plaintiffs' complaint.

4    Q.   That's correct.  And did one of your clients, Willian

5    Giménez González, also provide a declaration in this matter?

6    A.   That's correct.  That was Exhibit 13, I believe.

7         Willian Giménez González is W-i-l-l-i-a-n,

8    G-i-m-é-n-e-z, G-o-n-z-á-l-e-z.

9    Q.   Thank you.  Have you represented clients who are detained

10   recently at Broadview?

11   A.   Yes.  I've represented two clients detained at Broadview,

12   one in September, one in October.

13   Q.   Let's talk about your September client first.

14        Who was that?

15   A.   That was Willian, Mr. Giménez González.

16   Q.   How you did come to represent Mr. Giménez González?

17   A.   Mr. Giménez González has been a client of mine for over two

18   years.  Initially my office began to represent him in a civil

19   rights case against The Home Depot Corporation as well as the

20   City of Chicago, individual officers, and individual employees

21   of The Home Depot.

22        The complaint that we filed for him and several other

23   day laborers alleges that he was targeted based on his

24   nationality, dragged into The Home Depot, beaten, forced to

25   sign false charges, and then held in detention by CPD based on

Herrera - direct

119

1   those charges.  We've been pursuing that case since 2023.

2   Q.  When was he detained by ICE in September?

3   A.  Mr. Giménez González was detained on September 12th, 2025.

4   Q.  And what is your understanding, sitting here today, as to

5   why he was detained?

6   A.  I am not entirely clear as to why he was detained that day.

7          Later responses by the government, particularly in

8   media, alleged that Mr. Giménez González was detained based on

9   trespassing charges and also based on an order of removal *in*

10  *absentia* from an immigration court in Memphis.

11  Q.  What happened to that order of *absentia*?

12  A.  I actually assisted Mr. Giménez González with that -- that

13  order.  He was instructed by individuals in Chicago to go to

14  the court in Chicago on the date he was supposed to go to a

15  master calendar hearing in the Memphis court.

16         Because he missed his court date in Memphis, that

17  immigration judge ordered him removed *in absentia*.  I assisted

18  him with a semi-*pro se* motion to reopen his immigration

19  proceedings, which were successful.

20         His case was eventually transferred back to Chicago.

21  So at the time of his arrest, he had no pending order of

22  removal.

23  Q.  You were able to clear it up?

24  A.  That's correct.

25  Q.  How did you learn that he had been detained in September by

Herrera - direct

120

1    ICE?

2    A.  So Mr. Giménez González came to our office through an

3    organizing collaboration with one member of our coalition,

4    Latino Union of Chicago.  I learned, based on text messages

5    from organizers with Latino Union, that Mr. Giménez González

6    had been detained while on the way to a haircut in the Little

7    Village neighborhood.

8           His wife had called the organizers from Latino Union

9    because she was distraught and left alone.  And so that's how I

10   learned that he was detained.

11   Q.  Did you know where he had been taken to at that point?

12   A.  I had -- no, I did not know where he had been taken.

13   Q.  Did you try to find out where he had been taken?

14   A.  I asked the organizers if they knew where he had been

15   taken.  I asked his wife whether she knew where he had been

16   taken and --

17   Q.  Did they know?

18   A.  They did not know.

19   Q.  Did you undertake any other efforts to try to locate him at

20   that point?

21   A.  Yes.  Based on media reports and what I've known of

22   procedures after individuals are detained in the Chicago area,

23   I drove immediately to the Broadview detention facility in an

24   effort to try and locate Mr. Giménez González.

25   Q.  Before doing that, did you look up the ICE locator -- look

Herrera - direct

121

1    up his name in the ICE locator to see if he was in the system?

2    A.   Yes, I actually looked up his name in two locations, one in

3    the executive office for immigration reviews database to see

4    whether anything had changed with regard to his immigration

5    case, which we did not represent him on initially --

6    Mr. Giménez González is an asylum seeker -- to see whether

7    anything had changed with regard to his immigration case.

8    Nothing had changed.  The EOIR database still showed a 2026

9    hearing date.

10        I then looked at the ICE detainee locator using his

11   "A" number.  The query returned no results.

12   Q.   And when you say "no results," do you mean his name didn't

13   show up in any capacity?

14   A.   As I recall, the ICE detainee locator screen that came up

15   after I entered his "A" number was no results found.

16   Q.   And how long after that -- how long did you look him up

17   after you had found out he had been detained?

18   A.   I looked him up immediately thereafter.  I learned he had

19   been detained at approximately 11:00 a.m. on September 12th,

20   and I believe within the next 30 minutes I was seeking out

21   where he might have been.

22   Q.   And so you said you went to Broadview after that?

23   A.   That's correct.

24   Q.   And that was just based on -- on what information?

25   A.   Again, media reports that I had read regarding where people

Herrera - direct

122

1  might go if they were detained in Chicago, also conversations

2  with colleagues about where they tended to find their clients

3  in the event that they were detained by immigration agents.

4  Q.  Did you go to Broadview to make contact with your client?

5  A.  I did.

6  Q.  Why did you want to make contact with your client?

7  A.  First of all, I wanted to ensure his well-being and safety.

8  I understood that at times individuals are detained, there are

9  sometimes injuries.  So I wanted to make sure that he was okay.

10          Secondarily, I wanted to make sure that he did not

11  sign anything or was not coerced into signing anything because

12  of fear that he might forego rights that he had.

13          Third, I wanted to make sure that he was -- I had the

14  opportunity to try and fight transfer, because I was concerned

15  that I might lose contact with him or that his wife might lose

16  contact with him.

17          And then finally, I wanted to make sure that I had the

18  opportunity to inform him of his rights as a person detained.

19  Q.  Did you think it was important to contact him while he was

20  still at the first point of detention?

21  A.  I thought it was extremely important to do so.  Again, to

22  reiterate, my concern about transfer was primarily to avoid a

23  circumstance in which I would have no ability to travel to see

24  my client or to visit him in detention and also no ability to

25  facilitate connections between him and his community and his

Herrera - direct

123

1     loved ones.

2             Mr. Giménez González has quite a strong community

3     support network here, and I wanted to ensure that he remained

4     connected to that community support network.

5     Q.    Once you arrived at Broadview, what did you do?

6     A.    I approached the building.  Having parked a couple of

7     blocks away to the west of it, I walked about five minutes.

8             As I approached the building, which I had only seen in

9     media reports -- again, I had never seen the physical building,

10    but I did recognize the boarded-up windows and the crowd of

11    protestors that were in front -- I walked toward the building.

12    I was wearing a suit.

13            One protestor asked me what I was doing there.  I said

14    that I was a lawyer for a person who was detained in Broadview,

15    and I believe I received some cheers of support from the

16    protestors.

17            As I walked to the front, I wasn't sure how an

18    individual might access the building, so I approached the front

19    door, and I knocked.

20    Q.    Did the protestors threaten you in any way -- in any way

21    that day?

22    A.    No.  The protestors, again, were quite supportive and

23    saying "good luck" as I tried to do this.  One did mock me and

24    say, "I never thought to knock on the front door."

25            But I felt quite supported by the protestors that were

Herrera - direct

124

1    there.

2    Q.   And what happened when you knocked on the front door?

3    A.   No one answered.  There was also a key pad on the bottom

4    left of the front door.  I tried to hit the pound button and

5    the star button hoping that it might trigger a response, but no

6    one responded to that either.

7    Q.   Did you believe that was an intercom system?

8    A.   That's what I believed to be true, yes.

9    Q.   Did you see any ICE agents or other federal agents at that

10   point?

11   A.   No, there was no one at the front door.  The interior of

12   the building was completely obscured by plywood covering

13   windows.  I had not seen any officials at all to that point.

14          So I waited at the front door for two or three minutes

15   hoping that a camera might capture my image.  Again, I was

16   wearing a suit, hoping that there would be recognition that I

17   was a legal counsel for someone who had been detained there.

18   Q.   Were you ever able to see Mr. Giménez González in custody

19   at Broadview?

20   A.   I never was.  That same day I did hear protestors calling

21   out about people entering a side gate, and as they called out

22   about that, I ran to try to catch them.  I yelled to them that

23   I was an attorney representing someone I believed to be

24   detained there and asked whether they could confirm that my

25   client was in custody.

Herrera - direct

125

1       They acknowledged my presence but didn't say any

2   words.  One turned as if to say something.  The other, as I

3   recall, grabbed his shoulder, turned him back around, and they

4   walked into the building.

5   Q.   So to clarify, when you went to the side gate, this was a

6   second attempt to access Broadview that same day?

7   A.   That's correct.

8   Q.   And the two people you saw, were they federal agents?

9   A.   I believe them to be federal agents.  As I recall, they

10  were wearing uniforms.  There was no identification on said

11  uniforms, and I was only looking at their backs, so I can't be

12  sure.

13       But given their access to the building and that it's a

14  federal immigration detention facility or processing facility,

15  I believe that they were federal agents.

16  Q.   What did you say to them exactly?

17  A.   I said, "Excuse me.  I'm an attorney.  I have a client who

18  I believe is detained in this facility.  Can I please ask you

19  to let me know whether my client is in Broadview?"

20  Q.   And what was their response?

21  A.   Again, acknowledgment of my presence but no response.  As

22  they walked away, one person -- I believe it was the official

23  on the right -- waved the back of his hand at me.

24  Q.   In a wave good-bye?

25  A.   In a dismissive fashion, is the best I can say.

Herrera - direct

126

1    Q.   What did you do after that?

2    A.   Immediately thereafter, I informed the community of

3    supporters that Mr. Gonzalez has that I was not able to access

4    him at Broadview, and we sought to regroup to think through

5    what to do next.

6    Q.   And what did you decide to do?

7    A.   The following day, so September 13th, supporters of

8    Mr. Giménez González, his legal counsel as well as members of

9    Latino Union, elected officials such as Jesus Chuy Gonzalez,

10   Delia Ramirez, members of his clergy, which is an Episcopalian

11   church in the Chicago of Chicago, gathered to hold a press

12   conference in Broadview, again not knowing whether he was

13   detained there but believing so.

14        And the purpose of the press conference was to demand

15   his release or, at minimum, the opportunity to speak with him.

16   Q.   Did the press conference have its desired effect?

17   A.   I can't say whether it was causal, but ultimately, as the

18   press conference was ending around 2:00 p.m., his wife Mari did

19   receive a phone call from Mr. Giménez González and was able to

20   speak with him briefly.

21   Q.   Were you able to speak with him at that time?

22   A.   Only by happenstance.  Through the crowd, an individual

23   helped Mari find me, and Mari passed me the phone.

24        My only questions to Mr. Giménez González were about

25   his well-being, was he okay, had they told him anything.  And

Herrera - direct

127

1    then briefly I told him -- I asked him whether he had signed

2    anything, and he said that he had not.  And I told him not to

3    sign anything.

4    Q.  Was that call confidential, to your knowledge?

5    A.  At the time I could hear a din in the background.  I did

6    not believe it was confidential.

7         Later Mr. Giménez González informed me that he was

8    made to put the call on speaker phone and that an individual

9    officer was listening in to the entire conversation between us.

10   Q.  Was that call a sufficient length for you to provide full

11   legal counsel to your client?

12   A.  I was only able to speak with Mr. Giménez González for

13   about three minutes.  When he told me that he needed to go, I

14   passed the phone back to his wife, because I thought it was

15   very important for her to have contact with him.

16        But, no, I was not able to give sufficient legal

17   advice to Mr. Giménez González with the amount of time I was

18   allotted.

19   Q.  Did you have any further contact with him at Broadview?

20   A.  I did not have any further contact with him at Broadview.

21   Q.  During the time he was at Broadview, how did you feel not

22   being able to communicate with him?

23   A.  I was extremely nervous and concerned, primarily because I

24   had no ability to help him think through decision-making that's

25   critical in the initial moments of detention for an immigrant

Herrera - direct

128

1   client.

2        I was also not able to check in about the conditions

3   of his confinement, whether he was, you know, healthy or not.

4        I was also not able to give him a sense of what the

5   next steps might be in his case nor really get the permission

6   that I typically seek to pursue legal remedies for my clients.

7   Q.   What ended up happening to Mr. Giménez González after he

8   left Broadview?

9   A.   Mr. Giménez González was transferred to North Lake

10  detention facility in Baldwin, Michigan, which is about

11  four-and-a-half hours away from Chicago.

12  Q.   Did you file anything on his behalf?

13  A.   Yes, I filed a petition for habeas corpus in the Northern

14  District of Illinois on, I believe, Saturday evening or the

15  evening of the press conference, intending to keep him in the

16  Seventh Circuit or ideally near Chicago, again based on my

17  concerns about transfer.

18       Ultimately that case went before Judge Blakey in the

19  Northern District of Illinois, but because Mr. Giménez González

20  had been transferred about -- I believe he arrived five hours

21  before the habeas petition was filed -- his case was ultimately

22  transferred to the Western District of Michigan.

23  Q.   Is it fair to say you didn't know he had been transferred

24  when you filed the habeas here in the Northern District?

25  A.   No.   The order of events was, I spoke with him out -- via

Herrera - direct

129

1    the three-minute phone call outside of Broadview.

2           I returned to my office to prep a habeas petition.  I

3    filed it at 1:00 in the morning.  That same morning at 8:00

4    a.m., his wife called me to say that he had been transferred to

5    Michigan.

6    Q.   And did you end up litigating the case there?

7    A.   Ultimately, I did litigate the case in Michigan, not the

8    Western District.  Because ICE would not agree to an immediate

9    custodian being the warden of the North Lake detention

10   facility, which is a private GEO prison, we transferred

11   venue -- or dismissed the case in Western District of Michigan,

12   excuse me, and litigated it in the Eastern District of

13   Michigan.

14   Q.   Fair to say it would have been easier to litigate it in the

15   Northern District of Illinois?

16   A.   Based on subsequent experiences, yes, I would say it would

17   have been much easier.

18   Q.   Would it have been better for his case?

19   A.   I believe so.

20   Q.   Have you had other clients who were detained recently at

21   Broadview?

22   A.   Yes, October 16th, one client, Diego Ijom, I-j-o-m, Matom,

23   M-a-o-t -- M-a-t-o-m, excuse me, was detained at Broadview.

24   Q.   How did you come to represent Mr. Ijom Matom?

25   A.   Mr. Ijom Matom was eligible for a form of deferred action

Herrera - direct

130

1    in 2023.  It is a form of deferred action that my office has

2    significant expertise in, and so we assisted him applying for

3    and receiving that deferred action.

4    Q.   How did you come to find out he had been detained by ICE?

5    A.   Once again, my clients benefit from their strong

6    connections to organizers.  A group, Arise Chicago, has helped

7    Mr. Ijom Matom fight for his rights in various circumstances.

8    And their organizers texted me -- actually, called, I believe,

9    I'm sorry -- called me on October 16th to let me know that he

10   had been detained outside of his workplace.

11   Q.   Did you know at that point where he was located?

12   A.   I did not know where he was located.  I learned three hours

13   later via a phone call from his uncle that he had been detained

14   in Broadview.

15   Q.   Did you search the locators you testified about earlier to

16   try to find him before learning that information from the

17   uncle?

18   A.   Yes.  I again checked the EOIR database because, to my

19   knowledge, based on my prior experiences with him as a client,

20   Mr. Ijom Matom had no interaction with the immigration system.

21   And, again, given his legal status as a recipient of deferred

22   action, I thought it was very doubtful that he'd received a

23   notice to appear.

24        Secondarily, I checked the ICE locator system.  Again,

25   the ICE locator system received no results.

Herrera - direct

131

1          In addition, in this instance, based on learning new

2    approaches to the work via colleagues, I emailed the ICE ERO

3    detained email address as well as an email address for

4    Broadview facility, Broadview INS, I believe.

5    Q.   Did you receive responses to either of those emails?

6    A.   No, I did not.  And in those emails I provided evidence of

7    Mr. Ijom Matom's deferred action as well as my G-28, which had

8    been executed as I was assisting him with his deferred action

9    application.

10   Q.   Once you found out he was detained at Broadview, did you

11   try to contact him there?

12   A.   I did.  The following morning, I was accompanied by an

13   organizer from Arise, sought to enter the facility to speak

14   with him, this time with greater urgency given the fact I'd

15   brought with me evidence of Mr. Ijom Matom's legal status,

16   evidence of my representation of him.

17          This documentation included his approval letter for

18   deferred action, an extension letter for deferred action which

19   extended his deferred action from two years to four, a social

20   security card that he had received, a copy of the work permit,

21   essentially the entire immigration file that my office had in

22   our possession.

23          As I approached again, perhaps foolishly trying to go

24   to the front door, I was intercepted by four or five state

25   troopers.

Herrera - direct

132

1    Q.   Let me walk back one second.

2         Was it your belief that with that paperwork you could

3    show that your client had been wrongfully detained by ICE?

4    A.   That was my goal.  I thought that I could more efficiently

5    resolve his case, given the clarity with -- that his -- that

6    these documents -- that these documents had about the fact that

7    he was wrongfully detained.

8         So my goal was to demonstrate that quickly and ideally

9    have him released the same day as opposed to go through the

10   same experience that I had had with Mr. Giménez González,

11   including transfer and, you know, a long time detained for

12   someone who probably shouldn't have been.

13   Q.   And once you entered the front door with the immigration

14   file and your G-28, what happened?

15   A.   Again, I was intercepted by four or five state troopers who

16   informed me that there were no visitors to Broadview.  I

17   explained that I was an attorney representing a person detained

18   at Broadview and that I, at minimum, wanted to pass along

19   papers to functionaries there who might consider them and

20   whether it was appropriate to continue detaining Mr. Ijom

21   Matom.

22        Those individuals sent me around to a side door, which

23   is -- which was one-and-a-half blocks away maybe.  Again, the

24   folks I was accompanied by -- at this point, it was one

25   organizer, two members of clergy, and a member of the National

Herrera - direct

133

1    Lawyers Guild -- jumped over a barrier, walked through grass,

2    and arrived at a sort of back alley street where we, again, met

3    more state troopers asking what we were hoping to accomplish or

4    do.

5    Q.   So once you arrived at the second location on what you

6    called the back alley street, you spoke to the state troopers,

7    you said?

8    A.   Yes.  I spoke to one state trooper who was standing,

9    explained the situation, that I was an attorney representing an

10   individual who I believed to be wrongly detained in Broadview.

11          He passed me along to a state trooper sitting in a

12   state police vehicle.  I gave that individual Mr. Ijom Matom's

13   "A" number, his date of birth, his country of origin, and the

14   spelling of his name.  And that state trooper rolled up the

15   window, and I waited for probably five minutes there.

16   Q.   And then what happened?

17   A.   The state trooper rolled down the window, instructed the

18   state trooper who was standing outside of the vehicle to escort

19   me through a parking lot to a back area of the building -- I

20   believe it's the rear of Broadview -- which was enclosed by a

21   chain link fence and where there was a gate where vehicles

22   could enter and exit Broadview.

23   Q.   Did you talk to anyone at that fence?

24   A.   Yes, there was an individual.  I do not know what agency he

25   was from.  I believe he was a federal official, perhaps with

Herrera - direct

134

1    ICE or Customs and Border Protection.

2            However, as I approached that individual, he covered

3    his face with a neckie, and then he also had no visible

4    identification on his vest.  And that individual asked me what

5    I was hoping to do.

6    Q.  And what did you respond to that individual?

7    A.  I said I had three goals, one of which was to figure out

8    whether my client was detained at Broadview.

9            The second was to talk to my client to make sure that

10   he understood his legal rights.

11           And the third was to pass along paperwork showing that

12   he had lawful status in the United States or at least deferred

13   action and that his detention was inappropriate or incorrect.

14   Q.  And what was the agent's response?

15   A.  The agent took a copy which I had of Mr. Ijom Matom's work

16   permit as well as the letter showing approval for deferred

17   action and that that approval expired in 2027, walked away with

18   a walkie-talkie, and I was left standing, I think, for around

19   10 minutes.

20   Q.  And did he come back at some point?

21   A.  He did come back.

22   Q.  Did he say anything to you?

23   A.  Yes.  He said -- I'm paraphrasing, but I recall that this

24   was the gist -- that because of all the craziness, no one is

25   getting in or out of Broadview today.

Herrera - direct

135

1    Q.   And what did you take that to mean?

2    A.   I took it to mean that I could not visit Mr. Ijom Matom and

3    that I could not secure his release that day.

4    Q.   Did he provide you any information about your client when

5    he spoke to you that last time?

6    A.   I followed up with a question of whether he could confirm

7    or deny that Mr. Ijom Matom was detained.  He told me that he

8    could, that he was there.

9         I asked him again, because of concern about transfer

10   given my experience with Mr. Giménez González, whether it was

11   likely that he would be transferred during the weekend.  He

12   again used the word "crazy" to say, "It's too crazy.  I don't

13   think anybody's moving this weekend."

14        And then I asked if there was a way to monitor

15   Mr. Ijom Matom's whereabouts, at which point he showed me a

16   piece of paper with a URL.  I took a picture of that, believing

17   it to be something more accurate or updated than the ICE

18   detainee locator, but when I checked that later, nothing came

19   up.  There was -- and let me walk back if you don't mind.

20   Q.   Of course.

21   A.   I -- when he gave me that link, he said, "This will show

22   that he's here."

23        And so when I checked it later, there was still no

24   results for Mr. Ijom Matom's whereabouts.

25   Q.   So when you checked it later, it did not, in fact, show he

Herrera - direct

136

1    was at Broadview?

2    A.   That's correct.

3    Q.   Even though he was at Broadview by the federal agent's

4    admission?

5    A.   Yes.

6    Q.   And you were never permitted to provide legal documents to

7    anyone at Broadview showing your client had deferred action?

8    A.   No.   That was one of the final questions I asked the

9    functionary who was at the front of that gate.

10        I said, "I have several copies of immigration

11   documents which I believe show that my client should not be

12   detained here.   Is it possible for you to pass those on?"

13   Q.   And his response was?

14   A.   "No, I can't pass these on."

15        I asked him if there was any way for me to get these

16   documents to someone.

17   Q.   And what was his response?

18   A.   His response was -- he asked me whether I had the phone

19   number to Broadview.   I said that I did not.

20        And at that point he pulled out his cell phone, I

21   believe looking for the phone number to Broadview, told me he

22   also didn't have the number to Broadview.

23        And so at that point I did not have very many options

24   left.

25   Q.   Did you ever get to get to talk to your client while he was

Herrera - direct

137

1    in Broadview?

2    A.   I did not speak to my client while he was in Broadview.

3    Q.   During the time he was at Broadview, were you concerned

4    about not being able to speak to him?

5    A.   Extremely concerned about not being able to speak to him,

6    primarily because I did not know what proof of his immigration

7    status he had or what he'd been able to communicate to the

8    people at Broadview.

9    Q.   Were you worried that the lack of communication would

10   negatively impact his legal case?

11   A.   I was terrified that that might be the case because I had

12   heard -- and, you know, I've had experience as an immigration

13   attorney with pressure to sign legal documents while

14   individuals are in detention.

15   Q.   Did the lack of communication, in fact, negatively impact

16   his legal case?

17   A.   In my opinion, it did.  I was told after Mr. Ijom Matom was

18   transferred to Clay County in Indiana that he had signed a

19   voluntary departure form.  And that I learned later was based

20   on conversations that he had with -- with -- with the -- the

21   functionaries at Broadview.

22          I will say that when I filed a habeas petition also

23   now on Mr. Ijom Matom's behalf in the Northern District of

24   Illinois, one response from the government was Mr. Ijom Matom

25   had signed papers requesting voluntary departure.

Herrera - direct

138

1    Q.   So, in other words, they used it against him in his legal

2    proceedings?

3    A.   That's correct.

4    Q.   And had you been able to contact him in Broadview when you

5    went there that day, would your counsel -- what would your

6    counsel have been to him?

7    A.   Again, I would refer back to my testimony regarding Willian

8    Giménez González.  My first priority in speaking to him, if

9    only for three minutes, was asking him whether he had signed

10   anything and encouraging him not to to avoid this very

11   circumstance.

12            So the happenstance that I had in speaking with

13   Mr. Giménez González helped me avoid this possibility.

14            In the case of Mr. Ijom Matom, because I was able to

15   have no phone conversations with him, I was not able to counsel

16   him not to sign documents.  And I believe that's why he ended

17   up in the situation he was in.

18   Q.   And you have clients who are in other detention facilities

19   across the country?

20   A.   I do not have clients at this moment in other detention

21   facilities, but I have represented immigrant clients for about

22   a decade, and so I have previously had immigration -- or

23   clients in other immigration facilities.

24   Q.   As an attorney is your experience attempting to access your

25   clients at Broadview that past two months different from your

Herrera -

139

1   experience attempting to access your clients at other detention

2   facilities?

3   A.   It is significantly different.   At Broadview I have -- it

4   has been virtually impossible to contact any individual who is

5   detained at that facility during the course of their detention

6   there.

7        I generally receive no conversations with those

8   individuals until they are transferred to another state,

9   sometimes many miles away.

10       Even in detention facilities that were extremely high

11  security, for example, in Texas, in Georgia, in New York, and

12  in New Jersey, I had typically been able to schedule

13  immigration counseling appointments that were secure and

14  confidential within one to two days of my efforts to do so.

15       MS. VAN BRUNT:   That's all I have.   Thank you.

16       THE COURT:   Thank you.

17       MS. BRADY:   No questions from the government.

18       THE COURT:   I have a question.

19       In your declaration, which is document 24, on

20  paragraph 13, you stated that in the second call with

21  Mr. Giménez González, he informed you that a guard was

22  observing his call and instructed him to get off the phone when

23  he learned that he was speaking to his attorney.

24       THE WITNESS:   That's correct.

25       THE COURT:   When you testified earlier today, you told

Herrera -

1    me that he said to you that he had to get off the phone and

2    pass it to his wife, but you didn't mention anything about an

3    instruction from an officer that he should get off the phone

4    when he learned that he was speaking to you.

5            THE WITNESS:  Yes, I believe I offered more detail in

6    my testimony than in my declaration.

7            When he told me that the individual officer had told

8    him he needed to get off the phone, my hope was for him to

9    speak to his wife before the phone call was cut off.

10           THE COURT:  All right.  So you're not changing

11   anything in your declaration then.  You're just saying that

12   when he told him that -- you say when he learned that

13   Mr. Giménez González was speaking to his attorney, that implies

14   that he wouldn't allow him to talk to a lawyer.

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  Was that your impression?

17           THE WITNESS:  That was my impression.

18           THE COURT:  All right.  Thank you.  That's all I have.

19           Anything else based on what I asked him?

20           MS. VAN BRUNT:  Your Honor, at this point, I think

21   we'll waive --

22           THE COURT:  Wait.  Are you through with this witness?

23           MS. VAN BRUNT:  Oh, I am through with the witness.

24   I'm sorry.

25           THE COURT:  It sounds like *My Cousin Vinny*.  "I'm done

Herrera -

141

1    with this guy."

2      (Laughter.)

3             MR. VAN BRUNT:  I'm done with this guy.

4             THE COURT:  All right.  You're excused.  Thank you.

5             MS. VAN BRUNT:  You're excused.  Thank you.

6      (Witness excused.)

7             THE COURT:  Do we have any other witnesses?

8             MS. VAN BRUNT:  Your Honor, we do have two other

9    detainee witnesses, but we also recognize we're short on time,

10   given your trial, so --

11            THE COURT:  We can stay here until 5:45 today.

12            MS. VAN BRUNT:  Okay.  Could I confer for one second

13   with plaintiffs' counsel, please?

14            THE COURT:  Sure.  While you're doing that, let me ask

15   the government.  Do you have any witnesses here today?

16            MS. BRADY:  We weren't able to arrange for any

17   witnesses today, no, Your Honor.

18            THE COURT:  Okay.

19            MS. VAN BRUNT:  Okay.  Your Honor, we are going to put

20   on Mr. Ochoa Ochoa.  Just one second, please.

21     (Brief pause.)

22            THE CLERK:  Can you please raise your right hand?  Do

23   you swear or affirm that the testimony you're about to give in

24   this matter will be the truth, the whole truth, and nothing but

25   the truth?

Ochoa Ochoa - direct

142

1          THE WITNESS:  (Through interpreter.)  Yes.

2          THE CLERK:  Let me get you a microphone.

3          MR. COLE:  One moment, please.

4          THE CLERK:  Please raise your right hand.

5          Do you swear or affirm that the testimony you are

6   about to give in this matter before the Court will be the

7   truth, the whole truth, and nothing but the truth?

8          THE WITNESS:  (Through interpreter.)  Yes.

9     (Witness duly sworn.)

10          MR. COLE:  Sam Cole for the plaintiffs.

11                  SAMUEL OCHOA OCHOA,

12              PLAINTIFFS' WITNESS, DULY SWORN

13                  DIRECT EXAMINATION

14  BY MR. COLE:

15  Q.  Please state your name.

16  A.  Samuel Ochoa Ochoa.

17  Q.  I see you're using an interpreter today.  Is Spanish your

18  best language?

19  A.  Yes.

20  Q.  Mr. Ochoa, where were you born?

21  A.  In Venezuela.

22  Q.  And when did you come to the United States?

23  A.  In 2023.

24  Q.  And where did you settle when you came here?

25  A.  I've here in Chicago.

Ochoa Ochoa - direct

143

1  Q.  You have family in the Chicago area?

2  A.  Yes.

3  Q.  So you actually were in the Broadview detention center on

4  two different times; is that correct?

5  A.  Yes.

6  Q.  And when was the first time?

7  A.  First time was June 12th.

8  Q.  And when was the second time?

9  A.  From the 8th to the 9th of October.

10  Q.  Is it September or is it October?

11  A.  September.  I'm sorry.

12  Q.  And you were actually detained by immigration the entire

13  time between the June and September; is that correct?

14  A.  Correct.

15  Q.  But you actually made essentially an around-the-country

16  trip and ended up back in Broadview; is that fair to say?

17  A.  Correct.

18  Q.  I want to talk to you about your experience at the

19  Broadview Detention Center in September of 2025.

20  A.  Okay.

21  Q.  How many nights were you there?

22  A.  First time it was two days and the second occasion, 24

23  hours.

24  Q.  So in September you were there for one night; is that fair

25  to say?

Ochoa Ochoa - direct

144

1   A.   Correct.

2   Q.   Now, when you arrived at the Broadview Detention Center in

3   September, were you asked -- did you ask to make a phone call

4   with an attorney?

5   A.   Yes.

6   Q.   Can you please tell the Judge what happened -- what the

7   response was when you asked that?

8   A.   The ICE agents denied me to have a phone call with my

9   lawyer and asked me to use the public phone.

10  Q.   And when -- can you describe for the Court what the public

11  phone was that you had available to you?

12  A.   These were inside the cell.  One -- there were two phones.

13  One was damaged.  The other one did work, and they would give

14  you a 20-second phone call.

15  Q.   And did you have any opportunity to make a phone call that

16  no one else could hear that was in private?

17  A.   No, it was public.  It was not confidential.

18  Q.   Who was able to hear any phone call you'd make?

19  A.   The ICE agents who were in the area and the detained

20  people.

21  Q.   So I want to talk about the number of people who were

22  detained with you in that holding room.

23        How many people were in that room with you?

24  A.   About 40 or 50 people.

25  Q.   And what kind of furniture was in that room?

Ochoa Ochoa - direct

145

1   A.   The furniture was plastic colored.

2   Q.   And were you able to get a seat?

3   A.   Yes.

4   Q.   Was everyone able to get a seat?

5   A.   No.  Some were on the floor.  Some were on the seats.

6   Q.   And if you -- were you able to get up from your seat at any

7   time?

8   A.   When I went to the bathroom, I would have the risk of

9   losing my seat, and that's how we would be rotating.

10  Q.   I want to talk to you about sleeping that night in

11  Broadview.  Where did you sleep?

12  A.   I slept sitting on the chair.  You could say half sleep,

13  because it was impossible to sleep.

14  Q.   Why not?

15  A.   Because it was too cold.  The light was intense, and it was

16  just impossible to sleep sitting down.

17  Q.   Let's talk about the temperature.

18            What was the temperature of the room like?

19  A.   It really was very cold.

20  Q.   Well, did you have a blanket?

21  A.   No.

22  Q.   What about one of these little foil sheets?  Were you given

23  a foil sheet?

24  A.   Only some people had those, not everybody.

25  Q.   Well, if someone had testified, sir, that everyone is given

Ochoa Ochoa - direct

146

1    a blanket, would that be a true statement?

2    A.   I'm not understanding very well.

3    Q.   If someone had told you that everyone was given a blanket,

4    is that true?

5    A.   Well, it wasn't like that.  They weren't giving out

6    blankets.  They were just recycling the ones that were already

7    inside the cell.  They weren't issuing you a blanket when you

8    got there.

9    Q.   And many people didn't have one; is that correct?

10   A.   Many people did not have one, and they would be cold.

11   Q.   And you said you were trying to sleep on a seat, right?

12   A.   Yes.

13   Q.   So what about the people that weren't lucky enough to have

14   a seat, where did they sleep?

15   A.   On the floor, cold.

16   Q.   What kind of floor was that?

17   A.   It was concrete floor, flat.

18   Q.   Was there carpet or anything on top of the floor?

19   A.   No.

20   Q.   Were the people who were sleeping on the floor given a

21   blanket to sleep on or a mattress or any sort of pad?

22   A.   No.

23   Q.   I want to talk to you about the food you were given when

24   you were in Broadview that second time.

25   A.   Okay.

Ochoa Ochoa - direct

147

1    Q.   How many meals were you given?

2    A.   Three meals a day.

3    Q.   And what -- can you describe for the Court what the meals

4    were?

5    A.   Breakfast was this bread from Subway with lettuce and ham

6    and water.

7              Then for lunch, the same thing, a bottle of water,

8    bread from Subway with lettuce and ham.

9              And then for dinner, it was the same thing, a bottle

10   of water, piece of bread with lettuce and ham.

11   Q.   So if someone said that you were given one hot meal a day,

12   would that be a true statement?

13   A.   No, it isn't.  It is not true.

14   Q.   Now, did you notice the type of clothes that people --

15   other people were wearing that you were detained with?

16   A.   Yes, of course.

17   Q.   Now, were they clothes that were given to them by the jail

18   or were they clothes they were wearing when they were detained?

19   A.   These were the clothing that they had when they were

20   arrested by the agents.

21   Q.   And what type of clothes were they?

22   A.   Some had work clothes on.  Some had sport clothes on.  They

23   just had all different kinds.

24   Q.   And were people who were there longer given changes of

25   clothes and changes of underwear?

Ochoa Ochoa - direct

148

1    A.   No.

2              MS. BRADY:  Foundation.

3              THE COURT:  Excuse me.  What he observed.

4              MS. BRADY:  What?

5              THE COURT:  It's what he observed.  That's all.

6    BY MR. COLE:

7    Q.   I think you -- let me talk to you about how that room

8    smelled.  Like, can you describe for the Court the smell of the

9    room of the people you were detained with?

10   A.   The 24 hours that I was there, I didn't see them do any

11   kind of maintenance or cleaning.  The bathrooms were dirty, and

12   they did smell a bit bad, not hygienic.

13   Q.   You mentioned a little about the lighting at night.  Can

14   you talk about that a little bit more?

15              When you tried to sleep at night, what was the

16   lighting?

17   A.   The lights were always on to the max.

18   Q.   Did you -- did people try to cover their eyes to sleep?

19   A.   Some people would cover their eyes.  They would, you know,

20   cover themselves with a shirt or something to -- in order to

21   stop the light from going on their eyes.

22   Q.   I want to talk to you about the bathroom facilities there.

23              Can you describe for the Court what the toilets were

24   like?

25   A.   Well, I was only in two cells.  One had a shower; one did

Ochoa Ochoa - direct

149

1    not.  But the shower didn't work; it wasn't activated.  And the

2    bathrooms were dirty.

3            It's not just one person using the bathrooms.  There's

4    many people using them.

5    Q.  Well, what kind of -- what kind of privacy did you have to

6    use the toilet?

7    A.  There is no privacy.  It's in the same cell.  They're just

8    divided up with this half barrier.

9    Q.  And during the time that you were there, did you ever see

10   someone clean the toilets?

11   A.  No.

12   Q.  Anyone ever give you soap that you could use to wash your

13   hands?

14   A.  No.

15   Q.  Did you see anyone else with soap?

16   A.  I did see -- I did see, but in my case, I was never issued

17   any soap.  And the people that had been there longer, they did

18   have a little bars -- bar of soap.

19   Q.  Now, you talked about water with your -- with your food.

20           Can you describe the amount of water that you had with

21   each meal?

22   A.  It was just one bottle with every meal.  And if you would

23   run out of water, then you would have to refill it at the

24   bathroom sink.

25   Q.  And did you actually do that, use the bathroom sink to

Ochoa Ochoa - direct

150

1    refill your water?

2    A.   Yes.

3    Q.   And how did that water taste?

4    A.   The taste of iron, rust.

5    Q.   And did you drink it anyway?

6    A.   Yes, I was already coming from prisons where you do the

7    same.  You drink that kind of water.

8    Q.   Now, when you were at Broadview, do you receive any health

9    care?

10   A.   No.  And actually, I came from Texas, and I was ill, and I

11   did have a medical prescription.  I had medication I had to

12   take every eight hours, but they only gave it to me the first

13   time and never again.

14   Q.   When you say you were ill, can you explain what that means?

15   A.   I possibly had COVID.  I had a sore throat, and I had

16   fever.  But then when I was in Texas and I was going to be seen

17   the next day, they took me away from there in the early morning

18   hours, so I was not seen.

19   Q.   When you -- you said you had medicine with you when you

20   arrived at Broadview?

21   A.   Yes, medication and my personal belongings.

22   Q.   And how many times a day were you supposed to take that

23   medication?

24   A.   Every eight hours for six days, five days.

25   Q.   During the day that you were there, how many times did you

Ochoa Ochoa - direct

151

1   take it?

2   A.   Only one time when I got there.

3   Q.   Why didn't you take it additional times?

4   A.   Because I was telling the ICE agents, but they were just

5   not paying attention to me because, you know, the place was so

6   packed.

7   Q.   Now, did you see anyone else who was sick when you were at

8   Broadview?

9   A.   Yes, I did see a girl who was pregnant.  She was crying,

10  tears coming out of her eyes, who was asking for her

11  medication.

12  Q.   Can you describe for the Court what you heard?

13  A.   Well, they were asking her what kind of medication was it,

14  if she had a prescription.

15          And she was saying, yes, that it was -- she did have a

16  prescription and that it was in her belongings.

17  Q.   And do you know whether she was able to get her medication

18  or not?

19  A.   No, wasn't able --

20  Q.   You don't know or she wasn't able to get it?

21  A.   And then they put me back in my cell, and I wasn't able to

22  see anything else.

23          MR. COLE:  May I have a moment, Your Honor?

24     (Counsel conferring.)

25          MR. COLE:  I have no other questions.

Ochoa Ochoa - cross

152

CROSS-EXAMINATION

BY MS. BRADY:

Q.   Good afternoon.  My name is Jana Brady, and I'm an
Assistant United States Attorney, and I represent the
government in this matter.

        To clarify, you were only at the Broadview facility
for less than 24 hours in early September; is that accurate?

A.   Correct.

Q.   You're no longer detained there, correct?

A.   Correct.

Q.   Is it also correct that you do not have any personal
knowledge as to how the facility is currently treating the
detainees there?

A.   Correct.  But in the cell when people would come in, they
were telling me their stories and what had happened at the --
at that place.

Q.   But that wouldn't have been since September 9th of 2025,
correct?

A.   Correct.

Q.   What medication are you testifying that you should have
been taking while you're at Broadview?

A.   Amoxicillin and acetaminophen.

Q.   I'm sorry.  I'm not sure what that medication is.

        Do you have any other name for it?

A.   It's Ibuprofen for the soreness of the throat and then for

Ochoa Ochoa - cross

1    an infection.

2    Q.   Okay.  Amoxicillin, is that what you're trying to say?

3    A.   Amoxicillin and Ibuprofen.

4    Q.   Okay.  And you recovered from whatever illness that you had

5    at that time; is that correct?

6    A.   I did and recovering when I arrived to the detention center

7    in Indiana.

8    Q.   In terms of the girl that you described that was pregnant

9    and wanted her medication, I'm just going to refer you back to

10   that.  Do you recall that line of testimony?

11   A.   Well, I was outside.  I was asking for my medication, and

12   then she took advantage of that moment, and then she started to

13   ask for medication, too.

14   Q.   So is it fair, then, that you don't actually know if the

15   girl ever received her medication?

16   A.   Well, there was a window there you can see through, but you

17   cannot hear.

18   Q.   But you would have only been able to observe that window

19   for the less than 24 hours that you were present at the

20   facility; isn't that correct?

21   A.   Correct.

22   Q.   Okay.  So you don't know if the girl received her

23   medication after you left the facility; is that right?

24   A.   Correct.

25        MS. BRADY:  Thank you so much.

Ochoa Ochoa - redirect

154

1          MR. COLE:  Just briefly on redirect, Your Honor.

2          THE COURT:  Okay.

3                    REDIRECT EXAMINATION

4    BY MR. COLE:

5    Q.  Sir, you were asked some questions on cross-examination

6    about your sickness when you were at Broadview in September.

7          Do you remember those questions?

8    A.  They didn't ask me any questions.  I was the one that told

9    them that I was ill and that I have some medication they

10   prescribed in Texas.

11   Q.  Were you concerned that you had COVID?

12   A.  Yes.  I also asked for a COVID test, but it was not given

13   to me.

14         MR. COLE:  That's all, Your Honor.  Thank you.

15         May the witness be excused?

16         THE COURT:  I have a question.

17         When you were in the cells on either occasion, did you

18   see any wall-mounted water fountains?

19         THE WITNESS:  No.  All of us were drinking water from

20   the shower or from the sink.

21         THE COURT:  From the shower?  I thought you said the

22   shower wasn't working.

23         THE WITNESS:  From the shower or from the sink where

24   you washed your hands.  It's because you said in any of the

25   detention centers.

Ochoa Ochoa -

155

1           THE COURT:  No.  I meant the two in Broadview.

2           THE WITNESS:  Oh, in those two cells, from the -- from

3    the faucet in the sink.

4           THE COURT:  Okay.

5           THE WITNESS:  There was no water -- drinkable water

6    dispenser.

7           THE COURT:  All right.  That's all I have.

8           Anything based on that?

9           MR. COLE:  No, Your Honor.

10          MS. BRADY:  No, nothing further.

11          THE COURT:  All right.  You're excused.  Thank you.

12       (Witness excused.)

13          MR. COLE:  Your Honor, we have one additional witness,

14   unless you want to take a break first.

15          THE COURT:  Yes.  Why don't we take a short break,

16   about 10 minutes.

17       (Recess from 3:03 p.m. until 3:11 p.m.)

18          THE COURT:  Folks, I just want to tell you at 4:15

19   today, we have a very brief habeas proceeding.  So we will

20   break just for that and then return to this.

21          MS. GARCIA:  Very good, Your Honor.  We have one issue

22   to raise before we go to the next witness.

23          Your Honor, as you recall, your order from last Friday

24   directed defendants to return our clients to the Northern

25   District and keep them in the Northern District.

1          We've learned from defense counsel that our clients

2    may be moved to outside of the district, including to

3    facilities in Wisconsin or Indiana.

4          During this whole time that you've had this order, I

5    just wanted to raise to your attention, every time our client

6    is moved -- been moved, whether it's from Broadview to

7    Wisconsin to back, it has limited our ability to have contact

8    with our clients.  We've never had an in-person visit with our

9    clients.  And we would ask that you direct that our clients

10   remain at the district and at the MCC.

11         THE COURT:  Counsel, any problem that, because I was

12   doing to do that anyway?

13         MR. JOHNSON:  Your Honor, whatever the Court obviously

14   wants to order us to do.  I was told that the MCC was not an

15   option.  I don't have a great explanation for you as to why and

16   that they were otherwise, short of a court order, going to be

17   moved today.

18         THE COURT:  Well, it won't be short of a court order.

19         MR. JOHNSON:  I understand.

20         THE COURT:  And also while on that subject, we have --

21   we're in the middle of a government shutdown, as you know.  A

22   lot of you are working without being paid, and you have the

23   gratitude, I think, of the entire nation for that, all of you

24   government folks, including my own staff.  And our marshal

25   service has been taxed greatly, as you know as well, I'm sure,

1    even from where you are.

2           I would request the plaintiffs -- if they would agree

3    to allow the plaintiffs -- plaintiffs' counsel to agree to

4    allow the plaintiffs to appear remotely from the MCC tomorrow,

5    which we do all the time.  In other words, they can appear by

6    video.

7           MR. COLE:  What was the Court's anticipation --

8    anticipation of tomorrow's schedule?

9           THE COURT:  Okay.  Tomorrow's schedule is going to be,

10   I'd like you -- as you know I'm trying a jury case.  I'm going

11   to let them go a little early, and I think if we could

12   reconvene tomorrow -- because I've got a lot to think about

13   here, and I don't want to do anything precipitously, and we'll

14   be discussing some of those things this afternoon -- but I

15   would like you to come back tomorrow around 4:15 or something

16   like that, and I will be prepared to discuss what relief, if

17   any, I am prepared to order tomorrow.  So that's my thinking

18   right now.

19          MR. JOHNSON:  Sure.

20          THE COURT:  It's obviously interrupting the jury trial

21   to some degree, but I normally knock off at 4:30 anyway.  So

22   we'll knock off at 4:00 and reconvene around 4:15 tomorrow.

23          MR. JOHNSON:  That's fine with us, Your Honor.

24          THE COURT:  Okay.  So we will include in the order

25   today, Claire, that the plaintiffs in this case are to be kept

Maldonado - direct

158

1    at the MCC until further order of Court and will appear

2    virtually.

3              MR. COLE:  No objection, Your Honor.

4              THE COURT:  Okay.  Great.

5              MR. JOHNSON:  Thank you, Your Honor.

6              THE COURT:  Thank you.

7              Your next witness.

8              MR. COLE:  Your Honor, the plaintiffs call Ruben

9    Torres Maldonado.

10             THE CLERK:  Sir, please stand and raise your right

11   hand.

12             Do you swear or affirm that the testimony you are

13   about to give in this matter before the Court will be the

14   truth, the whole truth, and nothing but the truth?

15             THE WITNESS:  Yes.

16             THE CLERK:  Thank you.

17     (Witness duly sworn.)

18             MR. COLE:  You may be seated.

19       RUBEN TORRES MALDONADO, PLAINTIFFS' WITNESS, DULY SWORN,

20                         DIRECT EXAMINATION

21   BY MR. COLE:

22   Q.  Please state your name and spell it.

23   A.  Ruben Torres Maldonado, R-u-b-e-n, T-o-r-r-e-s,

24   M-a-l-d-o-n-a-d-o.

25   Q.  Now, you're here in court today with your daughter who is

Maldonado - direct

159

1    the back; is that correct?

2    A.   Correct.

3    Q.   And you were just in the newspaper recently after getting

4    released on an immigration court bond; is that right?

5    A.   Correct.

6    Q.   Thank you for coming to court for today.

7         Can you tell the Court where were you born, please?

8    A.   I was born in Minatitlán, Veracruz, Mexico.

9    Q.   And when did you come to the United States?

10   A.   March of 2003.

11   Q.   How old were you, approximately?

12   A.   18.

13   Q.   And you have quite a few family members in the United

14   States; is that right?

15   A.   Yes.

16   Q.   Tell the Court about your immediate family.

17   A.   Well, I have my brother and two children, my nephews and

18   nieces -- three children, I'm sorry.  Juan Garcia, Jorge Luis

19   Garcia, and Brenda.

20        I have my sister, Delia Perez, and I have three

21   nieces, Judy Perez and Helica Perez, and I forgot the next one.

22   Q.   I don't mean to make it a test.  I'm sorry.

23        THE COURT:  Did he say he was 18 years old?

24        MR. COLE:  He came to the United States in 2003 when

25   he was 18 years old.

Maldonado - direct

160

```
 1              THE COURT:  Oh, when he was 18 years old.

 2              MR. COLE:  Yes.

 3              THE WITNESS:  Correct.

 4    BY MR. COLE:

 5    Q.   And you have -- how many children do you have?

 6    A.   Two.

 7    Q.   And one of them is in the court today.

 8              How old is -- how old is your daughter?

 9    A.   16.

10    Q.   And you have another child as well; is that correct?

11    A.   Correct.

12    Q.   How old is he?

13    A.   Four.

14    Q.   And you have a partner as well?

15    A.   Yes.

16    Q.   And how long have you been together with your partner?

17    A.   20 years.

18    Q.   Okay.  Can you tell the Court about the type of work that

19    you do?

20    A.   I work for a painting company, and I also work on my own

21    doing remodeling.

22    Q.   And how long have you worked for that same painting

23    company?

24    A.   20 years.

25    Q.   Now, I want to just briefly discuss how you were detained
```

Maldonado - direct

161

1    and ended up Broadview.

2            Can you just describe for the Court what happened?

3    A.  Of course.  I went to Home Depot, like, at 2:00 p.m.  I had

4    already been there, like, at 12:00.  I went back to pick up

5    some material that I had forgotten.

6            So I went up on my truck, and I turned it on, and I

7    put it on reverse, and then two persons came up.

8    Q.  And you were detained at that time?

9    A.  Yes.

10   Q.  Okay.  And what day was that?

11   A.  Saturday.

12   Q.  And was it October 18th?

13   A.  Correct.

14   Q.  And where were you taken once you were detained?

15   A.  They took me to the Broadview Detention Center.

16   Q.  And how many nights were you there?

17   A.  Five.

18   Q.  And when you first arrived at Broadview, can you describe

19   for the Court what happened?

20   A.  Well, they took me out, handcuffed.  They put me in these

21   offices, and I got there, and there was, like, a supervisor.

22           And he asked me, like, if I was okay because my

23   T-shirt was like ripped, and my neck was, like, scratched.

24   Q.  And did you ever receive any medical care for the scratches

25   on your neck?

Maldonado - direct

162

A.   No.

Q.   Now, were you offered the opportunity to make phone calls
when you arrived at Broadview?

A.   No.

Q.   And at some point were you able to call your partner?

A.   Yes, from some of the phones that were on the inside that I
was told worked.

Q.   And describe that phone call for the Court, please.

A.   Well, some of the ones that the people there that had
already used the phone explained to me how to do it, to make a
phone call.

Q.   Was it -- was it self-explanatory?  Were the directions on
the wall that you could understand?

A.   No.

Q.   Well, did anyone provide you with any information on how to
make that phone call other than the other people who were
detained there?

A.   No.

Q.   So what happened when you called your wife?

A.   Well, I just told her that ICE had detained me and that my
truck had been left at The Home Depot parking lot.

Q.   Now, were you ever -- did you ever speak with an attorney
when you were detained?

A.   Not directly.  It was a coincidence.  It was the second
time when I called my wife, the lawyer was there, and then we

Maldonado - direct

163

1    connected with three phone lines.

2    Q.   And when you -- at that point you were actually able to

3    speak with your lawyer through that three-way phone call?

4    A.   Yes.

5    Q.   Was it a private phone call or were there other people

6    around?

7    A.   No, there were more people around us.

8    Q.   Well, who was around you?

9    A.   A lot of people that were detained.

10   Q.   Now, when you arrived at Broadview, were you given a list

11   of attorney names, sometimes called a pro bono list of

12   attorneys?

13   A.   No.

14   Q.   How many times were you able to speak with your attorney?

15   A.   Only that time.

16   Q.   Okay.  Now, I want to talk about how many other people were

17   detained with you in that holding room.

18          How many rooms -- first of all, how many rooms in

19   total were you -- were you detained in during your time there?

20   A.   Well, there were three rooms.

21   Q.   And -- sorry.

22   A.   And one specially for women.

23   Q.   How many people were detained with you at Broadview in the

24   same room?

25   A.   In the first room that was smaller, when I was detained,

Maldonado - direct

164

1   there were like 40 people.

2   Q.  And approximately how long were you in that one room?

3   A.  About six hours.

4   Q.  And then what about the next room that you were detained

5   in?  How many people were with you in that room?

6   A.  More than 100.

7   Q.  And how long did you stay in that room?

8   A.  In that room, I was, like, two days until -- two days.

9   Q.  And then did you go to another room?

10  A.  Yes, they would move us from one room to another.

11  Q.  And how many people were in that third room?

12  A.  Well, the thing is that in one room there were, like, 80,

13  and then in the other there were, like, 100.  So wherever they

14  would put us, there were a lot of us.

15  Q.  Okay.  Now, did you ever sleep in one of these overcrowded

16  rooms?

17  A.  Yes.

18  Q.  Where did you sleep?

19  A.  For some days I slept on, like, these sofas that they have

20  and then the other days on the floor.

21  Q.  Can you describe the sofas?

22  A.  It's like only -- like this plastic chair.

23  Q.  And is there a back to the chair?  Is there a back to it?

24  A.  Yes, like halfway, like this side (indicating) to the

25  shoulder.

Maldonado - direct

1   Q.  Could you lie down on the chair?

2   A.  No.

3   Q.  Why not?

4   A.  Because it's only a small space where you can sit down, a

5   small space.

6   Q.  Now, you said sometimes you slept on the floor.  How many

7   nights was that?

8   A.  It was, like, three nights.

9   Q.  What kind of floor was it?

10   A.  Concrete.

11   Q.  And was there anything over the concrete, like a carpet or

12   a mattress or a pad, anything?

13   A.  No, nothing.

14   Q.  Did they give you a pillow?

15   A.  No.

16   Q.  Was there anything that you could use as a pillow?

17   A.  We were using -- we would take the bottles of water and

18   fill them up with water and then put them back here

19   (indicating) so your head wouldn't be touching the concrete

20   floor.

21   Q.  How big were these bottles of water?

22   A.  The regular ones.  It's like the one there in front.

23   Q.  And what about a blanket, were you given a blanket to use?

24   A.  No.

25   Q.  Some people have talked about foil blankets.  Did you see

Maldonado - direct

166

1  anyone with a foil blanket there?

2  A.   Not the time that I was there -- not for the time that I

3  was there.

4  Q.   So if someone said that all detainees are issued foil

5  blankets, that would be false; is that correct?

6  A.   Correct.

7  Q.   Now, describe how crowded the floor was with people

8  sleeping on it.  Describe that for the Judge.

9  A.   It was full.  At night you couldn't walk.  You had to be

10  careful, like, if you had to use the bathroom, so you wouldn't

11  step on somebody's hand.

12  Q.   Now, I want to talk to you about the toilets.

13        How many toilets did you have access to?

14  A.   So in one of the rooms, they only had one small toilet.

15  And then in the other one, they had a toilet, and then they

16  had -- they had some, like, these bathtubs made out of metal.

17  They had two toilets and some bathtubs made out of metal, and

18  then in another one they only had one bathroom.

19  Q.   Okay.  And would you describe the toilet facilities as

20  clean?

21  A.   No.

22  Q.   How would you describe them?

23  A.   Very dirty with paper thrown about, toilet paper.

24  Q.   Now, when you arrived at Broadview, did they provide you

25  with a change of clothes?

Maldonado - direct

1  A.  No.

2  Q.  And what kind of clothes were you wearing when you -- when

3  you arrived?

4  A.  I had my work boots, my work pants, and this white T-shirt.

5  Q.  Now, during the five nights you were there, did they give

6  you new socks or new underwear?

7  A.  No.

8  Q.  Can you describe for the Court what the smell of the room

9  that you were -- the rooms you were detained in were like?

10  A.  A very bad smell.

11  Q.  Can you describe it?

12  A.  Well, it smelled like excrement.

13  Q.  I want to talk about now the food that you were given.

14        Can you describe for the Court how many meals a day

15  you were given?

16  A.  In the time that I was there, they would give it me three

17  times.

18  Q.  And tell the Court what you were given to eat.

19  A.  In the morning, they would give us this bottle of water and

20  this piece of Subway sandwich with one lettuce and one -- one

21  slice of ham.

22        And for lunch it was the same thing, and then dinner

23  it was the same thing.

24  Q.  Were you full after eating?

25  A.  No.

Maldonado - direct

168

1   Q.  If someone said that you were given at least one hot meal a

2   day, would that be -- would that be true?

3   A.  No.

4   Q.  In fact, were you ever given a hot meal any time you were

5   at Broadview?

6   A.  No.

7   Q.  Now, if you wanted additional water bottles, did you ever

8   ask for -- ask for that?

9   A.  Yes.

10  Q.  And what was the response?

11  A.  They didn't have any.

12  Q.  If someone said bottled water is available upon request and

13  free of charge, is that an accurate statement?

14  A.  No.

15  Q.  Now, did you ever receive medical care when you were at

16  Broadview?

17  A.  No.

18  Q.  You ever see anyone else get medical care?

19  A.  Only one person who had convulsions.

20  Q.  What about were there any people who were coughing when you

21  were there?

22  A.  Yes.

23  Q.  And what about sneezing?

24  A.  Yes.

25  Q.  How common were the coughing and sneezing when you were

Maldonado - direct

169

1   detained there?

2   A.   Very common.

3   Q.   And did you ever see anyone get medical care?

4   A.   No.

5   Q.   Now, when you were at Broadview, did you talk to other

6   people about how long they were -- had stayed there?

7   A.   Yes.

8   Q.   And anyone there longer than you?

9   A.   Yes.

10  Q.   Can you describe that for the Court, please?

11  A.   Well, when you get there, you know, you start asking:

12  "Well, how long have you been here?"

13          There were people that had been there 12 days, 5 days.

14  Q.   The people who were there for 12 days, did they try to get

15  more information about how long they were going to be there

16  for?

17  A.   Yes.

18  Q.   And what was the response?

19  A.   They would just say that they were going -- well, we're

20  going to check, and then they would close the door.

21  Q.   Now, did people who agreed to leave the United States stay

22  in Broadview just as long as people who wanted to fight their

23  case?

24  A.   No.   The people that would sign their departure or

25  deportation, they would leave earlier.

Maldonado - direct

170

1    Q.   Did the guards -- did the officers at Broadview tell people

2    that if they agreed to leave the country, they'd be able to

3    leave Broadview quicker; otherwise, they'd have to stay there

4    longer?

5    A.   Possibly, but when people were seeing that the people

6    signing were leaving faster, that's why they were signing.

7    Q.   And you saw that?  People -- people were signing because

8    they felt they wanted to leave; is that correct?

9    A.   Yes, yes.

10             MR. COLE:  Okay.  May I have a moment, Your Honor?

11      (Counsel conferring.)

12             MR. COLE:  No further questions.

13             MS. BRADY:  No questions.

14             THE COURT:  You're excused.  Thank you, sir.

15             THE WITNESS:  Thank you.

16      (Witness excused.)

17             THE COURT:  Is that the plaintiffs' last witness then?

18             MS. VAN BRUNT:  It is, Your Honor.

19             THE COURT:  And there's no witnesses here for the

20    government?

21             MS. BRADY:  That is correct.  We weren't able to line

22    up witnesses in the short time that we've had.

23             THE COURT:  All right.  I'll turn it over to the

24    plaintiffs.

25             MS. VAN BRUNT:  Your Honor, at this point I think

1  Mr. Manes would like to go through the requested relief, which

2  we submitted as Exhibit A to the motion for a temporary

3  restraining order.

4      MR. MANES:  Good afternoon, Your Honor.

5      As my colleague -- actually, let me make sure I have

6  the documents here.

7      As my colleague mentioned, we have submitted proposed

8  relief at Exhibit 17.1.  The relief is simple.  It's meant to

9  ensure minimal basic standards at the Broadview detention

10  conditions -- at the Broadview Detention Center.  The relief is

11  patterned on the court's order in the *Barco Mercado* case in the

12  Southern District of New York, and it narrowly targets the

13  violations that we've been hearing about in testimony today.

14      In summary, section 1 asks for minimum basic standards

15  of cleanliness, hygiene, food, water, not crowding, sufficient

16  space for people to live decently, and counsel access, ability

17  to make confidential calls.

18      Section 2 specifies the rights that people at the

19  facility should be notified about, and it includes all the

20  rights that are specified in section 1 in addition to the

21  provision of a list of immigration attorneys to detainees, the

22  provision of licensed medical and mental health care, the

23  ability to access medication, and the ability for people to

24  request more water if they need it, more food, an additional

25  meal if they -- if they need it.

172

1           What we've proposed in section 5 is that if the

2   facility can't come into compliance with these basic

3   requirements within 3 days, 72 hours, then people shouldn't be

4   held there for more than 12 hours.  It should go back to being

5   what the government claims this facility was, is, should be, a

6   12-hour holding facility where people are held briefly on their

7   way to a place that is set up and able to hold people overnight

8   for longer.

9           We also seek additional relief.  We'd like the Court

10  to post a copy of the notice of rights.  We'd like to have

11  regular inspections on the facility, which we think is

12  important, to monitor how the facility is being run on an

13  ongoing basis.

14          With respect to counsel access, sections 6 and 8

15  address the concerns that you heard about today, Your Honor,

16  from the attorneys; that the online detainee section -- section

17  6 addresses the online detainee locator system which, as you've

18  heard, does not list people in the -- as being detained at

19  Broadview in a contemporaneous fashion.

20          We heard at the beginning of the day that this may be

21  a tech issue.  I don't think that adds up.  What we've heard

22  from the former detainees is that people are processed into the

23  system in front of computers.  And it stands to reason that

24  once people are booked in, they would show up in the detainee

25  locator.  There is no evidence in the record that there is some

1   kind of computer or technological issue that causes people to

2   not show up in a system for days when they're at Broadview.

3          Based on the evidence that Your Honor has heard, the

4   trouble seems to be that people are not just being logged in at

5   Broadview.

6          We ask for people to be logged in in realtime and

7   within three hours at the outside at Broadview.

8          We're also asking for Your Honor to order the

9   defendants to permit attorneys to schedule calls.  We'd like

10  some basic things:  A working monitored phone number where

11  attorneys can call to set up a time to talk to their clients, a

12  call within three hours of a request under ordinary

13  circumstances, and also to be able to visit.

14         There's uncontested evidence in the record that there

15  are attorney visit rooms in this facility.  That was contained

16  in an audit that -- the government audit shows that there are,

17  in fact, purpose built attorney visit rooms at the facility.

18  We think that the defendants should be required to allow those

19  to be used for attorney visits.

20         Finally -- well, not finally.  A couple more items.

21         We'd like for the notice of rights to be translated so

22  people can understand it, so detainees coming into the facility

23  understand what their rights are, what they can insist on in

24  terms of the conditions, and an oral translation, if necessary,

25  if a detainee can't read or if the -- or if they don't speak

1    Spanish or English.

2          Finally, we'd ask for a prohibition on retaliation.  I

3    can tell Your Honor that, as you can tell from the record

4    before you, we've spoken to many people who were detained at

5    Broadview.  We spoke to many more who did not want to come

6    forward with their experience because they fear retaliation

7    from agents of the defendants, immigration officials in the

8    immigration system.  We could have had more witnesses here

9    today, but people were afraid to testify.

10          So what we're asking for is an order from the Court

11   prohibiting retaliation against the plaintiffs, witnesses, and

12   any declarants so that they don't -- they will have some

13   measure of comfort they're not going to experience retaliation

14   at the hands of the government for coming forward and asserting

15   their constitutional rights and those of other people who are

16   held at Broadview.

17          Finally, one issue that's come up in the testimony is

18   the question of forced signatures, of people having signatures,

19   being asked to provide signatures under coercion, threats, or

20   on documents that aren't translated.  The proposed hero doesn't

21   seek relief specifically on that at this point, but we think

22   there is now plenty of evidence in the record from -- I think

23   we have five examples of detainees being told that they have to

24   sign documents under some kind of threat, that they won't be

25   able to leave unless they sign, that they'll be held for longer

1    unless they sign.

2            Mr. Herrera's client apparently signed his voluntary

3    deportation paperwork despite having deferred action because he

4    wasn't allowed to speak with an attorney.  He couldn't get that

5    advice not to sign.

6            Attorney Vcelka's client, the nursing mother, was

7    removed from the country.  You may recall that testimony.

8            And one of our plaintiffs, Mr. Moreno, was asked to

9    sign deportation work.

10            We're concerned that this is a grave, ongoing

11    violation of due process that's happening at the facility.  We

12    don't have great insight into it because people are being

13    shipped out of the country quicker and without lawyers than we

14    can figure out what's going on.

15            We don't really know what papers these are, what the

16    processes are.  We need quick discovery in order to figure this

17    out and determine whether there is, in fact, a due process

18    violation that's happening.  There's a grave concern that

19    defendants are trying to coerce people to sign these voluntary

20    departure paper -- departure documents in order to waive their

21    rights and scare people out of the country even if they may

22    have a right to stay or claims for relief.

23            I'd be glad to talk in more detail about the specific,

24    more immediate things, like overcrowding, clean bedding, basic

25    hygiene, showers, toilet, food, water, confidential phone

1    calls, but that's my brief overview of the relief we're

2    seeking.

3              THE COURT:  Okay.  Would you like to respond?

4              MS. BRADY:  Very briefly.  I was just going to

5    reiterate that the government is asking for operational

6    flexibility so that the temporary restraining order, if

7    entered, does not interfere with the executive branch's ability

8    to enforce immigration laws.

9              And I just want to rest on our brief that we filed

10   with the Court, that being docket No. 39.  And then

11   specifically the declaration of Mr. Byers discusses the undue

12   burdens that the TRO relief would have upon the government's

13   operations in paragraphs 32 through 37.  And, again, that's

14   docket 39, and those are pages 35 and 36.

15             Thank you, Your Honor.

16             THE COURT:  Well, let me just make some observations

17   here.  It appears to me that we wouldn't even be here today if

18   the level of immigration enforcement had remained as it was in

19   the past, that this facility was built and maintained to

20   accommodate far fewer people than it has been forced to

21   accommodate or not accommodate at this time.

22             And I am not doing anything that intends to interfere

23   with the executive's decision to increase the enforcement of

24   the immigration laws in the manner that has happened in the

25   last few months, particularly in this city and in the suburbs

1    of this city.

2           But this is a conditions case, and this facility -- I

3    think the evidence has been pretty strong that this facility is

4    no longer just a temporary holding facility that processes

5    people and then ships them out to more appropriate places, as

6    we've heard today and as we've been hearing in the habeas cases

7    that we've been dealing with.

8           It has really become a prison.  And when somebody is

9    being held for five days or longer, it is no longer just a

10   processing center.  If it was just for 12 hours or maybe even

11   just 24 hours, that would be a whole different picture.

12          There's a lot of case law that has allowed conditions

13   that we would ordinarily find unconstitutional even in the

14   context of prisons that are holding convicted felons.  And

15   these are not convicted felons.  These are civil detainees.

16          So there's been a change of circumstances that brings

17   this whole case to the Court today.

18          And the declaration of Mr. Byers, as much as I

19   appreciate your, I'm sure, going to a lot of trouble getting

20   what you did, has been contradicted pretty thoroughly, or at

21   least a lot of it has, by the witnesses that we've heard today

22   and by the declarations that have been submitted by the

23   plaintiffs.  He says that they're offered as much water as they

24   want on demand.  That's not what I've heard.  That's just not

25   correct as far as I can tell.

1        Declarant after declarant, witness after witness says

2   they can't get water.  They have to drink rusty water out of

3   the sink if they want extra water and put it in the bottles

4   that they've been given two or three times a day with their

5   meals.

6        They are not given a hot meal.  He says they've been

7   given a hot meal.  I haven't heard one person say that they got

8   a hot meal.

9        Mr. Byers has claimed that there are bench-style

10  seating areas where people can sleep.  All I've heard about are

11  these plastic chairs that people are trying to sleep on or

12  floors that are cold and are kept cold by air conditioning and

13  bright lights.

14       And I'm not sure about these foil blankets.  I guess

15  there are some foil blankets being handed out but not to

16  everybody.  This last witness said he hadn't seen any.

17       So the fact that people are being kept overnight, not

18  just for one night, sometimes for multiple nights, in

19  conditions that are unnecessarily cruel, if you want to put a

20  word on it, sleeping shoulder to shoulder, next to filthy

21  toilets that have been overflowing and surrounded by human

22  waste, that's just unacceptable.

23       Now, maybe things have gotten better there.  I hope

24  they have.  And if they have, then any type of order that I do

25  enter -- and I want to really think about this, because I think

1    it should be as narrow as possible to satisfy the requirements

2    of a temporary restraining order.  You may be asking for a

3    little bit too much, so I want to really give this some

4    thought.  That's why I want you to come back tomorrow, and I'll

5    have something that I can think about, even though I'll be

6    trying a jury case between now and then.

7             The nice thing about jury cases is it gives the Judge

8    a lot of time to think about other things.

9      (Laughter.)

10            THE COURT:  If Mr. Byers were here, I would be able to

11   ask him about some of these things.  I'm not ordering him to be

12   here.  I'm going to rule on the record that I have.

13            And it's a disturbing -- it's a disturbing record.  I

14   think everybody can admit that we don't want to treat people

15   the way that I've heard people are being treated today.

16   Whether there's 40 or 50 or 60 or 100 or 120 people in these

17   rooms, they're not very big.

18            Mr. Byers was kind enough to give us a diagram of the

19   rooms, but I don't know -- he didn't include the size of those

20   rooms, but they don't look particularly big, because they

21   weren't constructed to be very big and hold the number of

22   people that they're bringing in to process.  I mean, that's

23   just the reality of the situation that we're dealing with.

24            So I want to -- I don't want to fashion an order that

25   is impossible to comply with.  I want to really think about a

1    narrow order that at least temporarily provides the type of

2    relief that avoids the conditions that we've been hearing

3    about.  I honestly don't think anybody in this room would like

4    to see that continue, if possible.  So I want to think about

5    that.

6           Now, in the meantime, you also have a motion for

7    expedited discovery, which I think you're entitled to but not

8    particular -- not to the extent -- at least between now and

9    when we get to the next stage of this proceeding, I think that

10   you should be able to take some depositions so that we can

11   actually get to the bottom of some of these questions that

12   remain open.  I don't want to tell you how many depositions or

13   who to depose.

14          I think you could have a conversation.  I think you've

15   all acted very professionally today, and I really appreciate

16   that.  I think you should have a conference the way we always

17   encourage counsel to do and see if you can agree on the

18   individuals at the facility or otherwise having knowledge of

19   the facility at Broadview that you need to depose.

20          I think you should keep the depositions to a

21   particular length if you can, but I think that's something you

22   should discuss and we can talk about tomorrow.  So I think I'm

23   going to allow expedited discovery on that basis.

24          You wanted a limited document request, too.  I think

25   you should be able to get more information.  I would like to

1   know how many people are actually being held or were being held

2   or are being held or can be held under certain conditions.  We

3   just don't have those numbers now.

4          We have lay witnesses testifying about how many people

5   they thought were in these cells.  There must be records about

6   how many people were processed on a particular day.  So I think

7   that's something you should talk about when we break today and

8   see if you can come up with a discovery plan, both for timing

9   and scope.  And if there are disagreements, which there very

10  well may be, we'll deal with them when I see you tomorrow.

11         As far as inspections go, I want to hold off on that

12  at this point.  I think we have certainly had a lot of prison

13  conditions cases in this court, as you know, and we have

14  allowed inspections from time to time.  We've had some cases

15  where there are decrees, either consent decrees or

16  court-imposed decrees which have monitors and that sort of

17  thing.  I don't think we're at that point yet.  But that's

18  something that you might think about going forward.  I'm not

19  ordering that now.  I'm just telling you that that's a

20  possibility in the future.

21         So what I want to do is give this some more thought

22  and try to draft something.  I do think the plaintiffs have

23  made a case that justifies the entry of some sort of temporary

24  restraining order, and I want to just be able to fashion that

25  in the most appropriate way I can between now and when I see

1    you tomorrow.

2            I don't think there's anything else pending at this

3    time.  So the motion for expedited discovery is granted for

4    the -- limited to the limitations that I've expressed today.

5            And I'm ordering the plaintiffs to remain at the MCC

6    and appear tomorrow at 4:15 by videoconference, by Webex, or

7    whatever they do over there.  And I think it's Webex.  Claire

8    is saying yes.

9            MS. VAN BRUNT:  Your Honor, one note.  Is it okay to

10   add to the order, just to facilitate, interpretation?  We'll

11   pay for it --

12           THE COURT:  Sure.

13           MS. VAN BRUNT:  -- but just so they can have it during

14   the hearing.

15           THE COURT:  Sure.  They can do it simultaneous --

16   there are some translators who can do that simultaneously.  I

17   don't know if you can get that, but they have them on the

18   phone.

19           MS. VAN BRUNT:  We can look into that.  We'll explore

20   the options.

21           THE COURT:  Our official interpreters might be able to

22   help you arrange that.  Otherwise, we'll do it the way we did

23   it today.

24           MS. VAN BRUNT:  Thank you.

25           THE COURT:  Obviously, that lengthens any kind of

183

1    proceeding.  It's not as efficient.

2              MS. VAN BRUNT:  Yes.

3              MR. EIMER:  Your Honor, if I may approach the Court.

4    Nate Eimer on behalf of the plaintiffs.

5              I understand Your Honor's position on inspections, and

6    we'll let that go.  But I think we're all wondering what this

7    looks like on the inside.  We've been told about benches or

8    plastic chairs.

9              Can we go have somebody go in and take photographs of

10   this facility?

11             THE COURT:  Okay.  I'm glad you said that, because I

12   did ask a question earlier to see whether or not these cameras

13   actually recorded anything, so we -- I don't know what it looks

14   like inside.

15             MR. EIMER:  Thank you, Your Honor.  Yes.

16             THE COURT:  Have you gotten an answer to that?

17             MR. JOHNSON:  Sort of, Your Honor.  There are things

18   being recorded.

19             My understanding is they're in the process of buying

20   some new computer equipment that will allow it to be saved

21   properly.  I think there is a month or two that's already

22   saved, but then every day that's recorded, it records over the

23   oldest stuff.

24             I'm trying to get some confirmation on that and when

25   we can get -- I don't know; we can talk about this -- but when

184

1    we can get some snapshots of arbitrary days.  I assume that's

2    what the Court and plaintiffs would --

3                THE COURT:  Well, at least that's a good start --

4                MR. JOHNSON:  Yes.

5                THE COURT:  -- because we can see what it looks like

6    in there.

7                MR. EIMER:  Yeah, it would be help if you --

8                THE COURT:  Since the lawyers haven't been able to get

9    in, the ones we've heard from at least, unless you have

10   somebody else that can describe it, it would be very helpful to

11   have a picture.

12               Maybe we can ask AI how to do it.  I don't know.

13               MR. JOHNSON:  I should be able to update you by

14   tomorrow.

15               THE COURT:  That would be great.  That would be great.

16   That would be a good start, obviously.

17               MR. EIMER:  Right.  So, Your Honor, I'm wondering if

18   we can send just a photographer in there to take pictures of

19   the facilities.  We know there's four rooms, apparently.  There

20   are attorney rooms.  I'm not sure what this looks like.

21               THE COURT:  Let's see tomorrow whether they're able to

22   get you some pictures.  Because if they have cameras all over

23   the place, as you say, you can just get a snapshot of the

24   various rooms, the intake room, that sort of thing.

25               MR. EIMER:  Okay.  Thank you, Your Honor.

185

1        Can I ask one other thing; and that is, a preservation

2   order to make sure that records are maintained until --

3        THE COURT:  Is there any problem with preserving?

4        MR. JOHNSON:  There's no problem.  We've already sent

5   that out, Your Honor.

6        THE COURT:  Okay.  That's good enough for me.

7        MR. EIMER:  That's good enough for me.  Thank you.

8        THE COURT:  All right.  Well, we're breaking earlier

9   than I was hoping -- not hoping -- expecting.

10       We will see you tomorrow at 4:15.  And if there's any

11  problems that arise between now and then about the MCC or

12  anything like that, let me know as soon as you can.  We'll

13  adjourn for the day then.

14       THE CLERK:  All rise.

15    (Adjournment at 4:15 p.m.)

16

17

18

19                    *   *   *   *   *

20       I certify that the foregoing is a correct transcript

21  from the record of proceedings in the above-entitled matter.

22  */S/Nancy L. Bistany*              *November 8, 2025*

23  _____        _____
    Nancy L. Bistany               Date
    Official Court Reporter

24

25

186

1                        I N D E X

2  WITNESS                                          PAGE

3  PABLO MORENO GONZALEZ

4      DIRECT EXAMINATION                              41
       CROSS-EXAMINATION BY MS. BRADY                  55
5

6  FELIPE AGUSTIN ZAMACONA SABOERANIS

7      DIRECT EXAMINATION BY MS. VAN BRUNT             59
       CROSS-EXAMINATION BY MS. BRADY                  71
8

9  CLAUDIA CAROLINA PEREIRA GUEVARA

10     DIRECT EXAMINATION BY MR. MANES                 75
       CROSS-EXAMINATION.  BY MS. BRADY                92
11

12 SHELBY VCELKA

13     DIRECT EXAMINATION BY MS. HICKEY               100

14
   KEVIN HERRERA
15
       DIRECT EXAMINATION BY MS. VAN BRUNT            117
16     BY THE COURT                                   139

17
   SAMUEL OCHOA OCHOA
18
       DIRECT EXAMINATION BY MR. COLE                 142
19     CROSS-EXAMINATION BY MS. BRADY                 152
       REDIRECT EXAMINATION BY MR. COLE               154
20

21 RUBEN TORRES MALDONADO

22     DIRECT EXAMINATION BY MR. COLE                 158

23

24

25